**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA,

v.

PETER BELER

        Defendant.

Case No. 1:19-cr-415

---

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Courtney R. Forrest
Emily Voshell
Jonathan Jeffress
KaiserDillon PLLC
1099 14th St. NW, 8th Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Facsimile: (202) 640-1034

*Counsel for Defendant Peter Beler*

TABLE OF CONTENTS

Proposed Findings of Fact ................................................................................................ 2

I.     The *Sell* Hearing ............................................................................................ 2

II.    Mr. Beler is Not Competent to Stand Trial ....................................................... 3

III.   ██████████████████████████ ..................................................... 4

IV.    █████████████████████████████████ .................... 7

V.     Mr. Beler Is Not Dangerous To Others ............................................................. 9

VI.    ███████████████████████████████████
       █ .................................................................................................. 11

       A.   ██████████ ....................................................................... 12

       B.   █████████ ........................................................................... 14

       C.   █████████████████████████████
            ████ ......................................................................................... 16

       D.   ████████████████████████
            ███ . .......................................................................................... 17

VII.   ████████████████████████████████
       ████ . ................................................................................................ 18

VIII.  █████████████████████████████████
       █████ ................................................................................................ 18

IX.    ███████████████████████████████████
       ████ ..................................................................................................... 19

X.     ████████████████████████████████████
       ████ ................................................................................................... 20

XI.    ████████████████████████████████████
       ████ ................................................................................................... 22

       A.   ████████████████ ..................................................... 22

       B.   █████████ ............................................................................ 23

       C.   ████ ......................................................................................... 24

       D.   ████████████ ....................................................................... 24

XII.   ████████████████████████████████████
       ██ . ..................................................................................................... 25

XIII.  The BOP's Treatment Plan Poses Significant Health Risks To Mr. Beler ......... 26

       A.   █████████████████████████ . ................... 27

       B.   ███████████████████████████████
            ███████ ................................................................................ 28

C.    BOP's plans for executing the treatment plan presents additional risks........................ 30

XIV.    The BOP Has Failed To Make Adequate Efforts To Convince Mr. Beler To Take
Medication Voluntarily ................................................................................................ 31

Proposed Conclusions of Law ................................................................................................ 33

I.    *Sell* Factor 1: The Government Has Not Shown By Clear And Convincing Evidence
That There Are "Important" Government Interests, And Any Government Interest is
Mitigated By "Special Circumstances." .......................................................................... 35

A.    Mr. Beler's crime is less serious than similarly charged offenses. ............................... 37

B.    Mr. Beler has already been confined for a significant portion of his likely sentence.... 39

C.    ███████████████████████████████████████████
      ..................................................................... 43

D.    ███████████████████████████████████████. .................. 45

E.    The BOP's plan poses a threat to a fair trial. ............................................................... 47

II.    *Sell* Factor 2:  The Government Has Not Shown That Involuntary Medication Is
Substantially Likely To Render Mr. Beler Competent and Substantially Unlikely To
Have Side Effects That Will Interfere with His Ability To Assist Counsel. ................. 49

A.    ██████████████████████████████████████████
      ............................................... 49

1.    ███████████████████████████████████
      ................................................... 51

2.    █████████████████████████████████████████
      ............................................ 52

3.    ████████████████████████████████████. . 53

4.    █████████████████████████████████████████
      ........ 54

B.    The government has not shown that the BOP's treatment plan is substantially unlikely
to cause side effects that will interfere with Mr. Beler's ability to assist counsel........ 56

III.    *Sell* Factor 3: The Government Has Not Proven That Involuntary Medication Is
Necessary To Further Its Interests ................................................................................ 57

IV.    *Sell* Factor 4: The Government Has Not Proven That The Proposed Treatment Plan Is
Medically Appropriate For Mr. Beler. ........................................................................... 59

A.    ████████████████████████████████████
      ..................................................... 60

B.    ████████████████████████████████████████
      ........ 60

C. ██████████████████████████████████
   ██████. ........................................................................................... 62

D. The risks to Mr. Beler are not outweighed by the benefits for a non-emergent, non-
   clinical purpose. ................................................................................... 64

Conclusion ........................................................................................................ 66

The Supreme Court has decreed that forced medication orders under *Sell* should be "rare." *United States v. Gamarra*, 940 F.3d 1315, 1319 (D.C. Cir.), *cert. denied*, 140 S. Ct. 570, 205 L. Ed. 2d 367 (2019) (Pillard, J., concurring) (quoting *Sell v. United States*, 539 U.S. at 166, 180 (2003)).  That is because ███████████ carry "potentially dangerous (and sometimes fatal side effects)" and, by their very nature, "alter the cognitive processes of the patient." *United States v. Berry*, 911 F.3d 354, 357 (6th Cir. 2018).  Indeed, before this grave intrusion of liberty is ordered, the government must prove by clear and convincing evidence that it is "*absolutely necessary* to fulfill an *important governmental interest*." *Id*. (emphasis added). Otherwise, the defendant will be deprived of "liberty … without due process of law."  U.S. Const. amend. V.

This is not the "rare" case where forced medication is warranted.  If the government is deemed to have such a strong interest in Mr. Beler's prosecution—despite his complete lack of violent history, ████████████████████████████████ ██████████████████████, and the strong probability that forced medication will deprive him of the right to a fair trial—then *Sell* orders would be appropriate in every felony case involving an incompetent defendant; they would not be "rare" at all.  Further, the government has failed to show that forced medication is substantially likely to render Mr. Beler competent █ ████████████████████████████████████████████████ ███████████████████████████.  The government has also failed to demonstrate that Mr. Beler will not suffer significant side effects that would interfere with his ability to assist in his defense, ███████████████████████████ ████████████  Nor has the government shown that the Bureau of Prisons ("BOP") proposed plan is in Mr. Beler's best medical interest.  Instead, the government presented a



1

generic treatment plan that insufficiently addressed Mr. Beler's individual medical condition and psychiatric needs, notwithstanding the availability of extensive medical records.

For all the reasons discussed in the following proposed findings of fact and conclusions of law, the government has failed to meet its clear and convincing burden on each of the four *Sell* factors. Therefore, the government's *Sell* request must be denied.

