```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      * * * * * * * * * * * * * * *    )
 3    UNITED STATES OF AMERICA,        )    Criminal Action
                                       )    No. 19-415
 4                    Plaintiff,       )
                                       )
 5        vs.                          )
                                       )
 6    PETER BELER,                     )    Washington, DC
                                       )    August 4, 2020
 7                    Defendant.       )    10:23 a.m.
                                       )
 8    * * * * * * * * * * * * * * *    )

 9

10                TRANSCRIPT OF COMPETENCY HEARING
                   HELD VIA VIDEO TELECONFERENCE
11           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
                     UNITED STATES DISTRICT JUDGE
12


13
      APPEARANCES:
14
      FOR THE GOVERNMENT:      NICHOLAS MIRANDA, ESQ.
15                             JENNIFER CONNOR, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
16                              FOR THE DISTRICT OF COLUMBIA
                               555 Fourth Street, NW
17                             Eleventh Floor
                               Washington, DC 20530
18

19    FOR THE DEFENDANT:       JONATHAN JEFFRESS, ESQ.
                               EMILY A. VOSHELL, ESQ.
20                             COURTNEY R. FORREST, ESQ.
                               KAISER DILLON, PLLC
21                             1099 14th Street, Northwest
                               Suite 800 West
22                             Washington, DC 20005

23    ALSO PRESENT:            GEORGE PATRICK CORVIN, M.D.

24                             JOHN H. QUINN, JR.
                               (Power of Attorney to the Defendant)
25
```

```
1      REPORTED BY:              LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
2                                United States District Court for the
                                   District of Columbia
3                                333 Constitution Avenue, NW
                                 Room 6706
4                                Washington, DC 20001
                                 (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3                              Direct      Cross        Red.

4

   WITNESSES FOR THE GOVERNMENT:
5

6  Leticia Armstrong, Ph.D.        8          51          107

7  Anne Cuccio, M.D.            111

8

9  EXHIBITS RECEIVED IN EVIDENCE                          PAGE

10

   Government's Exhibit Nos. 1-5                           47
11

   Joint Exhibit Nos. 1-16                                 50
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                THE COURT:  Let me just find out who is on and
2      then I'll call the case.
3                So we have the court reporter on; we have
4      somebody, I think, from IT.  I know Dorothy is on, but
5      there's somebody from IT.  Is that correct?
6                THE COURTROOM DEPUTY:  No.  John just set it up
7      for me, Judge.  He had to go to another courtroom.
8                THE COURT:  Okay.  So you've got that all set up.
9                My law clerk is on; is that correct?
10               THE LAW CLERK:  I'm on.
11               THE COURT:  I don't see Mr. Beler.  Is he on?
12               MR. JEFFRESS:  Yes, sir.  He is at the head of
13     that conference table with Dr. Armstrong there in the same
14     room.
15               THE COURT:  Okay.  I don't see that.
16               THE COURTROOM DEPUTY:  Judge, if you get to your
17     panel and hit number eight, you can expand who you can see.
18               THE COURT:  Oh, I see.
19               We have Mr. Beler, whom I've not met before.  Can
20     he put his hand up?  I don't seem to see him here.
21               Let me find out.  Who is on for the Government?
22               MR. MIRANDA:  Good morning, your Honor.  It's
23     Nichola Miranda for the United States.
24               MS. CONNOR:  And also Jennifer Connor for the
25     United States also.
```

```
 1              THE COURT:  Okay.  Mr. Beler, we have -- I see
 2     Mr. Jeffress.  Anyone else?
 3              MS. FORREST:  Yes.  Courtney Forrest, your Honor.
 4              MS. VOSHELL:  And Emily Voshell, your Honor.
 5              MR. JEFFRESS:  Also, your Honor, on the screen is
 6     John Quinn, who has power of attorney over Mr. Beler's
 7     affairs.
 8              THE COURT:  I saw him put his hand up.  Now we
 9     know who Mr. Quinn is.
10              Do we have the doctors on?
11              DR. CORVIN:  Good morning, your Honor.
12              THE COURT:  Can you identify yourself, please?
13              DR. CORVIN:  Yes, your Honor.  My name is George
14     Corvin.  I'm a psychiatrist in Raleigh.
15              THE COURT:  And who do we have as witnesses for
16     the Government?  Dr. Armstrong?
17              DR. ARMSTRONG:  Good morning, your Honor.  This is
18     Dr. Armstrong.
19              THE COURT:  There she is.
20              DR. CUCCIO:  I'm Dr. Cuccio.  I'm in Rochester for
21     the BOP.
22              THE COURT:  And there is another doctor that's
23     supposed to be on as well for the Government who perhaps has
24     not joined us yet.
25              DR. CUCCIO:  I'm Dr. Cuccio for the Bureau of
```

1    Prisons.  I'm a psychiatrist.

2              DR. ARMSTRONG:  And Dr. Armstrong for the Bureau

3    of Prisons.

4              THE COURT:  This is United States versus Peter

5    Beler, 19-CR-415.

6              I have exhibits that were filed, including some

7    additional ones with a prehearing notice, which includes

8    also a stipulation and various agreements relating to the

9    testimony.

10             The issue before the Court relates to whether

11   Mr. Beler can be administered medication on an involuntary

12   basis, ███████████████████████; in other words, over his

13   objection, whether he would be -- pursuant to the *Sell v.*

14   *United States* case.

15             The Government does have the burden of proof.

16   There's a four-part inquiry.  The Government has to prove by

17   clear and convincing evidence that forced medication is

18   warranted under the circumstances.

19             And the four requirements are whether or not the

20   administration of the medication to render a mentally ill

21   criminal Defendant competent to stand trial only if doing so

22   involves advances in important governmental interest such as

23   bringing to trial an individual accused of a serious crime;

24   two, the medication is, quote, "substantially likely" to

25   render the Defendant competent to stand trial, and

1    substantially unlikely to have side effects that'll

2    interfere significantly with the Defendant's ability to

3    assist counsel in conducting a trial defense; three,

4    alternative, less-intrusive treatments are unlikely to

5    achieve substantially the same results; and, four, the

6    administration of the medication is medically appropriate,

7    in the patient's best interest in light of his medical

8    condition.

9        So those generally are the criteria that we would

10   need to examine.

11       Before we start, is there anything else that needs

12   to be discussed?  My understanding is the Government will be

13   putting on two witnesses and the defense in rebuttal would

14   be putting on one witness.

15       Is there any initial statement the Government

16   wishes to make, something short?  If not, we'll move on.

17       MR. MIRANDA:  No, your Honor.  We are prepared to

18   begin with our first witness.

19       THE COURT:  Then go ahead and call the first

20   witness.  Ms. Dorothy Jones Patterson will be administering

21   the oath.  If you can give the name of the first person, and

22   hopefully that person will pop up on the screen.

23       I see Mr. Beler finally at the end of the table.

24       MR. MIRANDA:  Thank you, your Honor.

25       At this time, the Government would call I guess to

1   the virtual stand Dr. Leticia Armstrong.

2       LETICIA ARMSTRONG, Ph.D., GOVERNMENT WITNESS, SWORN.

3               THE COURT:  Proceed.

4                           DIRECT EXAMINATION

5   BY MR. MIRANDA:

6   Q.  Thank you, Dr. Armstrong.  Thank you for being with us

7   at this hearing.  Please let me know if you can't hear any

8   of my questions or if you need me to repeat anything.

9           First, could you please state and spell your name

10  for the record?

11          THE COURT:  Can I ask one thing?  It's important

12  to mute if people are not speaking so we don't get that

13  clanging noise in the background.

14          So, Mr. Quinn, you're not going to be speaking.

15  If you could just put it on mute and any of the others that

16  are unlikely to be talking, so we don't get that clanging

17  sound in the back.

18          Go ahead, Mr. Miranda.

19          MR. MIRANDA:  Thank you.

20  BY MR. MIRANDA:

21  Q.  Dr. Armstrong, could you please state and spell your

22  name for the record?

23  A.  Yes.  My first name is Leticia, L-E-T-I-C-I-A,

24  Armstrong, A-R-M-S-T-R-O-N-G.

25  Q.  Thank you, Dr. Armstrong.

```
 1              And where do you currently work?
 2   A.  I'm currently employed with the Federal Bureau of
 3   Prisons at the Federal Medical Center in Fort Worth.
 4   Q.  And how long have you worked there?
 5   A.  Approximately two years.
 6   Q.  What's your current position?
 7   A.  Forensic unit psychologist.
 8   Q.  How long have you been in that position?
 9   A.  Approximately two years.
10   Q.  And what are your general responsibilities in that
11   position?
12   A.  My general responsibilities are to conduct evaluations,
13   particularly competency restoration, competency or mental
14   state at the time of the offense.  My primary duty right now
15   is focused on competency restoration.
16   Q.  Thank you.
17              And just to go back to a little bit of your
18   education and other history, where did you go to school both
19   for college and graduate school?
20   A.  Yes.  I attended the University of Michigan and earned a
21   bachelor's of science in clinical and community psychology
22   in approximately 2005.
23              I attended Pepperdine University and earned a
24   master of arts in clinical psychology in approximately 2008.
25              And then I attended the Chicago School of
```

Armstrong - DIRECT - By Mr. Miranda

1   Professional Psychology and obtained a doctorate of

2   psychology with an emphasis in forensic psychology in

3   approximately 2013.

4   Q.  So focusing on each of your graduate degrees, for your

5   first graduate degree, what were you required to do to

6   obtain that degree?

7   A.  A specific number of courses pertaining to clinical and

8   community psychology in addition to general education

9   courses; and also, to complete an undergraduate doctoral

10  dissertation research project.

11  Q.  And for your second degree, what were you required to

12  do?

13  A.  For my master's degree I was required to take a number

14  of advanced courses in clinical psychology, including

15  theory, treatment, assessment, substance abuse treatment, as

16  well as complete various research activities.

17       And the Chicago School of Professional Psychology,

18  where I earned my doctorate program, again, I was required

19  to complete additional higher-level psychology courses in

20  assessment, various types of assessment, treatment,

21  evaluation.

22       And as I mentioned, I have a forensic focus, so

23  that is focused specifically on the forensic part of the

24  practice.  And I also had to complete a research project

25  dissertation as well as three years of clinical practical

Armstrong - DIRECT - By Mr. Miranda

1    training rotations and a one-year, 2000-hour predoctoral

2    internship.

3    Q.  So prior to your current employment, what type of

4    experience did you have, particularly in the field in which

5    you're currently employed?

6    A.  I started my internship with the Bureau of Prisons at

7    the Federal Medical Center Carswell.

8         I was hired on as a staff psychologist in 2013 at

9    the Federal Correctional Institute in El Reno, where I was a

10   staff psychologist for approximately three months, and then

11   became the drug abuse program coordinator, where I worked on

12   all the drug abuse programming at that institution.  I did

13   that until approximately June of 2015.

14        And I then transferred to the Federal Medical

15   Center Carswell, and I was a sex offender management program

16   psychologist until approximately January of 2018.

17        And then I transferred here to the Federal Medical

18   Center Fort Worth in approximately September 2018, where I

19   remain in the position of a forensic unit psychologist.

20   Q.  And before your current employment, can you talk about

21   whether you had any experience in particular with competency

22   or competency reports?

23   A.   Sure.  Prior to my current position, during my

24   internship year, 2012 to 2013, at the Federal Medical Center

25   Carswell, I did a specialty rotation in forensic psychology

1    where I completed competency evaluations.  I also completed

2    mental-state-at-the-time-of-the-offense evaluations,

3    competency restoration.

4            Prior to that, the three years of clinical

5    training rotations that I had during graduate school were

6    also in forensic psychology.  And that took place at

7    Wisconsin Department of Corrections, a county courthouse in

8    Illinois, as well as the Federal Bureau of Prisons, the MCC

9    Chicago in Chicago, Illinois.

10   Q.  Now, turning to your current position, can you discuss

11   just a little bit how many competency or insanity or sanity

12   reports you've been involved with?

13   A.  Sure.  I completed approximately 15 competency reports,

14   probably 15 to 20 reports on mental state at the time of the

15   offense.  I completed a presentencing report.  I completed

16   six competency restoration reports.

17           Prior to that, in my internship year at Carswell,

18   I also completed -- I would probably say a number of

19   reports, only under the supervision of a licensed

20   psychologist.

21   Q.  And other than what you've just added that we've already

22   talked about, do you have any further experience in the

23   field of clinical and forensic psychology?

24   A.  Sure.  I continue taking continuing education credits.

25   And because of the field, I focus on the required ethics of

1    treatment; I focus on forensic psychology; I participate in

2    BOP trainings that are offered for forensic psychologists.

3    My first year here as a forensic unit psychologist, all my

4    evaluations were directly supervised by our chief

5    psychologist as well as other licensed forensic

6    psychologists who had already been in the position for

7    years.

8    Q.  Have you been presented as an expert in any setting?

9    A.  Yes.

10   Q.  What was that?

11   A.  Forensic psychologist.

12   Q.  Do you belong to any professional organizations?

13   A.  I do.

14   Q.  What organizations are those?

15   A.  I'm a member of the American Psychological Association;

16   I'm a member of the Chapter 41, which is the law -- the

17   forensic psychology chapter of the APA; and I'm also a

18   member of the Association of Contextual and Behavioral

19   Science.

20   Q.  And have you ever been qualified as an expert in

21   clinical forensic psychology?

22   A.  Yes.

23   Q.  What's the different -- sorry.  When was that?

24   A.  Did you say when was that?

25   Q.  Correct.

1    A.  Oh, approximately one year ago.

2    Q.  And what is the difference between clinical and forensic

3    psychology?

4    A.  The primary difference would be that forensic psychology

5    is the intersection of psychology and law.

6    Q.  And do you currently see patients in both a forensic

7    setting and a clinical setting?

8    A.  Yes.

9    Q.  And how does that differ, just generally?

10   A.  In the forensic setting, I am primarily evaluating.  And

11   specifically in the competency restoration side, I'm

12   providing psychoeducation about the court system.  I'm also

13   making referrals, for example, to medical or psychiatry that

14   have to do with recommendations for -- in order to help

15   someone achieve competency restoration.

16        Aside from the forensic, I have other clinical

17   duties:  I maintain a triage schedule, where I respond to

18   mental health emergencies around the institution.  I provide

19   individual and group therapy to our patients here who have

20   significant mental health problems.  I provide group therapy

21   to the inmate population for various things, including

22   mental illness or simply just criminal thinking.  I provide

23   psychology interventions to individuals in our hospital.  I

24   think that is a summary of most of it.

25   Q.  How many patients approximately would you say you

Armstrong - DIRECT - By Mr. Miranda

1    currently see in a clinical setting?

