```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
      * * * * * * * * * * * * * * *   )
 3    UNITED STATES OF AMERICA,       )     Criminal Action
                                      )     No. 19-415
 4                    Plaintiff,      )
                                      )
 5       vs.                          )
                                      )
 6    PETER BELER,                    )     Washington, DC
                                      )     August 18, 2020
 7                    Defendant.      )     10:03 a.m.
                                      )
 8    * * * * * * * * * * * * * * *   )

 9

10             TRANSCRIPT OF COMPETENCY HEARING
                 HELD VIA VIDEO TELECONFERENCE
11        BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
                 UNITED STATES DISTRICT JUDGE
12

13

      APPEARANCES:
14
      FOR THE GOVERNMENT:      NICHOLAS MIRANDA, ESQ.
15                             JENNIFER CONNOR, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
16                                FOR THE DISTRICT OF COLUMBIA
                               555 Fourth Street, NW
17                             Eleventh Floor
                               Washington, DC 20530
18

19    FOR THE DEFENDANT:       JONATHAN JEFFRESS, ESQ.
                               EMILY A. VOSHELL, ESQ.
20                             COURTNEY R. FORREST, ESQ.
                               KAISER DILLON, PLLC
21                             1099 14th Street, Northwest
                               Suite 800 West
22                             Washington, DC 20005

23

      ALSO PRESENT:            GEORGE PATRICK CORVIN, M.D.
24
                               FRANCISCA OTERO
25                             (Power of Attorney to the Defendant)
```

```
1    REPORTED BY:                LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
2                                United States District Court for the
                                   District of Columbia
3                                333 Constitution Avenue, NW
                                 Room 6706
4                                Washington, DC 20001
                                 (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2

3                                   Direct      Cross          Red.

4

   WITNESSES FOR THE GOVERNMENT:

5

6  Anne Cuccio, M.D.                            8

7

8  EXHIBITS RECEIVED IN EVIDENCE                                PAGE

9

   Joint Exhibit Nos. 17 & 18                                    7

10

   Defendant's Exhibit Nos. 1, 2 & 3                            85

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  I think we may actually have

 2   everybody.  We have the court reporter; we have my law

 3   clerk.

 4              Dorothy, are you on?  Dorothy?  She's not on yet.

 5              We have the substitute for Mr. Quinn, Francisca

 6   Otero.  We have Ms. O'Connor and Mr. Miranda.  I think if

 7   you speak, your face pops up.  I saw Mr. Jeffress.

 8              Is there anybody else that's on that I have not

 9   identified?

10              MS. FORREST:  Courtney Forrest is on, your Honor.

11              THE COURT:  Okay.  And you're representing?

12              MS. FORREST:  Mr. Beler.

13              THE COURT:  Is it "Beler" or "Beler"?

14              MS. FORREST:  "Beler," your Honor.

15              THE COURT:  Are we ready to go, Dorothy?  Dorothy,

16   are we ready to go?

17              THE COURTROOM DEPUTY:  Is the Defendant on?

18              THE COURT:  Yes.  I can't see him right now, but

19   we did see him earlier; and Dr. Armstrong, I believe, was

20   with him.

21              THE COURTROOM DEPUTY:  Okay.  We're ready, then.

22              THE COURT:  Then let me call the case.

23              This is the United States versus Peter Beler.

24   It's Case No. 19-CR-415.

25              I believe we've identified everybody in terms of
```

```
 1      Mr. Beler and Dr. Armstrong; Ms. Otero for Mr. Quinn is

 2      here; Ms. O'Connor and Mr. Miranda for the Government;

 3      Mr. Jeffress and Ms. Forrest for the defense.  I did see

 4      Dr. Cuccio earlier.  I don't see her on the screen at this

 5      point.

 6              I believe we're still on the direct examination.

 7              So what I would ask is if people would mute so we

 8      don't have any clanging sound in the back.

 9              And, Dr. Cuccio, could you identify yourself?

10      That will probably mean you'll pop back up on the screen.

11              THE WITNESS:  I am here.  I'm Dr. Cuccio.  Am I on

12      the screen?  I'm blocking you.

13              THE COURT REPORTER:  I'm sorry.  I believe

14      Ms. Voshell is on the screen as well.

15              MS. VOSHELL:  Yes.  It's Emily Voshell on behalf

16      of Mr. Beler.  I didn't want to interrupt.

17              THE COURT:  I can't see everybody.  So part of the

18      problem is to try and --

19              THE COURTROOM DEPUTY:  Judge, did you hit the

20      number eight?  You can see more people that way.

21              THE COURT:  Let me do that.  You're right.  Let me

22      try that.  Here we go.  We have more.

23              Now I've lost Dr. Cuccio, though.

24              THE WITNESS:  I'm still here.

25              THE COURT:  There you are.  I see you on the top
```

```
1    there.
2              I believe we had stopped in the middle of the
3    direct of Dr. Cuccio.  So let us pick up at this point.  And
4    I must admit -- I'm sorry.  I don't remember whether it was
5    Ms. O'Connor or Mr. Miranda that was questioning Dr. Cuccio.
6    So if we could pick up at this point.
7              MS. CONNOR:  Good morning.  Jennifer Connor for
8    the United States.  It was me.  I was able to squeeze in my
9    last question at the end, so my direct was completed.
10             THE COURT:  So let's move to cross.  And we'll do
11   the same thing.  Identify yourself in terms of who you are
12   that is doing the cross-examination.
13             MS. VOSHELL:  Good morning, your Honor.  Emily
14   Voshell.  I will be doing the cross-examination of
15   Dr. Cuccio.
16             Judge, before we begin, briefly, we received
17   additional records from the Bureau of Prisons that we
18   submitted to the Court.  We filed a notice and we submitted
19   those exhibits in the same shared drive that the previous
20   exhibits had been shared in.  But I believe that I might be
21   referring to some of those in my cross, so I'd like to
22   officially move those exhibits in.  Those are Joint Exhibits
23   17 and 18.
24             Joint Exhibit 17 is Mr. Beler's 2019 Bureau of
25   Prisons medical and mental health records and Joint Exhibit
```

```
1   18 contains Mr. Beler's 2020 BOP medical and mental health

2   records.

3              THE COURT:  All right.  Government, do you have

4   any objection?

5              MR. MIRANDA:  No objection, your Honor.

6              MS. CONNOR:  No, your Honor.

7              THE COURT:  Okay.  Then I'll admit without

8   objection -- are they joint exhibits?

9              MS. VOSHELL:  Joint, Judge.

10              THE COURT:  So I'll admit Joint Exhibits 17 and

11   18.

12              (Whereupon, Joint Exhibit Nos. 17 and 18 were

13   entered into evidence.)

14              THE COURT:  Let's proceed.

15              THE COURTROOM DEPUTY:  Judge, the attorneys never

16   sent me a copy of the exhibit list.

17              THE COURT:  That would be very helpful to do that.

18   I have to say, the shared drive is not the easiest thing to

19   open.  I would ask if you could send one by the end of the

20   day, if you could send an exhibit list, both the Government,

21   if you have one, or defense, or if it's a joint list so it's

22   clear-cut.  Although we've been putting it on the record, it

23   makes it easier if we actually have a list that can then be

24   docketed and it's clearer without looking at the transcript

25   as to what got admitted and what didn't.  So I would ask
```

```
 1    after we finish with this if one could be docketed.  You can

 2    do it as a notice if you want.  But at least have it

 3    docketed.

 4            I'm not sure who should be doing it.  It sounds

 5    like it's mostly the defense.  So even though these are

 6    joint exhibits, I would ask that the defense would file it.

 7            THE COURTROOM DEPUTY:  They can send it to me.  I

 8    can do the filing.  Just send it to me.

 9            THE COURT:  Okay.  Then send it to our deputy

10    courtroom clerk and she can file it.  But it's helpful.

11            And then I would ask that we mark it as to what's

12    been admitted and what has not been admitted so there's no

13    dispute about it --

14            THE COURTROOM DEPUTY:  Yes.

15            THE COURT:  -- when it gets on the docket.

16            So let's proceed with the cross.  Go ahead.

17    (ANNE CUCCIO, M.D., GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

18                        CROSS-EXAMINATION

19    BY MS. VOSHELL:

20    Q.  Good morning, Dr. Cuccio.  My name is Emily Voshell.

21    I'm one of the attorneys representing Mr. Beler.

22            Dr. Cuccio, you testified on direct that you are

23    currently a forensic psychiatrist at the Federal Bureau of

24    Prisons facility at FMC Rochester in Rochester, Minnesota.

25    Is that correct?
```

```
1    A.  Yes.

2    Q.  And you provide -- that psychiatric care is through

3    telepsychiatry, you testified.  Right?

4    A.  Yes.

5    Q.  You also testified -- and it reflects on your CV -- that

6    you are a South Central regional psychiatrist, meaning that

7    you provide psychiatric care at UFMC Springfield,

8    additionally?

9    A.  I have in the past.  I don't right now.

10   Q.  Do you hold -- you testified that you do forensic

11   evaluations at Fort Worth currently.  Is that right?

12   A.  Yes.

13   Q.  So then other than Fort Worth and Rochester, are there

14   any other facilities where you currently provide

15   telepsychiatry?

16   A.  I provide telepsychiatry for the South Central region.

17   Q.  And do you provide any in-person psychiatry to any

18   people who are currently incarcerated at the Bureau of

19   Prisons?

20          THE COURT:  Can you put that in a time frame as to

21   whether she has in the past or whether she's doing it

22   currently?

23   BY MS. VOSHELL:

24   Q.  Currently, do you provide any in-person psychiatric

25   services to any people who are incarcerated in the Bureau of
```

 1    Prisons?

 2    A.  No, I do not, currently.

 3    Q.  What about before COVID-19 restricted in-person meetings

 4    in the Bureau of Prisons?  Did you provide any in-person

 5    psychiatric services to any people who were incarcerated in

 6    the Bureau of Prisons then?

