```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      * * * * * * * * * * * * * * *   )
 3    UNITED STATES OF AMERICA,       )      Criminal Action
                                      )      No. 19-415
 4                    Plaintiff,      )
                                      )
 5       vs.                          )
                                      )
 6    PETER BELER,                    )      Washington, DC
                                      )      August 24, 2020
 7                    Defendant.      )      10:13 a.m.
                                      )
 8    * * * * * * * * * * * * * * *   )

 9

10               TRANSCRIPT OF COMPETENCY HEARING
                  HELD VIA VIDEO TELECONFERENCE
11        BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
                  UNITED STATES DISTRICT JUDGE
12


13
      APPEARANCES:
14
      FOR THE GOVERNMENT:      NICHOLAS MIRANDA, ESQ.
15                             JENNIFER CONNOR, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
16                                FOR THE DISTRICT OF COLUMBIA
                               555 Fourth Street, NW
17                             Eleventh Floor
                               Washington, DC 20530
18

19    FOR THE DEFENDANT:       JONATHAN JEFFRESS, ESQ.
                               EMILY A. VOSHELL, ESQ.
20                             COURTNEY R. FORREST, ESQ.
                               KAISER DILLON, PLLC
21                             1099 14th Street, Northwest
                               Suite 800 West
22                             Washington, DC 20005

23
      ALSO PRESENT:            GEORGE PATRICK CORVIN, M.D.
24
                               FRANCISCA OTERO
25                             (Power of Attorney to the Defendant)
```

```
 1    REPORTED BY:            LISA EDWARDS, RDR, CRR
                              Official Court Reporter
 2                            United States District Court for the
                                District of Columbia
 3                            333 Constitution Avenue, NW
                              Room 6706
 4                            Washington, DC 20001
                              (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3                                   Direct      Cross        Red.

4

WITNESSES FOR THE GOVERNMENT:

5

6      Anne Cuccio, M.D.                          5          168

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Will Plaintiff's counsel identify

 2      themselves, please.

 3              MR. MIRANDA:  Good morning, your Honor.  Nicholas

 4      Miranda and Jennifer Connor for the United States.

 5              THE COURT:  And for the Plaintiff [sic]?

 6              MR. JEFFRESS:  Jonathan Jeffress, your Honor, and

 7      Emily Voshell and Courtney Forrest on behalf of Mr. Beler;

 8      the Defendant, actually.

 9              THE COURT:  Sorry.  I had a civil case earlier.

10              MR. JEFFRESS:  That's okay.

11              THE COURT:  And we have Dr. Cuccio.  Are you on?

12              THE WITNESS:  Yes, your Honor.  I'm right here.

13              THE COURT:  And do we have Mr. Beler and -- I

14      don't see him, but is he on?

15              DR. ARMSTRONG:  Yes.  Mr. Beler is here.  Can you

16      see him?

17              THE COURT:  I can't.  But as long as he's there,

18      that's fine.

19              So let me call the case.  This is 19-CR-415,

20      United States versus Peter Beler.  We've identified who's

21      on.  And we were -- when we were last in this hearing,

22      Dr. Cuccio was testifying and it was in the middle of

23      cross-examination.  And hopefully, the records that were at

24      issue have been provided so that she can proceed with her

25      testimony.
```

 1                  Dr. Cuccio, did you get the records you need?

 2                  THE WITNESS:  I did.  I had them printed out.

 3                  THE COURT:  Great.

 4                  So let's continue, then, with cross-examination.

 5         (ANNE CUCCIO, M.D., GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

 6                       CONTINUED CROSS-EXAMINATION

 7     BY MS. VOSHELL:

 8     Q.  Good morning, Dr. Cuccio.

 9                  Just to confirm, you've now received all of the

10     exhibits that have been introduced in this hearing?

11     A.  Yes.  I received the entire exhibit rather than just the

12     ones you're asking questions about.

13     Q.  Okay.  And so you received the entirety of all the

14     exhibits on a USB drive provided by the defense.  Correct?

15     A.  Yes.  And I was not able to bring the USB drive into my

16     institution, so I have now had to have somebody print them

17     at my own expense.

18     Q.  So the Government never provided you with exhibits,

19     whether on a USB drive or printed or otherwise for this

20     hearing?

21     A.  I do have the records from Mr. Beler.  These are those

22     records.  They may not have been in the same order.

23                  But it was my understanding that you were going to

24     send me the sections that you were asking questions on,

25     because this is seven binders, front and back, full of

1    papers.

2    Q.  So, Dr. Cuccio, as you've testified, you've previously

3    reviewed before writing your *Sell* report and before

4    testifying on both direct and cross-examination that you

5    have reviewed all of Mr. Beler's records ███████████████

6    ████████████████████████████████████████████████████████

7    ████████    Correct?

8    A.  From what I had, yes.  I've reviewed all his records.

9    Q.  And that includes the entirety ███████████████████

10   ████████████████    records?

11   A.  From what I had.  I know when you were asking me

12   questions, I couldn't find on my computer ████████████████

13   ████████████████████████    But I may not have gotten that one,

14   that section of it.  But I have the rest of it.

15   Q.  When you say you may not have gotten ████████  do you

16   mean that you not have received ██████████  prior to writing

17   your report and starting to testify on direct in this case?

18   A.  I reviewed the notes that has indications of what he has

19   taken when.  Yes.

20   Q.  I guess -- let's specifically direct -- I'd like to draw

21   your attention to Page 308.

22   A.  308.

23   Q.  This is ████████████████████████████████████  This is

24   Joint Exhibit 3.

25   A.  It's going to take me a while to find this.

1          THE COURT:  Dr. Cuccio, if they send you the

2    record -- have they sent it to you like exhibits so you can

3    look for Exhibit 3 and find it in there or they didn't do it

4    this way?

5          THE WITNESS:  There were three files.  And in

6    those three files there was an exhibit from one side, an

7    exhibit from the other side and a joint exhibit.  The joint

8    exhibit had the entire patient record in it, which is 4,000

9    pages.

10          THE COURT:  Okay.

11          THE WITNESS:  And that's why I had to print it

12    out.

13          THE COURT:  But as I understand it, defense

14    counsel is asking you about Exhibit 3, which, if you have

15    Exhibit 3, maybe there's less to look at than the whole

16    4,000 pages.

17          THE WITNESS:  (Shakes head in the negative.)

18          THE COURT:  No?

19          THE WITNESS:  That is the big one.

20          THE COURT:  All right.

21    BY MS. VOSHELL:

22    Q.  Joint Exhibit 3 contains 272 pages total, and those are

23    ███████████████████████ records.  This is Part 2 of 2

24    of ██████████████████ records.  And I'm

25    referring specifically to Page 308 of 539.  And 539 refers

1    to the total number of ███████████████ records,

2    the total number of pages ██████████████████

3    records.

4    A.   That is a section of the third exhibit.  But the third

5    exhibit is all together with everything else.  But I have

6    found the ████████████ records, and I'm looking for

7    Page 308.  We're getting close.  All right, then.  Tell me

8    the page number again.  I'm so sorry.

