1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2
     * * * * * * * * * * * * * * *    )
3    UNITED STATES OF AMERICA,        )     Criminal Action
                                      )     No. 19-415
4                    Plaintiff,       )
                                      )
5       vs.                           )
                                      )
6    PETER BELER,                     )     Washington, DC
                                      )     August 25, 2020
7                    Defendant.       )     10:00 a.m.
                                      )
8    * * * * * * * * * * * * * * *    )

9

10              TRANSCRIPT OF COMPETENCY HEARING
                 HELD VIA VIDEO TELECONFERENCE
11        BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
                 UNITED STATES DISTRICT JUDGE
12

13

     APPEARANCES:
14
     FOR THE GOVERNMENT:     NICHOLAS MIRANDA, ESQ.
15                           JENNIFER CONNOR, ESQ.
                             UNITED STATES ATTORNEY'S OFFICE
16                            FOR THE DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
17                           Eleventh Floor
                             Washington, DC 20530
18

19   FOR THE DEFENDANT:      JONATHAN JEFFRESS, ESQ.
                             EMILY A. VOSHELL, ESQ.
20                           COURTNEY R. FORREST, ESQ.
                             KAISER DILLON, PLLC
21                           1099 14th Street, Northwest
                             Suite 800 West
22                           Washington, DC 20005

23

     ALSO PRESENT:           GEORGE PATRICK CORVIN, M.D.
24
                             FRANCISCA OTERO
25                           (Power of Attorney to the Defendant)

```
 1     REPORTED BY:              LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
 2                               United States District Court for the
                                   District of Columbia
 3                               333 Constitution Avenue, NW
                                 Room 6706
 4                               Washington, DC 20001
                                 (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      I N D E X

2

3                                 Direct        Cross           Red.

4
   WITNESSES FOR THE DEFENSE:
5

6   George P. Corvin, M.D.            6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  I see Mr. Miranda.  Do we have

 2     Mr. Beler on the video?  No.  I don't see him.

 3              My law clerk, are you on?

 4              THE LAW CLERK:  Yes.  I'm on.

 5              THE COURT:  Dorothy, are you on?

 6              THE COURTROOM DEPUTY:  Yes, Judge.

 7              THE COURT:  Let's see.  Is Dr. Cuccio going to be

 8     listening in?

 9              DR. CUCCIO:  Yes.  I'm here.

10              THE COURT:  And we have Dr. Corvin?

11              DR. CORVIN:  Yes.

12              THE COURT:  Do we only have one Government counsel

13     or is there somebody else?

14              MR. MIRANDA:  No, your Honor.  We're both on.

15              THE COURT:  Who is going to be doing the

16     examination of Dr. Corvin?

17              MS. FORREST:  I am, your Honor.

18              THE COURT:  Identify yourself for the record.

19              MS. CONNOR:  Jennifer Connor.  I'll be doing the

20     cross-examination.

21              THE COURT:  That's what I meant.

22              I'm sorry.  Can you say your last name again?  I

23     have it in here somewhere.

24              MS. CONNOR:  Yes.  Connor, C-O-N-N-O-R.

25              THE COURT:  And do I have defense counsel?
```

 1              MS. FORREST:  Yes, your Honor.  Courtney Forrest,

 2    Jonathan Jeffress and Emily Voshell for Mr. Beler.

 3              THE COURT:  And who is going to be doing the

 4    examination of Dr. Corvin?

 5              MS. FORREST:  I am, your Honor.  Courtney Forrest.

 6              THE COURT:  All right.  I think we've got

 7    everybody on.

 8              Do we have Mr. Quinn on?

 9              MS. OTERO:  We have Francisca Otero in place of

10    Mr. Quinn.  My last name is O-T-E-R-O and my first name is

11    Francisca, F-R-A-N-C-I-S-C-A.

12              THE COURT:  Are you familiar with the file?

13    Because I did have a couple questions I wanted to ask about

14    the role of Mr. Quinn in terms of some of these decisions.

15    Do you know the answers or are you just listening?

16              MS. OTERO:  I have some familiarity with the file.

17    But I might -- I don't know whether I'd be able to answer

18    your specific questions.

19              THE COURT:  Okay.  Well, we'll wait until later

20    until I get to them.

21              Let me call the case.  United States against Peter

22    Beler, B-E-L-E-R, 19-CR-415.

23              Now we need to make sure Mr. Beler is there.  I

24    don't see him.  Is he on?

25              DR. ARMSTRONG:  Yes.  We're here.

```
 1            THE COURT:  Great.  Then let's proceed.
 2            I believe that defense counsel, Ms. Forrest,
 3    you're going to be calling Dr. Corvin.  And he needs to be
 4    identified and then he needs to be sworn in.
 5            I see you, Mr. Beler.  Good morning.  How are you?
 6    I hope you had a good evening.
 7            So he needs to be sworn in by Dorothy
 8    Jones-Patterson, the deputy courtroom clerk.
 9        GEORGE P. CORVIN, M.D., DEFENSE WITNESS, SWORN.
10                    DIRECT EXAMINATION
11    BY MS. FORREST:
12    Q.  Good morning, Dr. Corvin.
13    A.  Good morning.
14    Q.  Could you please just introduce yourself to the Court,
15    tell us your title and where you're employed.
16    A.  Yes, ma'am.  My name is George Patrick Corvin, M.D.  I
17    am a general and forensic psychiatrist and I am practicing
18    primarily in Raleigh, North Carolina, but provide
19    consultation services in the area of forensic psychiatry
20    around the country.
21    Q.  And, Dr. Corvin, could you pull up Defense Exhibit 1,
22    which is your CV.
23    A.  Yes, ma'am.
24    Q.  And could you just glance at that and confirm whether
25    this is a true and correct copy of your CV?
```

1    A.  Just one moment and I'll make sure of that.

2            Yes, ma'am.  This appears to be a current copy of

3    my curriculum vitae or résumé.

4    Q.  Great.

5            Could you briefly summarize your education after

6    high school, please?

7    A.  Yes, ma'am.  After graduating high school, I attended

8    Birmingham Southern College in Birmingham, Alabama.  I

9    graduated from there with degrees in biology and psychology.

10           I then attended the University of Alabama School

11   of Medicine, also in Birmingham, Alabama, graduating from

12   there after four years with my medical doctorate, my medical

13   degree.

14           I then relocated to Augusta, Georgia, where I

15   completed a four-year residency in general psychiatry at the

16   Medical College of Georgia.  I stayed on there for my final

17   year as chief resident of the program and did some research

18   with the department there.

19           After completing my residency, I then decided to

20   pursue what we call a fellowship, a period of advanced

21   training in a subspecialty area in psychiatry known as

22   forensic psychiatry.  That brought me to Raleigh,

23   North Carolina, where I've lived ever since.

24           During my fellowship year, which ran the 1996-1997

25   time frame, I actually took a position with the Department

 1    of Justice, which I continue today, although under a

 2    different framework.  There was a program operated by Duke

 3    University and the University of North Carolina in forensic

 4    psychiatry.

 5            During my fellowship, I worked primarily at the

 6    Federal Correctional Institution in Butner, North Carolina,

 7    now FCC Butner, where I received training in various areas

 8    of civil and criminal forensic practice.

 9            Since then, I've been practicing in Raleigh, North

10    Carolina.

11            THE COURT:  Could you tell us the years you were

12    at Butner?

13            THE WITNESS:  Yes.  I was at Butner from 1996

14    through 1997.  Now, I still work there some and have worked

15    for US attorneys and public defenders there, seeing folks

16    over the years.  But my period of employment during my

17    fellowship was a little over a year, from 1996 to 1997.