## PROPOSED FINDINGS OF FACT

### I. The *Sell* Hearing

A *Sell* hearing was conducted in this matter on August 4, 18, 24-25, and September 1, 2020. The government called two witnesses: Dr. Leticia Armstrong, Psy.D., and Dr. Anne Cuccio, M.D. Dr. Armstrong is a staff psychologist at FMC Fort Worth. She testified as to Mr. Beler's present condition and competency restoration efforts to date. Dr. Cuccio is a psychiatrist who has been employed by the BOP since 2010. GX 3 (Dr. Cuccio's C.V.).[1] She currently practices only by telepsychiatry; she has not provided in-person psychiatric services since March 2018. 8/18/20 Tr. at 10. This was the first *Sell* hearing at which she testified, and the first time she has testified in federal court. *Id*. at 44-46. The last time she offered expert testimony was in state court, over eighteen years ago (prior to the Supreme Court's decision in *Sell*). *Id*. at 45. She is not board-certified in forensic psychiatry. 8/4/20 Tr. at 113.

The defense called one witness, Dr. George Corvin, M.D. Dr. Corvin is a psychiatrist practicing clinically in Raleigh, North Carolina. After medical school, he completed a fellowship in forensic psychiatry at FMC Butner. DX 1 (Dr. Corvin's CV). He is a distinguished fellow of the American Psychiatric Association and board-certified in general and

---

[1] All exhibit cites are to exhibits admitted into evidence during the *Sell* hearing, which have been provided to the Court. Herein, government exhibits are cited as "GX"; defense exhibits are cited as "DX", and joint exhibits are cited as "JX".

forensic psychiatry by the National Board of Physicians and Surgeons. *Id*. Dr. Corvin has offered forensic opinions in over 300 criminal cases, including multiple *Sell* hearings in both state and federal courts. 8/25/20 Tr. at 16. In addition, he teaches regularly on various topics related to forensic psychiatry, including at FMC Butner. *Id.* at 15.

## II.    Mr. Beler is Not Competent to Stand Trial.

It is uncontested that Mr. Beler is not currently competent to proceed to trial and has remained incompetent for the duration of this case. On July 29, 2019, Dr. Jessica Micono, Psy.D., submitted a forensic evaluation in which she opined that Mr. Beler was currently incompetent. JX 6 (Micono report) at 14. ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

On August 14, 2019, at a hearing in this matter, the government and defense jointly concurred with the report's conclusion. Magistrate Robinson found Mr. Beler not competent to proceed and ordered him committed to a federal facility for treatment to restore competency. ECF No. 15.

After an extensive delay, Mr. Beler was transferred to FMC Fort Worth. Dr. Armstrong submitted a forensic evaluation on March 11, 2020, in which she, too, concluded that Mr. Beler was incompetent to stand trial. GX 2 (Armstrong report). ███████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

Dr. Cuccio also testified that she does not believe Mr. Beler to be competent to proceed to trial.  8/24/20 Tr. at 153.  Dr. Corvin concurred.  DX 2 (Corvin report) at 2.

**III.**







- [REDACTED]

- [REDACTED]

- [REDACTED]

**IV.** [REDACTED]

[REDACTED]

Weeks later, on March 5, 2019, the FBI detected activity from a user with Mr. Beler's IP address allegedly uploading child pornography files on a P2P network.  ECF No. 1-1.  On April 17, 2019, FBI agents executed a search warrant at Beler's apartment.  ███████████

████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

███████████

When agents entered the apartment, Mr. Beler had his computer hooked up to his television and was using the television screen as a monitor.  ECF No. 1-1, Criminal Complaint, Statement of Facts.  The computer allegedly was running a torrent program and file names indicative of child pornography were clearly visible on the screen to the law enforcement agents Mr. Beler had just let into his home.  ECF No. 1-1; JX 7 (FBI 302, Apr. 18, 2019) at 1.  ███████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

## V.    Mr. Beler Is Not Dangerous To Others.

Mr. Beler is not dangerous to others.  At 39 years old (he is 40 today), this was his first *arrest*.  There is no suggestion that Mr. Beler had ever viewed child pornography prior to March 5, 2019, just a few weeks before his arrest.[5]  ECF No. 57.  Nor is he alleged to have ever participated in any other kind of sexual misconduct.  The distribution alleged in the Complaint is solely by virtue of the use of a peer-to-peer network that automatically uploads material that one downloads to one's computer; there is no allegation that Mr. Beler ever distributed directly to any individual or engaged in any real-world contact.  *See* ECF No. 1-1.  Indeed, Agent Tanya Griffith testified that as of the date of the preliminary hearing, the FBI had not obtained any

---

[5] The government executed a search warrant at Mr. Beler's home on April 17, 2019, and seized all of the electronic devices in the home.  He was indicted on December 16, 2019.  There is no allegation in the indictment and the defense has not been provided with any discovery that shows Mr. Beler engaged in any illegal activity occurred before March 5, 2019, despite a presumably thorough search of all of Mr. Beler's devices.

evidence that Mr. Beler was aware that he was sharing the files in question with anyone else. 4/23/19 Tr. at 16.

The parties have stipulated that after his case was dismissed on October 7, 2019, Mr. Beler was in the community for a month, possessed multiple electronic devices, and yet did not return to viewing child pornography.  ECF No. 76 at 1.  ███████████████████

███████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

████████

There is no evidence in the extensive medical records that Mr. Beler was ever physically violent or verbally threatened any person in the community or any of the hospital staff.  Dr. Corvin testified that he saw no allegations of "violence towards others" or any acts of physical violence towards others in the records.  9/1/20 Tr. at 94-95.

The BOP also concluded that Mr. Beler poses no threat to others.  ███████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████████  Nor is there any indication in the BOP medical and mental health records that Mr. Beler has ever shown any signs of dangerousness to others within the BOP.  *See generally* JX 17 (Mr. Beler's 2019 BOP records) at 18.

**VI.** 







































### C. The BOP's plans for executing the treatment plan presents additional risks.

The BOP's proposed treatment plan is for a forensic, not a clinical, purpose, despite Dr.

Cuccio's repeated blending of the standards and her misstatements regarding the BOP's purpose

in making its request under *Sell*. *See*, *e.g.*, 9/1/20 Tr. at 191. The BOP's plan is designed to

---

[10] Notably, Dr. Corvin has recently given lectures at FMC Butner specifically related to applicable standards of care. 8/25/20 Tr. at 15.

make Mr. Beler competent to proceed to trial, ███████████████████████  This

difference in purpose has important ramifications:  As Dr. Cuccio acknowledged, she would not

provide Mr. Beler with long-term care, and if the Court ordered forced medication under *Sell*,

she would treat Mr. Beler to competency and no further.  8/18/20 Tr. at 48-50.