2    A.  Currently in my position?

3    Q.  Yes.

4    A.  I would say I've seen in my position since I've been

5    here at Fort Worth approximately 50 to 100.

6    Q.  And how many patients in a forensic setting?

7    A.  Approximately 30 to 40.

8    Q.  Other than what we have already discussed, is there any

9    education or training of yours that is directly related to

10   forensic psychology?

11   A.  I think I've covered most of it, the CEUs the Bureau of

12   Prisons offers in training for forensic psychology and the

13   APA-accredited training for forensic psychologists.

14          MR. MIRANDA:  At this point, your Honor, the

15   Government would seek to move in Dr. Armstrong as an expert

16   in clinical and forensic psychologies.

17          MR. JEFFRESS:  We have no objection to that, your

18   Honor.

19          THE COURT:  Then I will find that she's qualified

20   in clinical and forensic psychology as an expert.

21          Proceed, then, with your questions.

22          MR. MIRANDA:  Thank you.

23   BY MR. MIRANDA:

24   Q.  Dr. Armstrong, have you ever testified in a *Sell* hearing

25   before?

1    A.  I have not.

2    Q.  Now, speaking specifically about this case, what was

3    your role in the evaluation and recommendation for

4    Mr. Beler, the Defendant in this case?

5    A.  My primary role for Mr. Beler in this case was his

6    primary forensic evaluator.

7    ████████████████████████████████████████████

8    ████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ███████████

15   Q.  And in preparation for this hearing, what, if any,

16   information did you review?

17   A.  I reviewed my previous report that I submitted, I

18   believe, in March; I reviewed the *Sell* report I submitted

19   following that; and then the report that Dr. Cuccio had

20   done, which she had provided, the post-treatment plan.

21          I reviewed defense counsel's witness's report and

22   I reviewed Mr. Beler's overall file in the BOP, medical,

23   psychology and collateral records.

24   Q.  Speaking specifically about the competency evaluation

25   process, what did you review in order -- in the course of

```
1    your competency evaluation process of Mr. Beler?

2    A.  During the course of my evaluation process, I reviewed

3    collateral records that had been sent to me and that had

4    been collected; I reviewed telephone calls, emails from the

5    time Mr. Beler has been here; I reviewed notes by other

6    clinical staff that were working with Mr. Beler outside of

7    the forensic department specifically; medical notes that

8    indicated contacts the medical personnel have with

9    Mr. Beler.

10   ███████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   And I think that is most -- and then some of the legal

14   documentation that had been sent to me.

15   Q.  And why --

16   A.  I apologize.  Sorry.  I also reviewed his previous

17   record or report that Dr. Corvin had submitted.

18   Q.  Did I hear you say you collect and review collateral

19   information during your competency evaluation process?

20   A.  During referrals on competency evaluations, I typically

21   gather as much data as I can to either support my starting

22   hypotheses or to rule them out to see if there's anything I

23   am overlooking and to get a -- to the best of my ability to

24   get a sort of timeline of somebody, you know, in this case

25   Mr. Beler, a timeline of the presentation and how it
```

1    fluctuated over time.

2    Q.  And in speaking about Mr. Beler, when did you first meet

3    him?

4    A.  Approximately December 19, 2019.



25    Q.  Got you.

1          To be clear, I meant are these in person as

2     opposed to over VTC or --

3     A.  Oh, I apologize.  Yes.  They're in person.



Armstrong - DIRECT - By Mr. Miranda



Q.  I see that you're currently in the room with Mr. Beler.

         Prior to right now, when was the last time that
you met with him?

A.  Friday.  That was the 31st, I believe.

Armstrong - DIRECT - By Mr. Miranda

1  ████████████████████████████████████████████████████

2  ██████████

3  Q.  I think you mentioned this before.  But do treating

4  staff and other medical professionals at your facility

5  document their interactions with the Defendant?

6  A.  For the most part, yes.  I would imagine there's times

7  during rounds that, you know, they're informally just sort

8  of saying, "Hi.  How are you doing?"  And if there's nothing

9  notable, they might not make a note.  But the more pertinent

10  interactions they have with him, for the most part, yes,

11  those are documented.

12  Q.  And did you have access to their observations and notes

13  in forming your opinions?

14  A.  Yes.

15  Q.  Have you spoken with Dr. Cuccio specifically regarding

16  Mr. Beler?

17  A.  I have.

18  Q.  How often would you say you've spoken with her?

19  A.  Since the initial referral, pretty -- on a pretty

20  regular basis for consultation as far as things to try.  She

21  will inquire and want to know how he's functioning to kind

22  of think about treatment planning for psychiatry purposes.

23  ████████████████████████████████████████████████████

24  ██████████████████████████████████████████      And we

25  just sort of check in about his case in general.

1    Q.  And how often would you say you've consulted with her?

2    A.   On average, weekly.  There might be a week or two here

3    and there we miss due to kind of things going on in the

4    institution.  But for the most part, we speak pretty

5    regularly.



1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ██████████████████████████████████████████

5  ████████████████████████████████████

6  Q.  What is it that you hoped to gain from this testing?

7  A.  Generally, I would look at various things.  I would look

8  at measuring someone's motivation before we start, so making

9  sure they're motivated, because that can inform how they're

10  going to approach other testing.

11       The personality inventory, for example, gives me a

12  little more information about what psychological problems an

13  individual such as Mr. Beler might endorse or deny, any

14  current difficulties he might be having.

15       Sometimes I might administer a brief intellectual

16  measurer just to make sure if there's any intellectual

17  deficits that aren't apparent so that I can give

18  recommendations to use in group as psychoeducation, but also

19  to attorneys.

20       I might give malingering testing if I think

21  somebody could be malingering illness.  And I might give

22  cognitive memory testing, all depending on how the

23  individual presents.

24  ██████████████████████████████████████████

25  ████████████████████████████████████████████████

1    ███████████████████████████████████████████████

2    Q.  And --

3            THE COURT REPORTER:  Sorry, Doctor.  I didn't hear

4    the diagnosis.  Could you repeat that, please?

5            THE WITNESS:  ███████████████████████

6    ███████████████████████████████████████████████

7    ██████████████████████████████████

8        ████████████████████████████████████████████

9    ███████████████████████████████████████████

10       █████████████████████████████████████████

11   ███████████████████████████████████████████

12   ██████████████

13           THE COURT:  Thank you.

14           Go ahead, Mr. Miranda.

15           MR. MIRANDA:  Thank you, your Honor.

16   BY MR. MIRANDA:

17   Q.  And could you please explain what that is?

18   █████████████████████████████████████████

19   █████████████████████████████████████████

20   █████████████████████████████████████████

21   ████████████████████████████████████████

22   ██████████████████████████████████████████

23   █████████████████████████████████████████

24   ███████████████████████████████████

25   █████████████████████████████████████████



Q.  I believe you may have mentioned --

        THE COURT:  Excuse me.  Excuse me.

        Dr. Armstrong, can you move to your right a little

bit in your chair so I can see you?

```
 1            THE WITNESS:  Is that better?

 2            THE COURT:  Just to the right so we can see you.

 3    Thank you.  I don't want to have you too close.  That's

 4    better.  Perfect.

 5            THE WITNESS:  Okay.

 6            THE COURT:  Go ahead, Mr. Miranda.  I'm sorry to

 7    interrupt.  I just think that at least from my perspective I

 8    like to see the Doctor's face.

 9            Go ahead.

10            MR. MIRANDA:  Yes.  Absolutely.  Thank you, your

11    Honor.

12    BY MR. MIRANDA:

13    ████████████████████████████████████████████████████████

14    ██████████████████████████████████████████████████████

15    ████████████████████████████████████████████████████

16    ███████████████████████████████████████

17    ██████████████████████████████████████████████████████

18    ███████████████████████████████████████████████████

19    ██████████████████████████████████████████████████████

20    █████████████████████████████████████████████████

21    ████████████████████████████████████████████████████

22         ███████████████████████████████████████████████████

23    ████████████████████████████████████████████████████████

24    ██████████████████████████████████████████████████████████

25    ████████████████████████████████████████████████████
```

Armstrong - DIRECT - By Mr. Miranda



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  Q.   Thank you.
25          And just -- I didn't want to interrupt.



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Q.  I'm sorry.
24    A.  I --
25    Q.  Could -- go ahead.  I'm sorry.
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17    Q.  So how do you assess what methods of treatment are

18    appropriate for Mr. Beler?

19

20

21

22

23

24

25



```
1
2
3
4    Q.  Has the --
5          MR. MIRANDA:  Brief indulgence.
6    BY MR. MIRANDA:
7
8
9
10
11
12
13
14
15   Q.  I'm sorry.  How --
16         THE COURT:  I missed the last part.  This is the
17   Judge.  I'm sorry.  I missed the number of people you said
18   at the end.
19         Dr. Armstrong, could you repeat how many?
20         THE WITNESS:
21
22
23
24
25
```

Armstrong - DIRECT - By Mr. Miranda



BY MR. MIRANDA:

Q.  Is that also true in your experience and observations

for purposes related to competency restoration?

A.  So primarily, in competency restoration we are looking

to reduce -- if somebody has a significant mental illness,

we're looking to reduce the symptoms of that mental illness

that are impeding one's ability to go forward and assist in

their defense.  So we look at that primarily.

        And the other main issue might be that a person is

Armstrong - DIRECT - By Mr. Miranda

1    lacking the factual understanding of the court process.  And

2    so typically, that entails medication and/or psychoeducation

3    classes about the court proceeding, the court process in

4    general.

5    Q.  And is that true not just generally, but also

6    specifically in your experience and expertise for someone

7    ████████████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████████████████

11   ██████████████████████████████████████

12   ████████████████

13   Q.  Are you familiar with cognitive behavioral therapy?

14   A.  Yes, I am.

15   Q.  Who is cognitive behavioral therapy?

16   A.  Essentially, cognitive behavioral therapy is based on

17   the premise that an individual's thinking is related to how

18   they feel and behave.

19        So if somebody comes in and they're not liking the

20   way that they're behaving or that they're feeling a certain

21   way, that they don't like the way they're feeling, in CBT

22   we're focused on identifying the thoughts that are

23   contributing to the behavior and that are contributing to

24   the emotional intensity or just an emotion that they don't

25   like, that they find aversive.  We call that distorted

1    thoughts or irrational thinking.  And we would attempt to

2    help them identify and then alter that thought pattern,

3    hence to have a different behavior and a different emotional

4    experience.







Q.  And you don't have the ability to prescribe medication;
is that correct?
A.  That's correct.

1    Q.  Do you have personal professional experience observing

2    people and treating people with this or similar disorders

3    that have received medication?

4              MR. JEFFRESS:  Your Honor, I'm going to object

5    here.

6              I think the point is that she's only qualified as

7    an expert in the field of forensic psychology.  As

8    Mr. Miranda just pointed out, she's not allowed to prescribe

9    medication.  She has not been trained professionally on the

10   use of medication, side effects, anything like that.  I

11   don't think she's competent or it's within her field of

12   expertise to testify about the effects of medication.  It

13   seems like he's -- Mr. Miranda is not even asking for an

14   expert opinion, but a personal opinion.  I don't think

15   that's relevant.

16             So --

17             THE COURT:  Mr. Miranda, it's personal opinion.

18   But do you want to respond otherwise?

19             MR. MIRANDA:  Your Honor, it's not intended to be

20   a personal opinion, nor is it intended necessarily to be an

21   expert opinion.  It is simply whether she in her

22   professional course has observed and treated patients under

23   certain conditions and what she has been able to observe.

24             THE COURT:  I think in terms of observations,

25   knowing whether they've had medication or not, I think it's

1    limited.  But I think she can certainly discuss what she's

2    observed, without getting into side effects and all the

3    other things relating to medications.

4            So you need to reword it.

5            MR. MIRANDA:  Yes, your Honor.

6    BY MR. MIRANDA:



Armstrong - DIRECT - By Mr. Miranda





Q.   What about competency restoration sessions?

A.   Again, competency restoration, those are just

psychoeducational groups.  They do not focus on treatment.

So I don't provide treatment; I just provide the

psychoeducational piece.  And then eventually, we work on

applying that in a broader way, so applying what they've

learned to their case, to the court process in general.

And then if somebody needs more than that, that's

when I refer them to psychiatry or another psychologist

who's not the evaluator that can maybe do some treatment,





Q.  And can you speak a little bit to the difference between

treating a patient in a private, acute-care psychiatric

setting or a hospital versus a course of treatment within

the BOP?

A.  Without working in the hospital setting, my guess or my

understanding is that, you know, entering the ER or an

1    inpatient facility, there's a particular goal to be met.

2    The goal may be different.  For example, there I would

3    assume it would be to either manage the emergent situation

4    and either refer the person to outpatient or they're

5    released.  It's not a place they would stay for a

6    particularly long time.

7            In the BOP, we -- I guess it depends what the type

8    of evaluation is or the length of study period is related to

9    forensic.  We spend quite a significant period of time

10   attempting to help individuals experience symptom reduction.

11   And we'll utilize the full length of time that they're

12   permitted to be here to do so.

13   Q.  So I believe that you partially addressed this.  But

14   could you go into just a little more detail about how the

15   goal in that kind of acute or hospital setting differs from

16   the goal of the BOP competency restoration setting, which

17   you're a part of?

18           MR. JEFFRESS:  Your Honor, I'm going to object

19   here.

20           I don't think she has any experience in the

21   hospital setting.  It seems to me her entire experience is

22   based at BOP, judging from her CV and from what she was

23   qualified in.

24           THE COURT:  I think, Mr. Miranda, that she has

25   indicated in her answer that she does not -- she has not

1    worked in a private hospital.  So her experience has been in

2    BOP.  So I think her making assumptions is not going to

3    work --

4              MR. MIRANDA:  Yes, your Honor.

5              THE COURT:  -- unless you clarify she has had some

6    experience in some way, because she indicated herself that

7    she does not.  So unless you have something else you want to

8    add, I'll sustain the objection.

9              MR. MIRANDA:  Yes, your Honor.  I understand.

10   BY MR. MIRANDA:

11   Q.  Could you then explain a little bit about the goal of

12   the BOP competency restoration setting?

13   A.  The goal of the BOP's competency restoration is to

14   reduce an individual's symptoms enough to the degree that

15   they can meaningfully participate in the process and

16   proceeding and meaningfully participate in their defense.

17   That might require maybe a longer length of time.  ███████

18   ███████████████████████████████████████████████████

19   ███████████       We want to get them to the point that they

20   can have a fair trial by being able to understand and

21   participate in the court proceedings and improve -- you

22   know, through treatment, improve the quality of life as much

23   as we can.