 7    A.  I have before COVID-19, but not immediately before

 8    COVID-19.

 9    Q.  When was the last time that you provided in-person

10    psychiatric services to people who are incarcerated in the

11    Bureau of Prisons?

12    A.  About a year ago.  About a year before that.

13    Q.  About a year before the COVID-19 outbreak?

14    A.  Yes.

15    Q.  So about March of 2019?

16    A.  Let me think back.  It was probably more like March of

17    2018, actually.  So it must have been two years.  Yeah.

18    Q.  So for the two years leading up to the COVID-19 outbreak

19    and your report in this case, you did not provide any

20    in-person psychiatric services to anyone incarcerated at the

21    Bureau of Prisons?

22    A.  I'm sorry.  Say that again.

23    Q.  Just confirming, for the two years from March of 2018

24    until about March of 2020, you did not provide any in-person

25    psychiatric services to anyone incarcerated at the Bureau of

1    Prisons?

2    A.  That's correct.

3    Q.  All right.  You testified on direct that meeting with an

4    individual in person is, quote-unquote, "the standard."

5    Correct?

6    A.  In forensic psychiatry, yes.

7    Q.  Not in telepsychiatry?  Okay.  You have never met with

8    Mr. Beler in person?

9    A.  No, I have not.

10   Q.  You've only ever met with Mr. Beler over video?

11   A.  Yes.

12   Q.  And I understand that now many meetings, court hearings,

13   all kinds of interactions that used to be in person are not

14   because of restrictions put in place after the COVID-19

15   outbreak hit the United States in March of 2020.  Correct?

16   A.  Right.

17   Q.  But you didn't meet with Mr. Beler over video initially

18   because of the COVID-19 outbreak.  Right?

19   A.  Yes.

20   Q.  The first time that you interviewed Mr. Beler was on

21   January 29th, 2020.  Correct?

22   A.  Yes.

23   Q.  That was well over a month before COVID-19 restricted

24   travel in the United States and restricted BOP visitation.

25   Correct?

```
1    A.  Yes.

2    Q.  But COVID-19 did not prevent you from conducting your

3    initial interview with Mr. Beler in person?

4    A.  That's right.

5    Q.  All right.  Prior to writing your report, you telemet

6    with Mr. Beler three other times ███████████████████████

7    ████████████████        according to your report?

8    A.  Yes.

9    Q.  Okay.  And the first of those three times was on

10   February 4th, 2020.  Correct?

11              THE COURT:  If you need to look at the records,

12   you can.  Just tell us that that's what you're doing.

13              THE WITNESS:  I'm looking at records.

14              THE COURT:  That's fine.

15   BY MS. VOSHELL:

16   Q.  Can you please say what record you specifically are

17   looking at?

18   A.  I'm looking at my notes.

19   Q.  Your handwritten notes or the notes that are reflected

20   in the BOP records?

21   A.  The notes that are reflected in the BOP records.

22   Q.  So that should be Joint Exhibit 18 to which you're

23   referring.

24              THE COURT:  Do you have them as Joint Exhibit 17

25   and 18 or do you just have them separately, Dr. Cuccio?
```

1          THE WITNESS:  I have them copied out of my chart.

2     So I don't have the exhibits as exhibits, anything as

3     exhibits.

4          THE COURT:  Assuming that that's the complete

5     record, go ahead and look.

6          THE WITNESS:  So initially -- can I clarify one of

7     those questions about the initial way that I started doing

8     this?  Do I need to?  The initial way I started doing the

9     evaluations for these patients?

10          THE COURT:  You can.  Go ahead.

11          THE WITNESS:  I was employed on two different --

12     I'm employed in two different capacities for the BOP.  I am

13     a telepsychiatrist for the BOP and I work in a clinical

14     manner for the BOP treating patients all across the country,

15     mainly in the South Central region.  And I see people in

16     normal facilities for the BOP.  If they have a problem in a

17     regular facility, then I am contacted by someone and then I

18     see them.

19          They had a problem at Fort Worth where they lost a

20     psychiatrist; and so because I have forensic experience and

21     because I also see -- I know the patients in the South

22     Central region and I am working mainly in the South Central

23     region, I stood in for the person who left in Fort Worth.

24     And so I was standing in in her capacity.  And that's why I

25     saw him initially.  And they have not hired anyone there to

1    run that unit yet.  So I am standing in doing those forensic

2    evaluations as well.

3              But my main job for the BOP is to run

4    telepsychiatry.  I'm not mainly employed as a forensic

5    psychiatrist; I'm a clinician.  And I mainly treat people by

6    telehealth.

7              But I also volunteered to fly down there to see

8    him since I am stepping in and helping them out as an extra

9    part of my job in this forensic facility.  But I couldn't

10   get down there because of COVID.  So that's why I couldn't

11   get there.  So okay.

12             So we were talking about --

13   BY MS. VOSHELL:

14   Q.  So, Dr. Cuccio, just to get back to my initial question:

15   The first of the three times that you write that you met

16   with Mr. Beler ███████████████████████████████████████████

17   was on February 4th of 2020?  And if you have your report, I

18   can also direct you to the page of your report where you say

19   that, if that would be easier.

20   A.  I first met with him on January 17th.  And then I met

21   with him, if I'm looking at -- oh, I'm sorry.  Excuse me.

22   January 17th was the person who triages patients for

23   telepsychiatry.  And so he has a note in here that he did

24   not meet with him.

25             I first met with him on January 29th.  And --

1   Q.  We've been over your initial meeting with him on January

2   29th.

3          I'm asking specifically -- and again, Dr. Cuccio,

4   if this would make it faster, I think it might help if you

5   had your report in front of you, and I'm happy to refer you

6   to the page of your report.  I'm asking you about the second

7   time that you met with him, which was one of these three

8   meetings where you write in the report that you met with him

9   ███████████████████████████████████████████ if that was on

10  February the 4th of 2020.

11         THE COURT:  So your question -- excuse me.  Your

12  question is focused in terms of ███████████████████████████

13  Let her look at her records in terms of doing it.  If you

14  want to focus ███████████████████ so if she might have

15  seen him otherwise, that's fine.  So as I understand your

16  question, you're focusing on what dates she would have

17  spoken to him ███████████████   Is that correct?

18  Ms. Voshell?

19         MS. VOSHELL:  Judge, she wrote in her report that

20  she met with him three times in order to ██████████████████

21  ████████████████   And I'm asking simply that the first of

22  those meetings was on February 4th, 2020.  That is my

23  question.

24         THE COURT:  But she is indicating she saw him at a

25  different time.  So I'm trying to clarify from my

1    perspective that -- she may have seen him with a televisit

2    or whatever on January 29th.  But I take it she's asking you

3    about when you met ███████████████████  Am I correct?  Is

4    that what you're asking?

5              MS. VOSHELL:  I think just to be clear, Judge, I

6    have already asked her about her initial meeting.  So her

7    initial meeting was on January 29th, 2020, which we've

8    established.

9              She then writes in her report she went on to meet

10   with Mr. Beler an additional three times past the time of

11   her initial evaluation to -- ██████████████████████████████

12   ████████████████████████████████████████████  And I'm

13   just asking about what the date was of the first of those

14   meetings, which her report reflects as February 4th, 2020.

15   So I'm asking her to confirm that.

16             THE WITNESS:  Okay.  That report must be

17   incorrect, because my first meeting with him was on January

18   29th.  And when I first met with him, I talked to him ██████

19   █████████████████

20             And the --

21   BY MS. VOSHELL:

22   Q.  Yes.  I understand that the first meeting --

23   A.  The first meeting happened --

24             THE COURT:  Let her finish her answer.

25             Go ahead.

1           THE WITNESS:  And I don't have a note from

2    February, so that indicates to me that I probably did not

3    meet with him in person.  And that sounds like that's a

4    problem with my report.  That date is incorrect.  Okay?  I

5    have a note --

6    BY MS. VOSHELL:

7    Q.  Dr. Cuccio, do you have a copy of your report that you

8    submitted to the Court with you?

9    A.  Yes, I do.

10   Q.  Can I please direct your attention to Page 10 of that

11   report.

12   A.  Yes, you may.

13   Q.  It's starting at the very bottom of Page 9.  You write:

14   "I interviewed Mr. Beler on January 29th, 2020, as a

15   telepsychiatry forensic patient over a closed VTC

16   connection."  That's Page 9 going on in of your report.  And

17   this is Government's Exhibit 4.

18   A.  Yes.

19   Q.  Then continuing on to Page 10, in the second paragraph,

20   about a third of the way down, maybe a quarter of the way

21   down, you write:  "In an effort to continue ███████████

22   █████████████████████  I also met with him on three other

23   occasions:  February 4th, March 3rd and April 30th, 2020."

24   Correct?

25   A.  Yes.

1    Q.  Okay.  And your testimony now is that you did not in

2    fact meet with him on February 4th, 2020?

3    A.  Yes.

4    Q.  Okay.

5    A.  That report is incorrect.  There's a typo in the report.

6    I apologize.

7              THE COURT:  So what dates did you meet with him

8    ███████████████

9              THE WITNESS:  I would say the first date is the

10   first date I gave you for the first meeting.  I apologize.

11   My paperwork is not what it should be.  It is January 29th,

12   2020.

13   BY MS. VOSHELL:

14   Q.  And again, as we just went through, you write in your

15   report the first time you met with him -- and I think we all

16   agree with this -- was January 29, 2020.  Correct?

17   A.  I also spoke with him at that time ████████████████

18   Q.  My question is:  When was the next time that you met

19   with him after that?  You write in your report that you met

20   with him three additional times before writing your report.