9    Q.   Page 308.

10   A.   Got it.  Page 308. ██████████████████

11   Q.   Yes.  At the very top of that page.  And then about

12   halfway down that page would be ████████████

13   ███████████████████ as you've referred to it.

14   Correct?

15   A.   Yes, ma'am.

16   Q.   Okay.  Prior to writing your report in this case, did

17   you review ████████████████████████████

18   ███████████████████████████

19   A.   I don't recall reviewing -- having this in my hand.  But

20   I did go through the ████████ records that I have and I

21   went over those and I wrote down ████████████████

22   ████████████████████████████

23   ████████████████████████████

24   ██████████

25   Q.   So when you say that you don't recall reviewing this

1    page, do you mean that you did not review this page or that

2    you may have reviewed this page and you just don't remember?

3    A.   I mean that there are 4,000 pages here and I read them

4    twice.  And these are very difficult for me to remember █████

5    ████████████████   These are complicated records that took

6    weeks for me to review.  And to do it in this amount of

7    detail is not normally done.  Nobody in clinical practice

8    sits down and goes through the chart and says, "Did you look

9    at this on Page 309 of 500 of this one record?" when there's

10   4,000 pages.

11   Q.   I'm specific talking about ██████████████████████

12   ████████████████████████████

13   A.   I am specifically talking about that as well.

14   ██████████████████████████████████████████████████

15   ██████████████████████████████

16   ███████

17   ██████████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ███████████████████████████████

20   ██████

21   ███████

22   ██████████████████████████████████████████████████

23   ███████████████████████████████████████████

24   ████████████████████████████████████████████

25   ██████████████████████████████████████████████████



1

2

3

4    Q.  All right.  So on the point of whether or not you

5    reviewed            prior to writing your report in this case,

6    I believe your testimony is that you reviewed all the

7    records in this case and you don't have any specific

8    recollection of having reviewed            that's from Pages

9    308 to 315                            records?

10    A.  Yes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    BY MS. VOSHELL:



1

2

3          THE COURT:  Counsel, you're looking down.  You

4      need to move your notes up.  When you talk down, we can't

5      hear you.  So move your notes up so we can hear you.

6          MS. VOSHELL:  Sure.

7  BY MS. VOSHELL:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





BY MS. VOSHELL:







1

2

3

4    Q.  Dr. Cuccio, where in --

5    A.  Oh, no.  You're not going to make me do this, are you?

6    Q.  No.  Withdrawn.  I'll direct your attention.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





```
1            THE COURT:  I just got kicked off again.

2            THE WITNESS:  I can hear you at least.

3       Okay.  I'm on 144.

4            THE COURT:  I'm back.

5    BY MS. VOSHELL:
```



22





1

2

3

4          THE COURT:  Look, let her finish.  We had this

5     problem last time.  Just wait a beat.  Make sure she's

6     finished before you move on.  Okay?

7          Dr. Cuccio, finish whatever you were going to say.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24



BY MS. VOSHELL:





1

2

3

4

5

6

7   BY MS. VOSHELL:

8

9

10

11

12

13

14

15

16          THE COURT:  Don't talk while looking down,

17   Dr. Cuccio, because we can't hear you.

18          THE WITNESS:  Yes, ma'am.  Yes, ma'am.

19

20

21

22

23

24

25

27







1

2

3    Q.  Dr. Cuccio, when you talk about what you do generally,

4    to be clear, you testified prior on cross that this is the

5    first *Sell* hearing that you've testified at.  Correct?

6    A.  This is the first *Sell* hearing I've testified at.

7    Q.  Okay.  So when you talk about what you generally do,

8    you're not talking about what you generally do in *Sell*

9    hearings.  Correct?

10   A.  No.  I'm talking about what I do in my work.  I'm a

11   clinician.

12

13

14

15

16

17

18

19

20

21

22

23

24

25









THE COURT:  I'm sorry to interrupt.  Since I don't plan on looking at all 4,000 records, I thought I'd ask. It's whatever you brought to my attention.

I'm sorry to interrupt.  Go ahead.

BY MS. VOSHELL:

Cuccio - CROSS - By Ms. Voshell







37





39







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          THE COURT:  I couldn't hear that last bit.  You're

21    talking down, both of you.  You need to speak out.

22    BY MS. VOSHELL:

23

24

25

Cuccio - CROSS - By Ms. Voshell







1    BY MS. VOSHELL:





48









Q.  Dr. Cuccio, going back to the first thing that you said, you said that you could find a cite.  When you say that you could find a cite, did you mean that you could find a cite in the *Sell* appendix or that you could find a cite somewhere else?

A.  You know, if you gave me time, I could probably look it up if we were teaching medical students here on how to

1    diagnose and treat.  I could probably assign you to look it

2    up, what's the normal treatment medically.  Or you could

3    take my testimony as an expert that that is normally the

4    consistent -- that's what would consist of an adequate trial

5    of medications.  I can't tell you exactly where I got that

6    from at the moment.

7    Q.  Dr. --

8              THE COURT:  We've gone over an hour and a half.

9    Why don't we take a short break here and then come back.

10             Don't get off your screen, please, because then

11   you may have trouble getting back.  The time of course is

12   all over the ballpark.  Let me look.  According to my phone,

13   it's 11:47.  So how about reconvening at noon?

14             I'll take short breaks along the way and we can

15   decide whether we want to take like a half an hour or so for

16   people to eat lunch, depending on how much longer this --

17   how much longer you're planning on going.  But why don't we

18   take at least a break until noon and then pick up with your

19   questioning.  All right?  But don't get off the screen.

20   It's hard to get back on again.

21             DR. ARMSTRONG:  Your Honor, this is Dr. Armstrong.

22   Excuse me.  When we resume, will you require Mr. Beler to be

23   present?  ████████████████████████████████

24   ████████████████████████████████████████████

25   ██████████████████████████████████████



1   ███████████████████████████████████████

2   ███████

3           So we're going to take a break until noon and then

4   we'll see how we're doing.

5           DR. ARMSTRONG:  11:00 our time.  Right?

6           THE COURT:  Yes.  11:00 your time.

7           DR. ARMSTRONG:  Thank you.

8           (Thereupon a recess was taken, after which the

9   following proceedings were had:)

10          THE COURT:  Why don't we pick up at this point.

11          Counsel, do you have some sense of how much longer

12  it'll be?  I want to have some sense for people to have

13  lunch.

14          MS. VOSHELL:  (Speaking inaudibly.)

15          THE COURT:  I can't hear you.

16          MS. VOSHELL:  I'm sorry.  I was muted.

17          I would say maybe about an hour.  I'm going to try

18  to move quickly, but I don't want to overpromise.

19          THE COURT:  I just want to make sure.  If somebody

20  has to eat at a particular time, please let me know.  I tend

21  to eat later, but I don't want to do that to you all if for

22  medical or other reasons you need to eat earlier.  Then

23  we'll just take a break earlier.

24          I don't hear anything, so I'm assuming it's not a

25  problem.

1          Why don't we go ahead and pick up at this point

2     and proceed, and then we'll see how long this lasts.  I

3     won't go much longer without taking a break for lunch.