18            THE COURT:  Thank you.

19            I'm sorry.  Go ahead.

20            THE WITNESS:  Yes, ma'am.

21            MS. FORREST:  Thanks.

22    BY MS. FORREST:

23    Q.  I want to come back to that fellowship in a moment.

24            But in the meantime, could you tell us what, if

25    any, professional certifications you have?

1     A.  So currently, I have -- I'm a member of the American

2     Psychiatric Association.

3          And in 2009, the state chapter of the American

4     Psychiatric Association in North Carolina submitted my name

5     for membership as a distinguished fellow of the American

6     Psychiatric Association.  And so I've held that

7     certification or membership, if you will, since

8     approximately 2009.

9          I am also certified in general and forensic

10    psychiatry by the National Board of Physicians and Surgeons.

11         And in terms of licensure, I currently hold an

12    unrestricted medical license in North Carolina and also in

13    Kentucky.

14    Q.  Thank you.

15         So in terms of your current practice, do you

16    presently treat patients with psychiatric illnesses?

17    A.  Oh, yes.  In this room where I am now.

18    Q.  And does that include prescribing psychiatric

19    medications?

20    A.  It does.  Yes, ma'am.

21    Q.  How long have you been treating patients in private

22    practice?

23    A.  So since finishing my fellowship -- well, since 1997.

24    So upon completion of my fellowship, I took a position with

25    North Raleigh Psychiatry in Raleigh, North Carolina.  I have

1   worked here ever since then and am currently the managing

2   partner of this practice.  This is a single-specialty

3   psychiatric practice in Raleigh.

4   Q.  So has that been since about 1997, then?

5   A.  That is correct.  Thereabouts.

6   Q.  And I see you're in an office now.  Do you also have

7   experience treating patients in a hospital setting?

8   A.  Yes, ma'am.

9          So for about a decade, earlier in my career, when

10  I could tolerate sleep deprivation better than I can now, I

11  was one of the hospitalists at Holly Hill Hospital and also

12  Raleigh Community Hospital.  And both are -- were

13  psychiatric facilities in Raleigh.  Holly Hill still exists,

14  but Raleigh Community does not.

15         For part of that time, I was president of the

16  medical staff at Holly Hill and also served as the medical

17  director for their dual diagnosis program and chemical

18  dependency short-term rehab and detox units for about six

19  years.

20  Q.  Okay.  And approximately what years were those?

21  A.  I think I left there in around 2011, maybe.  I can't

22  remember exactly right now.  But it's been some years since

23  I've left -- since I surrendered my affiliation with the

24  hospitals.

25  Q.  Okay.  Now, could you tell us a little bit more about

1    your experience with the Bureau of Prisons during your

2    fellowship?

3    A.  Yes, ma'am.

4    Q.  What had you been doing there?

5    A.  So the way a fellowship works, the things that I was

6    doing at FCC Butner obviously were all manner of federal

7    forensic examinations through the -- I say the Department of

8    Justice, but it's the Bureau of Prisons.  Those would have

9    included competency evaluations, mental-state-of-the-offense

10   evaluations, treatment of and treatment recommendations for

11   sentenced inmates, what we call Title 18, USC, 4246, which

12   would be commitment evaluations for individuals nearing the

13   end of their sentence.

14         So all manner of clinical, but also forensic

15   evaluations.

16         I also was exposed to and had some practice, if

17   you will, looking at various realms of civil forensic

18   practice, even though those are not part and parcel of the

19   mission of the Bureau of Prisons.

20         The faculty there, Sally Johnson in particular,

21   Bruce Berger, folks of that nature, kind of helped teach me

22   the ropes, if you will, about where it is that psychiatry

23   interfaces with the law and how psychiatrists can assist

24   courts in making decisions and ways in which psychiatrists

25   should not be involved in court settings.  So it was great

1    training, in my view.

2    Q.  And as a part of that training, did you have experience

3    treating defendants to try to restore their competency to

4    stand trial?

5    A.  So I did, a lot; but it was not under the rubric of *US*

6    *v. Sell.*

7    Q.  Okay.  And to be clear, was that because your experience

8    at the BOP was prior to the Supreme Court decision in *Sell*?

9    A.  That's correct.  If I remember correctly, *Sell* came out

10   in 2003.  So I had left federal employment by that time.

11   Q.  And have you personally forcibly administered

12   medications to defendants in order to attempt to restore

13   their competency?

14   A.  Yes.

15   Q.  And was there any sort of -- I understand this is prior

16   to *Sell*.  Was there any sort of judicial process involved at

17   that time?

18   A.  So there was a judicial process involved at that time.

19   And it was a process that was much closer -- not identical,

20   but much closer to the rubric under other forms of

21   involuntary, nonemergent forced medication administration in

22   clinical practice.

23          *Sell*, of course, narrowed that somewhat.  Well,

24   actually, it narrowed it a lot.

25          And so prior to *Sell*, while it was a judicial

 1   process, it was very much different criteria that were

 2   established.  They were almost entirely clinically based.

 3   Q.  Okay.  And the defendants that you worked with that were

 4   being medicated to restore competency:  Did all of those

 5   defendants ultimately become competent?

 6   A.  No.  I mean, most probably -- I couldn't give you a

 7   specific percentage of my patients that I've treated.  But

 8   not all of them did.

 9   Q.  And I think we've discussed forensic psychiatry.  But

10   just so the record is clear, can you give us a definition of

11   what forensic psychiatry is?

12   A.  Yes, ma'am.  So forensic psychiatry simply is an area

13   where psychiatric medicine, where the training and

14   experience and the expertise that a psychiatrist has, is

15   applied to various legal questions, questions for the trier

16   of fact, in such a way that the psychiatric knowledge can be

17   offered, right, to help inform a decision of a

18   decision-maker or a trier of fact.

19          So in other words, it's sort of this area where

20   psychiatric medicine interfaces with legal practice, because

21   as you probably all know, there are certain areas of legal

22   practice, both civilly and criminally, that sort of ask

23   questions that are psychiatric or mental health-related.

24   Q.  And what percentage of your time is currently devoted to

25   forensic work in criminal cases?

1    A.  Well, it varies from week to week.  So lately it's been

2    probably too much forensic.

3              But in general, I will tell you that much less --

4    I intentionally keep my forensic practice limited.  It's

5    less than half of my practice time.  I believe that to be a

6    good forensic practitioner it helps to be a good clinical

7    practitioner, and so that's how I try to arrange my life.

8    Sometimes it doesn't work out that way, but that's how I

9    work.

10   Q.  And how do you keep up to date on developments in the

11   field of both general and forensic psychiatry?

12   A.  So there are several ways.  I mean, first and

13   foremost -- I'm looking at it on my desk right now -- there

14   are certainly journals, both in general psychiatry and in

15   forensic psychiatry, that I review on a regular basis:  The

16   Newsletter and Journal of the American Academy of Psychiatry

17   and the Law, the Journal of the American Psychiatric

18   Association, Psychiatric Times.

19             But above and beyond that, our state, as is, I'm

20   sure, the case around the country, the State of

21   North Carolina requires a certain number of continuing

22   education hours in our field for every three-year period, as

23   does my certification board.  Maintenance of board

24   certification alone is a mechanism by which one stays

25   current in the field.

1          I teach regularly various topics of forensic

2    psychiatry, including at FCC Butner.

3          And also, of course, through consultation with the

4    partners in my group.  I find it to be extremely helpful to

5    be practicing in a place where there are five more

6    psychiatrists right down the hall from me.

7          So -- and then, of course, practicing.

8    Q.  And you mentioned some teaching opportunities, including

9    at Butner.  On what topics have you taught?