In addition to the dangers discussed above, the BOP's competency restoration plan has

further flaws that would make it detrimental to Mr. Beler's health.  First, it is unclear whether a

psychiatrist will even be present to administer the medication and monitor Mr. Beler for side

effects. Dr. Cuccio testified that Mr. Beler may be moved to FMC Butner, where there are

psychiatrists on staff, but he may not.  8/24/20 Tr. at 138-39.  If Mr. Beler is not moved to

Butner, Dr. Cuccio will "treat" Mr. Beler solely over video and no psychiatrist will be present to

monitor his side effects in person.  *Id*. at 139.

Second, the BOP is constrained by its formulary.  *See* GX 5 (*Sell* Appendix).  Thus, what

is clinically indicated for Mr. Beler, were he to be medicated, and what the BOP can prescribe

(and has proposed here), are not the same.  Third, the BOP plan fails to account for both

administration of medication and monitoring of side effects after Mr. Beler is transferred to D.C.

for trial. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

## XIII.    The BOP Has Failed To Undertake Adequate Efforts To Convince Mr. Beler To Take  Medication Voluntarily.

The BOP has failed to make adequate efforts to convince Mr. Beler to take medication

voluntarily.  During his entire incarceration at the BOP—about two months at FCI Englewood

and nearly nine months at FMC Fort Worth—*Mr. Beler has never met with a psychiatrist in*

*person*.  8/18/20 Tr. at 34.  In fact, Mr. Beler has never been housed at a BOP facility where there is a psychiatrist on staff.  *Id.* at 37.  ████████████████████████████████

████████████████████████████████████████████████████.  Though Dr. Armstrong met with Mr. Beler multiple times in person, she testified that her role in his case was to be his "primary forensic evaluator" and to provide "competency restoration," as opposed to playing a therapeutic role.  8/4/20 Tr. at 16, 52.  ████████████████████████

████████████████ █ ████████████████████

 The sole BOP psychiatrist to have met with Mr. Beler by video, Dr. Cuccio, has made very little effort to attempt to convince Mr. Beler to take medication voluntarily.  ██████████



 Before the multi-day *Sell* hearing commenced in this case, Dr. Cuccio met with Mr. Beler over video once more—on July 28, 2020, a week before the *Sell* hearing and a week after Dr.

---

11 ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Corvin's report had been submitted to the Court.[12]  Thus, before the *Sell* hearing began, Mr. Beler had met with a psychiatrist on a grand total of three occasions despite being at FMC Fort Worth for nearly eight months—and none of those meetings were in person.[13]

Dr. Cuccio's failure to establish a therapeutic alliance with Mr. Beler is apparent from the records. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

Mr. Beler's distrust of Dr. Cuccio remained during the *Sell* hearing. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

## PROPOSED CONCLUSIONS OF LAW

As recognized repeatedly by the Supreme Court, Mr. Beler has a constitutionally protected right to refuse ███████████████. He "possesses a significant liberty interest in

---

[12] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

[13] Dr. Cuccio claimed that she wanted to meet with Mr. Beler in person but was prevented from doing so because of the COVID-19 outbreak. 8/4/20 Tr. at 121, 8/18/20 Tr. at 14.  But her initial meeting with Mr. Beler was on January 28, 2020, long before the COVID-19 outbreak. 8/18/20 Tr. at 12.  She then chose not to meet with Mr. Beler in February or early March before the outbreak, despite the false claim otherwise in her report. *Id*. at 12-14.

avoiding the unwanted administration ████████████ under the Due Process Clause[.]"
*Harper*, 494 U.S. at 221.  "The forcible injection of medication into a nonconsenting person's
body represents a substantial interference with that person's liberty."  *Id.  See also Riggins v.
Nevada*, 504 U.S. 127, 134 (1992) (finding that the forcible administration ████████████
presents a "particularly severe" interference with a person's liberty).  The Supreme Court, in
setting out the *Sell* standard, affirmed the holdings of *Harper* and *Riggins*, reiterating the
"significant liberty interest" in avoiding forced medication, and describing both as the
"framework" for the *Sell* standard.  *Sell*, 539 U.S. at 177-78.  *See also United States v. Dillon*,
738 F.3d 284, 287 (D.C. Cir. 2013) ("requiring a person to take unwanted ████████
medication entails a grave deprivation of a liberty interest protected by the Due Process
Clause.").

The Supreme Court in *Sell* "held that forced medication to render a defendant competent
for trial is intended to be 'rare[.]'"  *Gamarra*, 940 F.3d at 1319 (Pillard, J., concurring) (quoting
*Sell*, 539 U.S. at 180).  The government's power to forcibly medicate should be invoked only in
extreme situations because "[a]n individual has a 'significant' constitutionally protected 'liberty
interest' in "avoiding the unwanted administration of ████████ drugs."  *Sell*, 539 U.S. at 178
(quoting. *Harper*, 494 U.S. at 221).  Further, the "physical violence inherent in forcible
medication . . . necessarily requires a substantial and degrading intrusion of the body."  *United
States v. White*, 620 F.3d 401, 422 (4th Cir. 2010) (Keenan, J., concurring).  "State-imposed
medication… conjur[es] up plots of dystopian science fiction."  *Gamarra*, 940 F.3d at 1319
(Pillard, J., concurring).

The rarely met *Sell* standard requires the government to prove, by clear and convincing
evidence, that: "(1) '*important* governmental interests are at stake'; (2) 'involuntary medication

will *significantly further* those concomitant state interests' by the administration of drugs

'substantially likely to render the defendant competent to stand trial' and 'substantially unlikely

to have side effects that will interfere significantly with the defendant's ability to assist counsel

in conducting a trial defense'; (3) 'involuntary medication is *necessary* to further [state]

interests'; and (4) 'administration of the drugs is *medically appropriate, i.e.*, in the patient's best

medical interest in light of his medical condition.'" *Id.* (quoting *Sell*, 539 U.S. at 180-81)

(emphasis in original).