24   ██████████████████████████████████████████████████

25   ██████████████████████████████████████████████

Armstrong - DIRECT - By Mr. Miranda



16    MR. MIRANDA:  Thank you.  Those are all of the

17    questions that I have.

18        Your Honor, I do have a procedural point before I

19    let the witness step down, which is although the parties

20    have agreed on the exhibit list and the exhibits, I don't

21    believe that any of the exhibits, to include Dr. Armstrong's

22    forensic reports, have been formally moved into evidence.

23    And I believe the parties would stipulate to that.

24        MR. JEFFRESS:  Your Honor, we agree to that.  The

25    one copy that we have is that with respect to

Armstrong - DIRECT - By Mr. Miranda

1    Dr. Armstrong's report, which is Government's Exhibit 2, it

2    does have various opinions about -- you know, there's a

3    substantial likelihood that Mr. Beler would be restored to

4    competency through medication.

5         I think we have objected to that in her testimony.

6    And I think we would also say that those parts of the report

7    should not be considered as part of the evidentiary record

8    because that goes beyond her expertise.

9         Now, they also have a psychiatrist, who's

10    Dr. Cuccio, who's coming up to testify.  I think those parts

11    of her report we're not objecting to.  But I think for

12    Dr. Armstrong, because of her -- what she was qualified in,

13    we do object to her offering an expert opinion on the

14    substantial likelihood to restoring competency through

15    medication.

16         THE COURT:  Mr. Miranda, what's your response?

17         MR. MIRANDA:  (No audible response.)

18         THE COURT:  Mr. Miranda, do you want to respond?

19         MR. MIRANDA:  Oh, I'm sorry, your Honor.  I think

20    I was accidentally on mute.

21         Your Honor, while she cannot provide an expert

22    opinion on that, she can testify to that conclusion based on

23    her observations; ████████████████████████████████████████

24    ████████████████████████████████████

25         THE COURT:  The --

1          MR. MIRANDA:  ████████████████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████

4   ████████████

5          THE COURT:  I think, Mr. Jeffress, I'm not going

6   to excise that from the report.  I would fully agree she

7   cannot opine about the medication from a psychiatric

8   perspective.  I think she has testified, though, to her

9   observations ████████████████████████████████████████████

10  ████████████████████████

11         So it's a very limited basis or grounds for her.

12  But I'll put it in the context of her testimony, which

13  clearly is very limited.

14         MR. MIRANDA:  Okay.

15         THE COURT:  I'll allow the report to be admitted.

16         So which exhibits are being requested to be

17  admitted, Mr. Miranda?

18         MR. MIRANDA:  I believe, your Honor, if we are

19  doing it via stipulation, I believe that the parties agree

20  to the admissibility of all the exhibits on the exhibit

21  list.  That would be --

22         THE COURT:  Mr. Jeffress, are you agreeing to

23  that?

24         MR. JEFFRESS:  Yes, your Honor.

25         THE COURT:  If it's all of them, all of the

1    exhibits, that's fine.

2            MR. JEFFRESS:  We have a specific list, your

3    Honor.  It's Government's Exhibit 1, which is

4    Dr. Armstrong's CV; 2, the forensic evaluation by

5    Dr. Armstrong, which, other than our objection that the

6    Court just ruled on, we agree to; 3 is Dr. Cuccio's CV;

7    Government's Exhibit 4 is the forensic addendum and

8    treatment plan by Dr. Cuccio; and then Government's Exhibit

9    5 is a *Sell* index by Butner that we agree to the admission

10   of.

11           And then there's a number of joint exhibits and

12   also defense exhibits, whenever your Honor would like.

13           THE COURT:  Okay.  Why don't we do at least the

14   Government ones so that we have a record that indicates that

15   without objection, other than my ruling, which narrowly gave

16   the grounds for Dr. Armstrong's conclusions about the

17   efficacy of medication, it would be strictly based on her

18   observations and what she testified to.  So I would look at

19   what she said in her testimony, which is obviously a more

20   limited grounds.

21           Government's Exhibit 1 through 5, then, I will go

22   ahead and admit without objection, other than what we've

23   discussed.

24           (Whereupon, Government's Exhibit Nos. 1 through 5

25   were entered into evidence.)

```
 1              THE COURT:  The joint exhibits, you can decide
 2    when you want to have those admitted.  Do you want to admit
 3    them now or later?
 4              MR. JEFFRESS:  I think we should probably admit
 5    them now, your Honor, only because there are certain ones
 6    that I plan to offer in cross.
 7              THE COURT:  Which ones are they?
 8              MR. JEFFRESS:  Joint Exhibits 1 -- if we want to
 9    do them all at once, it's Joint Exhibits 1 through 16, your
10    Honor.
11              THE COURT:  1 through 16?
12              MR. JEFFRESS:  Yes.
13              THE COURT:  Mr. Miranda, I assume you have no
14    problem with that?
15              MR. MIRANDA:  (No audible response.)
16              THE COURT:  You have to unmute.  Mr. Miranda?
17              MR. JEFFRESS:  I think he's frozen.
18              THE COURT:  We're having problems with people
19    coming in and out.
20              MS. CONNOR:  Your Honor, this is Jennifer Connor.
21              Mr. Miranda just messaged me that he got kicked
22    out and he's trying to log back in.
23              THE COURT:  Okay.  Then we'll wait a moment.
24    Unfortunately, we have more people than usual on, and that
25    does create some issues.
```

```
 1              THE COURT REPORTER:  Judge, while we have a short
 2    break, could I ask Dr. Armstrong for an email?  There were
 3    some skips in the audio, and I need to clarify some sections
 4    of the testimony with her.
 5              THE COURT:  Could you give us an email?  It would
 6    make it easier for the court reporter.  Dr. Armstrong, could
 7    you give us your email, which we'll put under seal on the
 8    record?
 9              THE WITNESS:  Yes.  If it would be okay, I'd
10    rather not have it out there as personal information.
11              THE LAW CLERK:  Do we need to make sure the public
12    line is not open?
13              THE COURT:  It is open.  I think what we'll have
14    to do is set something up at the end where she will send an
15    email to chambers and we will pass it on, because the public
16    line is open.
17              Is that correct, Dorothy?
18              THE COURTROOM DEPUTY:  Yes.  I will also need a
19    copy of the exhibit list, if they could email that to me
20    also.
21              THE COURT:  All right.
22              THE COURTROOM DEPUTY:  I need that.
23              THE COURT:  So we'll handle it that way in terms
24    of having it sent to chambers.  We're required to have an
25    open line unless cases are sealed or somebody has asked for
```

1    something not to be on the public line.  And this hearing

2    would have been conducted in an open courtroom.

3            So they've given -- they've sent me some of the

4    exhibits, but I think they should send it directly to the

5    deputy courtroom clerk.

6            Mr. Miranda, you got kicked off.  But what we were

7    asking for -- I had admitted Government's Exhibits 1 through

8    5.  The joint exhibits, 1 through 16, they were asking to

9    have admitted.

10           I assume that that's fine with you?

11           MR. MIRANDA:  Yes, your Honor.

12           THE COURT:  Okay.

13           (Whereupon, Joint Exhibit Nos. 1 through 16 were

14   entered into evidence.)

15           THE COURT:  Presumably, Mr. Jeffress, you will

16   indicate at some point which defense exhibits you wish to

17   have admitted.  Am I correct?

18           MR. JEFFRESS:  Yes, your Honor.

19           THE COURT:  All of these need to be sent not only

20   to the -- though you have emailed them to me and to my law

21   clerk, we do need to have that sent, the actual exhibits,

22   along with the list, so that it's made part of the public

23   record.

24           THE COURTROOM DEPUTY:  Actually, Judge, all I need

25   is the list.  Since you already have copies of the exhibits,

```
 1    I just need the list itself.
 2              THE COURT:  Okay.  Then we'll just keep it to the
 3    list.
 4              Is it Mr. Jeffress?  I take it you're the one
 5    that's going to be doing the cross-examination?
 6              MR. JEFFRESS:  Yes, sir.
 7              THE COURT:  Go ahead.
 8                        CROSS-EXAMINATION
 9    BY MR. JEFFRESS:
10    Q.  Dr. Armstrong, good morning.
11    A.  Good morning.  Can you me?
12    Q.  I can hear you fine.
13              If you could just stay there, though.  You're on
14    the very edge of the camera.  I can see you fine; but if you
15    move a little to your left, then I start -- I lose you.  No.
16    No.  To the right.  I'm sorry.
17    A.  This side?
18    Q.  Yes.  Thank you.
19    A.  Okay.
20    Q.  I just wanted to ask a couple questions to clarify your
21    direct examination on your role with respect to Mr. Beler.
22    Okay?
23    A.  Okay.
24    Q.  So you have not served as a therapist to Mr. Beler.
25    Correct?
```

1    A.  Correct.

2    

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    Q.  So your role has strictly been as an evaluator for

22    purposes of evaluating Mr. Beler and preparing the report

23    that has been admitted as Government's Exhibit 2, your

24    report.  Correct?

25    A.  Correct.

1    Q.  And you said that in preparing that report, you said --

2    I'm sorry.  Withdrawn.

3             You said you've seen hundreds of patients --

4             THE COURT:  Somebody doesn't have their microphone

5    muted.  You need to mute your microphone when you're not

6    speaking.

7             THE WITNESS:  Could you hold on one second?  There

8    was some yelling here.

9             Okay.

10   BY MR. JEFFRESS:

11   Q.  You said you've seen --

12   A.  I'm sorry.

13   Q.  You said you've seen hundreds of patients with

14   ████████████████████████████  Is that right?

15   ██████████████████████████████████████

16   ██████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████

19   ███████████████████████████████████

20   ██████████████████

21   Q.  Let me ask you this:  Does Fort Worth -- do you have a

22   psychiatrist on staff there?

23   A.  We have a telehelp psychiatrist and we have a psychiatry

24   nurse practitioner.

25   Q.  But in terms of someone who works at the facility, a

Armstrong - CROSS - By Mr. Jeffress

1    psychiatrist is only available through telehelp?

2    A.  Currently.  The one we had previously, he departed.

3    Q.  And when did that person depart?

4    A.  I wouldn't know to be exact.  I would guess maybe

5    December of last year.

6    ██████████████████████████████████████████████████████

7    ████████████████  treatment.  Correct?

8    A.  I'm not aware of that, unless she saw Mr. Beler.  Not

9    that I'm aware of.

10   Q.  Not that you're aware of.  Okay.

11   █████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████

13   ████████████████

14   ██████████████████████████████████████████

15   Q.  Now, if you know, why doesn't Fort Worth have a

16   psychiatrist on staff?

17   A.  Well, we had a psychiatrist.  And when we actually

18   needed to hire a second one, our first one departed.  And

19   it's a process for government employment.  And then we

20   experienced the COVID pandemic, which made it even more

21   difficult to hire one on staff.

22   Q.  Okay.  So ideally, you would have one on staff there at

23   the facility.  Is that fair?

24   A.  We would like to have one.  Typically, yes.  Many of our

25   mainline institutions don't have them on site.  But at our

1    medical centers, we prefer, yes.  It's ideal to have one or

2    at the very minimum a nurse practitioner.

3    Q.  Is a nurse practitioner allowed to prescribe narcotics

4    in the state of Texas?

5    A.  Narcotics?

6    Q.  What's that?

7    A.  Narcotics?

8    Q.  Prescription drugs.

9    A.  Yes.

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   Q.  Okay.  Now, turning to Mr. Beler's procedural history of

14   his case, you have reviewed that history.  Correct?

15   A.  Of his legal case?

16   Q.  Yes.

17   A.  Yes.

18   Q.  And you know Mr. Beler made his initial appearance in

19   the case on April 17th, 2019.  Correct?

20   A.  Without looking at the records, yes.

21   ████████████████████████████████████████████████████████

22   ██████████████████████████████████████████

23   ███████████████████████████████████████████

24   ██████

25   ████████████████████████████████████████████

1  ████████████████████████████████████████████

2  ██████████

3  ███████████████████████████████████████████

4  ████████████

5  ████████████████████████████████████████████

6  ███████████████

7  ████████████████████████████████████████████

8  ██████████████████████████████████

9  Q.  And then so Mr. Beler -- the first federal facility

10  Mr. Beler went to was not FMC Fort Worth, but was FCI

11  Englewood.  Is that correct?

12  A.  That's correct.

13  Q.  And Mr. Beler arrived there on May 31st, 2019.  Is that

14  right?

15  A.  I'm going to have to look at my report.  But that sounds

16  right from the best of my recollection.

17  Q.  The purpose of that stay at FCI Engelwood was to

18  determine Mr. Beler's competency to stand trial.  Correct?

19  A.  That's correct.

20  Q.  And the evaluation was performed by Dr. Jessica Micono,

21  M-I-C-O-N-O, a Bureau of Prisons psychologist like yourself.

22  Is that right?

23  A.  That's correct.

24  Q.  And you have reviewed Dr. Micono's report in the

25  preparation of your report in preparation for your

1    testimony.  Is that right?

2    A.  Yes.

3    Q.  And her report is dated July 29, 2019.  Does that sound

4    about right?

5    A.  It sounds about right.  Without looking at it, again, I

6    couldn't tell you exactly.

7    Q.  So that would be about two months after he arrived at

8    the facility on May 31st, 2019?

9    A.  If the dates are correct, yes.

10   Q.  And you generally -- having reviewed Dr. Micono's

11   report, you generally concur, right, with the observations

12   and the comments and the findings in her report?

13   A.  Most of them, yes.

14   Q.  And her report has been admitted as Joint Exhibit --

15   let's see.  I have to get the number here.  Hold on.  That's

16   Joint Exhibit No. 6, Dr. Micono's report, which has already

17   been admitted.

18          On Page 3 of your report, which is admitted as

19   Government's Exhibit 2, you know, you state that

20   "Mr. Beler's psychosocial history was gleaned from the prior

21   evaluation."

22          Do you recall writing that in your report?

23   A.  Yes.  At the initial time of that report from March,

24   yes.

25   Q.  Of your March report, which is Government's Exhibit 2.

1     Correct?

2     A.  Yes.

3     Q.  And when you mean "the prior evaluation," you mean

4     Dr. Micono's evaluation?

5     A.  Yes.

6     Q.  So Dr. Micono essentially did the entire psychosocial

7     history for Mr. Beler, and then you borrowed that segment of

8     Dr. Micono's report to incorporate into your report.  Is

9     that right?

10    A.  I may have integrated parts.  I did not repeat it.  So

11    when I have my own psychosocial section, if what the

12    individual reports to me is pretty consistent, I won't

13    repeat it by writing it if the report has it previously.

14    Q.  I'm sorry.  I kind of lost you a little there.  Can you

15    repeat that?