21   Apparently, one of those was not February 4th, 2020, as you

22   wrote in your report.

23              So when was the next time that you met with him

24   after January 29th, 2020?

25   A.  I have another note in here from March 2nd, 2020.

1    That's when I have ████████████ and I spoke to the

2    psychologist.

3    Q.  Did you meet with him on March 2nd, 2020?

4    A.  To the best of my recall, I did not meet with him

5    directly on March 2nd.  I talked to the psychologist on

6    March 2nd and I probably pulled that date off when I wrote

7    the report because it was on the list with my name on it,

8    with my name on it out of BEMR.  So I probably went through

9    and pulled my name and said:  Date, date, date, date.  This

10   is when I met with him.

11   Q.  So turning your attention back to Page 10 of your

12   report, in that list of those three other occasions that you

13   met with Mr. Beler, so February 4th, 2020, you testified

14   that you did not actually meet with him on February 4th.

15        March -- what about March 3rd of 2020?  Did you

16   meet with him then?

17   A.  No.

18   Q.  And what about April 30th of 2020?  Did you meet with

19   Mr. Beler then?

20   A.  April 29th is the date of the note.

21   Q.  You met with him on April 29th of 2020?

22   A.  Yes.  That's probably a -- in BEMR -- when I wrote the

23   note -- I probably wrote the note on the 30th and I met with

24   him on the 29th.  I'm sorry.  It's a paperwork problem.

25   Q.  When you are talking about the note that you wrote that

1    shows that you met with him on April 29th, 2020, are you

2    referring to --

3    A.  Yes.

4    Q.  -- to the Bureau of Prisons Health Services clinical

5    encounter note?

6    A.  Yes.

7    Q.  So turning your attention back to Page 10 of your

8    report, when you say, "I also met with him" -- sorry.  When

9    you write, "In an effort to ███████████████████████

10   █████████████████████ I also met with him on three other

11   occasions:  February 4th, March 3rd and April 30th, 2020."

12   You in fact actually only met with him on one additional

13   occasion; and that was on April 29th, 2020, before writing

14   your report?

15   A.  Yes.

16   Q.  The first time that you met with Mr. Beler on January

17   29th, 2020, as we've discussed, there was no COVID-19

18   outbreak in the United States; but you still met with

19   Mr. Beler over telepsychiatry rather than going to Fort

20   Worth.  Right?

21   A.  I'm sorry.

22   Q.  I can repeat the question.

23        So as we discussed, on January 29th, 2020, when

24   you met with Mr. Beler through a telepsychiatry meeting,

25   there was no COVID-19 outbreak that would have prohibited

1    you from meeting with him in person?

2    A.  On January 29th, there was no COVID-19 outbreak.  No.

3    There was no --

4    Q.  Right.  I said "that would have prevented you from

5    meeting with him in person."

6              THE COURT:  Let her finish the -- let her think

7    and then answer.  Don't keep going back and forth with her.

8              MS. VOSHELL:  I apologize, Judge.  I just didn't

9    know if she could hear me.

10             THE WITNESS:  I had scheduled this for a different

11   room, but things don't always happen at the BOP.  So sorry.

12             One more time.  I'm turning you up.  I beg your

13   pardon.

14   BY MS. VOSHELL:

15   Q.  I'm not trying to interrupt you.  I just want to make

16   sure that you can hear me, and I see you leaning.

17   A.  Yes.

18   Q.  So, Dr. Cuccio, when you met with Mr. Beler on January

19   29th, 2020, you met with him through telepsychiatry even

20   though there was no COVID-19 outbreak that would have

21   prevented you from meeting with him in person?

22   A.  When I met with him on January -- yeah.  Right.

23   Q.  All right.

24   A.  I -- okay.

25   Q.  So you testified that you met with him one additional

1    time on April 29th of 2020.  And then this is not in your

2    actual report, but you met with him again on July 28th of

3    2020.  Correct?

4    A.  I met -- the next time I met with him was April 29th.

5    Is that what you're asking me?

6    Q.  I'm asking you after April 29th, 2020, the next time

7    that you met with him was on July 28th, 2020.  And I don't

8    know if you have the records produced in the same way that

9    they were produced to us, but this is Page 2.  This is the

10   second page in the 2020 -- in Mr. Beler's 2020 BOP records.

11   So this is Joint Exhibit 18 at Page 2.

12   A.  Yes.  I do have that one.  Yeah.  I have that.  Yes.

13   Yes.

14   Q.  So you didn't telemeet with Mr. Beler at all during the

15   month of May?

16   A.  No, I did not.

17   Q.  You did not telemeet with him at all during the month of

18   June?

19   A.  No, I do not.  I did not meet with him in person that

20   month either.

21   Q.  And just to clarify, you did not meet with him through a

22   telepsychiatry appointment either during the month of June?

23   A.  Yes.  I did not.

24   Q.  You did not telemeet with him again until that date

25   until the very end of July, July 28th of 2020?

1    A.  Yes.  I met with him █████████████ ██████ ███████

2    Q.  Where in the BOP records does it reflect that you met

3    with him ██████████████ ██████ ██████

4    A.  It's in the psychology notes.  ██████████ ███████

5    ████████████         But it's not --

6    Q.  So it's --

7    A.  It's not a specific meeting ████████████████    I

8    saw him.



1 ████████████████████████████████████████████████

2 ███████

3 Q.  Okay.  So you did not arrange a meeting with Mr. Beler

4 either immediately before or immediately after ███  ███████

5 ███████

6 A.  I don't recall, but I don't believe I did right after

7 that.

8 Q.  What about immediately before ███ ██████ ███████    Did

9 you arrange a meeting with him then?

10 A.  I don't believe I did.

11 Q.  Okay.  What about during --

12 A.  I believe I [indiscernible] the psychologist.

13 Q.  What about during ███ ██████ █████████████████████

14 ████████████████████████████████████████████████████

15 ███

16 ███████████

17 ██████████████████████████████████████████ ████████

18 ██████████████████████████████████████████████

19 ████████████████ █████████ █████████████████████████

20 ██████████████████

21 ████████████████████████████████████

22 █████████████████

23 Q.  When you met with --

24           THE COURT:  Excuse me.  Excuse me.  I need to have

25 you speak one at a time.  If you speak together, the court

1    reporter is going to have trouble.

2              Go ahead.

3    BY MS. VOSHELL:

4    Q.  So going back to that July 28th, 2020, meeting, the last

5    time that you had actually met with Mr. Beler was on April

6    29th, 2020, correct, before that July 28th, 2020 meeting?

7    A.  As far as I recall, yes.

8    Q.  When you met with him on July 28th, 2020, that was one

9    week after Dr. Corvin had submitted his report to the Court.

10   Correct?

11   A.  Perhaps.  I don't know exactly the dates.  But yeah.

12   Okay.

13   Q.  And that was one week before the initial *Sell* hearing in

14   this case, which was on August 4th of 2020?

15   A.  There was an initial *Sell* hearing then?  Okay.

16   Q.  I'm saying when you met with him on July 28th, 2020,

17   that was one week before the other hearing in this case

18   which was set for August 4th of 2020.

19   A.  Okay.

20   Q.  And when you met with him on July 28th of 2020, that was

21   three months since your last telemeeting with him.

22   A.  Okay.

23   Q.  After telemeeting with him two times and then not again

24   until three months later, then you telemet with him again on

25   August 5th of 2020, the day after the first part of this

1    hearing.  Correct?

2    A.  August 5th?  I don't have a note from August 5th.  Oh,

3    here it is.  Okay.  Yes.

4    Q.  And then you met with Mr. Beler again on August 13th of

5    2020?

6    A.  Yes.

7    Q.  So you telemet with him three times within the past

8    three weeks all surrounding this hearing.  Correct?

9    A.  Yes.

10   Q.  After previously having only met with him three times

11   total?

12   A.  Yes.

13   Q.  Dr. Cuccio, when you as a forensic psychiatrist are

14   evaluating a person, there are things that you can observe

15   in person that you cannot observe over video?

16   A.  Yeah.

17   Q.  Such as a person's movements and facial expressions?

18   A.  Sometimes.

19   Q.  And such as a person's entire body?

20   A.  Sometimes that's necessary and sometimes it's not.

21   Q.  But you can't see what a person -- sometimes you can't

22   see what a person might be doing with part of their body

23   that you don't see on the camera?

24   A.  Sometimes it's helpful, because I always have another

25   person in the room.  And the other person in the room will

1    tell me:  His feet were jiggling.  He was leaning towards

2    the camera.  His voice went up.

3            You know, after I talk to him on camera, we

4    discuss what happens in the room with the person who was

5    there.  So we have some mitigation of that.

6            But no.  It's always better to be there.  It's

7    true.

8    Q.  It can be more difficult or even impossible in some

9    cases to administer certain types of diagnostic tests if

10   you're not there in person?

11   A.  Normally, psychologists do diagnostic testing.

12   Q.  But there's some diagnostic tests that psychiatrists can

13   do.  And it's more difficult, if not impossible, to do some

14   of those tests if you are not there in person?

15           THE COURT:  Can you be more specific --

16           THE WITNESS:  Right.

17           THE COURT:  -- as to what tests you're talking

18   about?  Ms. Voshell, what tests are you asking her about?

19           MS. VOSHELL:  I'm asking generally if there are

20   tests that are more difficult to do or even impossible to do

21   if you're not there in person.

22           THE COURT:  You need to be more specific about

23   what you're talking about in terms of what kind of tests you

24   think she needs to answer about.

25

Cuccio - CROSS - By Ms. Voshell

1    BY MS. VOSHELL:

2    Q.  Certain neurocognitive tests you cannot do if you're not

3    there in person?