4          Go ahead.

5     BY MS. VOSHELL:

6     Q.  Dr. Cuccio, I'd like to talk a little bit about the

7     comparisons you've made both on direct and cross-examination

8     between BOP and a private hospital.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   ████████████████████

2   ████████████████████████

3   Q.  Mr. Beler is in a cell with a cellmate that does not

4   have a door that restricts him in there and keeps him from

5   moving around.  Correct?

6   A.  It has a door.

7   Q.  Okay.

8   A.  But the door is open, if that's your point.

9   Q.  The door to his cell is open.  Yes.

10  A.  And that's a --

11  ██████████████████████  ██████  ████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████

14  Q.  And, Dr. Cuccio, you've never worked at a private

15  hospital.  Right?

16  A.  I have worked at a private hospital.

17  Q.  What private hospital have you worked at?

18  A.  I worked at the hospital when I was working as a teacher

19  at OU.  And I've covered on -- when I've been -- on

20  weekends, I've covered on the other hospitals.

21          Let's see.  For a brief period of time, I've

22  worked in private care outpatient as well.  And for a brief

23  period of time, I've worked inpatient private adolescent

24  treatment.

25          So I've done a lot of different forms of

1    treatment.  I've covered geriatric patients.



22   Q.  Private hospitals don't limit the types of drugs that

23   can be prescribed to someone.  Right?  They don't have a

24   formulary like the BOP has?

25   A.  Sometimes they do and sometimes they don't.  And it

1    depends on the insurance and it depends on what kind of

2    hospital they're present in.  Yes.



1   

2

3

4

5

6

7

8

9

10          But no.   There's not limits like, "Are we going to

11   get paid further or not?"

12

13

14

15

16

17

18

19

20

21

22

23

24

25





1    BY MS. VOSHELL:









1 ████████████████████████████████████████

2 ████████████████

3           █████████

4  A.  No.  Excuse me.  This report you're referring to is

5  written by Dr. Armstrong.

6  Q.  Dr. Cuccio, I'm referring to --

7  A.  The forensic evaluation.

8  Q.  -- Government's Exhibit 4, Forensic Addendum and

9  Treatment Plan, which is --

10           THE COURT:  There are two reports.  So you need to

11  tell her which one you're talking about.

12           MS. VOSHELL:  Yes.  I believe I did, Judge.  I'm

13  referring to Government's Exhibit 4, which is Dr. Cuccio's

14  report, at Page 7.

15           THE WITNESS:  My Page 7 in this book is part of

16  that evaluation.  I do have a copy of the Addendum and

17  Treatment Plan, though.  I can pull that out.

18           THE COURT:  Why don't you pull that out and look

19  at that.

20           THE WITNESS:  All right.

21  BY MS. VOSHELL:

22  Q.  I'm referring to Page 7, but it's Government's Exhibit

23  4, which is a Forensic Addendum and Treatment Plan written

24  by you, Dr. Cuccio.

25  A.  Yes.  Page 7.  Where are you reading?

1    Q.  I'm reading from the second paragraph about halfway

2    down.



BY MS. VOSHELL:







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Q.  As you've -- withdrawn.

19        So, Dr. Cuccio, you wrote your report, the one

20    that we were just referring to, which is Exhibit 4, on May

21    20th of 2020.  Correct?

22    A.  Yes.

23

24

25







Cuccio - CROSS - By Ms. Voshell

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ███████████████████████████

4 ████████

5 ████████████████████████████████████████

6 ██████████████████████████████████

7 ██████████████████████████████████████████

8 ████████████████████████████████████████

9 ██████████████████

10 ██████████████████████

11 ████████████████████

12 ████████████████████████████████████████

13 █████████

14          THE WITNESS:  Do I have time to get online and

15 just look at my notes?

16          THE COURT:  Yes.

17          THE WITNESS:  Because I didn't get this in my

18 book.  I'm so sorry.  I got everything else, apparently, but

19 not that.

20          THE COURT:  Yes.

21          MS. VOSHELL:  If it's helpful, I'm referring to

22 your July 28th, 2020, encounter with Mr. Beler.

23          THE WITNESS:  Okay.  Got it.  I'm ready.

24 BY MS. VOSHELL:

25 ███████████████████████████████████













82





84







Q.  Dr. Cuccio, I'd like to talk about the *Sell* appendix

that you attach to your report, which is Government's

Exhibit 5.

          THE COURT:  Why don't we stop here.  It's 1:00,

1    and I had said that we would stop for the lunch break.

2    You're about to move into another topic.

3         So since we're hoping to be able to finish all of

4    the hearing within today and tomorrow, does anybody have a

5    problem?  So I assume everybody's at home or in a place they

6    can eat lunch and don't have to go out.  Can we do half an

7    hour, between 1:00 and 1:30?  Does somebody need more time?

8    If you do, please speak up.

9         MR. JEFFRESS:  That's fine, your Honor.

10        THE COURT:  Is that okay?

11        MR. MIRANDA:  That's fine.

12        MS. VOSHELL:  Yes.

13        THE COURT:  So we'll resume at 1:30.  Don't get

14    off the videoconference.  You can go away or sit in front

15    and eat, for all I care.  But don't get off.

16        MR. MIRANDA:  Thank you.

17        (Thereupon, a luncheon recess was taken, after

18    which the following proceedings were had:)

19        THE COURT:  I assume we're ready to resume at this

20    point.

21        MR. JEFFRESS:  Yes, your Honor.

22        THE COURT:  Counsel, go ahead.

23    BY MS. VOSHELL:

24    Q.  Dr. Cuccio, you attached to your May of 2020 report in

25    this case a document entitled FMC Butner *Sell* Appendix 2019.

1    Correct?

2    A.  Correct.

3    Q.  That is Government's Exhibit 5.

4         Dr. Cuccio, you rely on that appendix in part for

5    your opinion here.  Correct?

6    A.  I rely on that to help educate the Court.

7    Q.  And you write in your report on Page 13, Footnote 2,

8    quote, "I hold this opinion based on my clinical experience

9    and based on the degree to which Mr. Beler is similar to

10   previously studied populations of *Sell* defendants."

11   Correct?

12   A.  Are you talking about the appendix or the *Sell* report?

13   Q.  Your report, Government's Exhibit 4.

14   A.  Page 13?

15   Q.  Yes.  Page 13, Footnote 2.

16   A.  Yes.

17   Q.  Okay.  And in that footnote, are you referring in part

18   to the information presented in the *Sell* appendix that you

19   attached to your report?

20   A.  In part, yes.

21   Q.  The *Sell* appendix is not specific to Mr. Beler.

22   Correct?

23   A.  You mean it's not written only for Mr. Beler?

24   Q.  Correct.

25   A.  Right.  Correct.

1    Q.  The appendix talks generally about issues of competency

2    and administration of psychiatric medication.  Correct?  Not

3    specifically about issues of competency and administration

4    of psychiatric medication to Mr. Beler?

5    A.  It can be applied.  Some of these can be applied to

6    Mr. Beler as well.  It's applicable to Mr. Beler.  I'm not

7    sure what you're asking me about, what you're trying to sift

8    out of this.

9    Q.  I'm asking if the *Sell* appendix itself gives information

10   according to the folks at Butner who wrote it generally

11   about issues of competency and administration of psychiatric

12   medication.  The *Sell* appendix itself doesn't specifically

13   reference Mr. Beler or issues of his competency or

14   administration of psychiatric medication relating to him.