10   A.  So from whatever reason, they typically pick me to --

11   they ask that I teach various areas of civil law or civil

12   forensic practice.

13         So most recently I've been -- in fact, very

14   recently, I have been doing lectures for them --

15   unfortunately, recently this way -- on standard of care,

16   personal injury matters, consent for care, sort of various

17   medical malpractice issues, tort, things of that nature.  So

18   not so much in the area of criminal evaluations.

19         But Butner obviously has many people that can

20   teach those subjects.  But the folks at Butner have less

21   exposure to civil areas of practice, so they have used me

22   for that.

23   Q.  Now, in the course of your career, have you offered

24   opinions in criminal cases other than this one?

25   A.  Oh, yes.  Yes, ma'am.

1    Q.  Approximately how many times have you offered opinions

2    in criminal cases?

3    A.  Well, I lost track years ago.  But it's well in excess

4    of 300.

5    Q.  And you may have mentioned this slightly earlier.  But

6    on what various issues have you offered opinions in criminal

7    cases?

8    A.  So probably more often than not it's been on issues

9    regarding capacity, competency to stand trial.  I've got a

10   couple of competency-to-be-executed that are underway right

11   now.  So criminal insanity, diminished capacity, and on some

12   occasions *Sell* issues.

13   Q.  Approximately how many times have you offered opinions

14   in cases on *Sell* issues?

15   A.  Not many.  Probably over the years I would say less than

16   ten, to be honest with you.  *Sell* issues are not brought up

17   often, as the Court has heard.  They're not even brought to

18   the Court for review very often.

19            Of the *Sell* cases that I've been involved in, most

20   of them have probably been at the state level.  But a few in

21   federal court.

22   Q.  In the course of your forensic work, in approximately

23   how many of those cases were you retained by the prosecution

24   or the Government?

25   A.  Definitely the minority.  Probably 10 percent, if that;

Corvin - DIRECT - By Ms. Forrest

1    maybe some less.

2          There's a structural -- especially at the state

3    level, there's sort of a structural -- I don't want to say

4    bias, but the way that the structure is set up the

5    prosecutors tend to at the state level retain doctors that

6    work at state hospitals.  I don't know why that is that way.

7    It just is.

8          But there have been more than a few cases -- well,

9    there are more than a few cases that I have right now where

10   I'm working with state prosecutors, actually.

11   Q.  In what courts have you been previously qualified as an

12   expert witness?

13   A.  So I think other than in North Carolina, probably --

14   let's see -- New Hampshire, Georgia, Florida, Virginia,

15   Alabama, South Carolina.  I can't think of any others right

16   now.  I can't swear to the fact that I've named all of them,

17   but those are the ones that come to mind.

18   Q.  Were some of those federal courts?

19   A.  Yes.  Yes, ma'am.

20   Q.  And have you ever been appointed by a court to give an

21   independent expert opinion neither for the prosecution nor

22   for the defense?

23   A.  Yes, ma'am.

24   Q.  And what was the circumstances of that?

25   A.  So it was a federal case.  It's a little odd, but it was

1    a federal case involving some post-condition proceedings --

2    well, post-release proceedings.  There was a fellow in

3    North Carolina who had been on death row for 30 years along

4    with another family member of his, and it turned out that

5    they were innocent, [indiscernible] innocent.

6        In the years that followed, there were various

7    civil proceedings that went on.  Questions were raised

8    regarding the Defendant -- well, the released inmate's

9    relationship with his counsel at the time.

10        And the Judge questioned his capacity in terms

11    of -- well, I'm try to think of a way to say it -- concerns

12    that the attorney was taking advantage of the Defendant who

13    was intellectually limited.  And that's how I got involved.

14        THE COURT:  So when you say "his capacity," you're

15    talking about the Defendant's capacity or the --

16        THE WITNESS:  That is correct.  Yes, your Honor.

17        THE COURT:  Not the attorney's?

18        THE WITNESS:  Not the attorney's.  The Defendant

19    was making -- undue influence.  It was an undue influence

20    evaluation.  And the influencer was the attorney.

21        THE COURT:  Okay.

22        THE WITNESS:  Thank you, your Honor.

23    BY MS. FORREST:

24    Q.  And, Dr. Corvin, has any court ever found you

25    unqualified to offer an expert opinion?

1    A.  No, ma'am.

2              MS. FORREST:  Your Honor, I'd move to offer

3    Dr. Corvin as an expert in general and forensic psychiatry.

4              THE COURT:  Any voir dire or any objections from

5    the Government?

6              MS. CONNOR:  No, your Honor.

7              THE COURT:  Then I'll qualify Dr. Corvin as an

8    expert in general and forensic psychiatry.

9              MS. FORREST:  Thank you, your Honor.

10   BY MS. FORREST:

11   Q.  Dr. Corvin, have you performed a forensic evaluation of

12   Mr. Beler?

13   A.  Yes.  To the extent I've been able to, yes, ma'am.

14   Q.  And did you prepare a report containing your opinions

15   that you're offering in this case?

16   A.  Yes, ma'am.

17   Q.  Could you pull up Defense Exhibit 2, please.

18   A.  Yes, ma'am.

19   Q.  Is that the report that you prepared in this case?

20   A.  It is.  And I have a hard copy of it with me as well.

21   Yes, ma'am.

22   Q.  And in that report, do you offer an opinion regarding

23   whether Mr. Beler meets *Sell* criteria for involuntary

24   administration of medication to restore his competency?

25   A.  Yes.

1    Q.  And what is that opinion?

2    A.  My opinion is that he does not meet each of the criteria

3    established under *Sell*.

4    Q.  Now, I want to walk through how you reached that

5    conclusion and then talk about each of the criteria one by

6    one.  Okay?

7    A.  Yes, ma'am.

8    Q.  So first, what material did you review in the course of

9    forming your opinion?

10   A.  So in referring to my report -- and I'll try to be brief

11   about this.

12          So the records that were reviewed include reports

13   from Dr. Armstrong on March 11 of 2020 and Dr. Micono on

14   July 29, 2019, both BOP examiners.

15          I also reviewed the Defendant's medical and mental

16   health records ███████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ███████████████████████████

19          I reviewed a letter with some background

20   information from Attorney Jonathan Jeffress to Nicholas

21   Miranda in April of this year and the Butner *Sell* appendix

22   offered in 2019 by Herbel and Grady.

23          There was a forensic addendum and treatment plan

24   that the Court's been reviewing offered by Dr. Cuccio in May

25   of 2020.  There was also some discovery materials, including

1    an FBI report of April 18, 2019; an audio recording of an

2    execution of a search warrant at the Defendant's residence

3    on April 17, 2019.

4            And then, to be complete, subsequent to the date

5    of the report, I've also reviewed ███████████████████

6    ████████ obtained by the Bureau of Prisons.  Also had been

7    provided for review the BOP medical and mental health record

8    pertaining to Mr. Beler's treatment and evaluation at Fort

9    Worth, Texas.

10           And finally, I reviewed a series of photographs

11   obtained during the execution of the aforementioned search

12   warrant on the day of Mr. Beler's original arrest.

13   Q.  And in terms of the medical and mental health records

14   you reviewed, how voluminous were those records?

15   A.  They are in their entirety now well in excess of 4,000

16   pages.  They're lengthy.

17   Q.  And approximately what time frame did those records

18   cover?

19   ████████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████████

22   ██████████

23           ███████████████████████████████████████████

24   ██████████████████████████████████████

25   ████████████████████████████████████

1    Q.  And how does the volume of the medical records in this

2    case compare to what's available in a typical *Sell* case in

3    your experience?