    *Gamarra*, 940 F.3d 1315, the most recent D.C. Circuit decision to address forced

medication under *Sell*, was limited in scope because of the bare record and issues that were not

raised on appeal.  *Id.*  Recognizing the limits of the Court's decision in that case— but also the

importance of the issues at stake—Judge Pillard wrote separately "to highlight benchmarks we

expect the government to meet when requesting approval for forcible medication going forward,

with the hope that these benchmarks provide useful guidance to district courts evaluating such

motions in future cases.  *Id.*  Judge Pillard's concurrence addresses key principles for each of the

*Sell* prongs.  With those principles and the *Sell* jurisprudence as a guide, and under the specific

facts of this case, it is clear that the government has failed to meet its burden under each of the

four *Sell* prongs.

## I.   *Sell* Factor 1: The Government Has Not Shown By Clear And Convincing Evidence That There Are "Important" Government Interests, And Any Government Interest is Mitigated By "Special Circumstances."

    The first *Sell* factor requires the government to prove that there are "important"

government interests at stake and that those interests are not mitigated by "special

circumstances."  This is necessarily a highly fact-specific inquiry.  "The Supreme Court crafted a

sensitive and fact-specific inquiry, stating that '[c]ourts ... must consider *the facts of the*

*individual case* in evaluating the Government's interest in prosecution.'" *Dillon*, 738 F.3d 284,

296 (emphasis in original) (quoting *Sell*, 539 U.S. at 180). "The law places a burden on the government up to the time of forcible administration of psychotropic medication to have a current, important interest in prosecuting the defendant that suffices to justify that grave intrusion." *Gamarra*, 940 F.3d at 1321 (Pillard, J. concurring).

The D.C. Circuit has interpreted this as a two-part inquiry: first, the Court must determine whether the charged crime is a "serious" one; second, the Court must, looking at the specific facts, "evaluate whether '"[s]pecial circumstances ... lessen the importance of that interest.'" *Dillon*, 783 F.3d at 292; *see also Gamarra*, 940 F.3d at 1320 (Pillard, J. concurring).

Given the statutory maximum here (20 years), Mr. Beler concedes the seriousness of the crime. *See United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005) (holding "a felony [credit card fraud charge] whose maximum term of imprisonment is 10 years—is 'serious' under any reasonable standard").

However, even the "prospect of a 10-year sentence… is not a *de facto* license to force medicate a defendant." *White*, 620 F.3d at 423 (Keenan, J. concurring). Considering the facts of this case, as the Court must, it is clear that the "special circumstances" lessen the importance of that interest such that the "grave intrusion" of forcible medication is not warranted.

Indeed, during an earlier motions hearing in this case, Chief Judge Beryl A. Howell questioned the government's interest in federally prosecuting ██████████████ Mr. Beler, asking the government, "[e]ven if your charging decision is appropriate and makes sense in the normal case[,] when you're dealing with an incompetent person and the long-term repercussions, does that really make sense?" ECF No. 32, 10/25/19 Tr. at 14. She encouraged the government to "take another look at whether bringing federal charges against this particular defendant is the right choice ███████████████████████████

████ is a more appropriate charging decision for the long-term benefits of not just this
defendant but available bed space in the Bureau of Prisons, which is already in short supply." *Id.*
at 14-15.

In line with Chief Judge Howell's comments, there are numerous special circumstances
that mitigate the government's interest in prosecuting Mr. Beler, as discussed below.  Indeed,
when these circumstances show that the government has failed to prove that the "grave
deprivation" of Mr. Beler's liberty interest is warranted here.  *Dillon*, 738 F.3d at 287.

### A. Mr. Beler's crime is less serious than similarly charged offenses.

Courts have routinely recognized that, even where the crime may be considered "serious"
under *Sell*, the particular facts underlying the charged offense may lessen the government's
interest in prosecution.  "Not every serious crime is equally serious." *White*, 620 F.3d at 419.

The government's interest in prosecution—especially when compared to Mr. Beler's
liberty interest in avoiding the forcible intrusion of unwanted medication—is diminished here
because Mr. Beler's alleged conduct is less serious than in similar cases and he is not
dangerous.[14]  There is no allegation that Mr. Beler ever engaged in any hands-on contact—or
that he even ever tried.  *See* ECF No. 1-1.  There is no allegation that Mr. Beler chatted with
anyone regarding child pornography or attempted to make contact with anyone underage.  *Id.*  In
fact, ███████████████████████████████████████████ there is
no evidence he ever intended to engage in distribution, as opposed to simple possession.  The
alleged possession and distribution were exclusively through a file sharing network that
automatically uploads material from one's computer to a website for other people to download.

---

[14] If convicted, Mr. Beler also intends to appeal the reversal of the dismissal of his case on
speedy trial grounds.  ECF Nos. 34, 35.  That appeal has a strong chance of success. This, too,
lessens the government's interest in prosecution.

*Id.* Indeed, Agent Tonya Griffith testified at the preliminary hearing that, at that point, the FBI had not obtained any evidence that Mr. Beler was aware that he was sharing the files in question with anyone else. 4/23/19 Tr. at 16. The government has not presented the defense with any evidence suggesting otherwise. *See White*, 620 F.3d at 423 (Keenan, J. concurring) (noting that, considering the "spectrum" of serious crimes against property, there were a "multitude" of offenses that "would more strongly justify forcible medication that the offenses at issue here.").

Further, it is undisputed that the time period in which Mr. Beler allegedly committed these crimes—which was very brief (from March 5 to April 17, 2019)— ███████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████ Law enforcement agents also allege that Mr. Beler's computer was actively downloading child pornography when they arrived to execute the search warrant ███████████████████████████████████████

████████████████████████████████ ██ ███████████████████████████

The facts and circumstances of Mr. Beler's case thus lessen the government interest in prosecution. *United States v. Duncan*, 968 F. Supp. 2d 753, 762 (E.D. Va. 2013) ("While the charged offense is by no means trivial or unworthy of prosecution, given the facts and circumstances of this specific case, the charge does not to warrant the forced introduction of serious medications into the body against an adult person's will.").

---

[15] *See United States v. Duncan*, 224 F. Supp. 3d 580, 584 (W.D. Ky. 2016) (drawing "sharp contrast" under first *Sell* prong between mentally ill individual who "essentially enable[d] law enforcement to discover that he is in possession of firearms" and "a narcotics-trafficking felon who uses a firearm to protect his stash, or a felon who uses a weapon to threaten violence or to commit a bank robbery.").