16    A.  Sorry.  Yes.

17          So I may have integrated some of what she put in

18    her psychosocial report.  I didn't write up a psychosocial

19    myself, if that makes sense.  So when I interview somebody

20    and it's pretty consistent with the previous evaluator's

21    report, particularly in the institution, I won't repeat it

22    just for the sake of -- because the Court has already has

23    it.

24    Q.  And in fact, what you noted in your report was that,

25    quote, "No discrepant information has been obtained."

1    Right?

2    A.  At that point in time.  At the point of that report.

3    Yes.

4    Q.  Meaning that you didn't see any information that was --

5    you did not know of any information that contradicted what

6    was contained in Dr. Micono's report.  Correct?

7    A.  In talking to Mr. Beler at the time of that report, he

8    did not report himself anything that was inconsistent.

9    Q.  And since the time that you submitted your report,

10   Exhibit 2, have you found out any additional information

11   that contradicts what Dr. Micono said?

12   A.  I may have in the -- not necessarily contradicts, but

13   maybe added to it.  I don't know without looking at it

14   directly, because I haven't been able to review more of the

15   record.  I have been able to get information more from

16   Mr. Beler.

17         But without looking, I don't know that there's

18   something that it directly contradicts.

19   Q.  Off the top of your head, at least, as you sit here

20   today, you're not aware of -- you're still to this day not

21   aware of any discrepant information.  Is that correct?

22   A.  Not at this moment off the top of my head.  Not without

23   looking at it.

24         THE COURT:  Well, do you want to look at the

25   report?  Instead of your guessing about it, if there's a

1    report that you would like to look at, I see no reason why

2    you can't do it.  Do you want to check on a report to answer

3    the question?

4    BY MR. JEFFRESS:

5    Q.  Sure.  If you want the opportunity to review it, that's

6    fine.  Do you have Dr. Micono's report and your own report

7    there?

8    A.  Yes.

9    Q.  Okay.

10        THE COURT:  Dr. Armstrong, let me let you review

11   them.  Review it and then just let us know when you're ready

12   to answer the questions.

13        (Brief pause in the proceedings.)

14        THE WITNESS:  Okay.  So from Dr. Micono's report

15   of June 29, are you talking about under Background

16   Information?

17   BY MR. JEFFRESS:

18   Q.  Let's start there.  Do you disagree with anything in

19   there?

20   A.  I don't remember Mr. Beler reporting anything

21   significantly different than there.  I saw additional things

22   that were not discrepant to that in his record; but

23   Mr. Beler didn't report anything different, to the best of

24   my recollection.

25   Q.  You reviewed all of Dr. Micono's report in preparation

```
1    for your report.  Right?

2    A.  In preparation for writing my report, yes.

3    Q.  And did you disagree with anything significant -- I'll

4    say that -- in Dr. Micono's report?

5    A.  Do you mean the entire report now?

6    Q.  Yes.

7    A.  Okay.  So not -- in viewing it now, █████████████

8    ███████████████████████████████████  no.

9    Q.  Sorry.  I didn't hear that last part.  What did you say?

10   A.  Not that I can see directly, although I didn't utilize

11   her review of the records in my report.  ██████████████

12   ██████████████████████████████

13   Q.  I still -- I'm sorry.  I'm still not hearing that last

14   past.  ███████████████████

15   ██████████████████████████████████████████████

16   ██████████████████████████

17   ███████████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████████████████████████████

20   ███████████████

21   ███████████████████████████████████████

22   ████████████████████████████

23   Q.  All right.  But in any event, you don't have any

24   significant disagreement with the information contained in

25   Mr. Micono's report?
```

1   A.  Not significant discrepancies.  No.

2   Q.  Okay.  We'll come back to that.

3           Dr. Micono found Mr. Beler incompetent.  Is that

4   right?

5   A.  I believe that's what she opined.

6   Q.  Okay.  And the Government and the defense concurred in

7   the findings from Dr. Micono's report and her

8   recommendation.  Correct?

9   A.  Yes.

10  Q.  And then on August 14, 2019, Magistrate Robinson entered

11  an order committing Mr. Beler to the Attorney General for up

12  to 60 days, but not to exceed four months.  Is that correct?

13  A.  Correct.

14  Q.  And that was to determine whether Mr. Beler might attain

15  competency.  Right?

16  A.  Yes.

17  Q.  Then do you recall that as of October 7th, seven weeks

18  afterwards, after the order had been entered, Mr. Beler was

19  still at the DC Jail?  Do you recall that?

20  A.  I imagine that's where he was.  He was not here.  I do

21  know that.

22  Q.  So the case was dismissed at that point for failure to

23  transport him in a reasonable time.  Is that right?  Do you

24  recall seeing that?

25  A.  I don't recall that, but I do remember reading something

Armstrong - CROSS - By Mr. Jeffress

1   about it being dismissed at some point.

2   Q.  Okay.  And then he was rearrested on November 7th and he

3   arrived five weeks later at FMC Fort Worth on December 19th.

4   Is that right?

5   A.  I believe so.  Yes.

6   Q.  So he's now been at Fort Worth working with -- and

7   you've been evaluating him for seven and a half months.  Is

8   that right?

9   A.  Since December.  Yes.

10  Q.  Okay.  And all in all, since April 17th, 2019, the date

11  of his arrest -- we can take out the one month where he

12  was -- the case had been dismissed and he was released -- he

13  has been in custody now for 15 months.  Does that sound

14  right?

15  A.  He's been in custody for 15 months since the arrest in

16  November?

17  Q.  No; since the arrest -- since his original arrest in

18  April.

19  A.  April.

20  Q.  April of 2019.

21  A.  That sounds about right.

22  ████████████████████████████████████████████████████

23  ████████

24      ████████████████████████████████████████████████████

25  ██████████████████



1

2   Q.  And those records are listed out on Page 2 of your

3   report, Page 2 to 3.  Is that right?  It's Exhibit 2.

4   A.  Oh, you mean the list of what I did review?

5   Q.  Yes.

6   A.  Yes.  The numbers.  Yes.

7   Q.  And how old is Mr. Beler?  Do you know?

8   A.  I believe he's 40, from the health records.

9   Q.  That's right.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Armstrong - CROSS - By Mr. Jeffress

65



Armstrong - CROSS - By Mr. Jeffress



Q.  Okay.  And you reviewed those records?

A.  One more time.

Q.  You reviewed all of those records in preparation of your

report?

1    A.  I reviewed the records.

2    Q.  And how many pages would you estimate those records

3    would constitute?  Is it about 4,000 pages?  Does that sound

4    about right?  More or less?

5    A.  It's a pretty significant amount of pages.  It took up a

6    couple of boxes.  So I guess probably over a thousand.

7              THE COURT:  Let's say it's substantial and move

8    on.

9    BY MR. JEFFRESS:

10   Q.  You said it took up a couple of banker's boxes?

11   A.  Yeah.  It's a pretty substantial amount.

12   Q.  And as we talked about at the beginning, they span a

13   period of 18 years?

14   A.  Yes.  It seems like it.

15   ███████████████████████████████████████████████

16   ███████████████████████████████████████████

17   ██████████████████████████████████████

18   ███████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████

21   ███████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████████████████████

24   ███████████████████████████████

25   Q.  You can refer to your report, if you'd like.  Just

Armstrong - CROSS - By Mr. Jeffress

1    please tell me you're doing it.  But that's fine.



69



Armstrong - CROSS - By Mr. Jeffress

1

2

3

4

5

6

7

8

9

10

11

12

13

14        THE COURT:  Do you know on the record one way or

15   another?  He's making a hypothetical.

16   BY MR. JEFFRESS:

17   Q.  If you don't know, you don't know.  But anyway, we'll

18   find a way to put it in later.

19

20

21

22

23

24

25

Armstrong - CROSS - By Mr. Jeffress

1    Q.  In a voluntary hospitalization, a patient can discharge

2    himself at any time.  Correct?

3    A.  Yes.  Yes.



Armstrong - CROSS - By Mr. Jeffress







17          THE COURT:  Mr. Jeffress, you're now confusing

18    things.  You have to reword this.  I'm having trouble

19    following you as well.

20    BY MR. JEFFRESS:

75



1

2

3

4

5

6   Q.  Have you reviewed the interrogation of Beler conducted

7   by the Metropolitan Police Department and the FBI, I think,

8   at his apartment on the day of his arrest?

9   A.  A while back.

10

11

12

13

14

15

16

17  Q.  Now, you've seen Mr. Beler.  When you've seen him,

18  you've seen him in the controlled setting of Fort Worth, FMC

19  Fort Worth.  Correct?

20  A.  Yes.  A limited controlled setting.  But yes.  A

21  controlled setting.

22

23

24

25

Armstrong - CROSS - By Mr. Jeffress

1    ████████████████████████████████████████████

2    Q.  I'm sorry.  What was that last thing?

3    A.  If we're talking specifically about offenders with

4    mental illness, do they appear more healthy?  Is that what

5    you asked?

6    Q.  Do they present as healthy as in the real world or in a

7    controlled setting or do they usually present as less

8    healthy in a controlled setting, if you can say?

9    A.  I would imagine they'd present as -- generally present

10   similarly, if not slightly -- well, it depends.  The stress

11   of being in prison can make some appear less healthy.  Some,

12   the structure of the prison environment and the accessible

13   mental health staff regularly on the unit and the assistance

14   they get with ADL, activities of daily living, may make them

15   appear a little healthier.

16   Q.  And sometimes substantially healthier.  Right?

17   A.  I mean, can you repeat that?

18   Q.  Withdrawn.  Never mind.

19          Now, you mentioned -- we talked about Dr. Micono's

20   report from FCI Englewood.  Correct?  That was Exhibit 6,

21   Joint Exhibit 6, I think.

22   A.  Correct.

23   ████████████████████████████████████████████

24   ██████████████████████████████████

25        ████████████████████████

Armstrong - CROSS - By Mr. Jeffress



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Q.  And just going back to your report, you have said on

19    Page 9, where you summarize your findings, that

20

21

22

23

24

25

Armstrong - CROSS - By Mr. Jeffress

1          Right?

2   A.  I think so.  I'm trying to see where you're reading

3   from.

4   Q.  And you maintain that opinion even though the report was

5   submitted on March 18th, 2019?  Do you maintain that opinion

6   today?

7   A.  What paragraph are you reading from?

8   Q.  Sure.  It's under Opinion regarding 4241B.

9   A.  Thank you.  Yes.





1

2

3

4

5

6

7

8

9

10

11    Q.  We'll get to that.

12            Now, in the medical records, there is evidence

13    of -- I want to change to a different subject.  Okay?

14

15

16

17

18

19

20    Q.  Okay.  And --

21            THE COURT REPORTER:  Sorry.  This is the court

22    reporter.

23            Doctor, could you repeat your response?

24            THE WITNESS:  My response?  Yes.

25

Armstrong - CROSS - By Mr. Jeffress

1  ████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████

5  ████████████████

6  ██████████████████████████████

7  ██████████████████████████████

8          THE COURT:  Let's not have guessing.  If the

9  records are there and you can refresh your memory, go ahead

10 and do so.

11         THE WITNESS:  Okay.  Yes.  ████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ██████████████████████████████████████████████████

15 █████████████████

16 █████████████████

17 ████████████████████████████████████████████

18 █████████████████████████████

19 ██████████

20 Q.  I want to talk to you about Mr. Beler's history.  Okay?

21 Did you review the educational history of Dr. Micono's

22 report?

23 A.  Yes.

24 Q.  Okay.  And you saw that he was never suspended or

25 expelled from school at any point in time?

1    A.  Yes.

2    Q.  And I think we've established Mr. Beler is 40 years old.

3    Correct?

4    A.  Right.

5    Q.  Are you aware of any other criminal cases other than

6    this one that Mr. Beler has ever had in those 40 years?

7    A.  Not that I'm --

8    Q.  Neither as a juvenile nor as an adult.  Correct?

9    A.  Right.

10   Q.  As far as you're aware, has Mr. Beler ever been arrested

11   prior to this case?

12   A.  I don't think so.





1

2

3

4    Q.  And I see Mr. Beler is sitting there in the room with

5    you today.  Correct?

6    A.  Yes.

7    Q.  And is he restrained?

8    A.  No.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  All right.  Well, let's go to Page -- do you have your

2    report there?

3    A.  Uh-huh.

4    Q.  Let's go to Pages 8 and 9 of your report, if you can

5    review that.  Do you see the Forensic Assessment section

6    down towards the bottom of Page 8, which is --

7    A.  Yes.



Armstrong - CROSS - By Mr. Jeffress



85





Armstrong - CROSS - By Mr. Jeffress



17          THE COURTROOM DEPUTY:  Excuse me, Judge.  Can I

18     interrupt for a minute?

19          THE COURT:  Yes.

20          THE COURTROOM DEPUTY:  Can the Doctor ask how long

21     do we have?  Because John doesn't know how long that

22     telecast will go on.

23          MR. JEFFRESS:  I don't have too much longer, but

24     we have two other witnesses, too.

25          THE COURT:  I think we had set it up, at least on

 1    the calendar -- I don't know if that's what they had up -- I

 2    had from 11:00 to 3:30, because I knew we had three

 3    witnesses.

 4               THE COURTROOM DEPUTY:  He had a time that they cut

 5    off at the jail.

 6               THE COURT:  She's asking whether BOP has a time

 7    frame where they'll cut us off.  Do you know, Dr. Armstrong?

 8               THE WITNESS:  I think they set it up to start at

 9    9:00 and then go through noon.  And I think it cuts off

10    automatically or it allows you to reconnect.

11               THE COURT:  Is it something you can check into?

12    Because we have issues about the timing of it.

13               Can John check with the facility so we can

14    continue with the testimony?

15               THE COURTROOM DEPUTY:  Well, he emailed me and

16    asked me to ask, because apparently they didn't tell him

17    that information.

18               THE COURT:  I don't think she knows, is my point.

19               THE COURTROOM DEPUTY:  Oh, okay.

20               THE COURT:  Dr. Armstrong, do you know if they'll

21    cut it off at a certain time or not?

22               THE WITNESS:  I think it does.  This is a

23    different system.  So I think it will cut it off at noon.

24               THE COURT:  Which is 15 minutes from now, I

25    assume.

1           So I guess the question is:  Is there something

2    they can do to make sure it's longer than that so we can

3    finish this?  Who do we have to talk to about that?

4           THE WITNESS:  I can find out.

5           THE COURT:  I assumed that they knew with three

6    witnesses that this wouldn't be short, which is why I asked

7    to put the time frame until 3:30.  Now, I thought it was

8    starting at 11:00, but that's a different matter.  It still

9    was supposed to go for some time, because we have three

10   witnesses.