4    A.  Normally, psychologists do that.  I don't --

5    Q.  A physical assessment you cannot do if you're not there

6    in person?

7    A.  I have an on-site physician there.  And there are -- if

8    I need to refer to a neurologist, I can refer to a

9    neurologist.  If there's a nurse practitioner there who

10   specializes in psychiatry who can do evaluations for -- and

11   nurses who can do evaluations for side effects and things

12   like that.

13        So the diagnosis is pretty easy here

14   psychiatrically, if that's what you're asking me about.

15   Q.  I'm not asking about the psychiatric diagnosis; I'm

16   asking about the testing that -- testing limitations that

17   exist because there is no -- because you as the psychiatrist

18   on this case were not there in person to evaluate Mr. Beler.

19        THE COURT:  But you need to be more specific.

20   Excuse me.  You're asking in general terms.  That's not

21   helpful.  I'm the decision-maker here.  If you've got

22   specific tests that psychiatrists do that you think she

23   needs -- that they need to do in person, then indicate what

24   they are.  She's gone through other things.  Tell her what

25   you think the tests that you're referring to are.

1    BY MS. VOSHELL:

2    Q.   Dr. Cuccio, are you able to perform the Montreal

3    Cognitive Assessment if you're not there in person?

4    A.   If I wanted to do that, I would give the form to the

5    psychologist and let her do that.  But that's not necessary

6    here.

7    ███████████████████████████████████████████

8    ██████████████████████████████████████████████

9    ███████████████      If you wanted to do a MoCA, you would be

10   hard pressed to validate that screening test.

11   Q.   You are not able to do the Folstein test if you are not

12   there in person?

13   A.   I don't necessarily need to do that.  But I have done

14   those.  I have asked somebody to have him draw a clock and

15   have the arm say a quarter of 3:00 and then they send it

16   back to me and I look at it.  So yes.  I have done those.

17   Q.   Where is that reflected in your records that you've --

18   A.   I haven't done those with him.  I have done those with

19   patients. █████████████████████████████████

20   ████████████████████████████████████

21   ██████████████

22   ██████████████████████████████████

23   ████████████████████████████████████████████

24   ███████████████████████████████████████████

25   ██████████████████████████████

1  ████████████████████████████████████

2  ██████████████████████████████████████

3  ████████████████████████████████████████

4  ███████████████████████████████████████

5  ████████████████████

6  ████

7  █████████████████████████████

8  ██████████████████████████████████████

9  ██████████████████████████████████████

10 █████████████████████████████████████

11 ██████████████████████████████████████

12 ██████████████████████████████████████

13 ████████████████████████████████████████

14 █████████████████████████████████████

15 █████████████████████████████████████

16 █████

17  Q.  He's not in a hospital; he's in a prison.  Correct?

18  A.  Could you --

19  Q.  I said:  He is not in a hospital; he is in a prison?

20  A.  He's in a specialized unit within a prison.  He's in a

21  specialized unit where they have observation so that I know

22  what his orientation status is.

23         It's specifically --

24  Q.  When you say --

25         THE COURT:  One at a time, please.  Excuse me.

1          MS. VOSHELL:  I thought she was done, Judge.  I'm

2     sorry.

3          THE COURT:  Otherwise, we won't have a record.

4          Go ahead, Ms. Voshell.

5     BY MS. VOSHELL:

6     █████████████████████████████████████████████████

7     ███████████████████████████████████████████████████

8     ███████████████████████████████████████████████████

9     ████████████████████████████████████████████████

10    ████████████████████████████████████████████████

11    █████████████████████████████████████████████████████

12    ████████████████████████████████████████████████████

13    ████████████████████████████████████████████████████

14    ██████████████████████████████████████████████

15    ███████████

16    ██████████

17    ███████████████████████████████████████████████████

18    Q.  When you say you have staff that are there 24 hours a

19    day, you're referring to BOP prison guards.  Correct?

20    A.  And nursing.  We --

21    Q.  There's not a nurse in Mr. --

22          THE COURT:  Ms. Voshell, let her finish.  Okay?

23          MS. VOSHELL:  I'm sorry.

24          THE COURT:  Wait a beat before you move on.  I

25    realize it's more difficult with video than in person, but

1    let her finish and have a little space in there and then

2    move on.

3            So I heard something about guard and then

4    something about nursing and then I missed the rest of it.

5            Dr. Cuccio?

6            THE WITNESS:  I apologize, your Honor.  I'm a

7    little slow sometimes, too, and I just kind of pause a

8    little bit in between things.

9            But we have nursing staff that are present.  We

10   have psychologists that are present on a unit, not 24 hours

11   a day, but they are in and out.  We have a nurse

12   practitioner that is there during the day.  We have nurses

13   that give medications on that unit.  So we have specialized

14   staff on that unit that are there besides COs as well.

15   ████████████████████████████████████

16   ██████████████████████████████████████████

17   ███████████████████████████████████████████

18   ██████████████████████████████████████

19   █████████████████████████████████████████

20   ████████████████████████████████████████

21   ██████████████████████████████████

22   ██████████████████

23   BY MS. VOSHELL:

24   Q.  Dr. Cuccio, have you personally spoken with every

25   individual nurse who has been on Mr. Beler's unit in the

1    months that he's been at Fort Worth?

2    A.  No.  I have access to his records.  And when the nurses

3    have a problem, they put it in the record.  They also speak

4    to the psychologists and I read his record.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    Q.  The --

20    A.  I'm sorry.

21    Q.  I'm sorry.

22    A.  I'm a big talker.  Go ahead.

23          THE COURT:  Finish your answer.  Finish your

24    answer before she moves on.  Finish your answer.

25          THE WITNESS:  Yes, ma'am.  Yes, ma'am.

1    BY MS. VOSHELL:

2    Q.  Are you done?  I can ask my next question; or if you had

3    more to say, you can go.

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████

10   ██████████████

11            ████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ███████████████████

15   Q.  So to answer my question, no BOP psychiatrist has ever

16   met with Mr. Beler in person?

17   A.  Correct.

18   Q.  What is the name of the psychiatry nurse practitioner

19   that you say has met with Mr. Beler?

20   A.  The only BOP psychiatrist that has seen and evaluated

21   Mr. Beler ██████████████████████████  ████████  ████████████████

22   ████████  ████████

23   Q.  I asked:  What was the name of the nurse practitioner

24   who you said has met with Mr. Beler?

25   A.  She has a very difficult-to-pronounce name and she's

 1    new.  And I'm not sure --

 2              THE COURT:  Spell it.

 3              THE WITNESS:  Oh, I don't want to mess this up.

 4    Let me see if I have it written here.  I tried to keep my

 5    notes -- I don't think I have it written down here.

 6              It's like Masami [phonetic], but it's Mangala

 7    [phonetic] Masami.  It's something before Masami.  I'm

 8    sorry.  I can't say it and I can't spell it.  And I don't

 9    have it in my notes.

10    BY MS. VOSHELL:

11    Q.  What about in the BOP records?  Where in the BOP records

12    does it reflect that that nurse practitioner has ever met

13    with Mr. Beler?

14    A.  Let me see.  Do we have time for me to pull it up on my

15    computer?

16              THE COURT:  Yes.  Go ahead.  Take the time.

17              THE WITNESS:  Okay.  She has met with him when I

18    have met with him and she has been in the room.  I'm not

19    sure she has written a note in his chart, but I know she has

20    met with him.

21              If your question reflects how long she's been

22    there, she hasn't been there long.

23              I don't see a note written by her in his chart.

24    But she has met with him with me.

25

1    BY MS. VOSHELL:

2    Q.  On what of the occasions when you have met with

3    Mr. Beler through telepsychiatry has the nurse practitioner

4    also been there?

5    A.  At least the last two.

6    Q.  When you say "the last two," you mean August 5th and

7    August 30th of 2020?

8    A.  Yes.

9    Q.  What about July 28th of 2020?

10   A.  I'm not sure.  She may have been there that date.

11   Q.  But it sounds like not in -- during your January or

12   April meeting with Mr. Beler?

13   A.  No.  No.  She wasn't there yet.

14   Q.  So Mr. Beler has been at FMC Fort Worth from December of

15   2019 until today.  Correct?

16   A.  Yes.

17   Q.  And in those nearly eight months of being there, he has

18   never met with a psychiatrist in person?

19   A.  Only at ████  ████████  ████████

20   Q.  Okay.  And that was -- did that psychiatrist perform an

21   evaluation of Mr. Beler ██████  ████████  ██████  or was he

22   just in the same room with that psychiatrist ██████████████

23   ██████████████  ████████  ████████

24   A.  It depends on what you mean by an evaluation.  I mean,

25   she read my evaluation.  She evaluated him for herself and

1    she decided ███████████████████████████████ ████████

2    ███████        But she didn't do an H&P evaluation, a history

3    and physical evaluation.

4    Q.  So when you say -- when you're using the term

5    "evaluated," in that way, ███████████████████████████

6    ████ ██████ ██████████████████████████████████

7    A.  Yes.

8    Q.  And that psychiatrist is not a person who is employed by

9    the BOP.  Correct?

10   A.  She is employed by the BOP.  She is the former

11   psychiatrist who used to work at that facility.  And she now

12   is at another facility.

13   Q.  And before being held at Fort Worth, Mr. Beler was held

14   at Englewood for his initial competency evaluation.

15   Correct?

16   A.  Yes.

17   Q.  That was in 2019?

18   A.  Yes.

19   Q.  And Mr. Beler never met with a psychiatrist in person

20   when he was being held at Englewood?

21   A.  Not that I know of.  They don't have a psychiatrist on

22   staff there.

23   Q.  So Mr. Beler's never been held at a BOP facility where

24   there is a psychiatrist on staff?