15   Correct?

16   A.  This is something to help us understand, since we are

17   talking about Mr. Beler and his medications specifically,

18   and we're talking about how to treat him, we have to have

19   some basis upon which to do that and decide if it's

20   medically appropriate.  And that's what this appendix is

21   referring to, to help us give some small, tiny footprint of

22   information to base that on.

23           If that's what you're asking.  I'm not sure why

24   you're asking me this.

25   Q.  I'm asking you a pretty simple question, which is just:

Cuccio - CROSS - By Ms. Voshell

1    The Butner *Sell* appendix from 2019 is not -- well, it's not

2    something that you wrote.  Correct?

3    A.  No.  I didn't write it.

4    Q.  Okay.  And it's not something that Dr. Herbel or

5    Dr. Grady wrote after meeting with Mr. Beler.  Correct?

6    A.  Correct.

7    Q.  And the --

8          THE COURT:  Excuse me.  Is it procedures that are

9    set out to be followed by Bureau of Prisons?  Is that what

10   that is?  Or is this something else?  What is it?

11         THE WITNESS:  It's an educational document that

12   has -- it refers to some research.  It refers to how BOP and

13   in particular Fort Worth treats patients and what's

14   available to do if the patient, say, refuses medication and

15   the Court orders him to take medications, et cetera.  It's a

16   general educational --

17         THE COURT:  Who put it together?

18         THE WITNESS:  -- [indiscernible] at Butner.

19         THE COURT:  Who put it together?

20         THE WITNESS:  The forensic psychiatrists at Butner

21   use it, and it has been edited to apply to Fort Worth.

22         THE COURT:  Okay.  So it's a policy and procedure

23   manual generally?

24         THE WITNESS:  It's not really a policy and

25   procedure manual, but it's something that we send out with

1    these reports to the Court so that you can get a better idea

2    of what we're talking about and where some of our opinions

3    are coming from.

4              THE COURT:  So it's going to be applied generally

5    to different defendants in Fort Worth at this point.  Is

6    that correct?  Or it can be?

7              THE WITNESS:  It can be, if they're up for *Sell*.

8    He's the only one.

9              THE COURT:  Okay.  It's obviously not going

10   specifically to Mr. Beler.

11             Let's move on.

12   BY MS. VOSHELL:

13   ████████████████████████████████████████████████

14   ██████████  ██████  ████████████████████████████████████

15   █████████████████████████████████████████████████████

16   ████████████████████████████  ██████  ████████████

17   ██████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████████████████████████