4    A.  So the volume of mental health records that have been

5    available are greater than what is typically available in

6    any case that I've reviewed.  In fact, it's not the most

7    I've ever seen, but it's certainly at the upper edge of that

8    bell curve on that.

9         And in *Sell* cases, well, the same would apply.

10   ███████████████████████████████████████████████████████

11   ███████████████████████████████████████████████      So

12   it's far greater than average, if you will.

13   Q.  Now, you also mentioned that you did an evaluation of

14   Mr. Beler.  And what were the circumstances of that

15   evaluation?

16   A.  So in the course of this examination, I made

17   arrangements to interview and attempt to examine Mr. Beler

18   while he was at Fort Worth, Texas, at the FMC there.  But

19   due to the COVID restrictions, that was not an in-person

20   evaluation, as I mentioned.  It was by video teleconference.

21   Q.  And what was the date of that meeting by video

22   teleconference with Mr. Beler?

23   A.  I examined him on July 2nd of this year.

24   Q.  And approximately how long did you speak with him on

25   July 2nd?

1    A.  So in total -- there was some snippets with the video.

2    But in total, it was about an hour and 40 minutes.

3    Q.  And was your evaluation of Mr. Beler limited in any way

4    by your inability to meet with him in person?

5    A.  Yes.

6    Q.  And in what way?

7    A.  Well, the Court's already heard some of this.  I mean,

8    as a psychiatrist, it's always preferable to have a personal

9    contact with the examinee, both in terms of an evaluation of

10   that Defendant or individual in terms of making a diagnosis.

11   It's certainly important in terms of treatment because

12   psychiatrists are about relationship.

13           But as a forensic examiner who's not going to ever

14   be treating Mr. Beler, that in-person evaluation provides

15   data that is very difficult, if not impossible, to get from

16   a TV monitor.

17           I mean, one example is it's difficult to tell how

18   Mr. Beler smells.  It's difficult to see how he's moving in

19   the chair.  ███████████████████████████████████████

20   ███████████████████████████████████████

21           For those that can see Mr. Beler on the monitor

22   right now, ██████████████████████████████████████

23   ████████████████████████  You can't.  The resolution

24   is too low.  The image is too small.

25           So there are elements of a psychiatric examination

1    that are compromised in doing evaluations this way.  But

2    it's better, I suppose --

3                THE COURT:  Do you --

4                THE WITNESS:  Yes, ma'am.

5                THE COURT:  Go ahead.  Finish your answer.

6                THE WITNESS:  But it's better than having no

7    ability to examine someone or putting people's lives at

8    risk.  So it's a compromise.

9                THE COURT:  The question I was going to ask is

10   that when you did the video, did you have it the way we see

11   Mr. Beler now, where he's at the end of a table, or did you

12   see him the way we can see each other, where you basically

13   see from sort of the middle of the chest up?  Which way was

14   it?

15               THE WITNESS:  That is an excellent question, your

16   Honor.

17               So actually, it's sort of halfway in between.  So

18   it was -- I think it might have been that room.  The

19   image -- I don't know how y'all's screen looks like.  The

20   image was probably better than what I'm seeing right now,

21   but not a lot better.

22               So he was sitting at a table.  The camera was

23   about this far, but my image was bigger.  So it depends on

24   how you set up your screen.

25               THE COURT:  Okay.  Because the way it is now, he's

1    quite far down.  But you can obviously do the screens in

2    different ways in terms of what you can actually observe, if

3    they're closer in terms of at least expressions, maybe not

4    the whole body movements.

5              THE WITNESS:  You're absolutely correct.  Yes.

6    BY MS. FORREST:

7    Q.  Now, Dr. Corvin, did those limitations that you've

8    described limit your confidence in the opinions you're

9    offering in this case?

10   A.  Well, so, not for the opinions under *Sell*.  While there

11   are limitations, if the limitations were such that I

12   couldn't offer the opinions that I am prepared to offer

13   today with a reasonable degree of medical certainty, then I

14   probably would not be here.

15   ████████████████████████████████████

16   ████████████████████████████████████

17   ████████████████████████████████████

18   ████████████████████████████████████

19   ████████████████████████████████████

20   ████████████████████████████████████

21   ██ ███ █████████

22   Q.  And just to be clear, you are not recommending a

23   treatment plan of any sort for Mr. Beler.  Is that correct?

24   A.  Right.  That was not requested of me and so that is not

25   one of the opinions that I'm offering.

1    Q.  I want to move into some discussion of the medical

2    records now.  And before we get into the specifics, maybe

3    you can just give us an overview.













1

2

3

4

5

6    Q.   And are you -- you were present for Dr. Cuccio's

7    testimony.  Is that right?

8    A.   Yes.

9    Q.   And you reviewed her report?

10   A.   I did.  Yes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Corvin - DIRECT - By Ms. Forrest

























46





48



Corvin - DIRECT - By Ms. Forrest



50

BY MS. FORREST:







Corvin - DIRECT - By Ms. Forrest









1          THE COURT:  Go ahead, Ms. Forrest.



Corvin - DIRECT - By Ms. Forrest





























1

2

3          THE COURT:  Maybe we should take a break in here

4   sometime, because it's been about an hour and 45 minutes.

5   We can take a short break.  But I'll leave it to you as to

6   when you want to break.

7          MS. FORREST:  I think I have just a little more in

8   this area, your Honor.

9          THE COURT:  That's fine.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





1

2

3

4

5

6

7

8

9

10

11

12    Q.   I just have a few general wrap-up questions and then we

13    can take a break.  Are you okay with that, Dr. Corvin?

14    A.   I am.  Yes, ma'am.

15

16

17

18

19

20

21

22

23

24

25

Corvin - DIRECT - By Ms. Forrest



1   

2

3

4

5

6

7

8

9

10         MS. FORREST:  Your Honor, I think this is a good

11 place for a break, if you'd like to do that.

12         THE COURT:  According to my watch -- everybody's

13 is different -- I have ten minutes to 12:00.  So why don't

14 we take a 15-minute break and come back at five after 12:00.

15 Don't get off the system, because sometimes we have problems

16 getting back on.  But obviously, you can disappear.

17         So I'll see you back at five after 12:00.  We'll

18 resume at that point.

19         Do you have some sense of how long you're going to

20 be?

21         MS. FORREST:  I would say at least two more hours,

22 your Honor.

23         THE COURT:  Mr. Beler -- I assume there's somebody

24 there with Mr. Beler.  I can't see him.

25         At what point --

1          DR. ARMSTRONG:  Yes.

2          THE COURT:  -- does he want to have lunch?  Can he

3     eat where he is?  How do we want to arrange that?

4          DR. ARMSTRONG:  He can eat in here.  That's what I

5     offered him yesterday.  He declined.  They probably

6     delivered his lunch already for COVID reasons.  It's getting

7     sent to the unit, so he doesn't have to go over to retrieve

8     it from his room.

9          THE COURT:  What would he like to do about lunch?

10    Does he want to eat there?  Does he want to do something

11    else?

12         DR. ARMSTRONG:  What do you want to do, Mr. Beler?

13    Did you hear what the Judge said?  Would you like to get

14    your lunch and eat it in here or would you rather have time

15    to eat it down in your room?

16         And I'm not sure his unit -- they were actually

17    sent out for a search.  So I'm not sure if he's able to go

18    down on the unit.  They were doing a mass search.

19         THE COURT:  We don't need to do it now.  I'm just

20    asking what he wants.

21         DR. ARMSTRONG:  It's not clear.

22         Did you want to eat in here while we keep going

23    after the break or would you like to have time in your room

24    or elsewhere to eat?