Additionally, as the government appeared to concede in its questioning of Dr. Corvin, Mr. Beler is not dangerous and has not ever been physically violent to others. *See supra*, FOF at V. *See White*, 620 F.3d at 419 (noting the lack of evidence that defendant is "capable of or likely to commit future crimes of physical violence" as circumstance that mitigated the government's interest in prosecution); *United States v. Rogers*, 83 F. Supp. 3d 657, 661 (M.D.N.C. 2015) (noting defendant's lack of history of violent conduct as contributing to the special circumstances that outweighed the government's interest in prosecution).

In fact, there is clear evidence that Mr. Beler is *not* likely to re-offend. As the parties have stipulated, he was released into the community, believed his case had been dismissed, had multiple electronic devices, and committed no new crimes, including any child pornography offenses, as confirmed by forensic examination of those devices. ECF No. 76 at 1.

Moreover, the BOP has already found that Mr. Beler is not dangerous to others or himself in an institutional setting. JX 18 at 156; 8/18/20 Tr. at 53, 68. *See United States v. Ryan*, 441 F. Supp. 3d 574, 585 (M.D. Tenn. 2020) (finding that defendant's "'lack of dangerousness' in an institutional setting undercuts the government's interest in this case."); *see also Berry*, 911 F.3d at 365 ("evidence that in his current setting he poses no appreciable risk to himself or others undercuts the governmental interest necessary to medicate him."). Thus, the facts of this case, as well as Mr. Beler's lack of dangerousness, mitigate against the government's interest in prosecution.

**B. Mr. Beler has already been confined for a significant portion of his likely sentence.**

The government's interest in prosecuting Mr. Beler is also diminished by the amount of time that he has already been confined, and the additional time he will be confined if forced medication is ordered. *See United States v. Austin*, 606 F. Supp. 2d 149, 151-52 (D.D.C. 2009) (holding that government's interest diminished where defendant would have served "substantial

portion" of guidelines sentence once restored to competency, tried, convicted, and sentenced); *see also Sell*, 539 U.S. at 180 (noting that "the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, *see* 18 U.S.C. § 3585 (b)" affects the government's interest in prosecution); *Gamarra*, 940 F.3d at 1320 (Pillard, J. concurring) ("Subjecting a defendant to an extended period of pretrial detention may lessen the government's penal interest to the point that it no longer justifies forcibly medicating the defendant.").

Mr. Beler will have been incarcerated for over sixteen months by the time briefing on the government's *Sell* request is complete. Assuming he is eventually convicted and sentenced, he will be incarcerated for about another twenty-seven months by the time of sentencing, accounting for the time he may appeal the Order, competency restoration, and trial. Dr. Cuccio testified that if Mr. Beler is to be transferred to Butner (which is her preference), he will wait an additional month or two to be transferred. 9/1/20 Tr. at 178.[16] Once there, she opines it would be four to six months before Mr. Beler were restored to competency. 8/4/20 Tr. at 177. *If successful*,[17] and assuming that Mr. Beler could stay competent and that there were no delays (due to medication issues or otherwise), it would likely be at least another three to four months[18]

---

[16] It should be noted that both this Court and Chief Judge Howell commented on issues with bed space at the BOP. *See* 9/1/20 Tr. at 178 ("I do have people at Butner in other cases. … It isn't always easy to get them in."); ECF No. 32, 10/25/19 Tr. at 14-15 (noting that BOP bed space "is already in short supply.").

[17] *See* COL II.A, *infra*, for why competency restoration is unlikely.

[18] ████████████████████████████████████████████████
████████████████████████████████████████

from competency to trial and, if convicted,[19] at least another three months after that to sentencing.

Mr. Beler is also likely to appeal if this Court orders forced medication. That appeal could take up to eleven months, assuming no delays.[20] *See United States v. Morrison*, 415 F.3d 1180, 1186 (10th Cir. 2005) (accounting for projected time for appeal in time served calculation when assessing strength of government's interest in prosecution); *Duncan*, 968 F. Supp. 2d at 763-64 (same); *Ryan*, 441 F. Supp. 3d at 582-84 (same). Thus, with no delays (of which there have been many, largely due to BOP transportation issues and the delay of BOP forensic reports in this case, *see* ECF No. 16 (Motion to Dismiss on Speedy Trial Grounds) (documenting delays); ECF No. 61 (Notice of Objection to Delay in Completion of Forensic Report) (same)), Mr. Beler will have been incarcerated for forty-three months by the time of sentencing, were he to be convicted.

If, notwithstanding the complete absence of evidence that Mr. Beler was knowingly distributing child pornography, he received the mandatory minimum for the highest charged offense (distribution of child pornography), he would receive a sixty-month sentence, of which he would serve fifty-one months (assuming good behavior) with good time. 18 U.S.C.A. § 2252(b)(1). Thus, he would serve only an additional eight months in addition to what he had already served. There is every reason to believe that, even in the worst-case scenario of

---

[19] *See* COL I(C), *infra*, for why Mr. Beler is unlikely to be convicted at trial. *See also White*, 620 F.3d at 418 (noting first prong *Sell* analysis of pretrial incarceration assumes the defendant would be found guilty: "Of course, this assumption belies our judicial system's fundamental and critical presumption of innocence. Flouting such a seminal aspect of our law is particularly troubling considering that the government must show that important government interests are at stake in prosecuting White, and they must show it via clear and convincing evidence.").
[20] The interlocutory appeal to the D.C. Circuit in *Gamarra*, 940 F.3d 1315 took eleven months from the date the notice of appeal was filed to when the mandate issued.

conviction, Mr. Beler would receive the mandatory minimum. *See Berry*, 911 F.3d at 363

("There is no principled reason to ignore the realities of an individual defendant's likely actual

sentence when determining the extent of the government's interest in prosecution.") (internal

quotations and citations omitted). That is because the actual facts of this case are far less

egregious than those in this District where people have received equal or lesser sentences.[21]

      Or, if Mr. Beler was found competent and subsequently elected to enter a guilty plea, he

could very likely have the charges reduced to possession of child pornography, especially given

the very limited scope and questionable *mens rea* of the distribution charge. *See* n. 21 for

descriptions of cases similar to Mr. Beler's that resulted in guilty pleas to possession, rather than

distribution, of child pornography. There is no mandatory minimum for possession of child

pornography. 18 U.S.C.A. § 2252(b)(2).