11          THE WITNESS:  Right.

12          THE COURT:  Dr. Armstrong, can we continue with

13   the questioning while you check or is this something that --

14          THE WITNESS:  I'm trying to check.  Until 12:45.

15   And then I probably can check to see if it can get set up to

16   call back in.

17          THE COURT:  So we'd have to call back in and start

18   all over?

19          THE WITNESS:  I'm not sure.  I've never had --

20   [indiscernible] a computer services tech.

21          THE COURT:  I can't understand you.

22          THE WITNESS:  I'm not sure.  We're trying to find

23   out with our computer services tech right now.

24          THE COURT:  Okay.

25          THE COURT REPORTER:  Judge, if we get cut off, I'm

Armstrong - CROSS - By Mr. Jeffress

1    afraid I'll lose my opportunity to get the witness's email.

2    I'm happy to give her mine, if that's permissible.  But I

3    need to contact her for some places where the audio went

4    out, if I can.

5          THE COURT:  I'm hopeful we're going to go beyond

6    that.  But yes.  I don't have a problem while we're waiting

7    to find out how long it is what the email is.  But I believe

8    that --

9          Jamie, do we have Dr. Armstrong's email?

10          THE LAW CLERK:  Yes, Judge.

11          I can give it to you.

12          THE COURT REPORTER:  Thank you.

13          THE COURT:  While we're waiting to find out

14    whether we can -- whether we have to restart it, why don't

15    we continue with at least the questioning.

16          MR. MIRANDA:  Okay.

17          THE WITNESS:  Okay.

18          MR. MIRANDA:  Thank you, your Honor.

19          THE COURT:  We can continue until we get the

20    answer.

21    BY MR. MIRANDA:

22    ███████████████████████████████████████████████

23    ████████████████████████████████████████████

24    ████████████████████████████████████████████████

25    ████████████████████████

Armstrong - CROSS - By Mr. Jeffress

1 ████████████

2 ██████████████████████████████████

3 ████████████

4          MR. MIRANDA:  The Court's indulgence.  The light

5 keeps going on here.  I don't know why.

6 BY MR. MIRANDA:

7 ████████████████████████████████████████

8 █████████████

9 ██████████████████████████████████████████

10 ████████████████████████████████████

11 ███████████████████

12 █████████████████████████████████████

13 ████████████████████████████████████

14 ███████████████████

15 ████████████

16 ██████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████

19 Q.  I mean, let's look at Page 5 of your report.

20          THE COURT:  It says at the top here something

21 about "To extend meeting, please call video support."

22          Who's video support?

23          THE WITNESS:  Probably our computer tech guy.

24 Somebody went to go get him.

25          THE COURT:  Can you do that or do we need to do

                Armstrong - CROSS - By Mr. Jeffress

1    that?

2                THE WITNESS:  Well, I have staff that are going to

3    go try and retrieve him.

4                THE COURT:  I was not able to understand that.  I

5    have a note that has shown up on the screen which I assume

6    everybody can see.  The first part I can't see.  It's

7    covered.  But the rest says "To extend meeting, please call

8    video support."

9                So --

10               THE WITNESS:  Yes.

11               THE COURT:  -- that's video support at your

12   facility?

13               THE WITNESS:  Yes.  And somebody is calling to --

14   went to go get him.

15               THE COURT:  So have we called or we need to call?

16               THE WITNESS:  Well, I don't know until they speak

17   with him.

18               THE AUDIOVISUAL TECHNICIAN:  Judge, excuse me.

19               THE COURTROOM DEPUTY:  I can tell the person I was

20   in contact with.

21               THE AUDIOVISUAL TECHNICIAN:  Judge, this is John.

22   I just happened to come in.

23               Yes.  I thought this might happen.  The BOP

24   probably only has that call set up for two or three hours.

25   I need to contact their computer services guy, Chance, and

Armstrong - CROSS - By Mr. Jeffress

1    see what he can do as far as extending it.  I'm going to try

2    to call him now.

3              THE COURT:  All right.  Can we continue while we

4    wait so we at least use as much time as possible?

5              THE AUDIOVISUAL TECHNICIAN:  Sure.

6              THE COURT:  So let's continue, then.  Obviously,

7    we're barely into the -- we're still on the

8    cross-examination of the first witness.  We have two more

9    witnesses.

10             MR. MIRANDA:  Yes.  Your Honor, may I resume?

11             THE COURT:  Yes.

12   BY MR. MIRANDA:

13   ███████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ██████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   █████████

20   ████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ███████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   █████████

Armstrong - CROSS - By Mr. Jeffress



1  █████████████████████████████████████████████

2  ████████████████████████████████████

3  ████████

4  ██████████████████████████████████

5  █████████████████████████

6  ████████████████████████████

7  ███████

8  ██████████████

9  BY MR. MIRANDA:

10  Q.  You don't have anything -- although you recount the *Sell*

11  standard, you don't have anything about side effects in your

12  report.  Is that right?

13  A.  Correct.  That would be something that Dr. Cuccio could

14  speak to.

15  Q.  So you don't opine on side effects because you are not a

16  psychiatrist.  Is that fair?

17  A.  Correct.

18  Q.  But Dr. Micono made a number of different observations

19  in her report regarding side effects.  Isn't that right?

20  A.  I think.  I'll look back at her report.  ████████

21  ████████████████████████████████

22  █████████████████████████████████████████

23  ████████████████

24  ███████████████████████████████████████

25  ████████████████████████████████

Armstrong - CROSS - By Mr. Jeffress



1    ▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮

6    ▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮

10   ▮▮▮▮▮▮▮

11   A.   What page of her report?  I remember reading it, but

12   what page are you on?

13   Q.   Page 8.

14   A.   Okay.

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮

Armstrong - CROSS - By Mr. Jeffress

1

2

3

4

5

6

7

8

9

10

11

12

13

14   Q.  And you've spoken to Mr. Micono.  Correct?

15   A.  I have not directly, no, other than to just ask her for

16   a copy of her report.

17

18

19

20        THE COURT:  You can't make her the witness for

21   Dr. Micono, Mr. Jeffress.  So let's move it along.  It's

22   sitting there with Dr. Micono.  Nobody has contradicted it.

23   I don't think she can say one way or the other,

24

25             But Dr. Micono gave her observations and

1    gave her reasons for what she thought the source of them

2    was.

3    BY MR. MIRANDA:

4    ████████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████

6    ████████████

7    █████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████

9    ███████████████████████████████████████████████

10   ████████████████████

11   ████████████████████████████████████████████████

12   ██████████

13   ██████████████████████████████████████████████

14   ███████████████████████████████████████████

15        ████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████

19   A.  Could you tell me what paragraph?

20   Q.  The first full paragraph.  Sorry.

21   A.  Okay.  That's okay.

22        THE COURT:  Is there a question?  We've lost her.

23   BY MR. MIRANDA:

24   Q.  Do you see that in the report --

25        THE AUDIOVISUAL TECHNICIAN:  Your Honor, I believe

Armstrong - CROSS - By Mr. Jeffress

1    the prison has left.  I'm on the phone with them right now.

2    I'll be right back in touch with you as soon as they confirm

3    on the phone.

4              (Brief pause in the proceedings.)

5              THE AUDIOVISUAL TECHNICIAN:  I see the Judge

6    stepped away.  I just spoke to the computer services

7    department down there at Fort Worth and they're going to

8    reconnect.

9              THE COURT:  Have we been able to continue or not?

10             THE AUDIOVISUAL TECHNICIAN:  Your Honor, this is

11   John.

12             I spoke to their computer division down there.

13   They're reconnecting momentarily.

14             THE COURT:  Oh, great.  Thank you so much, John.

15   I appreciate it.  How much longer do we have once they

16   reconnect?

17             THE AUDIOVISUAL TECHNICIAN:  I don't know what

18   their setting it.  I know ours is set to -- on our end, it's

19   set to expire at 4:30.

20             THE COURT:  Okay.

21             THE AUDIOVISUAL TECHNICIAN:  I don't know what

22   they're going to be able to set it to or if they have other

23   hearings this afternoon.

24             THE COURT:  Hopefully, we're done before that,

25   since I have an executive session at 4:00.

1           But anyway, how much -- I guess one question is

2     whether people want to take a quick break before we come

3     back.

4           MR. MIRANDA:  Judge, I only have about ten more

5     minutes of cross, so then I'll be done.  She'll be done

6     unless they have redirect, I guess, just for the Court's

7     consideration.

8           THE COURT:  Well, I'm just saying, if it's going

9     to take them ten minutes, this is the time for people to use

10    restrooms or whatever.  I'm not saying -- don't get off.

11    Just move out of the screen.  If it's going to be quick,

12    then let's stay on and move forward as soon as they're

13    ready.

14          THE AUDIOVISUAL TECHNICIAN:  Judge, let me call

15    them back, because they should have connected by now.  They

16    might be having problems.  Let me check with them again.

17          THE COURT:  Thank you.  I appreciate it.

18          (Brief pause in the proceedings.)

19          THE AUDIOVISUAL TECHNICIAN:  Judge, they -- it

20    should be any minute.  They had to reach out to the main

21    office here in DC to actually make the connection since it

22    timed out.  So that's why it's taken a few extra minutes.

23    He said it should be connecting momentarily.

24          THE COURT:  From our time, not Texas time, but our

25    time, roughly how long do we have it?

```
1            THE AUDIOVISUAL TECHNICIAN:  I think another three
2      hours.
3            THE COURT:  Hopefully we're not going to use up
4      all the three hours.
5            THE AUDIOVISUAL TECHNICIAN:  I think they
6      mentioned 4:00 Eastern time.
7            THE COURT:  At least we won't be timed out in the
8      middle of the hearing here.
9            (Brief pause in the proceedings.)
10            THE AUDIOVISUAL TECHNICIAN:  Judge, I think based
11      on the language that popped on the screen, that should be
12      them.
13            THE COURT:  I haven't seen them yet.
14            DR. CUCCIO:  This is Dr. Cuccio.  I'm connected.
15            THE COURT:  But we're still missing Dr. Armstrong.
16      We had not finished the cross-examination of Dr. Armstrong.
17      I don't see her on there.  But you're on, so that's good.
18      Hopefully, it means the others will be coming on shortly.
19            THE WITNESS:  Can you all see me?
20            THE COURT:  There you are.
21            THE WITNESS:  I'm back.
22            THE COURT:  All right.  We're resuming.
23            So go ahead, Mr. Jeffress, with your next
24      question.
25
```

Armstrong - CROSS - By Mr. Jeffress

1    BY MR. MIRANDA:

2    Q.  Let me just go back to one thing quickly, Dr. Armstrong.

3    So I was asking you about the bottom of Page 8 of

4    Dr. Micono's report 

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Armstrong - CROSS - By Mr. Jeffress



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    BY MR. MIRANDA:

17    Q.  You talked about, you know, the restoration of Mr. Beler

18    to competency is obviously what you've studied, to see if

19    that's possible.  Correct?

20    A.  I studied if that was possible?

21    Q.  Yes.

22    A.  Yes.

23

24

25



9    Q.  Fair enough.

10         I want to talk about finally, you know, one thing

11    that you try to do is to establish a therapeutic alliance

12    with the patient.  Is that correct?

13    A.  A rapport.  Yes.

14    Q.  And I think you talked about trying to build rapport

15    with Mr. Beler.  Right?

16    A.  Yes.  Uh-huh.



Armstrong - CROSS - By Mr. Jeffress



Q.  Okay.

        MR. MIRANDA:  The Court's indulgence.

        That's all.

        Thank you very much, Doctor.

        THE WITNESS:  Thank you.

        THE COURT:  Mr. Miranda, anything further?

        MR. MIRANDA:  Very brief, your Honor.  Under five

minutes.

        THE COURT:  Go ahead.

                    REDIRECT EXAMINATION

1    BY MR. MIRANDA:



18              MR. MIRANDA:  Brief indulgence.

19              That's all I have, your Honor.  Thank you.

20              THE COURT:  If you'd give me just one minute to

21   look through my notes for a minute.

22              I don't have any additional questions at this

23   point.

24              So, Dr. Armstrong, thank you.  I appreciate your

25   taking the time.  I know it takes you away from other

Armstrong - REDIRECT - By Mr. Miranda

1    things.

2              So let's move to the next witness.  I don't know

3    whether you want to stay or leave.  It's up to you.

4              THE WITNESS:  Do you all need Mr. Beler to remain

5    here?

6              THE COURT:  He should remain because he should

7    hear what's happening.

8              THE WITNESS:  Okay.  I can find another custody

9    staff member to sit with him or I can sit with him.

10             THE COURT:  Presumably, we'll move to Dr. Cuccio,

11   Mr. Miranda?

12             MR. MIRANDA:  That's correct, your Honor.

13             THE COURT:  However you wish to do it,

14   Dr. Armstrong.  He should remain, but I don't think we have

15   an issue with who remains with him.

16             THE WITNESS:  Okay.  If I do go, it'll just be

17   another correctional worker being with him.

18             THE COURT:  That's fine.

19             (Witness excused.)

20             THE COURT:  Dr. Cuccio, I don't see you, but I

21   understand you're there.  Could you say your name?  Because

22   that way, you pop up.

23             DR. CUCCIO:  Yes, your Honor.  I'm here.  I'm

24   Dr. Cuccio.  Am I here?

25             THE COURT:  Yes.  All right.  Now I can see you.

1      All of us can see you, hopefully.

2              Dr. Cuccio -- now, the one question that I do have

3      before we start is, we've been going for quite some time.  I

4      don't have a problem.

5              But, Lisa, are you all right or do we need to take

6      a break?

7              THE COURT REPORTER:  Just, could I have just a

8      quick rest room break?

9              THE COURT:  Everybody can take a quick break.

10     Please come back as soon as possible so we can move this as

11     quickly as we can.

12             DEPARTMENT OF CORRECTIONS OFFICER:  We're going to

13     excuse him to use the rest room as well.

14             (Thereupon a recess was taken, after which the

15     following proceedings were had:)

16             THE COURT:  Let's at least start with Dr. Cuccio

17     at this point.

18             Do speak up.  I don't want -- if people are

19     diabetic or something and need to eat, I don't want to

20     create any issues for anybody.  For those that don't have to

21     say anything, you can sit there and eat as far as I'm

22     concerned.

23             We have Dr. Cuccio and Mr. Miranda.  Go ahead.

24             MS. CONNOR:  Actually, your Honor, this is

25     Jennifer Connor.  I'm going to be doing the direct of

1    Dr. Cuccio.

2                THE COURT:  That's fine.  Go ahead.

3                MS. CONNOR:  Thank you.

4                So, Dr. Cuccio, to start --

5                THE COURT REPORTER:  Excuse me.  The witness needs

6    to be sworn.