25   A.  Not that I know of.

1    Q.  And going back to the psychiatry nurse practitioner, you

2    indicate that there's nothing in the note, in the BOP

3    records, ever indicating that that psychiatry nurse

4    practitioner ever actually met with Mr. Beler, but your

5    testimony is that she attended your meetings with Mr. Beler

6    on August 5th and August 13th of 2020?

7    A.  Yes.

8    Q.  And you testified on direct that even if the nurse

9    practitioner were to meet with Mr. Beler, the nurse

10   practitioner is not able to make a forensic analysis

11   regarding involuntary medication pursuant to *Sell*?

12   A.  No, she's not.

13   Q.  And the nurse practitioner also has to be supervised by

14   a medical doctor with a license.  Correct?

15   A.  If she's prescribing, yes.

16   Q.  All right.  During your direct testimony, you discussed

17   your two to three years treating patients to competency and

18   your observations of them in Texas.  Correct?

19   A.  Yes.

20   Q.  And I want to clarify a few things about that

21   experience.

22          The competency treatment that you performed for

23   those two to three years in Texas was in person, not over

24   telepsychiatry?

25   A.  Yes.

1    Q.  And your observations of those patients was based on you

2    evaluating, meeting with and monitoring those patients in

3    person?

4    A.  Yes.

5    Q.  At some point in your testimony, you talked about your

6    prior experience observing patients that were treated with

7    medication in an effort to restore them to competency.  Is

8    that work that you only did in Texas or is that work that

9    you also did at some point during your experience at the

10   BOP?

11   A.  I did some work at Springfield.  But most of that was

12   not to restore competency.  There were a few patients who

13   were incompetent, but -- if I can recall.  But I don't

14   recall specifically who they were.

15   Q.  So when you draw from your experience observing people

16   who are being treated to competency with medication, you're

17   primarily referring to your time when you were working at

18   that state hospital in Texas.  Correct?

19   A.  Yeah.  The forensic hospital.

20   Q.  Yes.

21        And you last worked at that forensic hospital in

22   2002.  Is that right?

23   A.  I'd have to look.  I think it's been longer than that,

24   actually.  Is the date important?

25   Q.  Yes.  I mean, it's not clear to me from your CV.  So if

1    you can identify the date, that would be helpful.

2    A.  Let's see.  It looks like 2002 I was in admissions.

3    Yes.  I did various -- I was in various positions at that

4    facility, not in the competency unit.

5    Q.  What years did you work at the competency unit?

6    A.  Let me tell you about the structure of that place first

7    before we go into what was what, because I went straight

8    from my child fellowship to the competency unit at the

9    forensic facility there.  And when I did that, I worked

10   doing only competency -- seeing competency patients for a

11   number of years.  And that was a unit that took only

12   competency patients.

13         Then I moved to a long-term treatment unit where

14   people couldn't get competent.  So I don't know if you would

15   call that a competency -- treatment to competency or not.

16   But that was not so specific; it's, you know, "We're going

17   to send you patients who are found by the Court to not be

18   competent, and send them back in four months."  All right?

19         But later, I was treating patients that were in

20   GRI or who couldn't get competent who were there long-term,

21   much longer term.

22         And then I left for a short period of time and I

23   came back.  And I was chief of admissions, and I saw

24   everybody that came in.  And some of those patients were

25   going to the competency unit; some of those patients were

1    going to the long-term unit; some of those patients were

2    manifestly dangerous.  Okay?  So I saw a variety of people

3    while I was there.

4         So it's going to be hard for me to dissect out

5    exactly the particular amount of time that I saw competency

6    patients, if that's what we're going after.

7    Q.  So what -- if you can narrow down the amount of time

8    that you spent working with patients who had been found

9    incompetent to try to help them be restored to competency.

10   A.  That would be very difficult for me to do, because there

11   were -- like I was saying, I worked with patients who were

12   in all different phases of that.

13        When I was the chief of admissions, I was writing

14   the intakes for all those patients.  So they'd come into the

15   hospital and I'd go through all their legal records and I

16   wrote all the intakes for all three of the different kind of

17   patients.

18        So I wasn't restoring them; but I was, you know,

19   looking at what they were -- at what was going on with them

20   and deciding where they went and writing forensic paperwork.

21   Q.  So your testimony is that you're not able to narrow down

22   the time period that you were specifically working with

23   patients to restore them to competency, not just writing

24   their initial evaluations, but actually working with

25   patients to try to restore them to competency, but that the

1    time period that you did that --

2    A.  Are you --

3    Q.  -- ended prior to 2002?

4    A.  Is your definition of "restoring them to competency"

5    putting them on meds?  Treating them with meds?  Sending

6    them back to court?  Telling the Court they're competent

7    only for competency?

8    Q.  I guess, unless there's some other definition for

9    treating patients to try to make them competent that you

10   have.

11   A.  Well, part of that is the admission.  Part of that was

12   what happens with them when they can't be competent.  You

13   know, there's -- it depends on what your definition is.

14   Right?

15              THE COURT:  Let me suggest this:  The time period

16   that you worked admissions and the different descriptions

17   that you have given of the work with those who had

18   competency issues, what time period would you say in total

19   that would have encompassed?

20              THE WITNESS:  For the whole time I was at the

21   forensic hospital?

22              THE COURT:  If that's what you're talking about.

23              In terms of the one unit that you discussed trying

24   to restore competency that the Court ordered, the others

25   that appeared long-term with issues where it was unlikely

1    they'd be restored, and admissions.  As you described it, if

2    you took all of that together, what time period are we

3    talking about, approximately?

4           THE WITNESS:  It looks like it was about six

5    years.  Let's see.  1996 to '98, approximately, and then '99

6    to 2002, approximately.

7    BY MS. VOSHELL:

8    Q.  The entirety of your time working with people who had

9    been found incompetent by courts in Texas was prior to the

10   2003 *Sell* decision.  Correct?

11   A.  Yes.

12   Q.  So you testified on direct that when you were engaged in

13   competency restoration practice in Texas, whatever level

14   that would be, you would treat people with medicine to make

15   them competent without regard to the *Sell* prongs, because

16   *Sell* had not yet been decided.  Correct?

17   A.  Yes.  Yes.

18   Q.  So that meant that if someone was incompetent, you would

19   say:  Okay.  You're not capable of understanding the risks

20   and benefits of treatments ████████████████████ and

21   then you would go ahead and treat them with medication?

22   A.  Not exactly.  The judge would say that.  The judge would

23   say -- they would decide that in jail, and some

24   psychiatrists would see them in jail and say:  This person

25   is probably not competent; and then they would go to a judge

 1    and the judge would say:  Yes.  Not competent; and they

 2    would remand them to the forensic hospital and say:  Treat

 3    them to competency or, you know, do this.

 4         And then we would say:  We think that they're

 5    probably competent now, your Honor, and we would send them

 6    back.

 7         And then the judge would say:  Yes.  I agree.  I

 8    believe this person is competent.  And then they would go.

 9         So we wouldn't necessarily decide if they were

10    competent, if that's what you're asking me.

11    Q.  You [indiscernible] --

12         THE COURT:  I can't hear you.

13         MS. VOSHELL:  Sorry?

14         THE COURT:  Your voice was dropping down.

15         MS. VOSHELL:  I'm sorry.

16    BY MS. VOSHELL:

17    Q.  You testified that the previous times you have been

18    qualified as an expert witness have been in Texas state

19    court.  Is that right?

20    A.  Yes.

21         THE COURT:  Can you hold on just one second?  Hold

22    on.

23         (Brief pause in the proceedings.)

24         THE COURT:  I apologize.  I'm teleworking and I'm

25    at home.

1           Go ahead.  Sorry about the interruption.

2    BY MS. VOSHELL:

3    Q.  Dr. Cuccio, the [indiscernible] --

4           THE COURT:  I can't hear you, Ms. Voshell.

5           MS. VOSHELL:  Can you hear now?  Is that better?

6           THE COURT:  Yes.

7    BY MS. VOSHELL:

8    Q.  So, Dr. Cuccio -- now I'm trying to remember the last

9    question.  So you testified that the previous times you

10   qualified as an expert witness have been in Texas state

11   court.  Correct?

12   A.  Yes, ma'am.

13   Q.  Have you testified as an expert witness in court since

14   your time at the Texas forensic hospital where you left in

15   2002?

16   A.  No.

17   Q.  So you've never testified -- and again, that testimony

18   that you gave prior to 2002 was before the 2003 Supreme

19   Court *Sell* decision.  Correct?

20   A.  Yes.

21   Q.  Okay.  So you've never testified as an expert witness in

22   court about whether or not an individual should be

23   forcefully medicated under *Sell*?

24   A.  No, I have not.

25   Q.  This is the first time?

Cuccio - CROSS - By Ms. Voshell

```
1    A.  I didn't catch that.

2    Q.  I said, this is the first time?

3    A.  Yes.

4    Q.  Have you ever written any reports since 2003 about

5    whether or not someone should be forcibly medicated under

6    Sell?

7    A.  No, I have not.

8    Q.  Dr. Cuccio, you indicate in your report that

9    Dr. Armstrong told you ███████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ██████████      And that's your report at Page 10, about

13   halfway down the second paragraph.  Is that right?

14   A.  Now I'm not --

15   Q.  It's Government's Exhibit 4, Dr. Cuccio.

16   A.  Yes.  I'm sorry.  Okay.  Page 10, about halfway down.

17   Q.  It says, █████████████████████████████████

18   ██████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ██████████

21   A.  Back at that time, he was.

22   Q.  To be clear, that different psychology staff member was

23   a predoctoral psychology intern.  Correct?

24   A.  Yes.

25   Q.  So Mr. Beler was not meeting with a licensed
```

Cuccio - CROSS - By Ms. Voshell

1    psychologist or a psychiatrist ████████████████████

2    ████████████████████████

3    A.  No.  Not at that moment.

4    Q.  And there's no licensed psychologist who is meeting with

5    Mr. Beler now ████████████████████

6    ████████████

7    A.  Yes.  Dr. Armstrong meets with him daily.

8    ██████████████████████████████

9    ██████████████████████████████

10   ████

11   ████████████████████

12   ██████████████████████████████

13   ██████████████████████████████

14   ████████████████████████

15   ████████████

16   ██████████████████████████

17   ██████████████████████████████

18   ██████████████████████████

19   ██████████

20   Q.  Dr. Cuccio, where in the BOP records does it show that

21   Dr. Armstrong meets with Mr. Beler every single day?

22   A.  If you'd look at the psychology records, I'm not saying

23   every single day, but she's been in there -- she has seen

24   him daily.  And she doesn't write a note daily, but she's on

25   that unit every day.  And she writes a note frequently,

1    almost every day.  And if you look in the psychology

2    records, you can see that.  There's copious records from

3    psychology.