21   ████████████████████████████████

22   ████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████

25   ████████████████





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          (Clarification requested by the court reporter.)
13          THE COURT:  Everybody's dropping their voices.  I
14   know everybody's getting tired, but you need to speak up.
15          THE WITNESS:  Yes.  I apologize for that.
16
17
18
19
20
21
22
23
24
25
```

Cuccio - CROSS - By Ms. Voshell





13  Q.  Dr. Cuccio, I'd like to refer you to the Cochrane study

14  referenced in the *Sell* appendix.  That study is Joint

15  Exhibit 9.  And Cochrane is C-O-C-H-R-A-N-E.  The Cochrane

16  study is cited on Pages 11 to 12 -- I'm sorry -- Pages 2 to

17  3 of the *Sell* appendix.  Correct?

18  A.  Correct.

19  Q.  And that study looks at individuals who have been

20  forcibly medicated under *Sell* in the federal court system.

21  Correct?

22  A.  Correct.

23  Q.  Out of 90,000 federal criminal defendants processed each

24  year, only 350 to 400 are admitted to federal hospitals for

25  competency treatment, according to that study?

1    A.   That's what it says.

2    Q.   And in the sample size in the Cochrane study, the

3    Government only referred 287 of those people who had been

4    referred to federal hospitals for competency treatment to be

5    forcibly medicated over a six-year period.  Correct?

6    A.   Yeah.  I'm not sure exactly where you're reading.  But

7    yeah.

8    Q.   I'm reading from Page 114 of the article --

9    A.   Oh, you're reading from the article.

10   Q.   -- which is on the eighth page.  It says 114 at the top,

11   and it's under the heading Frequency of Involuntary

12   Treatment.

13   A.   Within the documents you sent to me, would this be in

14   Exhibit 10, Appendix 1 or Appendix 3?

15   Q.   It's in the joint exhibits and it's Joint Exhibit No. 9.

16            THE COURT:  Is this the material that she

17   provided?

18            MS. VOSHELL:  Judge, this study is cited in the

19   material that she provided.  But she didn't include the

20   study itself.

21            THE COURT:  Oh, okay.  So you've provided her with

22   a study?

23            MS. VOSHELL:  Yes.

24            THE COURT:  So that's presumably what they're

25   asking you to look at.

Cuccio - CROSS - By Ms. Voshell

1          MS. VOSHELL:  Yes.

2          THE COURT:  Dr. Cuccio, have you seen this study

3    before, the report?

4          THE WITNESS:  I have read it before, but it's been

5    a while.  And I don't see it here.  Let's see if I can find

6    it.

7          THE COURT:  Take your time.

8          MS. FORREST:  Joint Exhibit 9 would be after the

9    medical records, so it should be shortly after Dr. Micono's

10   report, if you printed them out in order.

11         THE WITNESS:  I'm getting close.  Cochrane.

12   Great.  Here we are.

13         What page are we on here in the Cochrane report?

14   BY MS. VOSHELL:

15   Q.  At the top it says 114.

16   A.  Okay.

17   Q.  Dr. Cuccio, you've read this study before.  Correct?

18   A.  Some months ago.  But yes.  Why?

19   Q.  I just wanted to confirm that you had read it.

20         So going back to my question, in the sample size

21   in the Cochrane study, the Government only requested 287

22   people to be forcibly medicated over a six-year period.

23   Correct?  That's under Frequency of Involuntary Treatment

24   about halfway down.

25   A.  "Administration of medication solely to restore

1    competency may be rare."

2    Q.  I'm looking on Page 114 under the subheading Frequency

3    of Involuntary Treatment, about halfway down that paragraph,

4    which is on the left-hand column.

5    A.  "Of these, 287 requests for involuntary treatment were

6    made over a six-year period of time, approximately 60 per

7    year."  Okay.  Yes.  That's what it says.

8    Q.  And those are cases in which the Government actually

9    requested that someone be forcibly medicated.  Correct?

10   A.  Under *Sell*, yes.  That's not all involuntary medication.

11   It's just under *Sell*.

12   Q.  Under *Sell*.

13   A.  Those are very few.  *Sell* is much fewer than other

14   cases.  Yes.

15   Q.  So that's about 60 per year that the Government even

16   requests that someone be forcibly medicated under *Sell*.

17   Correct?

18   A.  Yeah.  Most people are medicated under *Harper* or they go

19   ahead and agree to take medication.  So I guess he's

20   actually gotten ahold of the records and counted it out.

21   Not very many.

22   Q.  Of those Government requests in the period that they're

23   looking at in the Cochrane study, involuntary treatment was

24   only granted in 133 out of 287 cases.  Right?

25   A.  Right.

1    Q.  So that's -- less than half of the cases studied were

2    ones in which the Court granted the Government-forced

3    medication under *Sell*?

4    A.  It looks like that's what he says.

5    Q.  That comes out to about only 25 cases around the country

6    each year where federal courts order forced medication?

7    A.  Under *Sell*.

8    Q.  Under *Sell*?

9    A.  Yes.

10   Q.  Yes.

11   A.  It looks like that's what is happening in this report.

12   Yes.  How old is this?  I don't know if the numbers have

13   changed.  But yeah.

14   Q.  This is a study published in 2012, and it's cited in the

15   *Sell* appendix that you choose to -- chose to append to your

16   report.

17   A.  Yeah.  Things are -- 2012 is a little while ago.  But

18   yes.  There's not a lot of research done in this area.

19   There's not many patients, for one, and it's a protected

20   population.  So there's not a lot of research to be able to

21   cite.  That's why they have not cited many.

22   Q.  Dr. Cuccio, you would agree that, based on this research

23   that looked at six years of forced medication under *Sell*,

24   that it is rare for courts to authorize forced medication

25   under *Sell*?

1    A.  I wouldn't necessarily agree to that now.  I don't know.

2    Q.  According to this study that was published in 2012 and

3    that you chose to cite or chose to include in the *Sell* --

4    sorry -- that you chose to include the *Sell* appendix that