25         THE DEFENDANT:  It doesn't matter to me.

1           DR. ARMSTRONG:  It doesn't matter to him.

2           THE DEFENDANT:  It's up to you.

3           DR. ARMSTRONG:  What?  I didn't hear you,

4      Mr. Beler.  What did you say?

5           THE DEFENDANT:  It's up to you.

6           DR. ARMSTRONG:  Well, the Judge is asking you what

7      you prefer.

8           THE DEFENDANT:  I guess eat in my room.

9           DR. ARMSTRONG:  He said he guesses he'll eat in

10     his room.

11          THE COURT:  At what point do you want to do that?

12     Do you want to do it now?  We can make it a little longer

13     break.  Or do you want to do it -- take a break now and do

14     it later?  When do they usually eat?

15          DR. ARMSTRONG:  Well, since it's delivered to the

16     unit, he can kind of eat it whenever he wants.  I would

17     imagine it's already been delivered.

18          So the Judge wants to know:  Do you want to take a

19     little bit longer break right now so you can go to your room

20     and eat your lunch?  Or do you want to eat it later and take

21     a break later?  Do you usually eat it when it comes -- I

22     think you usually eat it when it comes to your unit, don't

23     you?

24          THE DEFENDANT:  Yeah.  Sure.

25          DR. ARMSTRONG:  So is that what you want to do?

1    Are you hungry right now?  Would you like to eat your lunch

2    right now?

3                THE DEFENDANT:  I guess.

4                DR. ARMSTRONG:  Yes.  He wants to go ahead and eat

5    now.

6                THE COURT:  How much time should we allot if we

7    break longer?  How much time should we allot for him to eat

8    and come back?

9                DR. ARMSTRONG:  How much time do you think you

10   need to eat?  They want to make sure to give you enough

11   time.

12               THE DEFENDANT:  Half an hour.

13               DR. ARMSTRONG:  He says maybe half an hour.

14               THE COURT:  So why don't we come back at 12:30.

15               Or do we need more time to bring you back?  I'm

16   asking the attendant.  We can eat until 12:30, add another

17   five minutes to get him in the room.  Or does he need more?

18               DR. ARMSTRONG:  No.  That should be sufficient.

19   30 minutes.

20               THE COURT:  Okay.  It's a little before 12:00,

21   according to this.  It's five to 12:00.  So let's resume at

22   12:30, then.  Everybody can have lunch or do whatever they

23   want as well.  I won't take a break later unless people need

24   to.  So we'll be back.  Please stay.  Leave the screens on

25   so we don't have a problem at some later point.

```
 1              THE COURT REPORTER:  I'm sorry, Judge.  Just for
 2     the record, is that Dr. Armstrong there in the room with
 3     Mr. Beler?
 4              DR. ARMSTRONG:  Yes, ma'am.  There may be a switch
 5     only because of my schedule.  So if you need to know later
 6     on, we can do that.  But I should be here until 1:00.
 7              THE COURT:  Okay.  Everybody have lunch, then.
 8              (Thereupon, a luncheon recess was taken, after
 9     which the following proceedings were had:)
10              DR. ARMSTRONG:  Hello?
11              THE COURT:  Dr. Armstrong?
12              DR. ARMSTRONG:  Yes.
13              THE COURT:  Mr. Beler is there, I take it, as
14     well, telephonically?
15              DR. ARMSTRONG:  Yes.  He's here.
16              THE COURT:  Can he hear us?
17              DR. ARMSTRONG:  He's nodding his head yes.
18              THE COURT:  Okay.  Then since we had trouble with
19     the video, if everybody -- we have everybody else.  We'll go
20     forward with your not being able to see us, but you
21     certainly will be able to hear what everybody is saying.
22              So if there's no objection from anybody, we'll go
23     forward with you two listening in on the phone.
24              DR. ARMSTRONG:  Yes, ma'am.
25              THE COURT:  I don't hear any objections.
```

1           We'll go forward, then.  So let's proceed.  We

2    were on the direct examination of Dr. Corvin.  So if we

3    could pick up on that.

4    BY MS. FORREST:

5    Q.    Dr. Corvin, ███████████████████████████████████

6    ████████████████  have you found any evidence in the records

7    that Mr. Beler ever presented a danger to others?

8    A.  No, ma'am.  The record, as voluminous as it is, doesn't

9    demonstrate a propensity for danger to others or the

10   [indiscernible] of others.

11   Q.  And to your knowledge, does he have any prior --

12           (Court reporter experiencing issues with video

13   connectivity.)

14           THE COURT REPORTER:  Judge, I'm back.  I can

15   report telephonically.

16           THE COURT:  Go ahead.  Let's get moving here.

17   BY MS. FORREST:

18   Q.  So, Dr. Corvin, my second question to you was:  To your

19   knowledge, did Mr. Beler have any criminal record prior to

20   being arrested in this case?

21   A.  To my knowledge, he did not.

22   Q.  And have you seen any evidence that the police ever had

23   to respond to his apartment other than to arrest him on the

24   charges in this case?

25   A.  Based on my information, they have not.



1

2

3

4

5

6

7

8

9  Q.  And based on your professional experience, so BOP and in

10  private practice, is there any care that BOP can provide to

11  patients that private hospitals cannot?

12  A.  No.

13          And as a corollary to that, I'll say that it is an

14  accepted sort of position that standards of care in a

15  private psychiatric hospital and state psychiatric hospital

16  and in a Federal Bureau of Prisons hospital are not

17  different.

18          There are a lot of differences, but the standard

19  of care is the same.  The availability of services from

20  hospital to hospital may change; but the necessity of

21  providing appropriate care is established by standard of

22  care, by the case law, federal law, the Emergency Medical

23  Treatment and Active Labor Act, which basically states:  If

24  we can't treat it when it's an emergency and you need it, we

25  are responsible for finding it for you.

1       So what I would say in direct answer to your

2   question, then, is there is not -- ███████████

3   █████████████████████████ individual in a community can be

4   and should be and generally is afforded the same level of

5   care as someone in a federal facility.  There is not a

6   different standard of care.

7   Q.  All right, Dr. Corvin.  Now I want to turn to the *Sell*

8   factors and go through your opinion as to each of those

9   factors.

10      So under the first prong of the *Sell* test, are you

11  offering an opinion in this case as to whether there are,

12  quote-unquote, "important government interests" at stake in

13  this case?

14  A.  No.  That is a judicial question.  It's not informed by

15  forensic testimony.  So I have no opinion on that subject as

16  a psychiatrist.

17  Q.  Have you formed an opinion as to whether the

18  Government's interest in prosecuting Mr. Beler is mitigated

19  by any special circumstances?

20  A.  So yes.  I have formed that.

21  Q.  And what is that opinion?

22  A.  So in mitigation of that legal question, psychiatric

23  testimony can and often is offered.

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

Corvin - DIRECT - By Ms. Forrest



87







90









96





16    Q.   Okay.  And is one piece of that other information the

17    audio recording you listened to?

18    A.   Yes, it is.

19    Q.   And what was -- what was happening in that audio

20    recording, generally?

21    A.   So the audio recording is -- it records the interactions

22    of Mr. Beler with the officers who executed the search

23    warrant and entered his apartment or his home on the date in

24    question.  And so it's a recording of the nature of their

25    interactions.

1          And as a psychiatrist, you know, you can glean a

2     fair amount from that, not simply based on what he said,

3     even though that's important, but how he said it, how he

4     responded.

5          And honestly, to some extent forensically you can

6     draw some inferences from the behavior -- from the

7     statements of the officers.  They're on the scene reacting

8     to what they observe.  So that's useful information above

9     and beyond the photographs.