      Given this realistic picture of Mr. Beler's likely confinement and likely sentence if

convicted, the government's interest in prosecuting him is greatly diminished. *See Ryan*, 441 F.

Supp. 3d at 582-84 (finding government's interest lessened where "it is reasonable to believe that

---

[21] *See, e.g. United States v. Pasha Pakdel*, 1:17-cr-00165 (RJL) (D.D.C. June 11, 2019)
(sentence of one day imprisonment on possession of child pornography where, over a two-year
period, the defendant made multiple child pornography files available for download on a peer-to-
peer network); *United States v. Thomas Meekins, Jr.*, 1:17-cr-103 (ABJ) (D.D.C. May 14, 2018)
(sentence of twenty-four months incarceration; though the charge was possession of child
pornography, he had been using Ares, a peer-to-peer file-sharing network); *United States v.
Michael Jacob*, 1:17-cr-0023 (JEB) (D.D.C. Sept. 19, 2017) (sentence of sixty months
imprisonment for distribution of child pornography and travel with intent to engage in illicit
sexual conduct where defendant arranged to meet an undercover agent and his purported 9-year-
old daughter to have sex with the agent's daughter, sent child pornography to the agent, and
brought a cell phone and laptop with over 600 images of child pornography to the meeting for
the agent to download); *United States v. Jason Gordon*, 1:17-cr-00026 (TFH) (D.D.C. May 9,
2017) (sentence of sixty months imprisonment for distribution of child pornography where
defendant arranged to meet an undercover agent and his purported 9-year-old daughter for
purposes of the defendant having sex with the agent's daughter, sent multiple videos to the agent
depicting prepubescent girls engaged in sex acts with adult men, and had 300 to 400 images of
child pornography on his phone).

[if convicted] Ryan will receive little to no additional time at sentencing" after forced medication process, including appeal, medication, preparation for and trial, and sentencing, complete); *Duncan*, 224 F. Supp. 3d at 586-87 (finding government's interest "lessen[ed]" where "it is unlikely that Duncan would face a lengthy sentence were he convicted of the crime charged against him."); *Austin*, 606 F. Supp.2d at 152 (importance of government's interest "certainly diminished" where defendant would have served "substantial portion" of sentence).





45



E.  **The BOP's plan poses a threat to a fair trial.**

Finally, the BOP's proposed plan is likely to deprive Mr. Beler of a fair trial for at least

two reasons.  █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████  The result will be to return this case to square one.  Because the government "has a

concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one,"

*Sell*, 539 U.S. at 180, this, too lessens the government's interest in prosecution.

"Forcibly medicating a defendant ████████████████████ can burden fair trial rights by

affecting the defendant's capacity to comprehend and react to trial events, consult with counsel,

testify, and control his behavior in front of the jury."  *Grigsby*, 712 F.3d at 974  (citing *Riggins*,

504 U.S. at 137-38).  This aspect of the first *Sell* prong "dovetails into the remaining three

factors[.]"  *Id*.

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

Additionally, assuming Mr. Beler becomes and remains competent, it is unclear where he will be held as he prepares for trial. Dr. Cuccio testified that she has seen the BOP hold individuals so that they go "straight to court" from the BOP. 8/24/20 Tr. at 161. If Mr. Beler is housed at a facility hundreds of miles away from his counsel until his trial date, his right to effective assistance of counsel will be badly compromised. ██████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

Thus, the government has failed to prove by clear and convincing evidence that its forced medication plan is unlikely to impact Mr. Beler's right to a fair trial. That accordingly diminishes the government's interest in this prosecution.

***

The "drastic step" of forcibly administering "powerful drugs to an unwilling criminal defendant should be taken rarely, and only when *absolutely necessary to fulfill an important governmental interest*, to avoid deprivation of the defendant's 'liberty ... without due process of law.'" *Berry*, 911 F.3d at 357 (emphasis added) (quoting U.S. Const. amends. V, XIV § 1).

Given the many special circumstances that lessen the government's interest in prosecution, this is not that "rare" case where the government's interest is great enough to justify this severe intrusion.

## II.    *Sell* Factor 2:  The Government Has Not Shown That Involuntary Medication Is Substantially Likely To Render Mr. Beler Competent and Substantially Unlikely To Have Side Effects That Will Interfere with His Ability To Assist Counsel.

To meet its burden on the second *Sell* prong, the government must prove, by clear and convincing evidence, that "involuntary medication will *significantly further* those concomitant state interests."  *Sell*, 539 U.S. at 181 (emphasis in original); *see also Dillon*, 738 F.3d at 287. To do so, the government must demonstrate "that the proposed treatment plan, *as applied to this particular defendant*, is 'substantially likely' to render the defendant competent to stand trial and 'substantially unlikely' to produce side effects so significant as to interfere with the defendant's ability to assist counsel in preparing a defense."  *Evans*, 404 F.3d at 242 (emphasis in original). The government must relate its proposed treatment plan to the factors specific to the defendant, including not only his diagnosis, but also, for example, "his age and the nature and duration of his delusions." *Watson*, 793 F.3d at 424.  "Merely showing a proposed treatment to be 'generally effective' against the defendant's medical condition is insufficient to meet this burden." *Id.*

### A.  The government has not proven ███████████████████████████ is "substantially likely" to restore Mr. Beler's competency.

Dr. Cuccio opined that ████████████████████████████████████ ██████ is substantially likely to restore Mr. Beler to competency.  However, the government has failed to support that conclusion with clear and convincing evidence, as *Sell* requires. ████████





That alone is sufficient to deny the government's request to medicate Mr. Beler. *See, e.g.,*

*Austin*, 606 F. Supp. 2d at 152 ████████████████████████████████

████████████████████████████████████████████ *United States v. Fabela*,

686 F. Supp. 2d 1082, 1089 (D. Ariz. 2009)████████████████████████████

During the *Sell* hearing, Dr. Cuccio offered only two arguments in support of her

conclusion that her treatment plan is substantially likely to restore Mr. Beler's competency.