7                MS. CONNOR:  Oh, yes.  Thank you.

8            ANNE CUCCIO, M.D., GOVERNMENT WITNESS, SWORN.

9                        DIRECT EXAMINATION

10   BY MS. CONNOR:

11   Q.  To begin, could you please state and spell your full

12   name, Doctor?

13   A.  My name is Anne Elizabeth Cuccio.  It's spelled A-N-N-E

14   C-U-C-C-I-O, M.D.

15   Q.  Where do you work?

16   A.  I work for the Bureau of Prisons.

17   Q.  And physically, which location?  Or where is your office

18   within the BOP?

19   A.  My home base is in Minnesota, Rochester, Minnesota, at

20   the medical center here.

21   Q.  How long have you worked there?

22   A.  I have worked for the Bureau of Prisons for ten years,

23   but I have worked at this facility for about two and a half

24   years.

25   Q.  What is your position at this facility currently?

1    A.  Right now, I continue to do telepsychiatry.  I work via

2    VTC connection, so I work all across the country.  I

3    previously worked out of Oklahoma City, where they had

4    people coming and going, and there was a lot of

5    transportation doing VTC evaluations of people.

6              So I've done a variety of things for the BOP.  I

7    work for Fort Worth doing the forensic evaluations at the

8    moment; I've worked at Springfield doing hospitalized

9    patients over the VTC; and I also work out of the general

10   prisons and see the prisoners out of the regular prisons,

11   inmates.

12   Q.  Where did you obtain your education?

13   A.  Well, I did my undergraduate at the University of

14   Oklahoma.  I did medical school in Virginia, the Medical

15   College of Virginia in Richmond.  Then I did my residency in

16   San Antonio.  It was a very good general psychiatry

17   residency.  And then I did child fellowship extended

18   training in Oklahoma City.

19   Q.  What degree did you ultimately accumulate or finish that

20   education with?

21   A.  Oh, I have a medical doctorate.  I'm an M.D.

22   Q.  And when did you obtain that degree?

23   A.  1991.

24   Q.  Specific to that training, what education did you

25   receive with regard to clinical and forensic psychiatry?

1    A.  I have an undergraduate degree in psychology and I also

2    am further specialized in child psychiatry.  But I also have

3    further training through the American Academy of Psychiatry.

4              I had intended to board in forensic psychiatry,

5    but at the last minute did not board.  And so I went on to

6    just be a clinician and have worked with the Bureau for many

7    years and have done other clinical work in forensic

8    psychiatry.

9    Q.  And what is the difference with that child psychiatry

10   specialty?  What type of education does that give you in

11   addition to a more general psychiatry education?

12   A.  The child specialty tends to be about -- well, I got a

13   lot of grounding in lifeline kind of personality things and

14   dealing with developmental issues, dealing with children,

15   certainly, but I also dealt with how parents relate with

16   children, older people, relating through the whole period of

17   life.

18             So it helped me a lot in my forensic career, kind

19   of dealing with what's going to happen with people

20   personality-wise and behavior-wise.  And it helped me to do

21   less biologically oriented things.

22             So I'm more of a generalized clinician than just

23   someone who gives out a lot of medications.  I have more of

24   a psychodynamic bent.  I'm -- I understand psychological

25   testing.  I understand those kinds of things more than I

1  would if I were just limited to general psychiatry or even

2  forensic psychiatry.

3  Q.  What types of experience did you have prior to your

4  current employment?

5  A.  Before I worked for the Bureau, I actually worked as a

6  contractor for the Bureau for about eight years while I was

7  an academic psychiatrist.  And I worked both teaching

8  medical students in the adult section and I also taught

9  child psychiatry.  So I have a lot of academic experience.

10           And before that, I did about eight years of

11  forensic psychiatry with the State of Texas.  And that was

12  just plain old forensic psychiatry, where I treated people

13  to competency before *Sell*.  So people would come in from the

14  courts.  Maybe eight or ten people a week would be admitted

15  to my unit.  And I would write up their reports together

16  with the psychologist who did testing, and we would treat

17  them to competency and send them back to court when they

18  were competent, if they got competent.  And most of them

19  did.

20  Q.  How long were you engaged in that type of work in Texas?

21  A.  I worked for that facility about eight years.  But I was

22  on the competency unit for about two or three years.

23  Q.  So in those eight years, you said you admitted

24  approximately eight people per week.  Is that right?

25  A.  Yeah.  And beyond that, I worked on -- past that, I

1    worked on the unit where they admitted the people who never
2    got competent, and so I did other kinds of reports for the
3    court as well.  So I saw that longer population, too.
4                 But yes.  When I was on the competency unit, I
5    admitted lots of people.
6    Q.  So it sounds like you just said you had the opportunity
7    to see patients both that were able to obtain competency as
8    well as those that just could not be treated during that
9    period of time?
10   A.  Yes.
11   Q.  Did that experience help inform your knowledge base in
12   terms of why some people are restorable and others are not?
13   A.  Yes, yes.  Yeah.  I got a lot of experience in severe
14   mental illness and people who hadn't been treated and went
15   through the jail system.  It was completely different than
16   my training that I had in residency, let's say, when I went
17   to this facility, and completely different from my
18   experience out in the world treating private patients.  And
19   it was very different, actually, than my experience has
20   been --
21                 (Background noise.)
22                 I'm sorry.  I have a big air conditioner here.
23   I'll try and speak up over the noise.
24                 And it was different to a certain extent than my
25   experience actually has been with the BOP, too.

1    Q.  You just mentioned treating patients in private

2    practice.  What is your prior experience in treating

3    patients in private practice?

4    A.  For a time, I had my own private practice where I went

5    to actually places that saw people who usually had Medicaid,

6    like community care places.  And I went and did some

7    contract work with them.

8         But I also saw private care patients when I was an

9    academic psychiatrist.  That's how I made money.  That's how

10   they paid me.  So I kind of taught for free and I saw

11   patients on the unit and I saw my own private patients in my

12   office when I was an academic psychiatrist.

13   Q.  Going back to your eight years in Texas, you mentioned

14   that you admitted patients.

15   A.  Yes.

16   Q.  Did you also conduct competency evaluations?

17   A.  Oh, yes.  Many.

18   Q.  Do you have an approximation of how many competency

19   evaluations you conducted during that period of time?

20   A.  No.  I think the other day I tried to add it all up and

21   do the math.  And I would estimate maybe a thousand.  I did

22   so many reports.  I remember doing report after report after

23   report.  I saw many, many, many patients.  So yeah.  I did

24   many reports.

25   Q.  And you mentioned that this was prior to *Sell*, you said.

1    Correct?

2    A.  Yes.  Before *Sell*.

3    Q.  So none of these were in regard to whether or not they

4    should be involuntarily medicated.  Correct?

5    A.  Right.  If they were incompetent, then we said:  Okay.

6    You're not capable of understanding the risks and benefits

7    of treatment because you're psychotic.  You don't understand

8    that.  And therefore, you need treatment for your mental

9    illness.  And that was the criteria.

10            So:  We need to do this as a physician because you

11    have a serious mental illness; you have a serious problem.

12    And we gave them treatment.

13            There were patients there who we did not treat,

14    obviously, because maybe they came in and they were

15    malingering.  You know, they came in and we did the

16    diagnosis for them.  And so we would say:  This person has a

17    malingering diagnosis.  We then would send them back to the

18    court.

19            Or:  This person has dementia.  And so we're

20    treating them for something else.  Right?

21            Or:  This person is persistently psychotic.  We're

22    going to treat them for their psychosis.  And the ones who

23    have psychosis are the ones that are going to have the most

24    difficulty with getting treatment because they have poor

25    insight.  Those are the ones that are going to say:  No.  I

1    don't want treatment.  That's a component of psychosis.

2    Q.  But in that employment of yours, while it wasn't under

3    the *Sell* legal stricture, you still treated patients for

4    competency restoration with medication.  Correct?

5    A.  Absolutely.  Yes.  We treated them to competency.  90

6    percent of the patients I saw I treated to competency.

7    Q.  What is the difference between clinical and forensic

8    psychiatry?

9    A.  Like Dr. Armstrong said, forensic psychiatry is kind of

10   the intersection of psychiatry and the law.  So if you want

11   to be really strict about it, a forensic psychiatrist may be

12   practicing no clinical psychiatry whatsoever and they may

13   even have their own private practice and just do court

14   stuff.  They may understand, like, all of the case law.

15          And for instance, when I studied for the boards, I

16   had to know all the names of all the case law.  And that's

17   what forensic psychiatrists do:  They memorize like an

18   attorney, so they know the different cases.  But they're not

19   going to necessarily treat patients and do that clinical

20   stuff.

21          The clinical person has a whole different way of

22   thinking about things:  I'm going to treat people and take

23   care of them to the best of my ability based on whether or

24   not -- and help them understand what the risk and benefits

25   of their treatment are, if they have the insight to do that.

1    Q.  And that would be separate and apart from what their

2    legal situation might be?  This would be -- that clinical

3    would be just the medical side of things?

4    A.  I'm sorry.  Could you say that one more time?  I'm just

5    not quite hearing you.

6    Q.  Sure.  Let me turn this up a little.

7            So if you're treating someone clinically, based on

8    the medical side of things, it would be without regard to

9    their legal situation.  Correct?

10   A.  Well, I still have to pay attention to their legal

11   situation.

12           For instance, I treat people clinically in the

13   Bureau, not as a forensic psychiatrist.  I don't write

14   reports for them or I don't -- I'm not focused on what their

15   legal problem is.  But I may see them pretrial, and I

16   certainly have to pay attention to what the Court wants for

17   them.  I have to understand it because of the setting I'm

18   treating them in.  But that's not considered necessarily

19   forensic psychiatry.  It's just part of their milieu.  It's

20   part of where they're at.

21   Q.  Now, are you Board certified in anything?

22   A.  Yeah.  I'm a Board-certified psychiatrist; and I'm

23   recertifying in child psychiatry, child and adolescent.

24   Q.  How do you stay up to date in new issues in your field?

25   A.  Well, there's a lot of reading.  There is a lot of

1    articles.  I am lucky to have a large group of psychiatrists

2    across the country that we stay in contact with one another.

3    There are also -- I have the opportunity to join

4    professional societies, which I don't often do a lot because

5    I have so much ability to contact my peers and do that.  So

6    it's mostly reading, mostly going to CME, doing that kind of

7    thing.

8    Q.  And have you been qualified as an expert before?

9    A.  Yes.  When I worked in Texas, in the state, I've been

10   qualified.

11   Q.  And what were you qualified as an expert in in those

12   situations?

13   A.  Well, in court as an expert.

14   Q.  I'm sorry.  What type of expert?

15   A.  Medical expert.

16   Q.  So I guess was it in the clinical and forensic

17   psychiatry that you're practicing now?  Was it the same type

18   of expertise that you were qualified in in Texas?

19   A.  Yes.  I was qualified to practice -- to testify in court

20   as a medical expert about the patients that I was testifying

21   about.

22   Q.  Okay.

23           MS. CONNOR:  Your Honor, at this time, I would

24   move in Dr. Cuccio as an expert in clinical and forensic

25   psychiatry.

```
1              THE COURT:  Any objections?

2              MS. VOSHELL:  No objections.

3              THE COURT:  Then I will qualify Dr. Cuccio as an

4    expert in clinical and forensic psychiatry.

5              MS. CONNOR:  Thank you, your Honor.

6    BY MS. CONNOR:

7    Q.  Doctor, what was your role in the evaluation of

8    Mr. Beler for this case?

9    A.  I was called to see him and evaluate him for treatment

10   once he was admitted to that facility.  Like Dr. Armstrong

11   said, they did have another treating psychiatrist that left

12   that was stationed there.  And now I am being called to

13   treat and do the forensic reports for him.  So that's what

14   I'm doing for him.

15   Q.  Do you travel to meet him in person to do these reports?

16   A.  I have talked to the Bureau about doing that, and they

17   have said no at this point because of what's going on in the

18   Bureau.  There has been a general -- they have said no one

19   is to travel except people who are going to facilities to

20   help out with COVID.

21   Q.  Okay.

22   A.  So --

23   Q.  What would your preferred method of treating Mr. Beler

24   be, if given the choice?

25   A.  Oh, I would certainly want to see him in person.  I
```

1    think that's the standard.  But given the circumstances, I'm

2    needing to rely on the staff that's there and needing to

3    stay in close contact with them and get help from the other

4    forensic psychiatrists around the Bureau.

5    Q.  In preparation for evaluating Mr. Beler, what materials

6    did you review?

7    A.  I reviewed the reports that are listed as exhibits and I

8    reviewed those extensive records behind me, 3,000, 4,000

9    pages of records.  He's got a lot of records.  So yeah.

10   Q.  What was the purpose of reviewing those extensive

11   records?

12   A.  ███████████████████████████████████████████████████████

13   ████████████████████████████████████████████    So it's super

14   important for us to be able to review records for him to get

15   his history and to be able to know what kind of treatment

16   he's had before, what his history of illness has been, how

17   he's functioned in the past.  And those records are fairly

18   helpful.

19   Q.  Can you tell us, what is an organic condition?

20   A.  "Organic" is kind of an old-fashioned word.  Back when I

21   was training, we used that word.  At some point they said:

22   No.  You're not supposed to use that word anymore, because

23   mental illnesses are considered organic as well now.

24           But it's supposed to be a demarcating line between

25   physical illness and mental illness.  So at some point long

1    ago, they considered physical illness as something separate

2    from mental illness.  And organic would have been physical

3    illness.

4    ███████████████████████████████████████████████████

5    ███████████████████████████████████████████

6    ███████████████████████████████████████████████████████

7    ███████████████████████████

8    █████████████████

9    ████████████████████████████████

10   ████████████████

11   █████████████████████

12   ██████████████████████████

13   ██████████████████████████████████████████████████████

14   ███████████████

15              MS. VOSHELL:  If I may interrupt briefly, we have

16   not been provided a copy of ████████████████████████

17   ████████████   I would ask that the Government provide us with

18   a copy of that before Dr. Cuccio testifies about it.

19              THE WITNESS:  Sure.

20              THE COURT:  Is ████████ part of the records that

21   were provided from -- is there a report that was done from

22   it, Dr. Cuccio?

23              THE WITNESS:  Yes.

24              THE COURT:  That was not in the records?

25              MS. VOSHELL:  I have not been provided with ████████

1    ████████████████████    No.

2    THE WITNESS:  I believe it's written into the

3    report.  But I don't believe I gave the actual report ████

4    ████    But I have provided it.

5    THE COURT:  Government, do you have a copy, ████

6    ███████████████████    Do you have a copy of the

7    report?

8    MS. CONNOR:  Of Dr. Cuccio's report?

9    THE COURT:  Right.  The report of ██████ is what

10   I assume is the problem.

11   MS. CONNOR:  Yes.  I only have Dr. Cuccio's

12   report.