4    Q.  And again, Mr. Beler has -- all right.

5            So, Dr. Cuccio, I want to be clear about your

6    purpose in testifying -- Is she still there?  I lost her.

7    A.  I'm here.

8    Q.  Dr. Cuccio, I want to be clear about your purpose in

9    testifying at this hearing.  You're here to testify for the

10   Government that the *Sell* prongs are satisfied, and thus this

11   Court should order that Mr. Beler be forcibly medicated

12   against his will.  Correct?

13   A.  Yes.

14   Q.  You're not here as Mr. Beler's treating psychiatrist?

15   A.  I would be treating him afterwards.

16   Q.  If the Court ordered that Mr. Beler be forcibly

17   medicated under *Sell*, you would be the psychiatrist treating

18   him, is your testimony?

19   A.  Yes.

20   Q.  But you're not currently Mr. Beler's treating

21   psychiatrist?

22   A.  No one is treating Mr. Beler.

23   Q.  And you're not here as the psychiatrist who would

24   provide Mr. Beler with long-term care for the rest of his

25   life?

1    A.   No.   He's not remanded to the facility for the rest of

2    his life.

3    Q.   Right.

4         And you're here as the BOP psychiatrist to

5    evaluate Mr. Beler through a telepsychiatry connection and

6    is opining on the *Sell* prongs.   Correct?

7    A.   Partly.

8    Q.   And if the Government is successful and Mr. Beler is

9    ordered to be forcibly medicated, BOP through you will

10   forcibly medicate him to make him competent to stand trial.

11   Correct?

12   A.   Correct.

13   Q.   And if Mr. Beler loses his trial or if he pleads guilty

14   and he's sentenced to a term of imprisonment, BOP will no

15   longer forcibly medicate him?

16   A.   That's not up to me.

17   Q.   And if Mr. Beler wins his trial and he's released or his

18   case is dismissed, BOP will no longer forcibly medicate him?

19   A.   Those scenarios are not up to me.

20   ███████████████████████████████████████

21   ██████████████████████████████████████

22   ████████████████████████████████████████

23   ████████████████████████████████████

24   ███████████████████████████████

25        If he is not at my facility, he's not in my care.

1    And I can't treat him.

2    Q.  Well, to be clear, so if Mr. Beler wins his trial and

3    he's released, he would no longer be in the BOP's care and

4    so you would not follow him throughout his life 

5    ████████████████████████████████████████████

6    A.  If he leaves my facilities, he would not be in my care.

7    Yes.  No.  He wouldn't be in my care.

1    ████████████████████

2    BY MS. VOSHELL:

3    Q.  There's a lot there, and I will break it down.  I will

4    ask you a number of questions about what you just said.

5             But to be very clear, Mr. Beler is, quote-unquote,

6    "under your care" because he is currently incarcerated at

7    the Bureau of Prisons having been charged with crime and

8    having been found incompetent by the Court.  Correct?

9             THE COURT:  I don't think the -- go ahead.  Never

10   mind.

11            THE WITNESS:  He --

12            THE COURT:  I don't think there's been a formal

13   ruling that he's incompetent.

14            MS. VOSHELL:  I believe the magistrate found that

15   he was incompetent as an initial matter and he's at the BOP

16   now for competency restoration.

17            THE COURT:  Right.

18            MS. VOSHELL:  So I can ask that a little bit more

19   clearly.

20            THE COURT:  Okay.

21   BY MS. VOSHELL:

22   Q.  So, Dr. Cuccio, the reason that Mr. Beler is,

23   quote-unquote, "under your care" is because Mr. Beler was

24   arrested and has been charged with an offense.  The

25   magistrate in the case has found he is incompetent as an

1    initial matter and now he is being housed at the Bureau of

2    Prisons for competency restoration?

3    A.  I don't know why you're saying "quote-unquote."

4            I think if he was -- if I were standing in front

5    of any other judge, he would be my patient.  He's my

6    patient. ████████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████    And he's my patient.  I don't

9    understand why you're asking me these questions in this way.

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████

20       ████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████████

23       ████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████















1 

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          So Mr. Beler was arrested on April 17th of 2019.

18    Correct?

19    A.  Okay.  Yes.

20

21

22

23

24    Q.  And then on April 23rd of 2019, Mr. Beler was ordered to

25    the custody of the Attorney General for a competency

1   evaluation?

2   A.  Yes.

3   Q.  And he was sent to FDC Englewood?

4   A.  Yes.

5   Q.  He was initially evaluated on May 31st of 2019?

6   A.  Yes.

7   Q.  And then he was placed in medical isolation for a period

8   of time and then reevaluated once the medical isolation was

9   over?

10  A.  Yes.

11  Q.  And Dr. Jessica Micono, who is a psychologist at

12  Englewood, evaluated Mr. Beler?

13  A.  Yes.

14  Q.  You've read her report.  Correct?

15  A.  Yes.

16  Q.  I'd like to just talk briefly about some of other

17  observations.

18          Dr. Micono met with Mr. Beler in person on July

19  10th and 11th of 2019.  Correct?

20  A.  Okay.  Do you mind if I pull out her report?

21  Q.  No.  And for the record, Dr. Micono's report is Joint

22  Exhibit 6.

23  A.  If I can find it.

24  Q.  I'm referring to Page 2 at the very top.  It describes

25  the dates and lengths of Dr. Micono's evaluations of

 1      Mr. Beler.

 2      A.  (Witness searching.)

 3      Q.  I'm happy to email you the report, if that's easier.

 4      A.  Oh, that would be great.  Thanks so much.

 5      Q.  That's fine.  If we were in court, I could hand it to

 6      you.

 7      A.  I wish I had a little less paper here.  If I were better

 8      at dealing with all this paper, I'd be much better off.

 9              (Brief pause in the proceedings.)

10      BY MS. VOSHELL:

11      Q.  I'm emailing you what has been marked as Joint

12      Exhibit 6, which is Dr. Micono's report.

13      A.  It's not quite here yet.  My email seems like it's slow,

14      too.  It's not just me.  Are you sending it to the BOP

15      address?

16      Q.  Yes.

17      A.  Oh, got it.  All right.  What were you asking me?  I'm

18      so sorry.

19      Q.  So I'm drawing your attention to Page 2 of Dr. Micono's

20      report.  She met with him on July 10th and 11th of 2019 in

21      person?  It's at the top of Page 2.

22      A.  Yes.  Okay.

23      ███████████████████████████████████████████████████

24      ████████████████████████████████████████████

25      ███████████████████████████████████████████████████



1    ████████

2    Q.  Dr. Micono ultimately concluded that Mr. Beler was

3    incompetent.  That's Page 14 of her report.  So it's the

4    third paragraph, the last sentence:  "It is this evaluator's

5    opinion that Mr. Beler is currently incompetent to proceed

6    with his case."

7    A.  Yes.

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████

12   ████████

13   ████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████

16   ████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████

19   ████████

20   Q.  Mr. Beler was ultimately found incompetent by the

21   magistrate and transferred to FMC Fort Worth for competency

22   restoration.  Correct?

23   A.  Yes.

24   Q.  And there, Dr. Armstrong oversaw his competency

25   restoration?

1    A.  Yes.

2    Q.  And continues to oversee his competency restoration.

3    Correct?

4    A.  Yes.

5    Q.  Dr. Armstrong noted that she did not obtain any

6    discrepant information from Dr. Micono's report?

7    A.  Well, there was some.

8    Q.  Dr. Armstrong in her own report noted that she did not

9    obtain any discrepant information from Dr. Micono's report?

10   A.  I --

11   Q.  I would draw your attention to Government Exhibit 2 --

12              THE COURT:  Excuse me.  The report speaks for

13   itself.  She can't comment on what somebody else did.  The

14   report says what it says.

15   BY MS. VOSHELL:

16   Q.  And Dr. Armstrong noted that Mr. Beler put forth good

17   effort on competency questions and repeatedly expressed

18   strong motivation to be found competent to proceed.  And

19   that's in her report at Page 9, which is Government's

20   Exhibit 2.

21   A.  Yeah.  That's psych-speak for he's not malingering.

22   Yeah.

23   Q.  All right.  Dr. Armstrong ultimately agreed with

24   Dr. Micono that Mr. Beler was not competent to proceed?

25              THE COURT:  Can I ask a question as to why you're

Cuccio - CROSS - By Ms. Voshell

1    asking her?  We've already had Dr. Armstrong testify about

2    her report and her testimony.  If you're leading up to a

3    question that comes from all of this, then do so.  She

4    doesn't have to testify about what somebody else has already

5    testified to.

6            MS. VOSHELL:  That's fine, Judge.  I can move on.

7    BY MS. VOSHELL:

8    Q.  Dr. Cuccio, you also testified at the first part of this

9    hearing that Mr. Beler is not competent?