5    cited this report.  Correct?  And you haven't done any

6    research since 2012.  Right?

7              THE COURT:  Do you want -- that's two questions.

8    Which one do you want her to answer?

9              MS. VOSHELL:  I'll ask the second.

10   BY MS. VOSHELL:

11   Q.  Dr. Cuccio, you haven't done your own independent

12   research to find out how frequently involuntary medication

13   is ordered by courts pursuant to *Sell*.  Correct?

14   A.  Oh, no, I have not.  Definitely not.  That's an easy

15   one.

16   Q.  You testified, I believe, multiple times at this point

17   that this is the first *Sell* hearing that you've ever

18   testified at.  Correct?

19   A.  Correct.

20   Q.  You testified that Mr. Beler is the only person who is

21   being held at FMC Fort Worth right now who -- for whom the

22   Government has requested forced medication under *Sell*.

23   Correct?

24   A.  Right now.  Correct.  He's the only one right now.

25   Q.  Turning back to that Cochrane study, the Cochrane study

 1    was not a double-blind study.  Right?

 2    A.  This is a review.

 3    Q.  It's not like the researchers here were looking at --

 4    were taking 100 people who were incompetent and

 5    force-medicating half and then not force-medicating the

 6    other half.  Correct?

 7    A.  No.  It's not like that.

 8    Q.  The study is only looking at people who courts had

 9    already determined met the criteria for forced medication

10    under *Sell*.  Right?

11    A.  Yes.

12    Q.  Which again happened in less than half the cases where

13    the Government petitioned the Court asking for people to be

14    force-medicated under *Sell*?

15    A.  Yes.

16    Q.  All right.  And some of the people who courts determined

17    would not be restorable under *Sell* would not have been

18    included in the study?

19            THE COURT:  I'm sorry.  Can you repeat that again?

20            MS. VOSHELL:  Yes.

21    BY MS. VOSHELL:

22    Q.  People who courts determined were not substantially

23    likely to be restored to competency under *Sell* would not be

24    included in the study.  Correct?

25    A.  Well, they gave evidence of -- they were there.  Right?

1    You're able to cite that they weren't -- in what way

2    included in the study are you talking about?

3    Q.  I'm saying the study ultimately examines people who were

4    ordered to be force-medicated under *Sell* by courts.  Right?

5    A.  Not necessarily.  It's talking in general about the *Sell*

6    process and it's talking about the limitations of it and

7    what the nature of it is and what the numbers are,

8    et cetera.  It's not necessarily talking all the way through

9    about who's going to be best treated and who's not.

10   Q.  The study looks at people who courts ordered to be

11   force-medicated who were then force-medicated and whether or

12   not those people were able to be restored to competency.

13   Correct?

14   A.  It looked at people who were thought to be incompetent

15   and thought to need treatment in one way or another.  You

16   just talked about numbers that don't have people who were

17   treated under *Sell*.

18   Q.  So --

19   A.  In the --

20   Q.  -- I'd like to turn your attention to Page -- sorry?

21   I'd like to turn your attention to Page 112 of the study.

22   A.  Okay.

23   Q.  And the second column, Restoration Analyses.

24   A.  Yes.

25   Q.  And under Restoration Analyses, they found that 78.8

1    percent of the 132 defendants were reviewed by clinicians as

2    having been restored to competency following treatment.

3    Correct?

4    A.  Yes.

5    Q.  And that 20 percent of the people who had been ordered

6    force-medicated under *Sell* were not restored to competency.

7    Correct?

8    A.  "Yes.

9    Q.  Okay.  And then in the next sentence -- I'm sorry -- in

10   the next paragraph, it begins, "In terms of treatment, 84.4

11   of those administered first-generation antipsychotic

12   medications were restored to competency compared to 73.5

13   percent of those given second-generation antipsychotic

14   medications."  Correct?

15            THE COURT:  Are you asking her was that what the

16   report says?

17            MS. VOSHELL:  Yes.

18            THE WITNESS:  Okay.  First paragraph, first

19   sentence:  "There was no difference in restoration between

20   Defendants who took medication orally and those requiring

21   injection"?  No?

22   BY MS. VOSHELL:

23   Q.  No.

24   A.  Is that where you're talking about?

25   Q.  No.  We were under Restoration Analyses.  The second

1    paragraph under Restoration Analyses:  "In terms of

2    treatment, 84.4 percent of those administered

3    first-generation antipsychotic medications were restored to

4    competency compared to 73.5 percent of those given

5    second-generation antipsychotic medications."  Correct?

6    A.  Yes.





1

2

3

4

5

6

7

8   Q.  I'd like to draw your attention back to the *Sell*

9   appendix on Page 4 --

10  A.  The *Sell* appendix.

11  Q.  -- which is Government's Exhibit 5.

12  A.  Okay.  Page 4.  Yes.

13  Q.  So drawing your attention to the third paragraph on Page

14  4, it reads, "According to the APA practice guidelines,

15  patients in their first episode of psychosis are

16  comparatively more treatment-responsive than multi-episode

17  patients, with more than 70 percent of first-episode

18  patients achieving remission of psychotic signs and symptoms

19  within three to four months and 83 percent achieving stable

20  remission at the end of one year."

21          Correct?

22  A.  Correct.

23

24

25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18          So, Dr. Cuccio, you've agreed that you reviewed
19    Dr. Jessica Micono's report.  Correct?
20    A.  That's correct.
21    Q.  And Dr. Jessica Micono is the doctor that Mr. Beler saw
22    at Englewood and she is the doctor that treated him -- or
23    evaluated him through the BOP.  Correct?
24    A.  She is a Ph.D. psychologist.  Correct.
25    Q.  Yes.





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          THE COURT REPORTER:  Excuse me.  The screen froze

1    there for a moment.  Did I miss something that you had said,

2    Doctor?