10    Q.  Okay.  And for the record, the audio recording is in

11    evidence as Joint Exhibit 8.

12         Dr. Corvin, approximately how long is the

13    recording that you listened to in Joint Exhibit 8?

14    A.  It is 26 minutes and 11 seconds, approximately.

15    Q.  And don't worry.  We're not going to play the whole

16    thing today.

17         But just generally, from what you remember, can

18    you describe Mr. Beler's demeanor during the course of that

19    interaction with the police on that morning?

20    ████████████████████████████████████████████████

21    ███████████████████████████████████████████████

22    █████████████████████████████████████████████████

23    ██████████████████████████████████████████████

24    ███████████████████████████████████████████████████

25    █████████████████████████████



Q.  At this point, I'd like to play a short clip from this
recording and have you explain to the Court the significance
of what you've heard in that portion of the tape.

        MS. FORREST:  We did a little experiment when we
were off the record.  I think probably the best way for
people to hear it is if Dr. Corvin plays it in his office.
BY MS. FORREST:
Q.  Dr. Corvin, if you could try to play the clip from about
four minutes, 23 seconds, to four minutes, 54 seconds.  And
I can tell you when to stop.  But then if anyone can't hear
it right now, the time will be in the record and we can go
back to it.

        So if you can start around 4:23.
A.  Okay.  I've got it cued I think at 4:22, if that's okay.

1    I'll start it now.  Start yelling at me if you can't hear

2    it.

3                (Whereupon, segments of Joint Exhibit No. 8 were

4    published.)

5    BY MS. FORREST:

6    Q.  I think we can stop it there, Dr. Corvin.

7    A.  Okay.

8    Q.  For the record, the female voice in that recording:  Do

9    you know who that is?

10    A.  I don't know her name, but I know she's one of the

11    investigators for the FBI.

12    Q.  Okay.  And the male voice on the recording:  Who is

13    that?

14    A.  Mr. Beler.

15    Q.  Okay.  And in that portion of the recording you just

16    listened to, what, if any, significance do you place on the

17    interaction?

18    ████████████████████████████████████████████

19    ████████████████████████████████████████████████

20    ████████████████████████████████████████████████

21    ██████████████████████████████████████████████████

22    ███████████████████████████████████████████████

23    █████████████████████████████████████████████████

24    ███████████████████

25         ████████████████████████████████████████

1    ███████████████████████████████████████████████

2    ██████████████████████████

3    Q.  And the female agent in that portion of the recording

4    mentioned that she could see the names of videos that were

5    up on the computer screen in Mr. Beler's living room.

6    A.  Correct.

7    Q.  Do you know what the nature of those recordings was?

8    A.  Not personally.  But I know that they -- it is alleged

9    from the discovery that these were illegal child pornography

10   files.  I guess that describes it correctly.

11   ███████████████████████████████████████████

12   ██████████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ██████████████████████

15   ██████████████████████████████████████████████

16   █████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   █████████████████████████

19          ██████████████████████████████████████████

20   ████████████████████████████████████████████

21   ███████████████████████

22        █████████████████████████████████████████████

23   █████████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ████████████████████████████████████████████████



Q.  Okay.  Let's listen to another short clip.  If you could

start at five minutes, 22 seconds, and we'll let it play

until approximately six minutes, [indiscernible] seconds.

A.  Okay.  I'm trying to get there.

        (Whereupon, segments of Joint Exhibit No. 8 were

published.)

BY MS. FORREST:

Q.  I think we can stop it there.

A.  Yes, ma'am.

Q.  And so was Mr. Beler the person speaking in the majority

of that clip?

1    A.   Primarily, it was Mr. Beler.   Yes.



1

2   Q.  All right.  Let's listen to another short clip.  If you

3   could try to play from 12 minutes, 36 seconds, to 12

4   minutes, 46 seconds.

5   A.  I'll do so now.

6           (Whereupon, segments of Joint Exhibit No. 8 were

7   published.)

8   BY MS. FORREST:

9   Q.    You can stop there.

10          Were you able to understand the question that the

11  agent asked there, Dr. Corvin?

12  A.  Yes, ma'am.

13

14

15

16

17

18

19

20

21  Q.  Let's play one more instance.  Let's play a clip from 20

22  minutes, 34 seconds, to 21 minutes, five seconds.

23          (Whereupon, segments of Joint Exhibit No. 8 were

24  published.)

25

1    BY MS. FORREST:

2    Q.  So that may have been a little hard to hear.  Can you

3    tell us, what was the question that the agent posed to

4    Mr. Beler?











10          THE COURT:  Go ahead, counsel.

11    BY MS. FORREST:

12    Q.  Dr. Corvin, are you aware that the indictment in this

13    case alleges that the offense conduct occurred between March

14    5th and April 17th of 2019?

15    A.  Yes, ma'am.



13    Q.   And are you aware of the stipulation that the parties

14    have reached in this case regarding Mr. Beler's release from

15    custody last fall?

16    A.   I don't know that I can quote the stipulation.  But I

17    know of that.  Yes.

18    Q.   It is ECF No. 76.  I'm just going to read the

19    stipulation into the record so we're all on the same page,

20    if that's all right, sir.

21         So the stipulation reads:  "On October 7th, 2019,

22    Magistrate Judge Robinson dismissed the criminal complaint

23    in this case and Mr. Beler was released.

24         "The Government appealed that decision to Chief

25    Judge Beryl A. Howell, who on November 6th, 2019, reversed

Corvin - DIRECT - By Ms. Forrest

1        that decision and reinstated the criminal complaint.

2                "Mr. Beler was rearrested the next day, November

3        7th, 2019, and a number of devices were seized from the

4        hotel room where he had been residing.

5                "A subsequent forensic analysis of the devices

6        seized from Mr. Beler on November 7th did not reveal

7        evidence of any criminal activity and specifically did not

8        reveal any evidence that Mr. Beler had searched for, viewed

9        or downloaded any illegal pornography," end quote.

10               Dr. Corvin, if Mr. Beler returned to the

11       community, do you believe it's likely that he would commit

12       further child pornography offenses?

13       A.  So I'm going to say no.  But I need to explain that a

14       bit.

15               MS. CONNOR:  Your Honor, I'm going to have to

16       object to this.

17               This is entirely too speculative.  And he's being

18       asked to comment on future potential criminal activity

19       without any basis of some sort of a risk assessment being

20       conducted or -- I mean, this is entirely speculative.  And

21       it's irrelevant to whether or not competency can be restored

22       as it relates to medication.

23               THE COURT:  Defense counsel?

24               MS. FORREST:  I think I was asking Dr. Corvin

25       particularly if he could draw any inferences from the

1    content of the stipulation, which is that Mr. Beler has

2    actually been released in the community and not reoffended.

3    But also, it goes to -- to the extent that Mr. Beler is not

4    dangerous, that is a mitigating factor in the Government's

5    interest under the first *Sell* factor.

6            THE COURT:  Is this something that's likely to be

7    disputed or not?  Counsel for the Government?

8            MS. CONNOR:  Your Honor, it's our opinion that

9    there is a -- well, I think we'll dispute it, but also that

10   I don't think the record is sufficiently developed that we

11   know for sure.

12           THE COURT:  I think, although it may have some

13   relevance, I do think frankly it's getting -- it's going

14   beyond what he's in a position to indicate.  He hasn't done

15   a risk assessment, which is something that he would

16   ordinarily do, especially relating to any -- what could be

17   viewed as sexual conduct.  Usually there are some risk

18   assessments that would be done.

19           I mean, based on -- it's clear that the

20   stipulation indicates and the Government agrees that when he

21   was released and then he was rearrested, they didn't find

22   anything to indicate that he continued, assuming that he

23   did, that he continued to look at any kind of or possess any

24   kind of child pornography.