████████████████████████████████████████████████████████ Neither of these points

come close to meeting the government's burden on this factor.





courts have consistently held that this alone is not sufficient to meet the government's burden to show that its proposed treatment plan is substantially likely to work for a specific defendant.  "Permitting the government to meet its burden through generalized evidence alone would effectively allow it to prevail in every case involving the same condition or course of treatment.  Because we are obligated to ensure that a given case is 'sufficiently exceptional to warrant the extraordinary measure of forcible medication,' we cannot permit such deference here."  *Watson*, 793 F.3d at

425 (citing *Evans*, 404 F.3d at 241 and *White*, 620 F.3d at 413); *see also Evans*, 404 F.3d at 241-

42 ("To hold that this type of analysis satisfies *Sell*'s second and fourth factors would be to find

the government necessarily meets its burden in every case ████████████████████████

████████  We do not believe that *Sell*'s analysis permits such deference.").

█  ████████████████████████████████████

████████

  To meet its burden under *Sell*, the government must not only set out the medications it

intends to use and their dosages, but it also must demonstrate how that treatment plan relates to

the defendant's particular medical condition.  *See Evans*, 404 F.3d at 241-42.  Here, the

government's treatment plan for Mr. Beler falls short, █████████████████████████

████████████

██████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████



This admission should be fatal to the government's argument. *See Watson*, 793 F.3d at 424 (reversing district court's *Sell* order because "nothing in the district court's decision indicates that it actually considered whether the evidence proffered by the government sufficiently addressed [the defendant's] particular medical situation").

54



In another *Sell* case, a staff psychiatrist from FMC Butner testified that there are additional relevant prognostic factors that bear on a defendant's restorability. *See United States v. Moruzin*, 583 F. Supp. 2d 535, 548 (D.N.J. 2008).



\* \* \*

The *Sell* hearing as a whole revealed that Dr. Cuccio relied on generalities and failed to analyze Mr. Beler's condition with specificity. She was unfamiliar with the details of Mr. Beler's medical records and made many misstatements of fact during her testimony. She also admitted she was inexperienced in *Sell* proceedings, and at times had difficulty applying the correct legal standards. *See* 9/1/20 Tr. at 191, 198.

In contrast, Dr. Corvin's testimony was detailed and thoroughly grounded in the records. His opinions were supported by peer-reviewed scientific literature. He also has far greater experience in *Sell* and other forensic proceedings in addition to his wealth of clinical experience.

Thus, the government has failed to establish by clear and convincing evidence that the BOP's proposed treatment plan is substantially likely to restore Mr. Beler's competency. *See United States v. Ruiz-Gaxiola*, 623 F.3d 684, 700–01 (9th Cir. 2010) ("We conclude that the generalized statements and unsupported assertions of the government experts, when contrasted with the specific and authoritative rebuttal evidence presented by the defense, were plainly insufficient to establish by clear and convincing evidence that the proposed regime of involuntary medication is substantially likely to restore Ruiz to competency.").

**B. The government has not shown that the BOP's treatment plan is substantially unlikely to cause side effects that will interfere with Mr. Beler's ability to assist counsel.**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

Moreover, Mr. Beler is detained in Fort Worth, Texas while his attorneys are in Washington, D.C.  Dr. Armstrong has informed defense counsel that because of the COVID-19 pandemic, both correctional and medical staff are being asked to perform additional duties at the facility; this has made it difficult to schedule calls with Mr. Beler and otherwise maintain communication.  Due to both physical distance and these logistical challenges, it will be extraordinarily difficult for defense counsel to monitor Mr. Beler during any period of involuntary medication to determine whether he is in fact having side effects that interfere with his ability to assist in his own defense.

In light of all of the above, the government has failed to demonstrate that Mr. Beler is substantially unlikely to experience side effects that interfere with his ability to assist counsel. *See United States v. Grigsby*, 712 F.3d 964, 975–76 (6th Cir. 2013) (finding no basis to conclude that counsel located hundreds of miles from mentally ill client would be able to know if client was experiencing side effects, or receiving timely treatment for them).

## III.    *Sell* Factor 3: The Government Has Not Proven That Involuntary Medication Is Necessary To Further Its Interests

The government has failed to prove by clear and convincing evidence that no treatment short of forcible medication could render Mr. Beler competent for trial.  As Judge Pillard cautioned in *Gamarra*, the question for this prong is not whether "some form of medication would be required to render" Mr. Beler competent. 940 F.3d at 1322-23.  Rather, the question is "whether the government met its burden of showing that garnering voluntary compliance, most likely in the context of an in-person therapeutic relationship, could not succeed." *Id*.  Generally,

a court should grant a *Sell* order only where the government has shown by "clear and convincing evidence not only that ████████████████ is needed, but also that medically appropriate efforts at voluntary compliance have been made and were not successful."  *Id*. at 1323.

The government has plainly failed to make that showing here.  No BOP psychiatrist has ever met with Mr. Beler in person.  The government has never even housed Mr. Beler at a BOP facility with a psychiatrist on staff, despite the fact that multiple facilities have on-staff psychiatrists.



Thus, the government has failed to meet its burden on this *Sell* prong.

## IV.    *Sell* Factor 4: The Government Has Not Proven That The Proposed Treatment Plan Is Medically Appropriate For Mr. Beler.

Finally, the government has not met its burden on the fourth *Sell* prong, which requires

clear and convincing evidence that "the administration of the drugs is *medically appropriate*, *i.e.,*

in the patient's best medical interest in light of his medical condition."  *Sell*, 539 U.S. at 181

(emphasis in original).  It is significant that the Supreme Court used the word "patient" in its

explanation of this factor, rather than "defendant"—"a choice that serves to emphasize that, in

analyzing this factor, courts must consider the long-term medical interests of the individual

rather than the short-term institutional interests of the justice system."  *United States v. Onuoha*,

820 F.3d 1049, 1059 (9th Cir. 2016) (internal citation and quotation omitted).  "Even if forcible

medication provides the only means of bringing an incompetent defendant to trial for a serious

---

23

crime, and is substantially likely to restore him to competency without causing side effects that would render the trial unfair, the treatment is nonetheless impermissible unless it is *also* in the defendant's best medical interest." *Ruiz-Gaxiola*, 623 F.3d at 703.

The side effects of the medication(s) that would be forced upon Mr. Beler are again relevant to this inquiry. *Id.* Unlike the second factor, however, the Court must consider the side effects of medication beyond mere interference with Mr. Beler's ability to assist counsel. Medication will often have long-term effects that are not in the patient's best medical interest. *See id.* at 705–06 ("There is no medical value to a medication regime that alleviates the mental disorder, if it does so at all, only for the short period of time necessary for trial preparation and the trial itself, while creating a risk of side-effects that would render the regime inappropriate for a patient's long-term treatment.").