13   MS. VOSHELL:  I don't believe --

14   THE COURT:  Does the report include a discussion

15   of ██████?

16   MS. CONNOR:  Yes.

17   MS. VOSHELL:  I'm looking right now.  Sorry.

18   THE WITNESS:  I'll try to hold that up like this

19   so you can see it.  How can I get that to you?

20   THE COURT:  What I'm trying to figure out is

21   whether the report was included in the materials that were

22   provided to -- I mean, does the Government have one?  Did

23   you -- presumably, whatever you had, you gave to the

24   defense.  Correct?

25   MS. CONNOR:  Yes.

Cuccio - DIRECT - By Ms. Connor

1          THE COURT:  The attorneys would have to do this.

2          THE WITNESS:  This is it (indicating).

3          THE COURT:  Is that what you have, counsel?

4          MS. VOSHELL:  Your Honor, I do not have that

5     report.  I just reviewed Dr. Cuccio's report that was

6     provided to us and to the Board.  And it does not -- it's

7     from May 20th of 2020.  And it does not reference ███████

8     █████████████████████████████████████      So this is

9     information that is brand new to us today that the

10    Government has not provided us.

11         THE COURT:  Somebody doesn't have their microphone

12    on mute.  We have that noise in the background.  Please do

13    so.

14         Dr. Cuccio, you have a separate report.  Did you

15    also include in your report, your longer report that you

16    did, did you mention ███████ in there?

17         THE WITNESS:  As far as I know, I did, actually.

18         THE COURT:  Do you know --

19         THE WITNESS:  I wrote that report months go.  But

20    let me look.

21         THE COURT:  Can you point out where you think it

22    is?

23         THE WITNESS:  Yes.  I will.

24         THE COURT:  While she's doing that, Government

25    counsel, do you have her separate report?  Not the report

```
1    you provided to the Court, but a separate report from

2    Dr. Cuccio?

3              MS. CONNOR:  No, your Honor.  I was referencing

4    her Sell evaluation report that I believed referenced ███

5    ███   But I'm looking for that myself.

6              THE COURT:  So we'll let the two of them look for

7    that.  I'm sure that in terms of the actual report she did,

8    it probably could be emailed.

9              THE WITNESS:  Yes.  I can scan it and email it to

10   you.

11             THE COURT:  But can you find at least a mention

12   that it was done?

13             THE WITNESS:  Yes, ma'am.  Yes, ma'am.

14             MS. VOSHELL:  Judge, you know, I have a searchable

15   .pdf up of the report.  I have also reviewed it thoroughly

16   myself.  I just Control-F'd that report.  And the only

17   mention ██████████████████████████████

18   ████████████████████   not anything that Dr. Cuccio has

19   conducted.

20             So I can represent that --

21             THE COURT:  In terms of looking at it, they can

22   look to find it.  Why don't we ask her what the result of it

23   was and we will have it emailed to you.

24             THE WITNESS:  Yes.  It was --

25             MS. VOSHELL:  Judge, I would ask --
```

1          THE COURT:  Go ahead, Dr. Cuccio.

2          THE WITNESS: 

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          THE COURT:  We should continue with it.

22     Obviously, we'll leave the issue open            because

23     defense counsel needs to get it and presumably Dr. Corvin

24     will want to look at it as well.

25          THE WITNESS:  Sure.

Cuccio - DIRECT - By Ms. Connor

1      THE COURT:  Do you have somebody in your office

2  that you could hand it to that could email it?

3      THE WITNESS:  No.  But I can do it right here.

4      THE COURT:  Who wants to get it from the defense

5  side?  I'm going to give you time to prepare, but we might

6  as well at least get this out.

7      THE WITNESS:  Should I send it to Mr. Miranda?

8      THE COURT:  Well, Mr. Miranda is the Government.

9  It sounds like defense counsel and the Government both may

10  need it.

11      MS. VOSHELL:  I'm happy to receive it for the

12  defense.  I can give you my email address.

13      THE COURT:  I'll have it taken off the record so

14  it just won't show up in there.  It won't be in the

15  transcript.

16      MS. VOSHELL:  That's fine, Judge.

17      THE COURT:  Go ahead.

18      MS. VOSHELL:  So my email address is

19  ██████████████████████████.  And that's ████████████

20  ████████████.

21      THE WITNESS:  Got it.

22      THE COURT:  For the Government, who wants to get

23  the Government one?

24      MS. CONNOR:  It can go to Mr. Miranda.  He can

25  share it with me, if that's easiest.

Cuccio - DIRECT - By Ms. Connor

1              THE COURT:  Mr. Miranda, can you give it to her?

2              MR. MIRANDA:  Yes.

3              MS. VOSHELL:  Judge, until I have an opportunity

4     to review the report, I would object to any additional

5     testimony from Dr. Cuccio regarding this █████████

6              Again, Judge, I have reviewed her report

7     thoroughly.  She allegedly did ████████  in March, did not

8     tell -- did not include that in her report.  And I had no

9     idea that it existed, nor did anyone on Mr. Beler's team.

10             I don't know that any testimony about it will be

11    appropriate at all, given the late disclosure.  We need to,

12    I think, discuss it as a team; but we might be asking to

13    exclude the report, which -- it was not marked as an exhibit

14    to the --

15             THE COURT:  Let me interrupt.  I'll let you finish

16    what you have to say.

17             I'm not excluding the report.  You will have an

18    opportunity. ████████████████████████  I don't know

19    that they're going to say much more.  You'll have an

20    opportunity to get the report, to cross-examine her about it

21    if you wish to and have Dr. Corvin look at it as well.

22             The whole purpose of this is to find out -- the

23    purpose of the hearing is not going to be to keep stuff out.

24    But you will have ample opportunity in which to review it

25    before you have any questions.  Since it's not -- █████████

1    ████████████████████████████████████████████████

2    ██   But it is an issue I'm reserving for the defense.

3           In the meantime, we should have this report go

4    out.

5           So, Mr. Miranda, what is your email?  And

6    Dr. Corvin will give his.  Everybody can get it and we'll

7    proceed.

8           THE WITNESS:  I have Mr. Miranda's email and I am

9    sending it right now.

10          THE COURT:  You do.  Okay.

11          And I'm assuming Dr. Corvin would like to see it

12   as well.  Am I correct, Dr. Corvin?

13          DR. CORVIN:  (Nods in the affirmative.)

14          THE COURT:  Yes.  Okay.  Let her send this last

15   one and then we'll send it off and then proceed with the

16   questioning.

17          MS. VOSHELL:  I'm happy to send it to Dr. Corvin.

18          THE COURT:  Who is that?  I'm sorry.  Who said

19   that?

20          MS. VOSHELL:  Oh, this is Emily Voshell.  I'm

21   happy to send it to Dr. Corvin.

22          THE COURT:  Why don't we just send it to him so he

23   at least has an opportunity to review it.

24          The issue ████████ is reserved, since you didn't

25   get a chance to look at it.  And I'd just as soon we sent

Cuccio - DIRECT - By Ms. Connor

1    it, so he can look at it.  But we're reserving the issue for

2    the defense so they can review it, discuss it, look at it

3    with their expert.  So we may wind up having to re-call this

4    witness at a later point relating to it.  But in the

5    meantime, there's no reason for him not to get it.

6          So, Dr. Corvin, what is yours?  Then let's get

7    back to the testimony.  Dr. Corvin, what's your email?

8          MS. FORREST:  We will re-forward it to Dr. Corvin

9    so he has it.  I have it right now.

10         THE COURT:  So let's pick up on the testimony,

11   then, from the Government, reserving the issue ███████████

12   We had what she said the finding was.  Let's proceed.

13         MS. CONNOR:  Thank you, your Honor.

14         THE COURT:  We'll reserve for the defense at a

15   later point.

16         MS. VOSHELL:  Thank you, your Honor.

17         THE COURT:  Go ahead.

18         MS. CONNOR:  Your Honor, I did have a few

19   additional questions that stem ██████████████    Would you

20   rather I wait to ask them until the defense has had a chance

21   to review it or should I ask them now?

22         THE COURT:  My inclination would be to let you ask

23   them so they'll know what it is they should be looking at if

24   they want to do cross at a later point.

25         MS. CONNOR:  Okay.

```
 1            THE COURT:  And cross may mean we need to have
 2    this witness testify at a later point.
 3            But you might as well find out what they're
 4    bringing out.  The defense might as well find out what the
 5    Government is using it for.
 6            MS. CONNOR:  Certainly.
 7            THE COURT:  And then you can respond to it when
 8    it's your turn.
 9            So go ahead.
10            MS. CONNOR:  Thank you.
11    BY MS. CONNOR:
12    ███████████████████████████████████████████████████████
13    ███████████████████████████████████████████████████████
14    ████████████████████████████████████████████████████
15    ████████████████████████████████████████████████████
16    ██████████████████████████████████████████████████████
17    ████████████████████████████████████████████████
18    █████████████
19        █████████████████████████████████████████
20    ██████████████████████████████████████████
21    ████████████████████████████████████████████
22    ██████████████████████████████
23        █████████████████████████████████████████████
24    ████████████████████████████████████████████████████
25        ████████████████████████████████████████
```





1

2

3

4

5

6

7

8

9

10

11    Q.   What types of observations of this nature have you made

12    with regard to Mr. Beler?

13    A.   One of the good things about practicing within the

14    environment that I practice in is that I have the ability to

15    be able to be hooked into the environment in a way that I

16    can't be in other environments.

17

18

19

20

21

22

23

24

25



7    Q.  Not exactly.  Let me ask it a different way.

8    A.  Oh, yeah.

Cuccio - DIRECT - By Ms. Connor



1  ████████████████████████████████

2  ██████████████████████████████████

3  ██████████████████████████████████

4  ████████████

5  Q.  Could you please describe the difference between a

6  psychiatrist that has a medical degree and a nurse

7  practitioner in psychiatry?

8  A.  A psychiatrist is a medical doctor.  So I went to

9  medical school; and instead of specializing in OB/GYN or

10  family practice, I specialized in psychiatry.

11          And a nurse practitioner is a nurse who has

12  further specialization and treats patients for psychiatric

13  problems.  And they are usually supervised by a

14  psychiatrist.

15  Q.  Are there limitations to what a nurse practitioner can

16  do in terms of prescribing medications that you are not

17  limited to?

18  A.  Yes.  Yes.  The nurse practitioners have to be

19  supervised by someone with a license.  They have to be --

20  the nurse practitioner at Fort Worth has to be signed off on

21  by the other physicians there.  They monitor her practice

22  when she writes for meds.

23  Q.  And are nurse practitioners able to evaluate forensic --

24  make a forensic analysis such as involuntary medication

25  pursuant to *Sell*?

1    A.  No.  That's a higher-level process than usually nurse

2    practitioners do.



21          THE COURT:  When you say "move him," what do you

22    mean by that?

23          THE WITNESS:  The BOP 's a big place.  We have

24    many facilities and we have hospitals.  I'm at a hospital

25    facility right here.  There are many facilities that treat

1    inmates, some of which treat them for competency.  The

2    facility that I'm at here ████████ and has only a

3    psychiatric unit, has three on-staff psychiatrists.

4          So, if necessary, we can put him on a plane and

5    move him to another facility within the BOP with no problem.

6          THE COURT:  So you're saying he could be moved to

7    another facility ██████████ and in-person █████████████

8    ███  Is that what you're saying?

9          THE WITNESS:  If he needs that kind of treatment.

10   I don't know ██████████████████

11         But yes. ██████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████

15   █████████████████████  But if it becomes necessary to move

16   him, we can easily move him and get him somewhere where he's

17   with a psychiatrist.  That's not a problem.  We do that all

18   the time.

19         THE COURT:  Thank you for clarifying that.

20         Go ahead, counsel.

21   BY MS. CONNOR:

22   Q.  If I could ask a followup to that, Doctor:  You say he

23   could easily be moved.  Is that in normal times with BOP

24   practice or is that true now during the COVID pandemic as

25   well?

1    A.  I think we can move him in the COVID pandemic, too.  I

2    mean, we do move patients still in the BOP.  If it's

3    necessary, we do it.  The BOP has not stopped accepting

4    patients.  We've not stopped accepting inmates.  If somebody

5    has to go somewhere, they still come in here and get

6    admitted to this facility medically and they still leave the

7    facility.

8    Q.  Okay.

9         THE COURT:  Could you stop a second?  We don't

10   seem to see the Defendant.  Is the Defendant here somewhere?

11        THE WITNESS:  He may need to say something.

12        THE COURT:  He was on there and then somebody came

13   in and Dr. Armstrong left.  But sometimes it doesn't show up

14   on my screen.  But somebody else has sent me a text

15   indicating that he doesn't appear to be on here.

16        I see Jabber Guest.  I don't know whether he's

17   there and we just can't see him or what.  Can somebody check

18   before we go any further?

19        DEPARTMENT OF CORRECTIONS OFFICER:  Can you see

20   him?

21        THE COURT:  Is that Mr. Beler there?  I don't see

22   him.

23        THE AUDIOVISUAL TECHNICIAN:  Yes.  He's behind the

24   young lady in the mask.  There we go.

25        THE COURT:  Okay.  So he is here.  Sorry to

```
 1    interrupt.  Let's pick up.
 2              Now, what happened to Dr. Cuccio?
 3              THE WITNESS:  I'm here.
 4              THE COURT:  You're there.  Okay.  You're down at
 5    the bottom.
 6              Go ahead and pick up.
 7              MS. CONNOR:  Thank you.
 8    BY MS. CONNOR:
 9    Q.  Doctor, have you had an opportunity to read the report
10    prepared by the defense expert, Dr. George Corvin?
11    A.  Yes.
12    Q.  And so would Mr. Beler's representation to Dr. Corvin
13    that your total meeting time with him was 30 minutes -- is
14    that correct or incorrect?
15    A.  That was what Mr. Beler had thought.  And that's not
16    correct.
17    Q.  Your testimony is --
18    A.  That doesn't surprise me, but that's not correct.
19    Q.  Your testimony is that each meeting was approximately 30
20    to 45 minutes, if I understand you correctly?
21    A.  Yeah.  Yeah.
22    ████████████████████████████████████████████████████████
23    ████████████████████████████████████████████████████████
24    ████████████████████████████████████████████████████████
25    ████████████████████████████████████████████████████████
```



1    ███████████████████████████████████████████

2    ███████████████████████████████████████████

3    █████████████████████████████

4    Q.  Yes.

5         I'm sorry.  I'm having some connection issues.

6    After you finished your answer, my screen went blank.  But

7    now I seem to be back.