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   Q.  Mr. Beler, in addition to -- withdrawn.

14           And again, you attended Mr. Beler's ██████

15   ██████  Correct?

16   A.  Yes.

17   Q.  And you testified at that hearing?

18   A.  Yes.

19   Q.  And you wrote about that hearing in your report?

20   A.  I'm sorry.  Say that again.

21   Q.  You wrote about ████  ██████   ████████  in your report?

22   A.  In which report?  The *Sell* report?

23   Q.  Yes.

24   A.  I don't recall.

25   Q.  May 20, 2020 report.

1    A.  Can I look?

2    Q.  Yes.  It's at Page 11 of your report.

3    A.  Okay.  Yes.  That's the results.  Yes?

4    Q.  Right.



1    

2

3

4

5

6

7

8    A.   Tell me where I said that.

9    Q.   We have the transcript from the first part of the

10   hearing.

11

12

13

14   Q.   You testified on August 4th, 2020, at the first portion

15   of this hearing that it is a good thing -- this is Page 156

16   of that transcript:

17

18

19

20

21

22   A.   Yes.

23   Q.   Do you remember testifying to that?

24   A.   Yes.

25



Q.  And I'm referring to --

          THE COURT:  I can't hear you.  If you look down,
we can't hear you.  You have to speak -- I realize you're
looking at notes.

          MS. VOSHELL:  Yes.  I'm sorry.  I was just trying
to pull up the exhibit.

1    BY MS. VOSHELL:

2    Q.  I'm referring to Joint Exhibit 3, ████████████

3    ███████████████████████████████████████

4    █████████

5    ████████████████████████████████████████████

6    ████████████████████████████████████████████

7    ██████████████

8    ██████████████████████████████████████

9    ███████████████

10   █████████████████████████████████████

11   ███████████████████████████████████████

12   ████████████████████████████████████████████

13   ███████████████████████████████████████████

14   ███████████

15           THE COURT:  We lost you at the end.

16           MS. VOSHELL:  I said I'm looking at Pages 313 to

17   314 of what I believe is a total of 539 pages of records

18   ████████████████████████████████████

19   █████████████████████████████

20       ███████████████████████████████████████

21   ██████████████████████

22   BY MS. VOSHELL:

23   Q.  That wasn't my question.

24       ██████████████████████████████████

25   ████████████████████████████████████████████

Cuccio - CROSS - By Ms. Voshell

1    ████████████████████████████████

2    A.  I don't have those records right at my fingertips.  I'm

3    sorry.

4    █████████████████████████████████████████████████

5    ████████████████████████████████████

6    █████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████

9    A.  I don't know.  I don't have access to that right now.  I

10   don't know what the date is to have access to those records.

11   Q.  Do you have the ██████████████████████████ records with

12   you?

13   A.  I have them on my computer and I have a big stack of

14   them right here.  I have access to the -- what he did when,

15   the progress notes.  I have the medical notes.

16          So you're asking me the dates and times of records

17   of when he got certain things out of 4,000 records?  It's

18   kind of hard for me to do.  I apologize.

19   Q.  Right.  Again, if we were in court, I would hand you

20   this.  I can try emailing those records to you, if that

21   would be easier.

22   ████████████████████████████████████

23   █████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   ███████████████████████████████████████████████



1    ████████████████

2        ████████████████████

3    ██████████████████

4        █████████████████

5    ████████████████████████

6    ████████████████████████

7    ███████████████████████

8    ████████████████████████

9    █████████████████

10   BY MS. VOSHELL:

11   Q.  Just so the record is clear, in Joint Exhibit 3, ████

12   █████████████████████████

13   ██████████████████████████

14   ███████████████████

15   █████████████████████████

16   ███████████      So that'll start on Page 308

17   of those records and continue on to Page 313 of those

18   records.

19          THE COURT:  Excuse me.

20          Do you have those records, Dr. Cuccio, in the

21   context of the way she has set it out?  She doesn't have the

22   exhibits.  She needs to have the exhibits given to her.

23   What she has is the records separately.

24          THE WITNESS: ████████████████

25   ████████      And I can -- let's see if I can go all the

Cuccio - CROSS - By Ms. Voshell

1    way down to 300 -- I have through 273.  I did not get a

2    copy.  273.  I apparently did not get a copy of that when

3    they mailed them to me.  Apparently, I only got copies

4    through -- that's a problem in the BOP.  That's not a

5    problem with the Court.

6    BY MS. VOSHELL:

7    Q.  Dr. Cuccio, I'll email you right now the joint exhibit

8    to which I'm referring, if that helps.

9    A.  That would be great.  That would help me.  Yes.  If I

10   need to repeat the dates, that would be good.

11

12

13

14

15

16            THE COURT:  Okay.  That's fine.  That's fine.

17            Why don't we take a break while you email it at

18   this point.  It's five to 12:00.  How about a 15-minute

19   break at this point.  I'll take one later, too.  But why

20   don't we take a break while you email the exhibits and we'll

21   resume at 12:15.

22            MR. JEFFRESS:  Thank you, your Honor.

23            THE COURT:  See you all back at 12:15.

24            (Thereupon a recess was taken, after which the

25   following proceedings were had:)

```
 1    BY MS. VOSHELL:

 2    Q.  So for this, Dr. Cuccio, it would be helpful if you have

 3    what's been labeled as Joint Exhibit 4.

 4              THE COURT:  Dr. Cuccio, I don't see you.  Are you

 5    on?  Can you say something?  Because that puts you on.

 6              THE WITNESS:  I'm here.  Yes, your Honor.  Can you

 7    see me now?

 8              THE COURT:  Oh, there we are.  Okay.  You have to

 9    say something.  Occasionally, it just puts it blank.  But I

10    can see you.  We're all set.

11    BY MS. VOSHELL:

12    Q.  Dr. Cuccio, Joint Exhibit 4 ███████████████████████

13    ██████████████████████  which go from Pages 1 to 3479.

14    A.  I don't have them in that order, but we'll try.  What

15    are you referring to?

16    Q.  Again, Dr. Cuccio, now that we're on the record, so my

17    understanding is that the Government has not provided you

18    with the joint exhibits as they have been presented to the

19    Court for today's hearing.  Correct?

20    A.  Correct.

21    Q.  Okay.

22    A.  I have them, but -- I have them in the wrong form, I

23    guess.  But yes.

24    Q.  So the Joint Exhibit 4, which has been previously

25    introduced, ██████████████████████████████████████████████
```

Cuccio - CROSS - By Ms. Voshell

1    Pages 1 through 3479.  ████████████████████████

2    ██████████████████████████████████

3    ███████

4       ██████████████████████████████████████

5    ████████████████████████████████

6    ████████

7    ████████████████████████████████████████████

8    ██████████████████████████████████

9    ███████

10   ████████

11   ████████████████████████████████████

12   A.   Can you give me a page number?

13   Q.   Page 14 of those records.

14   A.   14 of which records?  ████████████████████

15   Q.   ████████████████████        Yes.  And they have the page

16   numbers at the bottom.  This is Page No. 14.

17            THE COURT:   Is that their page number or the one

18   you have when you marked them as exhibits?

19            MS. VOSHELL:  I did not put page numbers on there,

20   so that is their page numbers.  I assume that's as they were

21   provided to Dr. Cuccio.

22            THE WITNESS:  It's hard to get it off this.  Let's

23   see.

24            What was your question?  I'm sorry.

25

Cuccio - CROSS - By Ms. Voshell

1    BY MS. VOSHELL:

2    ███████████████████████████████████████

3    ████████████████████████████████

4    █████

5    ██████████████████████████████████

6    ███████████████████████████████████████

7    ███████████████████████████████████████

8    ███████████████████████████████████████

9    ███████████████████████████████████████

10   ███████████████████    which is again on that same page,

11   Joint Exhibit 4, at 14 --

12   A.  I don't see that.

13   Q.  -- the last paragraph labeled No. 2.

14   A.  My Page 14 is a consent form.

15   Q.  Page 14 at the bottom.

16   A.  ██████████████████████████████████

17   ████████████████████████████████████████

18   That's what my Page 14 has ██████████████

19          THE COURT:  ██████████████████████

20   ██████████████████    Because that presumably is what

21   they're reading from.

22          THE WITNESS:  I'll see if I can find that.

23   BY MS. VOSHELL:

24   ██████████████████████████████████████

25   ████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11   BY MS. VOSHELL:

12   Q.  You might be looking at Joint Exhibit 5,

13

14

15

16

17

18

19

20

21          MS. VOSHELL:  There are two sets of records

22          One set is 1,148 pages.  And that's Joint

23   Exhibit 5.  The other is 3,479 pages.  That is Joint Exhibit

24   4.  I'm only going to be referring to Joint Exhibit 4, if

25   that's helpful.

```
1            THE COURT:  That's helpful for the record, but she

2     doesn't have them this way.  ██████████████████████████

3     ████████████████████████████████████        Am I correct?

4            MS. VOSHELL:  Yes.  Yes.

5            THE WITNESS:  And we're looking at Page 14.

6     Right?

7            MS. VOSHELL:  Page 14 of the records that total

8     3,479 pages, which have four different entries.  ████████

9     ████████████████████████████████████████████████████████

10    ███████████

11           THE WITNESS:  Got it.  I have it.  Finally.  Yes.

12    BY MS. VOSHELL:

13    ████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████

15    ████████████████████████████████████████████████████████

16    ████████████████████████████████████████████████████████

17    ████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████

19    █████████████████████████████████████████████

20    ████████████████████████

21    ████████████████████████████████████████████████

22    ████████████████████████████████████████████████████████

23    ████████████████████████████

24    Q.  I was going to say, that is Page 14 of Joint Exhibit 5.

25    So that is a different set of documents than the set of
```

Cuccio - CROSS - By Ms. Voshell

1    documents to which I'm referring.