```
 1   BY MS. VOSHELL:

 2   Q.  All right.

 3   A.  I didn't hear that.

 4        THE COURT:  She didn't say anything.

 5   BY MS. VOSHELL:

 6   Q.  I didn't say anything.  I was finding my place.

 7   A.  I'm sorry.

 8   Q.  Next I'd like to refer to Joint Exhibit 18, which is

 9   Mr. Beler's 2020 BOP records.  Specifically, I'd like to

10   refer to Page 47, which is Mr. Beler's January 17th, 2020,

11   encounter with Dr. Armstrong.

12   A.  These are not numbered, are they?

13   Q.  We did add numbers to these at the very bottom.  At the

14   lower right-hand side of the page, they say "Beler_" and

15   then the page number.

16   A.  Oh, great.  Okay.  What was the number you were

17   referring to?

18   Q.  47.

19   A.  347?

20   Q.  47.

21   A.  47.  Beler 000047 is blank for me.

22        THE COURT:  Does it have anything on it?

23        THE WITNESS:  It's cosigned by Harvey Paul, M.D.

24   It's 47.

25
```

1    BY MS. VOSHELL:

2    Q.  Are you looking at the 2019 records or the 2020 records?

3    A.  2019.

4    Q.  I'm referring to the 2020 records.

5    A.  So we restarted the numbering.  Got you.  I've found it.

6    Thank you.

7    Q.  And this is a note from Dr. Armstrong of February 17th

8    of 2020.

9    A.  Yes.



































19          (The Court drops from the VTC screen.)

20          THE WITNESS:  Uh-oh.  Did we lose the Judge?

21          THE COURTROOM DEPUTY:  The Judge got kicked out.

22          THE WITNESS:  Should I stop?

23          THE COURT:  Yes.

24          (Thereupon a recess was taken, after which the

25     following proceedings were had:)

 1                 THE COURT:  So I think everybody is here now, so I

 2       think we're ready to go.

 3                 THE COURTROOM DEPUTY:  Is the Defendant on?

 4                 THE COURT:  Mr. Beler?  Is he around?

 5                 THE DEFENDANT:  Yes.  I'm here.

 6                 THE COURT:  Great.  Welcome back, Mr. Beler.

 7       Thanks for hanging in there and being patient with the

 8       hearing.  I appreciate it.  It's important for you to be

 9       able to hear what's going on.

10                 I think we have everybody.  So let's pick up.  Go

11       ahead.

12                 Oh, one thing.  If the court reporter could read

13       the last question and answer, because my computer just shut

14       out altogether.  I got knocked off the court system as well

15       as the VTC hearing.  And I have a feeling -- I had to call

16       Dorothy, the courtroom deputy, to let her know I was off and

17       couldn't hear anything.

18                 So can you read last question and answer?

19                 (The segment of the record referred to was read by

20       the reporter as above recorded.)

21                 THE COURT:  Dr. Cuccio, had you finished or is

22       there something else?

23                 THE WITNESS:  It's a little unnerving hearing your

24       voice read back to you like that.  I'm sorry.

25                 I've lost my thread.  I guess I'm done with that.

1          THE COURT:  Okay.  Let's pick up with the

2    questioning.

3    BY MS. VOSHELL:









Q.  Are you aware that when the agents came to Mr. Beler's

apartment to execute a search warrant, he was allegedly

downloading child pornography right in front of them?

A.  Yes.

            MS. CONNOR:  Objection, your Honor.

            THE COURT:  What's the basis?

            MS. CONNOR:  That this particular line of

1    questioning is irrelevant to whether or not this particular

2    expert believes that he should be involuntarily medicated

3    for the purpose of competency restoration, not what he was

4    doing at the time of arrest and/or the time of the search

5    warrant execution.

6            Her testimony is supposed to be about his current

7    state, the fact that medication in her opinion would make

8    him competent and not whatever he was doing at the time of

9    the arrest and/or related to the allegations that he's

10   charged with.

11           THE COURT:  Counsel, what's your response?

12           MS. VOSHELL:  Judge, under the first prong of

13   *Sell*, a relevant consideration when the Court is to assess

14   the Government's interest in prosecuting this case is -- █

15   ████████████████████████████████████████████████

16   ██████████████████████████████████████████

17   ██████████████████████████████████████████

18   █████████████████████████████████████████████████

19   ████████████████████

20        ████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   █████████████████ ████ ██████

24        ██████████████████████████████████

25   ████████████████████████████████████████

1    ███████████████████████

2    ████████████████████████████████

3    ████████████████████████████████████

4    ███████████████████████████████

5    ████████████████████████████████████

6    ███████████████████

7         THE COURT:  Government?  If it's for the limited

8    purpose --

9         MS. CONNOR:  Your Honor, I think, though, that the

10   *Sell* prong, number one, is a legal question.  And this isn't

11   the witness to weigh in on a legal question.

12   ████████████████████████████████

13   ████████████████████████████████████

14   ████████████████████████████████

15   ██████████████████████ this witness's testimony

16   and, quite frankly, her direct is based on whether or not

17   his competency can be restored with forced medication.  So

18   this would actually in addition to my previous objection be

19   beyond the scope of her direct exam.

20        THE COURT:  Okay.

21        MS. VOSHELL:  I'm not asking her --

22        THE COURT:  Give me a moment to take a look at

23   something.  But it certainly is beyond the scope in terms of

24   what they have brought up.  So -- and it's well beyond the

25   scope.  I mean, they completely stayed away from anything

1     relating to that.

2              So you're basically using her as a witness to

3     pursue your first prong in terms of what you would like to

4     have her -- ███████████████████████████████████

5     ██████████████████████████████████████████████████████

6     ██████     So I think on those grounds at least at this point I

7     will sustain it.

8              So move to whatever else you've got.

9     BY MS. VOSHELL:

10    Q.  Dr. Cuccio, I'd like to talk about how forced medication

11    as the Government is proposing it would actually work in

12    this case.

13             I believe you testified on direct that you would

14    be the psychiatrist administering the medication to

15    Mr. Beler if the Court orders him to be forcibly medicated

16    under *Sell*.  Is that correct?

17    A.  That's possible, yes, depending on which facility he's

18    housed at.  If he's housed at another facility, he would

19    have another psychiatrist treating him.

20             THE COURT:  Excuse me.  Who would make that

21    decision?

22             THE WITNESS:  It's possible that I could make that

23    decision.  I could request that he go to another facility

24    ████████████████████████████████████

25    ███████████████████████████████         And if he needed

Cuccio - CROSS - By Ms. Voshell

1    more support than they could possibly give him at a smaller

2    facility, I could request that he be moved to Butner or some

3    other place.  Most likely, Butner, where they have a lot of

4    experience with *Sell* cases.

5              He got selected to go there by a nonclinician as

6    kind of a default choice.  And so sometimes this happens,

7    that the clinicians say:  Oh, at this point in time, this

8    person is not appropriate to be treated at this facility and

9    we need to transfer him.  And they look at all the things

10   that are going on.

11             He may be even closer to home, actually, at

12   Butner, too.  So it's possible that he could get treated

13   there with an in-person psychiatrist if that's also going to

14   be helpful to him.

15             THE COURT:  At this point, have you decided what

16   you would be recommending?

17             THE WITNESS:  I would love for him to go to

18   Butner, actually.  Medication-wise, I've decided.  But

19   you're asking me about if he were to stay or if he were to

20   go?

21             THE COURT:  I'm really asking you more if you're

22   the one who's the potential decision-maker, whether you've

23   made up your mind at this point what you would do, to keep

24   him or send him.  Because that's what she's getting at,

25   who's going to treat him.

1          THE WITNESS:  I would prefer to send him.  But if

2     I can't send him, I would treat him.

3          THE COURT:  Can I just ask in terms of Butner --

4     because I know from other cases there's a waiting list.  Is

5     there a waiting list for him?  Would he jump the waiting

6     list or be on a different waiting list than the typical case

7     coming in that we would send, you know, to Butner for

8     examination?

9          THE WITNESS:  It's possible, because that would be

10    between psychiatrists.  We could -- depending on the

11    urgency. ███████████████████████████████████

12    ████████████████████  He's been here long enough.

13          So I think we could probably talk to them about

14    that.  I can't guarantee what they're going to say to me.

15    But yeah.

16          THE COURT:  So you know what your answer is.

17    BY MS. VOSHELL:

18    Q.  So if Mr. Beler is not moved to Butner, you will

19    continue to treat him by video --

20    A.  Yes.

21    Q.  -- while he is at Fort Worth?

22    A.  Yes.

23    Q.  Okay.  And again, there continues to be no psychiatrist

24    who is based at the Fort Worth facility?

25    A.  Yes.  There is no psychiatrist.

1    Q.  Okay.  So you would be treating Mr. Beler again by

2    video, not in person, if he remains at Fort Worth?

3    A.  Yes.  I would treat him in the same way I treat all the

4    other patients at Fort Worth.  I treat a lot of psychiatric

5    patients at Fort Worth.  But yes.

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████

14   ██████████████████████

15   Q.  Is there any option other than Butner and Fort Worth for

16   where Mr. Beler will be housed if the Court orders him to be

17   force-medicated under *Sell*?

18   A.  We have other federal medical centers.  I'm situated at

19   a federal medical center.  They don't do as much forensic

20   work here at Minnesota.  But Butner is the best place, in my

21   opinion.

22           They could see him also at Devens.  I don't

23   believe they do as much forensic work, but they do some at

24   Devens.  So there are various medical centers that they

25   could see him at.













1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          THE COURT REPORTER:  Sorry, Doctor.  Could you

25    repeat the end of your answer, please?

















17    UNIDENTIFIED CORRECTIONS OFFICER:  I'm sorry.  I

18    wanted to interject and I wanted to let you know we have

19    about an hour left.  So I want to know what the time frame

20    was looking like.  But he has to go in about an hour.

21    THE COURT:  We had done it at 5:00 for our time

22    and 4:00, I think, for yours.

23    UNIDENTIFIED CORRECTIONS OFFICER:  Yes, ma'am.  So

24    what time, then?

25    THE COURT:  We have an hour left for today.