25           But would you agree, Dr. Corvin, that ordinarily

1    you would do some sort of risk assessment if you were

2    actually considering somebody being released to the

3    community?

4            THE WITNESS:  Absolutely.  Actually, what I would

5    say is, can I join the Government's opinion on this?

6            While the conduct during his release was

7    reassuring, it doesn't -- in and of itself, that does not

8    lead to a firm opinion about his future risk.  There are

9    specific offender risk assessments that are done

10    specifically for sex offenders if we contemplate that that

11    would be the question.

12            And so while it is reassuring, I also agree that

13    it is not possible to offer such an opinion within a

14    reasonable degree of medical certainty.  It would be

15    necessary to do a further assessment of the sort that I

16    don't even do.  I don't do those assessments.

17            So what you said is correct.

18            THE COURT:  All right, sir.

19            So let's move on, then.

20    BY MS. FORREST:

21    Q.   We'll move on the next *Sell* factor, Dr. Corvin.

22            Have you reviewed Dr. Cuccio's proposed treatment

23    plan for Mr. Beler?

24    A.   Yes, ma'am.

25    Q.   Have you formed an opinion as to whether that treatment

1    plan is substantially likely to render Mr. Beler competent?

2    A.  Yes, ma'am.

3    Q.  What is that opinion?

4    A.  That it is not likely to restore his capacity to proceed

5    to trial.

6    Q.  And why do you believe that the medication plan in

7    Dr. Cuccio's proposal would not render Mr. Beler competent

8    to stand trial?

9    

10   

11   

12   

13   

14   

15   

16   

17   

18   

19   

20   

21   

22   

23   

24   

25













Corvin - DIRECT - By Ms. Forrest



















Corvin - DIRECT - By Ms. Forrest



























Corvin - DIRECT - By Ms. Forrest

143



Corvin - DIRECT - By Ms. Forrest



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24          THE COURT:  I wanted to check something at the
25     door.  Hold on.
```

```
1              (Brief pause in the proceedings.)
2              THE COURT:  Sorry.  We live in a world of
3     packages.  In my neighborhood, you need to get them or they
4     disappear.  Sorry.
5              THE WITNESS:  Same here.
6              THE COURT:  Please go ahead.
```





























159





```
 1              MS. FORREST:  Your Honor, I'm about to shift to a
 2     slightly different area.  This might be a time for maybe a
 3     brief bio break, if people are agreeable.
 4              THE COURT:  Sure.
 5              Let's see.  It's 20 to 4:00.  Could we make it
 6     short, since we're only going until 5:00, say, a ten-minute
 7     break?  It always takes us longer when we get back.  Don't
 8     get off the computers, please.
 9              MS. FORREST:  Okay.  Thank you.
10              THE COURT:  Thank you.
11              (Thereupon a recess was taken, after which the
12     following proceedings were had:)
13              THE COURT:  So is Mr. Beler on the phone with
14     Dr. Armstrong or with somebody else?
15              UNIDENTIFIED CORRECTIONS OFFICER:  He's here.
16              THE COURT:  I think we're all set, then.  Are we
17     missing anybody?  I don't think so.  It looks like we've got
18     both Government counsel, defense counsel, Dr. Corvin.
19              Dr. Cuccio, are you on the screen somewhere?
20     Maybe not.
21              DR. CUCCIO:  Can you hear me, your Honor?
22              THE COURT:  All right.  You're on.
23              So let's proceed, then.  We are continuing with
24     the direct of Dr. Corvin.
25              MS. FORREST:  Yes.
```

THE COURT:  Counsel?

BY MS. FORREST:

























174













1    BY MS. FORREST:































196









1

2

3

4

5

6

7

8

9

10          UNIDENTIFIED CORRECTIONS OFFICER:  Sorry.  Sorry.

11    Can we --

12          THE COURT:  Somebody is speaking.  Who is that?

13          UNIDENTIFIED CORRECTIONS OFFICER:  This is the

14    BOP.  We're having a count.  Mr. Beler has to go back to his

15    unit for count.  Count is at 4:00.  It's 3:40.  He has to go

16    there for that.

17          THE COURT:  So he needs to leave now or -- he

18    needs to leave right now or you're just telling me he's

19    going to have to leave shortly?

20          UNIDENTIFIED CORRECTIONS OFFICER:  Yes, ma'am.  In

21    the next seven minutes.  Around 3:50.  And he has to go back

22    to his housing unit.

23          THE COURT:  Do you want to have a last question or

24    do you want to wait?  We're obviously going to have to put

25    this off.

1          MS. FORREST:  Yeah.  I was just about to start the

2     topic of side effects, so it might be best to keep that all

3     together for the next time.

4          THE COURT:  All right.  Then let's look at -- it

5     seemed to me that the earliest we could get those who need

6     to come -- and I can go through these quickly, just so we

7     have it on the record.  I discussed it not on the record at

8     one point.

9          So what I'm going to ask is that, after I say the

10     dates, if people would speak up and indicate to me whether

11     they're available.  And I realize there are several

12     attorneys on both sides.  I don't have a problem with having

13     extra people, as long as they're actually going to be

14     participating in either the questioning or whatever.

15          MR. JEFFRESS:  We conferred on it, your Honor.  We

16     have some dates we all agree on.

17          THE COURT:  Tell me what they are.

18          MR. JEFFRESS:  I think it's the 3rd or the 4th of

19     September.

20          THE COURT:  I've got some issues on the 3rd.  How

21     about the 1st?  September 1st, Tuesday?

22          MR. JEFFRESS:  I think that depends on whether

23     they're going to re-call -- do a rebuttal.  Ms. Voshell will

24     not be here on the 1st.

25          MS. VOSHELL:  The 3rd or the 4th.  Right.

1          So I think that the proposal would be to take the

2    rest of Dr. Corvin's testimony next week.  But if the

3    Government plans to re-call Dr. Cuccio, then we would need

4    to go the following week.

5          MR. JEFFRESS:  Yeah.  That's fine.

6          THE COURT:  And does --

7          MR. MIRANDA:  I think we would -- I'm sorry, your

8    Honor.  I interrupted you.

9          THE COURT:  Go ahead.  Who is speaking?

10          MR. MIRANDA:  Oh, sorry.  AUSA Miranda.  Sorry,

11    your Honor.

12          THE COURT:  Well, let me say this:  I have some

13    cases I can move around.  But I have some criminal cases and

14    I have some sentencings that are going to be done on video

15    next week.

16          So frankly, August -- Monday, August 31st, I have

17    fully open, as well as September 1st.  I'd like to not push

18    this back too far.

19          My calendar begins to pick up more, because a lot

20    of these dates have been set around when you can have

21    in-person hearings, when you can't, not necessarily that I'm

22    going to, but I didn't set them at a point where the Chief

23    Judge had said we weren't doing them.  And the courtrooms,

24    frankly, weren't ready.

25          MR. JEFFRESS:  Courtney, can you do those days?

 1              MS. FORREST:  I can do Monday the 31st.  Tuesday

 2     the 1st, I have something on my calendar, but I think I can

 3     move it.  So I'm going to say yes to both of those days.

 4              MR. JEFFRESS:  That's fine with me, then.

 5              THE COURT:  How about the Government?

 6              MR. MIRANDA:  We can do the 1st, but not the 31st.

 7     We can do the 3rd or 4th later that week.

 8              THE COURT:  But I have problems later that week.

 9     So then -- I can move some of this, but I can't move all of

10     it.

11              MS. FORREST:  Dr. Corvin, are those dates workable

12     for you?

13              THE WITNESS:  The 31st works; and the 1st I can

14     make work.

15              THE COURT:  It sounds like -- somebody can't do it

16     the 31st.  I forgot who it was.

17              MS. CONNOR:  That's me, your Honor.  I can't do

18     the 31st.

19              THE COURT:  Who is "me"?

20              MS. CONNOR:  Jennifer Connor.  I'm sorry.

21              I can do the 1st, but I'm not available on the

22     31st unless I'm doing it by phone in my car while driving

23     back from out of state.

24              So I could listen to the rest of the direct, but

25     it would be very difficult for me to do the cross that day.