The BOP's proposed treatment plan is not medically appropriate for Mr. Beler because it endangers his health in several significant ways.

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

    This standard of care has been recognized by courts as well as other doctors at the BOP

medical facilities.  *See Onuoha*, 820 F.3d at 1059 ██████████████████████████████

██████████████████████████████████████████ . . . . best medical

interests are best medical interests, whether that individual is in custody or in the community);

*United States v. Almendarez*, 179 F. Supp. 3d 498 (W.D. Pa. 2016) █████████████████

████████████████████████████████████████████

██████████████████████████ ; *United States v. Reynolds*, 553 F. Supp. 2d 788, 794

(S.D. Tex. 2008) ██████████████████████████████████████

█████████████████████████████████████████████████

███████████████

     ██████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████





    The overwhelming weight of the evidence indicates that Mr. Beler is at an elevated risk

for serious side effects from the medications Dr. Cuccio has proposed.

**F.  The risks to Mr. Beler are not outweighed by the benefits for a non-emergent, non-clinical purpose.**

The government is seeking to involuntarily medicate Mr. Beler for a non-clinical, non-emergent, purely legal purpose:  to render him competent to stand trial.  Thus "the balance of harms and benefits" are "related to . . . quintessentially legal questions of trial fairness and competence."  *Sell*, 539 U.S. at 180–83.  The question presently before the Court is whether bringing Mr. Beler "to trial *alone* justif[ies] in whole (or at least in significant part) administration of a drug that may have adverse side effects. . . ." *Id.* (emphasis in original).

For this reason, the Court must decide whether the government's legal interest in treating Mr. Beler *just long enough to bring him to trial* justifies the risk to Mr. Beler's long-term health:

> '[T]he patient's best medical interest' cannot be measured . . . by evaluating the benefit and risk over the period of the trial only.  There is no medical value to a medication regime that alleviates the mental disorder, if it does so at all, only for the short period of time necessary for trial preparation and the trial itself, while creating a risk of side-effects that would render the regime inappropriate for a patient's long-term treatment. If the involuntary antipsychotic medication is to be administered for so short a period, it is clearly not in 'the patient's best medical interest' to risk serious medical consequences for a benefit that, if one results at all, is only a temporary alleviation of the symptoms and not a long-term remedy for the mental illness.

*Ruiz-Gaxiola*, 623 F.3d at 706 (quoting *Sell*, 539 U.S. at 180-81).

Dr. Cuccio's opinion that the proposed treatment plan is medically appropriate for Mr. Beler must be discounted because it is based on the wrong legal standard. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████  When asked whether she agreed that the issue before the Court is whether

███████████████ can be administered to Mr. Beler involuntarily *for the purpose of rendering him competent*, she responded:

> Well, I'm of two minds. 
>
> ██████████████████████████████████████████████
> ██████████████████████████████████████████████
> ██████████████████████████████████████████████
>
> **So yes.  I apologize.  I'm not sticking strictly to the Sell criteria here when I'm answering some of those questions.**

9/1/20 Tr. at 191 (emphasis added).

Moreover, Dr. Cuccio either did not recognize, or did not give sufficient weight to, the fact that Mr. Beler retains a constitutional right to refuse unwanted medical treatment, in spite of his mental illness. *Compare Sell*, 539 U.S. at 178-79 ("an individual has a constitutionally protected liberty 'interest in avoiding involuntary administration of ██████████████'—an interest that only an 'essential' or 'overriding' state interest might overcome") (quoting *Riggins*, 504 U.S. at 134) *with* 8/18/20 Tr. at 52 (testifying that Mr. Beler has a right to refuse medication "[i]f he is competent to understand the risks and benefits of treatment").  Dr. Cuccio also incorrectly conflated Mr. Beler's incompetency *to stand trial* with incompetency *to make medical decisions for himself*—█████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████
██████████████████████████████████████

████████████

████████████████████████████████████████████████

████████████████████████████████    This is not what the Supreme

Court intended to permit in *Sell*.  If the government is permitted to forcibly medicate Mr. Beler,

"an all-too-common, non-violent, long-detained defendant, in a case in which several factors

strongly militate against forced medication, it would risk making 'routine' the kind of drastic

resort to forced medication for restoring competency that the Supreme Court gave no hint of

approving in *Sell*."  *White*, 620 F.3d at 422.

When the proper standard is applied, the administration of involuntary medication is

clearly not in Mr. Beler's long-term best medical interest. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████

**CONCLUSION**

The government has fallen far short of meeting its clear and convincing burden to justify

the involuntary administration of ████████████████ to Mr. Beler under *Sell*.  This

heightened evidentiary burden is not a mere formality; it reflects that "the grave risks involuntary

██████████████████████ pose to a person's liberty and autonomy—his say over what is done to

his own brain—call for heightened attention." *Gamarra*, 940 F.3d at 1320 (Pillard, J.

concurring). The government must exercise "exacting diligence" to meet this burden, and it has

not done so here. *Id.* For all of the foregoing reasons, the government has failed to satisfy any

of the four *Sell* factors.

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

    The government's motion for an order authorizing involuntary medication under *Sell*

should be denied.

DATED:  September 22, 2020          Respectfully submitted,

                                  *Courtney R Forrest*

                      Courtney R. Forrest (DC Bar Number 996740)
                      Emily Voshell (DC Bar Number 1029403)
                      Jonathan Jeffress (DC Bar Number 479074)
                      KaiserDillon PLLC
                      1099 14th St. NW, 8th Floor West
                      Washington, DC 20005
                      cforrest@kaiserdillon.com
                      evoshell@kaiserdillon.com
                      jjeffress@kaiserdillon.com
                      Telephone: (202) 640-2850
                      Facsimile: (202) 640-1034

                      *Counsel for Defendant Peter Beler*

**CERTIFICATE OF SERVICE**

I certify that on September 22, 2020, I filed the foregoing Defendant's Proposed Findings of Fact and Conclusions of Law under seal via the Court's CM/ECF system and served copies by email on all registered parties.


*/s/ Courtney R. Forrest*

Courtney R. Forrest