8         █████████████████████████████

9    ███████████████████████████████████████

10        Do you see me?

11   Q.  Yes.

12   A.  Okay.  I'm sorry.  I have a lot of noise in my office.

13   I'm in a cubicle and, you know, it's the BOP.  Sorry about

14   that.  Can you hear me?

15   Q.  You're back.

16   A.  So sorry.  I am so sorry.

17   Q.  I'm not sure if it's your end or mine.

18        Did you diagnose him or did someone else?

19   A.  Both.  Yeah.  Because, you know, like every time I see

20   somebody, I have to diagnose them.  Right?  But yes.  ███

21   ███████████████████████████████████████

22   █████████████████████████████████████

23   ███████████████████████████████████████████

24   ████████████

25   ███████████████████████████████████████████





Q.  Now, you mentioned earlier that you have prior

experience observing patients that were treated with

medication in an effort to restore their competency.

Correct?

A.  Yes.  I've done that.  Yes.

Cuccio - DIRECT - By Ms. Connor

1    Q.  What were the results of that treatment of those

2    patients?

3    A.  Very few of them did not become competent.  The ones who

4    did not become competent were mainly severely demented to

5    the point that they couldn't find the canteen to eat their

6    food.

7              One comes to mind who was so demented that we had

8    to send him -- he was only 19, but he had done drugs.  And

9    we had to send him to a nursing home.  And unfortunately for

10   him, he was so demented that when he left all the other

11   inmates clapped because he was incontinent; he couldn't find

12   his way to the canteen.  They were having to help him out,

13   and the other inmates didn't tolerate that.  So, you know,

14   it's very sad when you can't become competent.

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████

18              Uh-oh.  I didn't hear you.

19              THE COURT:  Are you having problems?

20              THE WITNESS:  I didn't hear that last little bit.

21   I'm sorry.

22              THE COURT:  We can't hear you, Ms. Connor.

23              MS. CONNOR:  (Speaking inaudibly.)

24              THE COURT:  No.  No.  We can't hear you.

25              THE WITNESS:  It looks like a battery problem, I

1    bet, or something, or a cord problem.

2            THE COURT:  Mr. Miranda, can you send an email or

3    text to her and tell her we can't hear her?

4            MR. MIRANDA:  I am doing both right now.

5            THE AUDIOVISUAL TECHNICIAN:  She may want to

6    disconnect the ear set/microphone she's been using and use

7    whatever is on the keyboard.

8            THE COURT:  She just took them out.

9            MS. CONNOR:  (Speaking inaudibly.)

10           THE WITNESS:  No.  I can't hear you.  Not good.

11           THE COURT:  We still can't hear.

12           MR. MIRANDA:  As you can tell, that was a literal

13   game of telephone.  And she said that -- we obviously

14   couldn't hear.  She doesn't know what the problem is.  I

15   told her the best I could do was tell her the old tech

16   adage:  Restart and log on again.

17           THE COURT:  So she's getting back on again?

18           MR. MIRANDA:  She's trying that right now.  She'll

19   be back on in a minute.  Hopefully, that's all it is.

20           THE COURT:  We might as well relax for a few

21   minutes.

22           (Brief pause in the proceedings.)

23           (Ms. Connor now appearing telephonically.)

24           MS. CONNOR:  Can you all hear me now?

25           THE COURT:  Yes.  This is the disadvantage of not

Cuccio - DIRECT - By Ms. Connor

1    having the video, because you don't know when they've

2    finished speaking in terms of their answer.  So I'd wait a

3    beat before you move to the next question.

4              MS. CONNOR:  Sure.

5              THE COURT:  So let's pick up at this point.

6              Go ahead and continue with your questions for

7    Dr. Cuccio.

8              MS. CONNOR:  Thank you very much.  I appreciate

9    everybody's patience with me.

10   BY MS. CONNOR:

11   Q.  Dr. Cuccio, do you remember where we left off?

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ██████████████████████

15   Q.  I think we were past that.  And my computer is almost

16   back up with a question.  So I need another 30 seconds, I

17   think.

18   A.  Okay.  ███████████████████████████

19   ██████████████████████████

20   Q.  I have where we were.

21             In your opinion, is the Defendant currently

22   competent to stand trial?

23   █████

24   ███████████████████████

25   ████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11          (Telephone ringing.)

12          THE WITNESS:  I'm so sorry.  That's my phone.

13          THE COURT:  Whose phone is that?

14          THE WITNESS:  I'm so sorry.  There.  That's my

15  phone.  Sometimes I just ignore those things.

16

17

18  BY MS. CONNOR:

19

20

21

22

23

24

25

Cuccio - DIRECT - By Ms. Connor



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15        But -- uh-oh.  It looks like the Bureau of

16   Prisons is going to fall off the line.

17            THE COURT:  We're scheduled until 4:00.

18            THE WITNESS:  All right.  But yes.

19

20

21

22

23

24

25

```
1    BY MS. CONNOR:

2    Q.  What is --

3               THE COURT:  Before you ask the next question,

4    Dorothy or John, can we at least get it until 4:00?  We got

5    the little note that said they're about to shut us off

6    again.

7               THE COURTROOM DEPUTY:  Okay.  I'm trying to email

8    someone.

9               THE COURT:  Well, continue.  But I wanted to make

10   sure you knew that.

11              THE COURTROOM DEPUTY:  Okay, Judge.

12              THE COURT:  Go ahead with the questions.

13              MS. CONNOR:  Thank you.

14   BY MS. CONNOR:
```

15   ███████████████████████████████████████████

16   ████████████████████████████████

17   ████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████

20   ██████████████████████████████████

21   █████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ██████████████████████████

Cuccio - DIRECT - By Ms. Connor







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          THE COURT:  One other question with the -- before

18     you resume the questioning.

19

20

21

22

23

24

25

155





1

2

3

4

5

6

7

8

9

10

11

12

13

14          THE COURT:  I don't have any other questions.  So

15    let me let you proceed with the questions that you had.

16          MS. CONNOR:  Thank you.

17    BY MS. CONNOR:

18

19

20

21

22

23

24

25



1  

2

3

4

5

6

7

8

9

10

11                                    He's --

12    Q.  And why is that?

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2

3

4

5

6

7           So this indicates --

8    Q.   Can you describe -- I'm sorry.  Go ahead.

9    A.   That's okay.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cuccio - DIRECT - By Ms. Connor



1

2

3

4          I think hospitals -- private hospitals have a

5     timeline that they have to live by.  They're acute.

6          We don't.  We have a different timeline.  We can

7     know people longer and we can keep them longer.  And we are

8     not driven by money; we're not driven by insurance.  We can

9     treat people in the way they need to be treated to get them

10    well.  That's one of the reasons I do this kind of work, I

11    have to say, because I can treat patients, know what they're

12    up to and give them what they need without having to mess

13    with the private world of insurance.

14    Q.  Specifically with regards to Mr. Beler, what medication

15    would you prescribe?

16

17

18

19

20

21

22

23

24

25

















169



Cuccio - DIRECT - By Ms. Connor







Q.  In your expert opinion, do the benefits of medication

outweigh the potential side effects?

A.  Yes.

Q.  Why is that?

A.  Definitely.

Q.  Why is that?



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Q.   Thank you.

23    A.   Sorry.

24    Q.   Please continue.

25



15    Q.  Okay.

16              THE COURT:  I'm sorry.  Excuse me, counsel.

17              Can you say that again?  I missed the last part of

18    what you said, Dr. Cuccio.

19

20

21

22

23

24

25

Cuccio - DIRECT - By Ms. Connor



BY MS. CONNOR:



1
2
3

4   Q.  What is the difference between the food that's offered
5   at the canteen versus the food that's offered at the lunch
6   hall?
7   A.  From what I understand, it's more like cheese and
8   crackers and candy bars and things that you can eat.  But in
9   the COVID days, it's not the best.  They have -- I think
10  they have one hot meal a day now.  They used to have three,
11  because I think they're having to bring the meals to the
12  unit now, unfortunately.  It's a little better.
13
14
15
16
17
18
19
20
21
22
23
24
25



Obviously --

Q.  How do you come up with that number?

A.  Beg your pardon?

Q.  Where do you get that?  What are you basing that ▮▮▮▮▮

▮▮▮▮▮▮▮▮ time frame on?

A.  Well, partly it's the *Sell* criteria.  But, you know,

there's personal experience.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1   
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Q.  In your expert opinion, could he be restored to

Cuccio - DIRECT - By Ms. Connor

1    competency with therapy alone?

2    A.  No.  No.  That's not going to do it.  He's --



1

2

3

4

5

6

7

8

9   Q.   In your expert opinion, is the medication that you have

10  described here medically appropriate for the Defendant?

11  A.   Yes.

12  Q.   And what is [indiscernible]?

13  A.   What?

14           THE COURT:  I think we missed the last part of

15  what you said, counsel.

16           MS. CONNOR:  I'm sorry?

17           THE COURT:  We missed whatever you said at the

18  end.  At least I did.

19           MS. CONNOR:  I asked if in her expert opinion the

20  medication that she has described at this hearing was

21  medically appropriate for the Defendant.

22           THE WITNESS:  Yes.

23  BY MS. CONNOR:

24  Q.   And would this treatment and the administration of

25  medication be specifically tailored to him as an individual?

1    A.   Yes.

2    Q.   Would the treatment team at the BOP be able to kind of

3    rework or retool the medication based on his reaction to

4    this medication?



1   ████████████████████████

2     ██████████████████████████████████

3   ████████████████████████████████████████

4   ████████████████████████████████

5   ████████████████████████████████████

6   ████████████████████████████████████

7   ██████████████████

8   Q.  In your expert opinion, is it appropriate to give

9   Mr. Beler this medication against his objection in order to

10  restore him to competency?

11  A.  Yes.

12  Q.  And why?

13  ██████████████████████████████

14  ███████████████████████████████

15  ███████████████████████████████

16  █████████████████████████████

17  ████

18    ████████████████████████████

19  ████████████████████████████████████

20  ███████████████████████████████

21  ████████████████████████████

22  ████████████████████████████████

23  █████████████████████████████

24  █████████████████████████████

25  ██████████████████████████



20    THE COURT:  I have to interrupt at this point.

21  We're obviously not going to -- we're going to have to

22  continue the hearing.  For one thing, I need to get on to

23  another matter in about ten minutes.

24        My suggestion would be -- everybody seems to be

25  available on August 18th.  We'd start at 10:00.  We do need

Cuccio - DIRECT - By Ms. Connor

1    to check and just make sure that the Bureau of Prisons does

2    not have a problem.

3              Either John or Dorothy, can we figure that out?

4              THE COURTROOM DEPUTY:  I checked the calendar.

5    There's nothing on the calendar for that day, so it

6    shouldn't be a problem.  So I'm just waiting to hear back

7    from Chashawn.

8              THE COURT:  So she would check with the Bureau of

9    Prisons, so the Bureau of Prisons is the one we're waiting

10   for.

11             THE COURTROOM DEPUTY:  Yes.

12             THE COURT:  Why don't we make an assumption and

13   put it on your calendars, and I will confirm that that's

14   actually the date and the time.  We will pick up with the

15   direct of Dr. Cuccio and obviously the rest of it.

16             Since we're having a break in here, I would hope

17   that defense counsel, getting the reports and whatever,

18   ███████████      if you need something beyond what you

19   actually have been given on email, please ask for it so you

20   get it so that when you do the cross-examination or when

21   Dr. Corvin testifies you actually have the information and

22   we don't have to call her back at some point since there's

23   going to be a break in here.  I would hope that you could

24   talk to the expert and see if there needs to be something

25   else.  I would have had her just re-called afterwards, but I

1      think we can do it all at once, that that will work better.

2              So I think that's it.  Let me -- anything else

3      from Dorothy that we need to do sort of logistically or are

4      we okay?

5              THE COURTROOM DEPUTY:  Just confirming the date:

6      August 18th at 10:00.  Right?

7              THE COURT:  Right.  And we should have it for a

8      couple of hours.

9              THE COURTROOM DEPUTY:  I put in for five hours.

10             THE COURT:  Perfect.  Perfect.  Even if we don't

11     use it, at least we won't have to do this all over again.

12             THE COURTROOM DEPUTY:  Yes, Judge.

13             THE COURT:  That's fine.

14             Government, anything from you?

15             MS. CONNOR:  Your Honor, I'm sorry to interrupt.

16     If I may, I actually only had one question left.  And so

17     maybe it makes sense to start with the cross when we resume.

18             THE COURT:  I actually had a couple of questions.

19     So let me -- if you want to finish your line of inquiry,

20     that's fine.  Go ahead.

21     BY MS. CONNOR:

22     Q.  The last question I had for the whole direct is:

23     Dr. Cuccio, is it your expert opinion that Mr. Beler is

24     substantially likely to be restored to competency if he were

25     medicated?

Cuccio - DIRECT - By Ms. Connor

 1    A.  Yes.  I believe he is.

 2              MS. CONNOR:  With that, that's the end of my

 3    direct.

 4              THE COURT:  I had a couple of questions, but I

 5    won't ask them now.

 6              But is there anything else from the Government

 7    that I need to talk about at this point?

 8              MR. MIRANDA:  Nothing from the Government.

 9              THE COURT:  How about from the defense?  Anything

10    else we need talk about?

11              MS. VOSHELL:  No.

12              MR. JEFFRESS:  No, Judge.

13              THE COURT:  So let's hope that the Bureau of

14    Prisons is able to do it on the 18th at 10:00.  If they're

15    not, we'll get back to you and pick another time.  But I

16    won't do it beyond around that time.  I'm not going to push

17    it off to too late.  I want to make sure -- he's been

18    waiting a while.  I want to make sure we get this done.

19              So everybody take care.  Be well.  And we'll

20    reconvene on August 18 the.

21              I thank you very much.  I promise not to starve

22    you next time.  I realize that both the court reporter,

23    Dorothy and the witnesses and attorneys have been there.

24    You'll be slimmer, but I do apologize.  But it does seem to

25    me best to try to get as much done as we can since these

1    things are not easily set up, especially with as many people

2    as we have.  But hopefully, starting at 10:00, we'll be able

3    to finish in time for everybody to eat lunch.

4            Take care, everybody.  We'll be back.  Have a good

5    evening.

6            MS. CONNOR:  Thank you.

7            MS. VOSHELL:  Thank you.

8            (Proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE**

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8              Please note:  This hearing occurred during the

9    COVID-19 pandemic and is therefore subject to the

10   technological limitations of reporting remotely.

11

12

13                    Dated this 8th day of August, 2020.

14

15              /s/ Lisa Edwards, RDR, CRR
                Official Court Reporter
16              United States District Court for the
                  District of Columbia
17              333 Constitution Avenue, NW, Room 6706
                Washington, DC 20001
18              (202) 354-3269

19

20

21

22

23

24

25