2    A.   Oh.

3    ████████████████████████████████████████████

4    ██████████████████████████████████████████████████

5    █████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████████████

9    ██████████████████████████████████████████████████

10   ██████████████

11   BY MS. VOSHELL:

12   ████████████████████████████████████

13   ██████████████████████████████

14   ███████████████████████████████████████

15   ██████████████████████████████████████████████████

16   ██████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████

19          MS. VOSHELL:  But if I may just pause.  I don't

20   know if there's any way for the Government to -- I guess

21   there's several ways that we could do this, but I don't know

22   that this is the best.

23          So, Judge, I would suggest that we take a break

24   either for the Government to provide the witness with the

25   exhibits that have been introduced in the case.  If the

Cuccio - CROSS - By Ms. Voshell

1    Government is unable to do that, I can collect the pages to

2    which I'll be referring and email those in some smaller

3    documents.

4              But at this point, I have attempted to email the

5    entirety of the exhibits to the witness.  We've attempted to

6    put those in the shared link to the witness.  And I think

7    we've done everything that we possibly can in our power as

8    the defense to try to get the exhibits to the witness.

9              I just don't know that I can do the rest of my

10   questioning without referring to the exhibits that have been

11   produced in the case.

12             THE COURT:  Mr. Miranda, have you made an effort

13   to get the record to her?

14             Or Ms. O'Connor?

15             MS. CONNOR:  Your Honor, both Mr. Miranda and I

16   have been unable to access the shared link ourselves today.

17   I did email counsel as well as their person in their office

18   who had originally shared that link with us asking for them

19   to send us a new invite to it so that we could try to access

20   it and send the documents ourselves.  We're just waiting on

21   a response to that.

22             For whatever reason, the shared link is not

23   working on our end today either.

24             THE COURT:  The shared link, I have to say, has

25   been problematic for me off and on as well.

1          But at any rate, we can take a break at this point

2     and figure out some way to make it work.  Perhaps if you've

3     got specific pages you want to refer to, that might be

4     easier at this point while we wait and see if we can get the

5     shared link to send it.

6          Hang on one second.  Hold on.  Never mind.

7          THE WITNESS:  It would be so helpful if you could

8     send me the specific pages.

9          THE COURT:  Why don't you send the pages.  And put

10    on the record precisely which ones they are so the

11    Government at a later point can take a look at it in the

12    joint exhibits, assuming that they can get access to it at

13    some point.  But the records are the records.

14          Why don't we take a break and send her the

15    individual pages you're going to be focusing on.  She

16    doesn't need the whole record if that's not what she's going

17    to get.

18          I'm assuming that Ms. O'Connor, who would be the

19    one to do redirect, will figure out how to do this in terms

20    of the procedure so that we can proceed with it.  Hopefully,

21    when we move to Dr. Corvin, a better method has been found

22    for the records.

23          MR. JEFFRESS:  Yes.  It has.  He has all the

24    records.

25          THE COURT:  So at this point, it's a little after

1    1:00.  Suppose we take a break until 1:30, since we only

2    have an hour and a half left for today.

3         And I would ask that -- I'm sorry to make you do

4    this, Mr. Voshell, but if you could pull out the pages.  And

5    what was the best way of doing it?  Email?  How many pages

6    are we talking about, Ms. Voshell, roughly?  An

7    approximation.

8         MS. VOSHELL:  The amount is not huge.  I think

9    it's just going to take time to get them all.  I think we're

10    talking maybe 50 pages.  Maybe 50.

11         THE COURT:  How many?

12         MS. VOSHELL:  Maybe 50, if I had to guess.

13         THE COURT:  50?

14         MS. VOSHELL:  Five zero.

15         THE COURT:  I was going to suggest faxing them,

16    but that's not going to work.  I guess you need to do an

17    attachment.

18         What's the best way for an attachment at your end,

19    Doctor?  Would it be a .pdf?  What can we do to make sure

20    you can open it?

21         THE WITNESS:  Usually, a .pdf is okay.  But if

22    it's too large, my email won't take it.  If you can send a

23    .pdf in bunches, it'll be fine.  But if you send a giant

24    amount, it won't go through.

25         THE COURT:  Why don't you break it down if it's 50

1    pages so we can get it sent to her in terms of the specific

2    pages.

3              We'll resume back at 1:30 unless somebody's

4    figured out a better way to do this.  Just disappear from

5    the screen.  Don't close down.  And I promise not to pay

6    attention if you're eating in front of the computer.  That's

7    fine.

8              We're on a break.  Be back at 1:30.

9              MR. JEFFRESS:  Thank you.

10             (Thereupon a recess was taken, after which the

11   following proceedings were had:)

12             THE COURT:  Dr. Cuccio, were you able to get the

13   records that hopefully were sent to you?

14             THE WITNESS:  No.  They bounced back.

15             THE COURT:  They didn't come?

16             THE WITNESS:  They were sent and then my email

17   rejected them, I believe.

18             MS. VOSHELL:  Yes, your Honor.  I sent them all to

19   her.  It took the full 30 minutes.  But just moments ago I

20   got an undeliverable message that they did not go through

21   except for one set.  So she has Part 1 of Joint Exhibit

22   No. 2.

23             THE COURT:  Could we send them as even more

24   separated ones, just break it down even more?

25             MS. VOSHELL:  We've been attempting that.  For

 1    Joint Exhibits 2 and 3, I sent them over.

 2            THE COURT:  Let's go off the record for a second.

 3                (Discussion had off the record.)

 4            THE COURT:  Defense Exhibits 1, 2 and 3 are being

 5    admitted without objection.

 6                (Whereupon, Defendant's Exhibit Nos. 1, 2 and 3

 7    were entered into evidence.)

 8            MR. MIRANDA:  Your Honor, Government's exhibits

 9    were also previously admitted.

10            THE COURT:  What we need is an exhibit list from

11    the Defendants and a joint one from the Government that goes

12    to Dorothy Jones-Patterson so she has it.  Send it to her so

13    it can be docketed and it'll be official that they will be

14    admitted, but it'll also identify them so it'll match up

15    with what's on the record.

16            Dorothy, we still haven't heard from them?

17            THE COURTROOM DEPUTY:  I'm talking to them now,

18    Judge.

19            THE COURT:  Sorry.

20            THE COURTROOM DEPUTY:  Judge, the facility itself

21    can do it any day that you set.  It's up to the psychiatrist

22    or whoever else you need here at the jail to coordinate the

23    date with that person.

24            THE COURT:  I'm not sure what you're saying.

25            THE COURTROOM DEPUTY:  We can have it any day, he

```
1    said, according to the IT person.  It's just getting the

2    doctor.

3              THE COURT:  Which doctor are you talking about?

4    Dr. Cuccio or somebody else?

5              THE COURTROOM DEPUTY:  Whichever doctor you need

6    from the jail to coordinate that.

7              THE COURT:  The Bureau of Prisons, not the jail?

8              THE COURTROOM DEPUTY:  Right.  The Bureau of

9    Prisons.

10              THE COURT:  She's available.  Does she need to do

11   something?

12              THE COURTROOM DEPUTY:  No.  I just need to let the

13   IT person know what day.

14              THE COURT:  We're doing two days.  We're doing --

15   we can always kick it back if we don't need it, but at the

16   rate we're going, I think we will.  August 24th, 10:00 to

17   5:00; August 25th, 10:00 to 5:00.  And everybody's

18   available.

19              THE COURTROOM DEPUTY:  Okay.  So that's fine with

20   their IT person.  They can hook it up for that day.

21              THE COURT:  So we've got that all set.

22              I'll put on the record that we've had some

23   difficulties getting the records to Dr. Cuccio for the

24   cross-examination.  Using a government computer, which I

25   understand, because that's what I have, the advantage is IT
```

1    can go in and fix it.  The disadvantage is they have all

2    sorts of firewalls that don't let you accept things, which

3    creates problems.  So we've had a problem trying to email

4    things to her and get her certain materials for the

5    cross-examination.

6              So we're going to at this point stop the hearing.

7    We've set the other two dates.  Then we've gotten -- we're

8    on their calendars.  And once I get off, you all will need

9    to talk about who is going to FedEx overnight whatever the

10   records are that need to be provided.  I would do the whole

11   records, not just the pieces that Ms. Voshell wants to use.

12   We need to make sure -- I'll get off.  You all talk with

13   Dr. Cuccio and find out what she has and does not have and

14   FedEx whatever it is that she actually needs.  Okay?  So we

15   make sure we don't have a problem again with this.

16             Everybody take care.  Be well.  And I'm going to

17   get off.

18             And you need to talk to Ms. Edwards about making

19   arrangements for the transcript.  Don't wait too long so she

20   can get this stuff done in between here.

21             Then the parties are excused.

22             And, Dr. Cuccio, if you could talk to them and

23   make sure whatever day Dr. Armstrong cannot be there that

24   they actually make arrangements to have somebody bring him

25   for the hearing so we don't have a delay with that.

```
1              THE WITNESS:  Yes.

2              THE COURT:  Okay.

3              THE WITNESS:  Yes, Judge.

4              THE COURT:  Thank you.

5              MR. JEFFRESS:  Thank you.  Bye.

6              (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8                    Please note:  This hearing occurred

9    during the COVID-19 pandemic and is therefore subject to the

10   technological limitations of reporting remotely.

11

12

13                   Dated this 21st day of August, 2020.

14

15         <u>/s/ Lisa Edwards, RDR, CRR</u>
           Official Court Reporter
16         United States District Court for the
               District of Columbia
17         333 Constitution Avenue, NW, Room 6706
           Washington, DC 20001
18         (202) 354-3269

19

20

21

22

23

24

25