```
1              UNIDENTIFIED CORRECTIONS OFFICER:  Okay.

2              THE COURT:  And we have it set up for tomorrow as

3       well.

4              UNIDENTIFIED CORRECTIONS OFFICER:  That's fine.

5       Thank you.

6              THE COURT:  Thank you.

7              Counsel?

8       BY MS. VOSHELL:

9       ███████████████████████████████████████████

10      ████████████████████████████████████████████

11      █████████████████████████████████████████████

12      ██████████████████████████████████████████████

13      ██████████████████████████████

14      ███████

15      █████████████████████████████████████████████

16      ██████████████████

17      ██████████████████████████████████████████████

18      ██████████████████████████████████████████████

19      ████████████████████████████████████████████

20      █████████████████████████████████████████████

21      ████████████████████

22      ████████

23      ███████████████████████████████████

24      █████████

25      █████████████████████████████████████████████
```

Cuccio - CROSS - By Ms. Voshell











Q.  And you discussed the plan to get Mr. Beler competent

through forced medication if he's being held at Fort Worth

or if he's being held at Butner.  But if Mr. Beler is

eventually found to be competent, his trial would be

1    conducted in DC.  Correct?

2    A.  I don't know.

3    Q.  Well, his case is out of DC.  Correct?

4    A.  Okay.  Yes.

5    Q.  Do you not know that?

6    A.  You're at DC.

7              THE COURT:  Well, let's assume -- clearly, it's

8    going to be DC.  Let's move this along, okay?

9              MS. VOSHELL:  Okay.

10              THE COURT:  Let's get to the point.  The trial's

11   in DC.  He's sitting someplace, Fort Worth or Butner.  What

12   else?

13   BY MS. VOSHELL:

14   Q.  So if Mr. Beler is competent and he is brought back to

15   DC to stand trial, you or any other BOP psychiatrist will

16   not be visiting him in the DC Jail to make sure that he is

17   continuing to perform well on his medication.  Correct?

18   A.  What's been happening recently is I've seen the courts

19   hold people back until it's time for their court date and

20   then they go right to court.  That's what some of them have

21   been doing.  Not for the *Sell* cases, but for *Harper.*  When

22   they become competent, they've been going straight to court

23   and are not spending a lot of time in jail so they don't get

24   off their meds.

25              I've also seen people go to facilities that are

1    managed by the BOP, and I manage some of those people.  But

2    I don't manage the people at DC, though.

3    BY MS. VOSHELL:

4    Q.  Does anyone from BOP --

5            THE COURT:  You're making the assumption that they

6    go to the DC Jail.  There are other facilities that some

7    individuals are at.

8            THE WITNESS:  I don't know if he would be there or

9    not.  I don't know where he would go.

10    BY MS. VOSHELL:

11    ███████████████████████████████████████████████████

12    ███████████████████████████████████████████████████

13    ████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████

15    ██████████████████████████████████

16    ██████████████████████████████████████████████████████

17    ████████████████████

18          █████████████████████████████████████████████████

19    ██████████████████████████████████████████████

20    ██████████████████████████████████████████

21    █████████████████████████████████████████████████████

22    ████████████████████████████████████████

23    ████████████████████████████████████████████████

24    ██████████████████████████

25          ████████████████████████████████████████████

Cuccio - CROSS - By Ms. Voshell





1

2

3

4

5

6

7  Q.  You testified that BOP's plan would be to keep Mr. Beler

8  at some facility hundreds of miles away from his counsel in

9  the time leading up to his trial as a way to continue to

10  keep medicating him to keep him competent.  Correct?

11        THE COURT:  Okay.  That's not -- that's not an

12  issue here.  That's a legal issue or some other thing in

13  terms of his access to counsel.  That's not something she

14  needs to answer.

15        Let's move on.

16  BY MS. VOSHELL:

17

18

19

20

21

22

23

24

25

165









12          MS. VOSHELL:  Judge, I have no further questions.

16          MS. VOSHELL:  Judge, I have no further questions

17    for Dr. Cuccio.  Thank you.

18          THE COURT:  Let's start with the redirect.

19          MS. CONNOR:  Yes, your Honor.  Thank you.

20          THE COURT:  Do you need a five-minute break here

21    or is everybody ready to go forward?

22          It looks like we're ready to go forward.

23          MS. CONNOR:  Yes, your Honor.

24                    REDIRECT EXAMINATION

25

1    BY MS. CONNOR:

2    Q.  Dr. Cuccio, you received a number of pages of documents

3    that were sent to make sure you had the exhibits in exhibit

4    form.  Correct?

5    A.  Yes.

6    Q.  Did anything in that packet that you had printed out

7    change your opinion or conclusion in any way?

8    A.  No.

9    Q.  How often during the course of forming your opinion did

10   you talk to Dr. Armstrong in relation to Mr. Beler?

11            MS. VOSHELL:  Objection, Judge.  I believe this

12   has been asked and answered.

13            THE COURT:  Go ahead.  At this point, she can

14   answer it, assuming that she's in a position to do it.  I

15   frankly don't remember what the answer was.

16            But go ahead.

17            THE WITNESS:  I'm not sure I remember the answer

18   either.  There have been -- early on, I didn't speak to her

19   as much because there was not as much that I could do and

20   there was not as much going on.

21            But more recently, we've talked at least weekly

22   about what's happening with him and I've started seeing him

23   at least weekly, too, because I'm hoping he will get started

24   on meds soon, too.

25

1    BY MS. CONNOR:

2    Q.  And in addition to speaking with Dr. Armstrong, how

3    frequently do you read updated BOP records as it relates to

4    Mr. Beler?

5    A.  Oh, I've probably spent more time on this patient than

6    I've spent on any patient I've ever seen in my entire

7    career.  I would have to say I read records constantly with

8    him.  I've probably spent the last two weeks doing nothing

9    but reading his records.

10          But I've read a lot of -- in general, I've read

11   his records at least once a week.  I've read some part of

12   his record once a week.

13   Q.  Now, if the Court were to order forced medication in

14   Mr. Beler's case, what would -- and let's assume that he

15   does not get sent to Butner, that he stays where he is and

16   you are treating him.  What would that treatment look like

17   for the remainder of his stay with the BOP?

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25        ██████████████████████████████████████████████████



1  ███████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ██

4      MS. VOSHELL:  Your Honor, I apologize for

5  objecting in the middle of the witness's testimony, but I

6  think this is pretty far afield and not relevant to the

7  Court's determination.

8      THE COURT:  She was asked a question about

9  whether -- what she would set up should the Court order it

10  and she was in charge of it.

11      But I think we can move on.  Go ahead.

12          ████████████████████████████████

13  ████████████████████████

14  BY MS. CONNOR:

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  █████████████████████████████████████████

18  █████████████████████████████████████████

19  ██████████████████████████████████████████

20  ███████████████

21  ███████████████████████████████████████████

22  ███████████████████████████████████████████

23  ██████████████████████████████████████████

24  ██████████████████████████████████████████

25  ██████████████████████████████████████████



Q.  How do the goals from an acute facility differ from the

goals in the BOP treatment system?

A.  An acute facility --

        MS. VOSHELL:  Objection to relevance, Judge.

        THE COURT:  I'll allow that one.

        THE WITNESS:  My experience with an acute facility

is that they want to be able to treat people to the point

that they are well enough to move to a less-restrictive

facility, a less-restrictive level of care.

        So they would go from their facility and this

patient would go to a group home or someplace like that, a

rehab place.  And then they would continue treatment.

        But with the BOP, we don't have that kind of

1    stepdown.  We can provide longer-term treatment.  They're

2    already fairly restricted.  We know where they are all the

3    time and we can offer treatment in an appropriate milieu

4    throughout their stay.  We're not limited timewise.

5    BY MS. CONNOR:





1

2

3

4

5

6

7

8

9

10

11

12          THE COURT REPORTER:  I'm sorry, Doctor.  I didn't

13  catch the last part of your answer.

14

15

16

17

18

19

20

21

22

23

24

25





















MS. CONNOR:  Thank you.  I have no further

1     questions.

2          THE WITNESS:  █████████████████████

3          MS. CONNOR:  Your Honor, that was my last

4     question.  Thank you.

5          THE COURT:  So I think what we'll do is we would

6     be starting with Dr. Corvin, presumably.  Is there -- well,

7     let me just ask:  Is there anything else from the Government

8     that you would be putting on at this point?  Anything else

9     from your end?

10          MR. MIRANDA:  No, your Honor.

11          THE COURT:  Then it seems to me it's Dr. Corvin,

12     I'm assuming, that the defense is calling.  Am I correct?

13          MR. MIRANDA:  Yes, your Honor.

14          THE COURT:  Why don't we stop at this point.

15     There's no point starting him.  I don't know whether he's

16     on.  We could get his background on in the next 20 minutes,

17     if you want, if he's available, and get that out of the way.

18          MS. CONNOR:  I'll leave that up to the Court, your

19     Honor, as to whether to start or whether to just begin

20     tomorrow.

21          MS. FORREST:  I'm sorry to interrupt.  Mr. Beler

22     has to go downstairs for count in about five minutes, so I

23     don't know that there would be enough time to start another

24     section for him.

25          THE COURT:  Why don't we stop at this point.  This

1    has been a long day for Mr. Beler as well as everybody else.

2         And I appreciate, Mr. Beler, that you've sat

3    patiently listening to everything.  And so we will see you

4    tomorrow.  We have -- your counsel will be putting on a

5    psychiatrist and we'll go through his testimony.  So I will

6    see you tomorrow.  Take care of yourself.

7         Why don't I just let you go, then.  We'll start

8    tomorrow.  We're starting at 10:00 Eastern time and 9:00 out

9    where Mr. Beler is living.  So let me get off and we'll

10   start tomorrow at 10:00.

11        I would ask that you try to get on -- get on a

12   little early so if we have problems we don't wind up

13   having -- losing 10 or 15 minutes doing this.

14        Hopefully, we'll be able to finish the testimony

15   tomorrow.  I don't know how long it will be.  Do you have

16   some idea how long you expect to have him testify?  An

17   estimate?

18        MS. FORREST:  I would estimate about four hours,

19   your Honor.

20        THE COURT:  All right.  Let me see how it goes in

21   the morning as to whether we need to add an extra day since

22   I think we had problems with the rest of the week trying to

23   come up with something.

24        But we might be able to do it if we needed another

25   half day.  We might be able to come up with something.  But

1    let's see how quickly it goes tomorrow.

2              All right.  Everyone stay well.  I'll talk to you

3    tomorrow.  Take care.

4              MS. VOSHELL:  Bye.

5              MR. JEFFRESS:  Thank you.

6              MS. FORREST:  Thank you.

7              (Proceedings concluded.)

1                          **<u>CERTIFICATE</u>**

2

3                     I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8                          Please note:  The hearing occurred during

9      the COVID-19 pandemic and is therefore subject to the

10     technological limitations of reporting remotely.

11

12

13                         Dated this 26th day of August, 2020.

14

15               <u>/s/ Lisa Edwards, RDR, CRR</u>
                 Official Court Reporter
16               United States District Court for the
                     District of Columbia
17               333 Constitution Avenue, NW, Room 6706
                 Washington, DC 20001
18               (202) 354-3269

19

20

21

22

23

24

25