```
1              THE COURT:  No.  How about the 1st, then?

2              MS. CONNOR:  The 1st is good.

3              MR. MIRANDA:  Yes, your Honor.

4              THE COURT:  So the 1st.

5              I don't know whether BOP can start any earlier or

6    whether they do breakfast and stuff, which I don't want to

7    interfere with, whether we can -- it's 10:00 for us, but

8    it's 9:00 for you all.  I don't know whether you can do, you

9    know, 8:30 or something at BOP or if they don't start that

10   early.

11             Does anyone know?  Dorothy?

12             THE COURTROOM DEPUTY:  I don't know, Judge.  I

13   don't know that.

14             THE COURT:  Why don't we check on it.

15             It'll either be 10:00 for us and 9:00 for them or

16   9:30 for us and 8:30 for them.  I have an executive session,

17   where all the judges are meeting, at 4:30.  So I can do the

18   whole day.  So I would certainly continue until September

19   1st.

20             If we're going to do some other day and I would

21   put it in the wings -- and I'm hoping not -- I may need to

22   move stuff around.  So I'd like to know it now.  Is anybody

23   not available on the 2nd, which would be Wednesday?  That's

24   just in case we need a backup.

25             THE WITNESS:  SO let me start.  On the 1st, I've
```

1    got a board of directors meeting, but it starts at 4:30,

2    too, so the 1st is still good.

3              The 2nd, if we know enough ahead of time, I have

4    patients, but I can move it around.  Again, I'll make it

5    happen if we need to.

6              THE COURT:  I would hope that certainly as we

7    progress on the 1st, we'll have a better idea of whether we

8    need to have -- and I don't know whether the Government can

9    tell us at the beginning on the 1st whether they're going to

10   put Dr. Cuccio on or not or if they need to hear the whole

11   testimony.  So we'll leave that out there.

12             But I'd like to have another day, because I will

13   need to move one of my cases on the 2nd, and I'd just as

14   soon do it early.  It's hard to get these cases if you're

15   doing video.  You have to get on a list to be able to do

16   these.

17             Dorothy, the 1st, can you double-check and make

18   sure that we can actually do this?

19             THE COURTROOM DEPUTY:  I just sent an email,

20   Judge, to see if we can do it that day.

21             THE COURT:  Let's assume we can, hopefully.  How

22   about the 2nd?  Is there somebody who cannot do it on the

23   2nd if we need it?

24             MS. VOSHELL:  If Dr. Cuccio would be testifying,

25   Judge, I am unavailable the 2nd, 3rd and 4th.  But I'm

1    available the 7th, if the Government chooses to call her.

2          MR. MIRANDA:  I think the 7th is Labor Day.

3          THE WITNESS:  It's Labor Day.

4          MS. VOSHELL:  I apologize.  I'm available the 8th,

5    then, and the 9th and 10th.

6          THE COURT:  What is the lack of availability, if I

7    could be so nosy?  I mean --

8          MS. VOSHELL:  My lack of availability?  I'm going

9    to be out of state on a long-planned vacation, which is my

10   only week on vacation this year.

11         THE COURT:  I'm not going to interfere with your

12   vacation.  I just need to know that it's something that --

13   otherwise, we're all going to have to move stuff around.

14   And as I said, later in September creates problems because

15   I've got more things on my calendar and there are locked-up

16   defendants who are ready for trial and stuff.

17         So the 2nd does not work for you.  Okay.

18         How about the 3rd?  Maybe I'll move it to the 3rd

19   from the 2nd.  Can we do the 3rd?

20         MS. FORREST:  I think, Judge, the situation is the

21   same.  We can finish Dr. Corvin; but if the Government is

22   re-calling Dr. Cuccio, we can't do it that week.

23         THE COURT:  Then we're really in trouble, at least

24   from my perspective.  I think at this point I'm going to

25   hope that we get it done.

1          I would like to see if we could start a little

2    earlier with this.  I don't know whether BOP has a problem.

3    Our own IT people are in early.  I don't want him to not get

4    breakfast or something.  But let's double-check.  We'll do

5    it the 1st.  We'll see how early we can do it and we'll go

6    until 4:30.

7          I will then -- we'll have to pick another day if

8    it goes over.  If it does, I hope it would be short and

9    maybe I don't have to move my whole calendar around.  But as

10   the month progresses, it's getting tougher.  I have more

11   things that are going to be more difficult.

12         So we'll leave it at the 1st.

13         Dorothy, my deputy courtroom clerk, is checking to

14   see, to make sure that we have it all open, both at the end

15   of -- at our end as well as at the BOP end.

16         Dr. Cuccio, are you available on the 1st?

17         DR. CUCCIO:  Yes, your Honor, I am.

18         THE COURT:  And then we'll figure it out.  We'll

19   send you an email.  We'll have to give you a new number

20   anyway to call.  We'll let you know when we can start.

21   We'll try and start as early as possible.  It would be nice

22   if we could start earlier than 10:00 at this end.

23         Anything else?

24         DR. CUCCIO:  The BOP opens for business very, very

25   early in the morning.  No problem.

```
 1                THE COURT:  Perfect.  Well, then, maybe we could
 2      start at 9:00 on our end and 8:00 on theirs.
 3                Let's go for that, Dorothy.
 4                THE COURTROOM DEPUTY:  You want 8:00?
 5                THE COURT:  8:00.  9:00 here.
 6                Anything else from -- Dorothy, anything else I
 7      need to do?
 8                THE COURTROOM DEPUTY:  No.  I'm just trying to
 9      get -- the date should be fine.  I just need to get a number
10      from John.  That's all.
11                THE COURT:  Perfect.
12                Government counsel, anything else I need -- we
13      need to talk about?
14                MR. MIRANDA:  Not from the Government, your Honor.
15                THE COURT:  Defense?
16                MS. FORREST:  No, your Honor.
17                THE COURT:  Okay.  And either of the doctors?
18      Anything I need to know?
19                THE WITNESS:  Nothing from me.
20                THE COURT:  I appreciate your cooperation.
21      Obviously, this is longer than we thought.  But he's not a
22      simple case.
23                THE WITNESS:  Correct.  No worries.  Thank you.
24                THE COURT:  Then I'll excuse everybody.  Everybody
25      take care.  Be well.  Masks, distancing, whatever.  Take
```

1    care.

2             MS. VOSHELL:  Thank you.

3             THE COURT:  I'll see you.  Bye.

4             DR. CUCCIO:  Thank you, your Honor.

5             MS. FORREST:  Thank you.

6             (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3                        I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8                        Please note:  This hearing occurred

9     during the COVID-19 pandemic and is therefore subject to the

10    technological limitations of reporting remotely.

11

12

13                        Dated this 29th day of August, 2020.

14

15                        <u>/s/ Lisa Edwards, RDR, CRR</u>
                          Official Court Reporter
16                        United States District Court for the
                             District of Columbia
17                        333 Constitution Avenue, NW, Room 6706
                          Washington, DC 20001
18                        (202) 354-3269

19

20

21

22

23

24

25