```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      * * * * * * * * * * * * * * *   )
 3    UNITED STATES OF AMERICA,       )      Criminal Action
                                      )      No. 19-415
 4                    Plaintiff,      )
                                      )
 5       vs.                          )
                                      )
 6    PETER BELER,                    )      Washington, DC
                                      )      September 1, 2020
 7                    Defendant.      )      9:06 a.m.
                                      )
 8    * * * * * * * * * * * * * * *   )

 9

10              TRANSCRIPT OF COMPETENCY HEARING
                  HELD VIA VIDEO TELECONFERENCE
11        BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY,
                  UNITED STATES DISTRICT JUDGE
12


13
      APPEARANCES:
14
      FOR THE GOVERNMENT:     NICHOLAS MIRANDA, ESQ.
15                            JENNIFER CONNOR, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE
16                             FOR THE DISTRICT OF COLUMBIA
                              555 Fourth Street, NW
17                            Eleventh Floor
                              Washington, DC 20530
18

19    FOR THE DEFENDANT:      JONATHAN JEFFRESS, ESQ.
                              COURTNEY R. FORREST, ESQ.
20                            KAISER DILLON, PLLC
                              1099 14th Street, Northwest
21                            Suite 800 West
                              Washington, DC 20005
22

23    ALSO PRESENT:           LETICIA ARMSTRONG, Ph.D.

24                            FRANCISCA OTERO
                              (Power of Attorney to the Defendant)
25
```

```
 1        REPORTED BY:                 LISA EDWARDS, RDR, CRR
                                       Official Court Reporter
 2                                     United States District Court for the
                                         District of Columbia
 3                                     333 Constitution Avenue, NW
                                       Room 6706
 4                                     Washington, DC 20001
                                       (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3                                    Direct      Cross        Red.

4

   WITNESSES FOR THE DEFENSE:

5

6    George P. Corvin, M.D.          6          78          145

7

   REBUTTAL WITNESSES FOR THE GOVERNMENT:

8

9    Anne Cuccio, M.D.              162        106

10

11   EXHIBITS RECEIVED IN EVIDENCE                           PAGE

12

   Defendant's Exhibit No. 4                                211

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  I see Dr. Corvin.  Jamie is on.  For
 2     the Government, we need Mr. Miranda and Ms. Connor.
 3              MR. MIRANDA:  I'm here, your Honor.
 4              MS. CONNOR:  I'm here.
 5              THE COURT:  We need Mr. Jeffress, Ms. Forrest and
 6     Mr. Quinn, I think it is?
 7              MS. FORREST:  This is Courtney Forrest.  I'm here.
 8              MS. OTERO:  This is Francisca Otero substituting
 9     for John Quinn.
10              THE COURT:  We're missing Mr. Beler.
11              Is Mr. Jeffress going to be on?
12              MS. FORREST:  Yes.  He will be on momentarily,
13     your Honor.
14              THE COURT:  Dorothy, are you on?
15              Not yet.
16              (Discussion had off the record.)
17              MS. FORREST:  Ms. Voshell is not here, your Honor.
18     She's on vacation.
19              MR. MIRANDA:  I should say before I begin, we are
20     expecting Dr. Cuccio to come on later, but I don't expect
21     that she will be on for the first couple of hours of the
22     testimony today.
23              THE COURT:  Okay.  But we need Mr. Beler.  Once we
24     have Mr. Beler and Dr. Armstrong, we should have everybody
25     ready to go.
```

```
 1              Dorothy, are you on?

 2              THE COURT REPORTER:  I'll text her, Judge.

 3              MR. JEFFRESS:  Your Honor, Ms. Forrest will be

 4    handling the direct, and so I don't think I'm needed.  But

 5    at 10:00 I have a brief status conference with Judge

 6    Friedrich, so I'll just have to step off for that.  But

 7    please continue.

 8              THE COURT:  No problem.

 9              MR. MIRANDA:  The same goes -- this is AUSA

10    Miranda.  The same goes for me this afternoon at 1:00.  I

11    have a brief status, VTC, in front of Judge Sullivan.  But

12    Ms. Connor is doing the cross.

13              THE COURT:  No problem.

14              And do we have Mr. Beler?

15              DR. ARMSTRONG:  Yes.

16              MS. OTERO:  I think my connection was unstable.

17    ████████████████████████████████████████████████████████

18    ███████████████████████████████████

19              THE COURT:  Right.  ████████████████████████

20    ████████████████████████████████████████████████████████

21    █████████████

22              MS. OTERO:  I will get the answer to that.

23              THE COURT:  Thanks.

24              So we have Mr. Beler on.  I can't see him, but as

25    long as he's there.  Is he there?
```

```
 1              MR. JEFFRESS:  Yes, he is.

 2              THE COURT:  Good morning, Mr. Beler.

 3              DR. ARMSTRONG:  Yes.  He's here.

 4              THE COURT:  Is Dr. Armstrong there or somebody

 5     else?

 6              DR. ARMSTRONG:  Yes, ma'am.  I'm here until about

 7     1:00.

 8              THE COURT:  Okay.  Good morning, everyone.

 9         So I think we have everybody that we need.  I

10     think the court reporter has heard who's on.

11         So this is the United States against Mr. Beler,

12     19-CR-415.  We're continuing the Sell hearing, S-E-L-L.  And

13     it's Dr. Corvin who is still on direct.  So we'll pick up at

14     that point.

15     (GEORGE P. CORVIN, M.D., DEFENSE WITNESS, PREVIOUSLY SWORN.)

16                    CONTINUED DIRECT EXAMINATION

17     BY MS. FORREST:

18     Q.  So, Dr. Corvin, when we broke last week, I believe we

19     were discussing the fourth Sell prong.

20         So under that prong, in order to render an opinion

21     as to whether the proposed treatment plan is medically

22     appropriate for Mr. Beler, do you need to consider the side

23     effects he might suffer?

24     A.  Yes.

25     ████████████████████  ████  ████████████████████
```



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          THE COURTROOM DEPUTY:  I'm on.  I'm on, but we

24     can't get the jail.

25          THE COURT:  Mr. Beler was on a few minutes ago.

```
 1                    (Discussion had off the record.)

 2              THE COURTROOM DEPUTY:  Judge, is he on?

 3              THE WITNESS:  I still see him.

 4              THE COURT:  Others could see him.  I could not.

 5    Is he still on?

 6              THE WITNESS:  Yes, he is, ma'am.

 7              THE COURT:  And Dr. Armstrong is with him.

 8              THE COURTROOM DEPUTY:  Judge, did you hit 8?

 9    Maybe you can see more people.

10              THE COURT:  I don't see him.  But the other people

11    that are on have indicated he's there.

12              THE AUDIOVISUAL TECHNICIAN:  Judge, hi.  This is

13    John.  Have you pressed the 8 button on your dial pad?

14              THE COURT:  I will now.

15              THE AUDIOVISUAL TECHNICIAN:  It'll expand your

16    field of vision.

17              THE COURT:  I generally wait a little bit.  Okay.

18    There he is.  All right.

19              Good morning, Mr. Beler.

20              THE AUDIOVISUAL TECHNICIAN:  You should have

21    everybody.

22              THE COURT:  More or less.  Yes.

23              Why don't you pick up -- I think Dr. Corvin was

24    answering the question.  Go ahead, Dr. Corvin.

25              THE COURT REPORTER:  I'm sorry.  I believe I need
```

Corvin - DIRECT - By Ms. Forrest

1     to have the question repeated, please.

2               THE WITNESS:  Same here.

3     BY MS. FORREST:























10        THE COURT REPORTER:  I'm sorry to interrupt.  Is

11   there a microphone that is not muted?  There's a lot of

12   background noise.

13        THE WITNESS:  Yes.

14        MS. FORREST:  We'll see if that's better.















1 ██████████████████████████████████████████

2 ███████████████████████████████████████████

3 ████████████████████████████████████

4 ████████████████████████████████████

5 ███████████████████████████████████████████

6  Q.  Can we move to Joint Exhibit 6, please, which is the

7  report of Dr. Jessica Micono.

8  A.  That will take me just a minute to find.

9  Q.  Sure.

10  A.  Joint 6?

11  Q.  Yes.

12  A.  I'm there.

13  Q.  Did you review that record when forming your opinions in

14  this case?

15  A.  Yes, ma'am.

16 ████████████████████████████████████

17 ████████████

18 ████████████

19 ████████████████████████████████████

20 ████████████████████████████████

21 ██████████████

22 ████████████████████████████████████

23 ██████████████████████████████

24 ████████

25 ███████████████████████████████████████████

Corvin - DIRECT - By Ms. Forrest



Corvin - DIRECT - By Ms. Forrest























Corvin - DIRECT - By Ms. Forrest



















49















Corvin - DIRECT - By Ms. Forrest



57





























1

2

3

4

5    BY MS. FORREST:

6    Q.  Dr. Corvin, are you familiar with the Cochrane article

7    that was cited in the *Sell* appendix?

8    A.  I am.

9    Q.  Can we look at that quickly, which is at Joint Exhibit

10   9?

11   A.  I will get there.  I'm there.

12   Q.  If you could go to Page 109 of the article, which is

13   Page 3 of the .pdf.

14   A.  I'm there.

15   Q.  Okay.  If you look in the right-hand column, so during

16   the period examined by this article, which was six years,

17   then the question was:  How many requests were made to

18   federal courts to forcibly medicate defendants?

19   A.  So it says a total of 287 requests were made to federal

20   courts throughout the United States during this six-year

21   time period.

22   Q.  Okay.  And of those, in how many cases did the Court

23   authorize involuntary medication?

24   A.  So they authorized medical -- involuntary medical

25   treatment in 133 of the cases, which is 46 percent.

1    Q.   Okay.  Now if you could turn to Page 113 of that.

2    A.   We lost somebody.

3              THE COURT:  Go ahead.  It's all right.

4              THE WITNESS:  113, you say?

5    BY MS. FORREST:

6    Q.   Yes.

7    A.   I'm there.

8    Q.   So in Table 4, do you see there's a Restoration By

9    Diagnosis table?

10   A.   Yes.

11   ████████████████████████████████████████████████████

12   ██████████

13   █████████████████████████████████████████████████████

14   ████████████████████████████

15   Q.   Okay.  And just to be clear, this is just within that 46

16   percent of defendants in which the treatment was actually

17   ordered.  Right?

18   A.   That's right.  So this is the subset of that subset.

19   ██████████████████████████████████████████████

20   ███████████████████████████████████████████████

21   █████████████

22   █████████████████████████████████████████████████

23   ███████████████████████████████████████████

24   ████████████████████████████████████████

25   ██████████





Q.   Thank you, Dr. Corvin.

      MS. FORREST:  At this time, I have no further

questions.  I just do have one housekeeping matter, your

Honor.

 1              THE COURT:  All right.

 2              MS. FORREST:  So last week during his testimony,

 3     Dr. Corvin was reading from some FDA guidance ███████

 4     ████████████████████   I believe.

 5              And if Dr. Corvin could send me that, I'd like to

 6     circulate it and add it as a defense exhibit so that the

 7     record is complete.

 8              THE COURT:  All right.  I don't have any problem.

 9     That's excellent.  We should have the article as opposed to

10     having him refer to it and not having to look it up.

11              THE WITNESS:  Sure.  Yes.

12              THE COURT:  If we could do that promptly, that

13     would help.

14              MS. FORREST:  I can do this on a break, your

15     Honor.

16              THE COURT:  Let me suggest a short break before we

17     begin the cross-examination.

18              I'd ask that you not get off the -- you can move

19     away, but please don't get off the video, because every once

20     in a while we have trouble getting people back on.

21              So at this point, according to -- I have that it's

22     10:50.  I'll give you 15 minutes, so 11:05.  Then we'll

23     promptly start with the cross-examination at that point.

24     But I'd ask that people -- if you want to just move away

25     from the screen, I don't have a problem with it.  But please

1    don't get off the computers.  We've spent a lot of time in

2    the couple of days that we've had this where we've had

3    problems with people getting off and restarting this whole

4    thing.

5            All right.  So we'll have a short break.  Thank

6    you.

7            (Thereupon a recess was taken, after which the

8    following proceedings were had:)

9            THE COURT:  Mr. Beler is on.  We have the witness.

10   I think Mr. Miranda was going to be off.

11           MR. MIRANDA:  I'm on for now, your Honor.  I'll be

12   off around 1:00.

13           THE COURT:  Oh, okay.  I'm trying to keep track of

14   this.

15           DR. CUCCIO:  I'm here.

16           THE COURT:  Who is that?

17           DR. CUCCIO:  Dr. Cuccio.  Dr. Cuccio is here.

18           THE COURT:  Oh, great.

19           Is Ms. Forrest on?

20           MS. FORREST:  Yes, your Honor.

21           THE COURT:  Okay.  So we've got the court reporter

22   that's on; my law clerk is on; Mr. Beler is there; I assume

23   Dr. Armstrong is there; Dr. Cuccio is on; Mr. Miranda is on;

24   Ms. Connor, Mr. Jeffress and Ms. Forrest.

25           Are we missing Ms. Otero?

1           MS. OTERO:  No, your Honor.  I'm here.

2           THE COURT:  So it sounds like everybody is here.

3           So we're ready to go.  Let's begin the

4    cross-examination.

5           MS. CONNOR:  Thank you, your Honor.

6                      CROSS-EXAMINATION

7    BY MS. CONNOR:

8    Q.  Dr. Corvin, I'd like to start with discussing side

9    effects, because that was a large part of your testimony

10   today.

11          You testified that -- or you understand, rather,

12   that the *Sell* criteria speak to the side effects as they

13   interfere with the Defendant's ability to assist counsel.

14   Correct?

15   A.  Yes.

16   Q.  And you understand that the standard is not that the

17   Defendant not suffer any side effects at all, but side

18   effects that prohibit his ability to interact with counsel.

19   Correct?

20   A.  That is correct.  Yes.

21   Q.  It's equally not the standard that the side effects not

22   be permanent.  Correct?

23   A.  It doesn't speak to that.  That would not apply.

24   ██████████████████████████████████████████████████████

25   ██████████████████████████████████████████████████

Corvin - CROSS - By Ms. Connor



1
2
3
4
5
6
7
8
9
10
11
12
13          THE COURT REPORTER:  I'm sorry, counsel.  I'm
14     having trouble hearing you.  Could you repeat the question?
15     BY MS. CONNOR:
16
17
18
19
20
21
22
23
24
25









84





Q.  Now, you were retained in this case in April of 2020.

Is that right?

A.  Yes, ma'am.

Q.  And prior to forming your expert opinion or writing your

report from July of 2020, you spoke with Mr. Beler one time

for a total of one hour and 40 minutes?

A.  Yes.  Just one time.  And it was about one hour and 40

minutes, if I'm remembering correctly.  Yes.

1    Q.  And it was over the VTC?

2    A.  It was.

3    Q.  You've never met with him in person.  Correct?

4    A.  I have not.

5    Q.  How many times have you actually observed him prior to

6    this hearing, whether in person or over the VTC?

7    A.  Oh, before the hearing?  One.

8    Q.  And is that one interview the hour-and-40-minute

9    interview?

10   A.  That's right.

11   Q.  Okay.  And your testimony today is that psychiatry is

12   based on relationships.  Right?

13   A.  Yes.

14   Q.  And you have been able to set forth an opinion for this

15   Court without establishing such a relationship.  Correct?

16   A.  For the limited purpose of this question.  ███████

17   ███████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████

19   ███████

20           But yes.  You're right.  I've offered the opinions

21   without seeing him.

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ██████████████████████████████████████

25   ████████████████████████████████████████████████████████



12  Q.  And so given the current limit of -- limited abilities,

13  you've both met with him via VTC and both come up with

14  treatment plans.  Correct?

15  A.  That's also true.  Yes.

16  Q.  You didn't [inaudible] any of the specific testing on

17  him that you argue Dr. Cuccio could and should have done,

18  did you?

19          THE COURT REPORTER:  Sorry, Ms. Connor.  I missed

20  something in the first part of your question there.

21  BY MS. CONNOR:

22  Q.  You didn't conduct any of the specific testing on him

23  that you argue Dr. Cuccio either could or should have done.

24  Correct?

25  A.  That is correct.  I should say some of the testing I

1    couldn't do because I'm not there with him.  Some of the

2    testing that we've discussed during the hearing I couldn't

3    do because I'm not trained to do it.

4         So I don't know specifically what Dr. Cuccio's

5    depth of experience, like, ███████████████████████████

6    But that is correct.  I did not make arrangements for that

7    testing to occur.

8    Q.  And you're aware from Dr. Armstrong's testimony and

9    report that Dr. Armstrong saw and interacted with Mr. Beler

10   virtually every day.  Correct?

11   A.  Yes, ma'am.

12   Q.  You didn't speak with Dr. Armstrong about Mr. Beler, did

13   you?

14   A.  I did not.

15   Q.  And you heard Dr. Cuccio testify that she spoke with

16   Dr. Armstrong at least once a week.  Correct?

17   A.  I did.  And that's a good thing.  Yes, ma'am.

18   Q.  And in fact, you [indiscernible] Dr. Armstrong at all

19   before forming your expert opinion?

20        THE COURT REPORTER:  If I could have the question

21   again, Ms. Connor.

22   BY MS. CONNOR:

23   Q.  The question was:  Dr. Corvin, you did not speak with

24   Dr. Armstrong at all before forming your expert opinion.

25   Correct?

1   A.  Correct.

2   Q.  And you didn't speak with Dr. Cuccio either.  Correct?

3   A.  Correct.

4   Q.  You didn't speak with any of the BOP medical staff

5   providing daily care to Mr. Beler, did you?

6   A.  I still have not.

7   Q.  And you --

8   A.  That's correct.

9   Q.  And you didn't review any of his BOP records until after

10  you had formed your opinion and submitted your report.

11  Correct?

12  A.  Also correct.  For example, ███████████████████████████

13  ████████████        So you're absolutely correct.

14  Q.  Now, part of the items that you testified that you

15  reviewed in reaching your opinion, ████████████████████

16  ██████████████████████        were some of the discovery items

17  in this case?

18  A.  A limited amount.  But yes.  Some of the discovery

19  items.  Yes.

20  Q.  Did you review the statement of facts associated with

21  the complaint in this case?

22  A.  I don't think I have.

23          And I want to make sure for the record that I

24  didn't overstate it.  ██████████████████████████████

25  ████████████████████████████████        But that being

1    said, I don't think I've reviewed that document.

2    Q.  So then were you aware that the alleged criminal conduct

3    spans a six-week period of time from March 5th to April 17th

4    of 2019?

5    A.  I think I did know that.  Maybe not the specific dates,

6    but I knew there was a block of time.

7    Q.  And were you aware that the FBI allegedly found 2,000

8    images and videos of child pornography on his desktop

9    computer and more on a cloud account?

10   A.  So I knew there was a volume of files, if you will.  I

11   didn't know that number, but I knew it was more than an

12   image.

13   Q.  And did you know that they were on both the desktop as

14   well as in a cloud account?

15   A.  I don't think I knew that.

16   Q.  Okay.  So knowing that, then, would that affect your

17   opinion as to whether or not he was committing or -- could

18   have been committing this offense for a greater span of time

19   than what you originally testified to on direct?

20   A.  Oh, I didn't know I did testify to the range of time.

21        Yeah.  It does affect it, because, I mean, I agree

22   with you.  It occurred over a period of weeks.

23   Q.  Yes.

24   A.  I didn't --

25   Q.  Minimally.  Correct?



1    A.  Yes.  That they are aware.  Correct.

14         So I am unaware of him having been identified as
15    having engaged in that range of criminal conduct previously,
16    which is obviously, you know, a reassuring fact.



Q.  Okay.  You reviewed the audio clip of the agent's

interactions with Mr. Beler and you made conclusions about

those interactions.  Correct?

A.  Some.  Yes.

Q.  Did you reach out to the agent to discuss that

interaction?

A.  Oh, goodness, no, I did not.  I wouldn't know how.  But

I did not.  I did not make that effort.

1 ████████████████████████████████████████

2 ████████████████████████████████████

3 ██████████████████████████████████

4 ████████████

5 ██████████████████████████

6  Q.  I'm sorry to cut you off.

7        Have you spoken directly with any of the officers

8  involved in the arrest or the charges in this case?

9  A.  No, ma'am, I haven't.

10  Q.  In forming your opinion, did you interview any witnesses

11  who were in close contact with the Defendant on or around

12  December of 2018?

13  A.  So the only individuals outside that I've talked to

14  about his history has been another attorney that's been

15  working with him outside of this arrangement over a longer

16  period of time.  So he had a great deal to say about his

17  concerns about Mr. Beler.

18        But I think he is the only individual.  It might

19  be a Mr. Quinn.  And I think he's the only outside party

20  that I've spoken to that I would sort of consider a

21  fact-collateral witness about Mr. Beler.

22  Q.  So no building managers or neighbors that would have

23  been able to observe him in the relevant time period?

24  A.  No, ma'am.

25  Q.  In preparation for your opinion in this case, you also

1   reviewed a letter that was prepared by defense counsel that

2   went to AUSA Miranda.  Correct?

3   A.  I did.

4   Q.  So when interviewing the Defendant and forming your

5   opinion, you were well aware of the legal position and

6   strategy that defense counsel intended to advance in this

7   case.  Correct?

8   A.  At least to the extent that it's in that letter, yes.

9   Although I can't remember it specifically right now.  But

10  yes, ma'am.  I did read the letter.

11  ██████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ███████████████████████████████████████

15  ████████████

16  Q.  And you reviewed extensive records in this case ███

17  ████████████████████████████████████████████

18  Correct?

19  A.  Yes, ma'am.

20  Q.  In your review of those documents, have you come across

21  any evidence at all that Mr. Beler is physically violent

22  towards others?

23  A.  I have never seen him act physically violently towards

24  others.

25  Q.  And have you seen any allegations of violence towards

1    others?

2    A.  No.  No, ma'am.

3    Q.  What about that he even poses a risk of [inaudible] to

4    others in any way?

5            THE COURT REPORTER:  Again, I missed a word in

6    there, counsel.

7    BY MS. CONNOR:

8    Q.  What about that he poses a substantial risk of bodily

9    injury to others?

10   A.  Bodily injury to others, no.  I have not seen that

11   allegation.

12   Q.  And likewise, while his apartment was disheveled and

13   messy, have you found any evidence in the record that he has

14   caused property damage to someone else's property?

15   ██████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████

18   █████████████████████████████████████████████

19   █████████████████████████████████████████████

20           So the evidence of dangerousness towards property

21   of others is slightly -- similarly, I'll say, somewhat

22   scant.

23   ██████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████

25   ███████████████████████████████████████████████









BY MS. CONNOR:







1          Do you remember saying that?







BY MS. CONNOR:





THE COURT:  I thought all these records had been

1    provided to the doctors, all of them, not half of it.  We

2    had this problem last time and Dr. Cuccio stopped around the

3    page numbers -- it sounded the same.  Is it in some other

4    aspect of it?

5            MS. CONNOR:  I thought that it was part of the

6    joint exhibit.  I will tell the Court that I am sending two

7    pages, so I have every confidence that it will actually go

8    through very quickly.

9            THE COURT:  Okay.  Go ahead.

10           MS. FORREST:  Your Honor, I'm going to object.

11   Dr. Corvin has the records in their exhibit form as they've

12   been admitted.  There's no reason we need to be excerpting

13   pages and sending them around and cluttering the record.

14   Counsel should be able to find the point that she needs to

15   make in the records, in the exhibits that have already been

16   admitted.

17           THE COURT:  But he doesn't seem to have the page.

18   My understanding is all of them were sent, all of records.

19           MS. FORREST:  Yes, your Honor.  But counsel --

20           THE COURT:  He needs to --

21           MS. FORREST:  -- doesn't have the right --

22           THE COURT:  Excuse me.

23           The easiest thing is to pull it out if it's part

24   of the report and let's move this along.  He can indicate if

25   he hasn't seen it before.  Meanwhile, let's get moving.

1          MS. CONNOR:  Yes, your Honor.

2          THE WITNESS:  Can you give me that page number

3    again, just to make sure we're looking at the same thing?

4    BY MS. CONNOR:

5    Q.  Sure.  I'm trying to attach it to an email.  If you can

6    give me just one minute --

7    A.  Sure.

8    Q.  -- so I can keep this moving along.  I don't think I

9    have the doctor's email address, actually.  But the email is

10   ready to go as soon as I have that.

11   A.  I can give it to you right now if you want.  It's

12   ███████████████████.

13          THE COURT:  We'll seal that in the transcript.

14          THE WITNESS:  Thank you.

15          MS. CONNOR:  Counsel is all cc'd.  I've sent two

16   documents.

17          THE COURT:  Can I simply ask, is this from -- what

18   did you take it out of?  A joint exhibit?  What was it from

19   again?

20          MS. CONNOR:  Yes, your Honor.  It was from Joint

21   Exhibit 4, I believed, although the page numbers are not

22   lining up for some reason.  ██████████████████████

23   ██████████████████

24          THE WITNESS:  So I am looking at Joint 4, ████████

25   ████████████  And I do have a 2487.  But it's from a

1    doctor.  It's a progress note from a doctor.

2    BY MS. CONNOR:

3    Q.  Have you received the one that I sent you via email?

4    A.  I'm looking right now.  It does not look like it.

5            Oh, something's just come through.  There we go.

6    Got it.

7    Q.  So there's two .pdfs attached.  Each of them have two

8    pages.  If you would just open the one where the first page

9    has.

10    A.  So I've got -- yes.  I've got a 2353 and a 1451 in the

11    first one.  And then let me make sure I've got the other one

12    open.  Yes.  I've got it.

13    Q.  Okay.  Do you see there where it says the patient --

14            THE COURT:  Which document are you talking about?

15    Which document are you talking about?

16            MS. CONNOR:  2487 of the pages that were just

17    emailed to the doctor.

18            THE WITNESS:  So you're looking for a Page 2487.

19    Got it.  I'm there.

20    BY MS. CONNOR:

21    ██████████████████████████████████████████████████████

22    ██████████████████████████████████

23    ██████████

24    ██████████████████████████████████████████████

25    ██████████████████









18  Q.  Private acute-care hospitals are going to be extremely

19  reluctant to force medication except in the most extreme or

20  emergency circumstances.  Correct?

21  A.  Well, I don't know the -- let me partially disagree with

22  that.  In a private hospital -- and I've been in many -- I'm

23  reluctant to --

24          You're talking a nonemergent situation?

25  Q.  Correct.

```
 1    A.  -- I'm reluctant to administer those meds.  But we do

 2    have protocols for nonemergency forced medication

 3    administration.  We don't want to do it, but we do do it.

 4          So I guess I would say that we are reluctant.  I

 5    hope they're reluctant in a Bureau of Prisons facility, too.

 6    I mean, you don't want to do it unless there's clearly --

 7    unless the standard has been met.  So I don't know if that

 8    answers your question at all.

 9    Q.  Well, if the standard has been met, we're talking about

10    some sort of emergency standard in order for that to

11    qualify.  Correct?

12    A.  Oh, so in emergency forced medication administration,

13    that's done regularly in private acute-care facilities.  I

14    would hesitate to say -- every day.  But yes.  That does

15    occur.

16    Q.  Right.  But in an nonemergency setting, what would

17    qualify for forced medication in an acute-care hospital

18    setting?

19    A.  So in an acute-care setting, the first sort of thing

20    that has to exist is that you can't nonemergently

21    force-medicate -- I'm doing it from my experience in the

22    states where I've practiced -- you can't administer

23    nonemergency forced medications to a voluntary patient.  So

24    they have to be -- they have to present as committable and

25    be under an involuntary hold.
```

Corvin - CROSS - By Ms. Connor

1          Then in order to administer forced meds, the

2    protocol is not that dissimilar to what happens in

3    *Washington v. Harper*.  So in the hospitals where I've

4    worked, we have -- the term I always hear is a

5    quasi-judicial setting in which a psychiatrist serves as an

6    a officer for a consult, if you will, that is not involved

7    with the patient's care.  The evidence is presented to that

8    panel.  The patient is given the right to argue his case and

9    to have a nurse or somebody at his -- you know, speak for

10   him or her.

11         So nonemergency forced medication to involuntarily

12   admitted patients in private psychiatric hospitals does

13   occur.  And the criteria that -- you might not be trying to

14   cut your wrist; you might not be swinging at somebody; but

15   you're so gravely disabled and incapable of making treatment

16   decisions that you're in a situation where it was not

17   foreseeable that you could ever safely leave a hospital

18   setting without treatment.

19         So there's several sort of thresholds:

20   involuntary, incapable of making a decision, and necessity

21   of care without which it is not foreseeable that they will

22   be able to spontaneously improve such that they could leave

23   the hospital.  But it does happen.

24   ██████████████████████████████████████████████████████

25   ████████████



Q.  A hospital ████████ does not have a long-term

forensic goal, the same as the Bureau of Prisons.  Correct?

A.  Correct.  A private hospital's goal would be to improve

functioning to the degree that they no longer -- well, one

goal would be to improve functioning so that they don't

require involuntary medications, so they can be safely

managed in a less intrusive environment or less restrictive

environment, I should say.

        And so private hospitals would routinely in my

experience discharge people who no longer required inpatient

1    care but would nonetheless, even though the question is not

2    asked, would nonetheless be viewed as incapable as

3    proceeding under *Dusky* because of their impairment.





1

2    Q.  And the FDA studies that you've talked extensively

3    about, those -- the FDA is not studying for the treatment of

4    competency restoration.  Correct?

5    A.  Correct.  Yes, ma'am.

6

7

8

9

10   Q.  Right.  And your testimony this morning was that the

11   medical standard of care deviates from FDA guidelines every

12   day.  Right?

13   A.  We do.  We do.

14

15

16

17

18

19

20

21

22

23

24

25





1

2

3

4

5

6

7

8

9

10

11

12

13

14          But there are medicines that you can do that with.

15     But it's neither of these medicines.

16     Q.  Now, you've testified with regard to the Cochrane study

17     and the -- well, you're familiar with the Cochrane study.

18     Correct?

19     A.  Yes, ma'am.

20

21

22

23

24     Q.  Are you familiar with the underlying facts of the

25     Cochrane study?

1    A.   Oh, well, I mean, I'm familiar with what's in the

2    record. ███████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ███████████████████████

5         And that was actually -- that's one of the

6    limitations that I think they've noted in one of those

7    studies, which is, you know, there's a realm of severity in

8    these illnesses.

9         So I don't know the underlying demographic facts

10   of the study participants.

11   ████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████

13   ████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   █████████████████████████████████████████████████

17   ███████████████████████████████████████████████████

18   ██████████████████████████████████████████████████

19   ████████

20   █████████████████████████████████████████████████████

21   ███████████████████████████████████

22   ██████████████████████████████████████████████

23   Q.   You said that a patient's desire for medication or their

24   opposing or refusal for medication should be taken into

25   consideration.   Correct?

1    A.  Always.  Yes.

2    Q.  However, there are different standards when we're

3    talking about forced medication.  Correct?

4    A.  That's right.

5    Q.  And the more serious an individual's illness, the

6    increased likelihood that they would need either a higher

7    dose or medication for a longer period of time or both

8    before they start to show improvement.  Correct?

9    A.  That's also true.  But -- I mean, I think I understood

10   your question; and I would agree with what you just said.

11   Yes.





















Q.  Now, turning to your interview of Mr. Beler, when you
interviewed him, I think you testified earlier on cross that
you didn't ask him a lot of questions about the allegations
in this case?
A.  That's right.  The only thing I wanted to know in terms
of -- well, what was his understanding of why he was even
there?  And he did understand that.

        But in terms of the actual allegations or what I
would say is his offense conduct, I did not delve into that
with him even superficially.
Q.  And you agree that he's not currently competent under
the *Dusky* standard.  Correct?
A.  Certainly as of the day I saw him, he was not competent
under *Dusky*.  From what I've seen here, I would suggest he's
probably still not competent.  Yes.
Q.  And are you familiar with the professional guidelines

1    that maintain that there are ethical considerations that

2    would preclude probing into the substance of a case with a

3    defendant that is not competent?

4    A.   That's right.  There's a lot of -- there's a lot of good

5    articles written about this in forensics.  Most of us would

6    say that if you're not competent, how can you competently --

7    in other words, to submit to such an examination, you are

8    engaging in a legal procedure or forensic procedure with

9    someone who is not capable.

10          Now, that's not -- not everybody universally

11   agrees with that.  Sometimes judges will order it anyway.

12   But it's problematic.  It's an issue.

13   Q.   You would agree that it should not be done?

14   A.   I would agree that if someone is not competent, you may

15   not be getting good data anyway.  So in most instances, I

16   would not do so if not compelled to do so.

17   ███████████████████████████████████████████████████

18   ██████████████████████████████████████████████

19   ████████████████████████

20   ███████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   █████████████

23        ███████████████████████████████████

24   ██████████████████████████████████████████████

25   ███████████████████████████████████████████████



1  ████████████████████████████████████████

2  ████████████████████████████████████████████

3  ███████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ███████████████████████████████████████████████

6  █████████████████████████

7  ████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████

9  ████████████████████████████████

10  Q.  Yeah.  Okay.

11       Dr. Cuccio's treatment plan:  Mr. Beler reported

12  to you, and you documented in your report, that Dr. Cuccio

13  met him -- met with him for a total of 30 minutes.  Correct?

14  A.  Right.  Well, that's just what was reported to me.  I

15  don't know that that's true.  It --

16  Q.  Did --

17  A.  -- was just what was said.

18  Q.  I'm sorry for stepping on your answers.

19       Did you speak to anyone to verify or dispel that

20  reporting by Mr. Beler?

21  A.  No.  But if you were to ask me, do I think there's

22  reasonable doubt as to that, I'd say there's considerable

23  doubt as to that being accurate.  It was just what was

24  reported.

25  Q.  Okay.  But where you included it in your report was also

Corvin - CROSS - By Ms. Connor

1    part of your basis for stating that you didn't think that

2    Dr. Cuccio had established enough of a rapport with him.

3    Correct?

4    A.  Well, I don't think that.  I don't think I have, either.

5    So it's related, but it's kind of a separate thing.

6         I think -- I'm getting a good view of you as a

7    person, but I don't feel like I know you nearly as well as I

8    would if we were sitting 10 feet apart from each other,

9    talking during breaks, things of that nature.  I mean, I've

10   actually talked to you off the record some, but it's still

11   artificial, strained.  It's not nearly as effective as being

12   face to face with somebody, you know.

13   Q.  But you've been able to outline a treatment plan that

14   you believe is appropriate.

15   A.  Well, yeah.  But my first part would be to exhaust every

16   opportunity to get in the same room with Mr. Beler.  That

17   would be the first part of my treatment plan.  And I was

18   asked, I think, by the Court.  And that's -- from where I'm

19   sitting, that's what I would entertain.  But I would first

20   do everything I could to not have to unsheathe the needle.

21   Q.  And you're aware that Dr. Armstrong has met with him in

22   person a significant number of times.  Correct?

23   A.  Correct.  Yes.  And for what it's worth, Dr. Armstrong

24   seems to be exceptionally personable, right, in her

25   interactions with the Court.  I mean, if I was in the

1   hospital, I would want -- I would be very happy with her as

2   my therapist.  Right?  She seems like she's -- would be easy

3   to get to know.

4   ████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ██████████

8   ██████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ███████████████████████████████████

12     ████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████

18  ███████████████████

19  Q.  Prior to forming your opinion in this case, you did not

20  know how many times Dr. Cuccio, either by herself or along

21  with Dr. Armstrong, had actually spoken to Mr. Beler about

22  medication.  Correct?

23  A.  No.  Until I saw the actual record, I did not know with

24  what frequency he was being seen and things of that nature.

25  And it's still a little difficult to ascertain, but I've got







1  ████████████████████████████████████

2  ████████

3  Q.  And packet inserts for different medications are written

4  by pharmaceutical companies with an eye towards limiting

5  their liability.  Correct?

6  A.  I don't disagree with that entirely.  I think that's to

7  some extent true.

8  Q.  You wouldn't blindly follow a package insert without

9  also using your education and experience, would you?

10  A.  Also true.  I'd probably be a bad psychiatrist if I just

11  was like a robot and did exactly what the -- went by the

12  book all the time.  That's the heart of psychiatry, though,

13  is knowing when you can do that and when you shouldn't do

14  that.  But you're absolutely right.  I agree.

15          MS. CONNOR:  I have no further questions.

16          THE COURT:  All right.  Redirect?

17          MS. CONNOR:  I'm sorry.  Can you hear me?

18          THE COURT:  Yes.  Did you have additional

19  questions?

20          MR. CONNOR:  No.  I said that I had no further

21  questions, but I think my signal dropped out.

22          THE COURT:  No.  We can hear you.

23          THE WITNESS:  I can hear you.

24          THE COURT:  So let's do redirect.

25          MS. FORREST:  Your Honor, would it be possible

1    just to take a brief break so I can consult with

2    Mr. Jeffress before we do redirect?

3            THE COURT:  How much time?  Because we're going to

4    be dropping people out at 1:00, so I was trying to move

5    forward.  Just tell me how much time so I can tell

6    everybody.  How much time do you need?

7            MS. FORREST:  Ten minutes.

8            THE COURT:  Okay.  So it's now 12:35.  So 12:45.

9    Please don't get out of the computers.  Just move away, if

10   you want.  Don't get off them.

11           (Thereupon a recess was taken, after which the

12   following proceedings were had:)

13           THE COURT:  It's 12:45.  Do we have everybody

14   back?

15           Dr. Cuccio, are you on?

16           I see Dr. Corvin.  I don't see --

17           DR. CUCCIO:  Yes.  I'm here.

18           THE COURT:  Mr. Beler we're missing.

19           Ms. Connor, are you around?

20           MS. CONNOR:  Yes, your Honor.

21           THE COURT:  Thank you.

22           MR. MIRANDA:  I'm here, but I will be leaving soon

23   for the 1:00.

24           THE COURT:  I see Mr. Jeffress; I see Ms. Forrest.

25           Ms. Otero, are you around?

1          MS. OTERO:  Yes, your Honor.  Yes, your Honor.

2          THE COURT:  We've got Dr. Corvin.

3          So we have redirect.

4          MS. FORREST:  Your Honor, if I --

5          MS. CONNOR:  Your Honor --

6          MS. FORREST:  Your Honor, I'm having a hard time

7    hearing you on your connection.

8          Dr. Corvin, could you just say something to see if

9    I can hear you?

10         THE WITNESS:  Testing one two three.

11         MS. FORREST:  Okay.  I'm having trouble hearing a

12   little bit.  Everyone's coming across as a whisper.  But I

13   will do the best I can.

14         MS. CONNOR:  I'm having trouble staying connected,

15   so I've asked chambers to send the call-in information.  As

16   soon as that happens, I may just hang up and then call in by

17   phone, because I'm only getting every other word at this

18   point.

19         THE COURT:  That's funny, because I can hear all

20   of you very well.

21         MR. JEFFRESS:  I can hear fine, too.

22         Courtney, are you sure that --

23         MS. FORREST:  I'm having a very hard time.  Maybe

24   I'll try to move in the room where Mr. Jeffress is.  If I

25   could have the Court's indulgence just one moment.

1          THE COURT:  Sure.  That's fine.

2          MS. FORREST:  Can everybody hear me?

3          THE COURT:  Yes.  I can hear you fine.

4          MS. FORREST:  Great.  I'm going to close the

5   connection on my own computer, then.  Thank you.

6          THE COURT:  All right.  Redirect.

7          MS. FORREST:  Let me just pull up my notes, your

8   Honor.  The Court's indulgence.

9                    REDIRECT EXAMINATION

10  BY MS. FORREST:

11  Q.  Dr. Corvin, in your report that you submitted in this

12  case, did you offer a proposed treatment plan for Mr. Beler?

13  A.  No.

14  Q.  Were you asked to do that?

15  A.  No.

16  Q.  And would you feel that it was inappropriate for you to

17  offer a treatment -- to recommend a course of treatment

18  based on the amount of contact you have had with Mr. Beler?

19          MR. MIRANDA:  Excuse me.  I'm sorry to interrupt.

20  I just noticed that AUSA Connor dropped off the call, and I

21  have to also get off the call, which means there won't be

22  Government counsel on the call.

23          THE COURT:  Hold on.  I think she said she was

24  having trouble hearing.  I think she was going to try and

25  call in.  But let's make sure we have her before we go any

 1    further.  She had said she was going to try and call in

 2    because she had trouble hearing.

 3                    (Pause in the proceedings.)

 4                    (Beeping noise heard.)

 5                    THE COURT:  Is that somebody coming on or off?

 6                    MS. CONNOR:  This is Jennifer Connor.  I just came

 7    on via phone.

 8                    THE COURT:  Okay.  Mr. Miranda is gone, so I

 9    wanted to make sure we still had Government counsel.

10                    MS. CONNOR:  Okay.

11                    THE COURT:  Did you hear the first question?

12                    MS. CONNOR:  I'm back.  And I'm not on the video

13    at this point.

14                    THE COURT:  Who's this?

15                    MS. CONNOR:  Jennifer Connor.  I'll stay on the

16    phone line so my connection doesn't kick me out.

17                    THE COURT:  Did you hear the initial questions

18    that Ms. Forrest had for Dr. Corvin?  Or do you need her to

19    repeat them?

20                    MS. CONNOR:  (No audible response.)

21                    THE COURT:  Ms. Connor?

22                    MS. CONNOR:  I'm sorry.  No.  I heard it until --

23    if she wants to pick up, we're fine.

24                    THE COURT:  So she doesn't need to repeat them?

25                    MS. CONNOR:  No.

1          THE COURT:  Go ahead.

2     BY MS. FORREST:



Corvin - REDIRECT - By Ms. Forrest













Q.  Okay.  You were also asked some questions about your one

VTC with Mr. Beler --

A.  Yes, ma'am.

Q.  -- and why you didn't meet with him more frequently.

A.  Yes.

Q.  Do you recall how long it took for us to arrange that

one meeting with Mr. Beler through the BOP?

A.  It took -- I don't know, but it took a frustratingly

long period of time.  That's not a criticism of anybody;

it's just the system, that it takes a long period of time.

Q.  I believe you were asked some questions on

cross-examination about side effects and whether all side

1    effects are relevant to the *Sell* analysis or only those that

2    affect a defendant's ability to communicate with counsel.

3           Do you recall that?

4    A.  Yes, ma'am.

5    Q.  And under the fourth prong of the *Sell* test, whether the

6    proposed treatment plan is medically appropriate, are all

7    potential side effects relevant to that aspect of your

8    analysis?

9    A.  Well, so, I think it's probably not an argued point that

10   even with the very important goal of restoring a criminal

11   defendant to capacity, you still don't want to -- there's

12   only so much hurting of an individual that should be viewed

13   as reasonably appropriate.

14          So it's -- there's a continuum.  Is it reasonable

15   that a patient might -- and a defendant might experience

16   mild side effects and that be viewed as acceptable under the

17   *Sell* doctrine?  Sure.  But somewhere along the line, it

18   becomes bad enough and potentially hazardous enough -- and

19   I'm thinking as a clinician right now -- that it is not okay

20   to do that.

21   ████████████████████████████████████████

22   ██████████████████████████████████████████

23   ████████████████████████████████████████

24   ████████████████████████████████████

25   ██████████████████████████████████████████

1  ████████████████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████

4  ████████████████████████████████████████████

5  ███████████

6          I know I've worded that very poorly.  But there's

7  only so far that we can go.

8  Q.  Okay.  You were also asked a couple questions about the

9  Cochran study on cross-examination --

10  A.  Yes.

11  Q.  -- which is Joint Exhibit 9.  So could you open that up

12  quickly, please.

13  A.  Yes.  Joint 9?

14  Q.  Yes.

15  A.  It'll take me just a second.

16  Q.  Sure.

17  A.  I am there.

18  Q.  And is this the Cochran study that you were discussing

19  during your direct examination?

20  A.  That's what I was discussing.  Yes.

21  Q.  Are you aware of any other Cochrane studies in the

22  literature generally?

23  A.  Not right off the top of my head.  No.

24  Q.  In this Cochrane study, if you could turn to the third

25  page of the .pdf.  I believe it's -- actually, let me take

1    that back.  Yes.  The third page, Page 109 of the article.

2    A.  One moment, please.

3    Q.  Yes.

4    A.  I am there.

5    Q.  Okay.  Do you see Table 1 there, Descriptive Statistics?

6    A.  I do.

7    Q.  And does that entail a list of primary diagnoses among

8    defendants who were considered in the study?

9    A.  Yes.

10   Q.  And so I think you were asked whether all of the

11   defendants in the study suffered from delusional disorders.

12   A.  Oh, yes.  Yeah.

13   Q.  But that was not all of the patients in the study.  Is

14   that right?

15   A.  That's right.  And now that -- so my confusion on this

16   is there is -- and I haven't thought about this for a long

17   time.  There was another article that maybe just Herbel

18   wrote that did focus on delusional disorder.  There may have

19   been one or two articles.  But this is not one of those

20   articles.  This has a category of other psychotic illnesses

21   as well.

22   ███████████████████████████████████████████████████

23   ███████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

1    ████████████████████████████████████████

2    ███████████████████████████████████████

3    ██████████

4    Q.   Okay.   Thank you.

5           You were also asked a couple of questions about

6    package inserts generally and who writes them it.

7    A.   Uh-huh.   Yes, ma'am.

8    Q.   Is it your understanding that package inserts have to be

9    approved by the FDA before the drug can be marketed?

10   A.   That is true.   Yes.

11   Q.   And you were also asked some questions about whether you

12   were in possession of certain information at the time you

13   wrote your report.

14          You listened to all of the testimony from

15   Dr. Cuccio and Dr. Armstrong.   Is that right?

16   A.   Yes.

17   Q.   And you've reviewed some of the Bureau of Prisons

18   records that were not available to you at the time you wrote

19   your report?

20   A.   Yes.

21   Q.   Has anything that you've heard during this hearing or

22   read in those records changed your opinions that you're

23   offering in this case?

24   A.   No.   I mean, to some extent, some of that information

25   strengthens my concern -- well, elevates my concerns,

1  ████████████████████████████████████████

2  ████████████████████████████████████████████

3  ██████████████████████████████

4  ██████████████████████████████████████████████

5  ██████████████████████████████

6  Q.  Okay.

7  A.  So I have.

8  Q.  So do you stand by your opinions on all four of the *Sell*

9  prongs as they were offered in your report?

10  A.  I do.

11         MS. FORREST:  I have no further questions at this

12  time, your Honor.

13         THE COURT:  All right.  From the defense's

14  perspective, is there any other evidence that you will be

15  offering?

16         MS. FORREST:  No, your Honor.

17         THE COURT:  From the Government's perspective, are

18  you going to be offering additional evidence?

19         MS. CONNOR:  I'm sorry.  From the Government's

20  perspective -- what was that?

21         THE COURT:  Are you going to be offering, I guess,

22  a rebuttal at this point?  Any additional evidence?

23         MS. CONNOR:  Thank you, your Honor.  Yes.  We do

24  want to call Dr. Cuccio briefly in rebuttal.

25         THE COURT:  Okay.  It's now 1:10.  One question --

1    Dr. Armstrong, if you're there, has Mr. Beler been able to

2    eat at the desk or do something?  I haven't seen anything

3    there.  I'm always loath to --

4        DR. ARMSTRONG:  Well, he -- go ahead.

5        THE COURT:  I'm loath to take a total break and

6    have him disappear because we had so many problems the last

7    time getting going again.  But I don't want to starve him,

8    either.

9        DR. ARMSTRONG:  Yes, your Honor.  I asked him

10   during the break, and he again brought the food in his

11   pocket at the time.  So just before we started again, he

12   said he did not -- I asked him if he would like to have them

13   bring up his lunch, and he said he did not.

14       Do you want them to bring it up now?

15       THE COURT:  How many -- let me switch it to the

16   Government for a second.  Ms. Connor, how long do you

17   estimate your rebuttal is?

18       MS. CONNOR:  I would estimate 30 minutes at the

19   most.

20       THE COURT:  Okay.  So the question is:  Do we want

21   to just plow forward?  Do we want to take a break for lunch

22   and then come back?  Does anybody have views?

23       MS. FORREST:  I think I would prefer a break, your

24   Honor.

25       THE COURT:  Is everybody available if we took a

1    half-hour break, which would put us at 1:45?

2            If I could ask Mr. Beler if he could eat where he

3    is so we don't lose him in between.  And then everybody else

4    could come back.  So is there anybody who has a problem with

5    that?

6            And, Dr. Cuccio, are you -- would you be available

7    to come back at 1:45?

8            DR. CUCCIO:  Yes, your Honor.  I can come back.

9            THE COURT:  I'm -- if you don't speak up, I'm

10   assuming everybody's agreeable to it.  Does that work for

11   everybody?

12           DR. ARMSTRONG:  This is Dr. Armstrong, your Honor.

13   I may have to depart at 1:30 our time.

14           THE COURT:  I'm sorry.  When?

15           DR. ARMSTRONG:  I'm actually -- normally, I leave

16   in about 45 minutes.  And the maximum I can stay is

17   approximately another hour and 15 minutes.

18           THE COURT:  If they're correct, an hour and 15

19   minutes, if we break for half an hour, after the evidence

20   we're not going to have argument or anything else.

21           DR. ARMSTRONG:  Okay.

22           THE COURT:  So rather than plowing through and not

23   letting everybody have a break, I'll go ahead and do it.

24           But please promptly come back at 1:45.  Thank you.

25           (Thereupon a luncheon recess was taken, after

 1    which the following proceedings were had:)

 2              THE COURT:  I see the court reporter.

 3              Dorothy, I assume you're on?

 4              THE COURTROOM DEPUTY:  Yes, Judge.

 5              THE COURT:  My law clerk?

 6              THE LAW CLERK:  Yes, Judge.

 7              THE COURT:  Mr. Beler, I think, is lurking on the

 8    sides there.

 9              Ms. Connor, you're on.

10              Mr. Miranda, I understand, is not.

11              MR. MIRANDA:  I'm on.

12              THE COURT:  Is Mr. Jeffress on or is he the one

13    that's going to be off?

14              MS. FORREST:  I don't think we need him to

15    proceed, your Honor.  This is Ms. Forrest.

16              THE COURT:  That's fine.  I just wanted to make

17    sure we know who's here for the court reporter.

18              Ms. Forrest is here.

19              Dr. Corvin I see.

20              There you are, Mr. Miranda.

21              Ms. Otero, you're on for Mr. Quinn.

22              Dr. Corvin is there.  I think we have everybody.

23              So let's proceed with the rebuttal witness.

24              I would just remind Dr. Cuccio -- whom I'm

25    assuming is the person you're calling.  Am I correct,

1      Mr. Connor?

2              MS. CONNOR:  Yes.  Is she on?

3              DR. CUCCIO:  Yes.  I am here.

4              THE COURT:  Let me remind you you're still under

5      oath.  I'm not going to have you sworn in.  If you just

6      would identify yourself so we have it for the record.

7              And then, Ms. Connor, you can proceed.

8              DR. CUCCIO:  I'm Dr. Cuccio, the treating

9      physician.

10     (ANNE CUCCIO, M.D., GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

11                        DIRECT EXAMINATION

12     BY MS. CONNOR:

13     Q.  Dr. Cuccio, you heard Dr. Corvin's testimony in this

14     case.  Correct?

15     A.  Yes, I did.

16     ████████████████████████████████████████████████

17     ██████████████████████████████████████████████

18     ████████

19     ██████████████████████████████████████████████████

20     ██████████████████████████████████████████████████

21     ██████████████

22     ███████████

23        █████████████████████████████████

24     ███████████████████████████████████████████████████

25     ███████████████████████████████████████████████████





























        MS. CONNOR:  Thank you.  I have no other

questions.

        THE COURT:  I have a practical question,

Dr. Cuccio.

        You had indicated at one point that, assuming the

Court ordered, as the Government has requested, that the

medication be involuntarily administered, that he might stay

where he is or he might move to Butner or some other place.

        Would you be involved with him if they moved him

someplace else?

        THE WITNESS:  No.  I would just be involved in the

1    transfer, like, you know, talking to them.

2             THE COURT:  So someone new would pick up?

3             THE WITNESS:  Yeah.  Probably someone like --

4    someone like -- probably Butner would be the place where he

5    would go.  So yeah.

6             THE COURT:  So you have a treatment plan and he

7    goes to Butner.  Would they simply accept it or would they

8    do their own review and consideration as to whether they

9    thought that was a treatment plan that was workable?

10            THE WITNESS:  You know, this is a very common

11   treatment plan.  And so I'm not sure that they would want to

12   rework this.  ████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████

15            But I certainly don't think they would want to go

16   through *Sell* again.

17                    ███████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20            THE COURT:  Would these other places, say, Butner,

21   would they have psychiatrists that would deal with Mr. Beler

22   face to face?

23            THE WITNESS:  Yes.  They're on site.  They have

24   forensic psychiatrists who do these *Sell* cases.  They have

25   psychiatrists on site.  They have Ph.D. psychologists on

```
1    site. ███████████████████████████████████
2    ████████████████████
3              Yes.  It may take a while to get him there.  It
4    would be nice to get.
5              THE COURT:  It would --
6         █████████████████████████████████████████████
7    ████████████████████████████████████████████████
8    █████████████████████████████████████████████████
9    ██████████████████████████████████████████████
10   █████████████████████████████████████████████████
11        ██████████████████████████████████████████
12   ████████████████████████████████████████████████
13   ████████████████████████████████████████████████
14   ██████████████████████████████████████████████
15   ████████████████████
16             THE COURT:  Because I do have people at Butner,
17   other cases.  And I'm just curious.  It isn't always easy to
18   get them in.  So I'm curious as to how long this would take
19   to get him there.  So you're talking about at least a month?
20             THE WITNESS:  Yeah.  I'm guessing.  Yeah.
21   Especially since it's not an emergency, because he's -- ██
22   ██████████████████████████████████████████████████
23   ██████████████████████████████████████████████████
24   ██████████████████
25             THE COURT:  I don't have any other questions of
```

1    the psychiatrist.

2            I did have a question for Ms. Otero.  I don't know

3    whether Ms. Otero is ready to answer or if she needs to

4    check.  But I was interested in finding out whether

5    Mr. Quinn -- it sounds like the father, at least in the

6    record, had some involvement.  But he's no longer involved,

7    since he's deceased.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Do you know that?

25            THE WITNESS:  I do not.  The only thing I know

1    about Mr. Quinn is in the records.



9              THE COURT:  From your perspective, looking at the

10   records and from what you know, you've indicated what

11   information there is.

19              MS. OTERO:  To be clear, your Honor, that was

20   Dr. Cuccio answering your last question.

21              THE COURT:  I know.  I know.

22              MS. OTERO:  Oh, okay.  Sorry.



20          MR. JEFFRESS:  Your Honor, could we -- Mr. Quinn,

21  when he comes back, could we submit a declaration or

22  something like that?  I think these are very important

23  questions and also very sensitive questions.

24          THE COURT:  I don't have a problem.  He wanted to

25  participate, so I'd like to get some answers.

1          MS. OTERO:  I would prefer to have him -- I've

2     noted your question.

3          THE COURT:  Pay attention, please, Ms. Otero.  I'm

4     not going to hold this over to have Mr. Quinn come and talk.

5     I wanted to know if Ms. Otero happened to know the

6     information.  She does not.  I don't have a real problem

7     with getting a declaration that would answer those

8     questions.



17          Let me know if you can hear me.  Can you still

18   hear me?

19          MR. JEFFRESS:  Yes, your Honor.

20          MS. OTERO:  Yes.



MR. JEFFRESS:  Your Honor --

```
1          MS. OTERO:  By the end of the week, he and I
2     could -- he could get something together.
3          MR. JEFFRESS:  Your Honor, I think we had a few
4     questions for Dr. Cuccio on cross from the -- to re-call
5     her.
6          THE COURT:  Okay.
7          MS. FORREST:  Yes.  But before we do that, I
8     actually had some information for the Court that might be
9     able to shed some light on the power-of-attorney issue.
10    ███████████████████████████████████████
11    ███████████████████████████████████████████████
12    ███████████████████████████████████████████████
13    ████████████████████████████████████████
14    ██████
15    ████████████████████████████████████████
16    ████████████████████████████████████████████
17    ███████████████████████████████████████
18    ██████
19         So we will get you a declaration.  But I think
20    that document will also help answer the Court's questions.
21         THE COURT:  Okay.  I may just not have realized
22    there was a second one because the first one, I thought, was
23    broad.
24         MS. FORREST:  Yes.  There's a second document.
25         THE COURT:  I'll go back and look at the docket
```

1    and pull it up and take a look at it.  Eventually, we're

2    going to have to set dates at the end.  So I'll get back to

3    setting that date.

4         But go ahead with your cross-examination of

5    Dr. Cuccio.

6                        CROSS-EXAMINATION

7    BY MS. FORREST:

8    ██ ████████████████████████████████████

9    ████████████████████████████████████████████

10   ██████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████

14   ██████████████████████████████████████

15   ██████████████████████████████████████████

16   ██████

17   ████████████████████████████████████████████

18   ██████████████████████████████████████████

19   ██████████████████

20   ██████████████████████████████████████████████

21   ██████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ██████████





189











17    MS. OTERO:  It's been half an hour.

18    THE WITNESS:  Excuse me?

19    THE COURT:  You have to -- Ms. Otero, you have to

20  mute your microphone.

21    MS. OTERO:  Oh, I'm so sorry.

22    THE COURT:  She was talking on the phone.

23    Go ahead.







15    Q.  Correct.

16         Now, the very first sentence that you read says,

17    "Clinicians should try to avoid antipsychotics and other

18    dopamine-blocking drugs, e.g. antiemetic agents, in patients

19    with catatonia, including patients who are psychotic,

20    impulsive or aggressive."

21         And my question is:  That sentence is not limited

22    to any certain subtype of catatonia.  Correct?

23    A.  It also says, "There are reports that second-generation

24    antipsychotics may treat catatonia.  All antipsychotics can

25    participate and worsen catatonia" -- "precipitate."  Excuse

1    me.  "Precipitate and worsen catatonia."









18          MS. FORREST:  I have no further questions, your

19   Honor.

20          THE COURT:  Any redirect?

21          MS. CONNOR:  No, your Honor.  Thank you.

22          THE COURT:  Do we then have all of the evidence

23   other than getting the declaration relating to Mr. Quinn and

24   going back and looking at the other -- I have a feeling I

25   just looked at the first one and didn't see the second one.

1    But I will take a look at the second one, which may answer

2    some of these questions as to what his role is.

3          If we're done, what I'd like to do is set a

4    schedule that would have the findings of fact and

5    conclusions of law.  You've been getting the transcripts

6    along the way, other than obviously today.  I'd like to turn

7    this around fairly quickly.  Hopefully, people will have

8    focused in on -- we have a lot of evidence.  But to focus in

9    on what really needs to be considered by the Court in making

10   this decision.

11         So I'd like to set a schedule.  And it seems to me

12   that the Government needs to go first, since they have the

13   burden, and then the Defendant, and then whatever reply the

14   Government wishes to make.

15         So how quickly can you do this, Government?

16   Hopefully, you've been looking at this along the way since

17   we've been getting transcripts.

18         MS. CONNOR:  Can --

19         THE COURT:  Can you get it done in a week or less?

20         MR. MIRANDA:  Oh, we can.  I'm sorry, your Honor.

21   We were actually just IM-ing each other to discuss dates in

22   our schedule.  I'm sorry.  That was the reason for the

23   delay.  Obviously, if we were in court and face to face, we

24   would be coming up with a particular date.

25         THE COURT:  But I need to hear from the Government

1    first and then we'll figure it out.  I don't want this

2    strung out.  As the year progresses, and it doesn't look

3    great for doing a lot of in-court things, it's not terribly

4    efficient, frankly, but we're stuck with it in terms of

5    video and teleconferences, et cetera.  It takes much longer

6    than doing things in court.  Since you've had the

7    transcripts, I'm hopeful that we can do this citing,

8    obviously, to the record fairly quickly.

9            MR. MIRANDA:  Yes, your Honor.  I think,

10   especially given our schedule and the holiday, we would ask

11   for two weeks from today.

12           THE COURT:  You don't work on holidays?

13           MR. MIRANDA:  No.

14           THE COURT:  I'm joking, sort of.

15           How much time does the defense want?

16           MR. JEFFRESS:  Your Honor, could we have ten days

17   after that?  Or a week?  A week to ten days?

18           THE COURT:  Are you talking business days or

19   calendar days?

20           MR. JEFFRESS:  Your Honor, do you think maybe they

21   should be simultaneous submissions?

22           THE COURT:  The only reason I thought -- they have

23   the burden.  I'm willing to do that if you think -- it

24   depends on how you all plan on doing it.  I don't have a

25   problem if you want to do it simultaneously.  I just -- my

1    concern was they would be ships passing in the night.

2          But as a practical matter, if you think it would

3    be more efficient, I don't know how much of a conversation

4    you've had about it.  I had given some thought to doing --

5    having everybody do it together.  All the evidence is there.

6    We've got the standards that you need to work with, and then

7    we'd have responses to it.  It would make it certainly go

8    more quickly.  But I wasn't sure that it was going to lay it

9    out well enough for me.

10          But if you think it can be done that way, as I

11    said, I'm perfectly happy to do that.

12          MR. JEFFRESS:  I think that makes more sense.  And

13    then we can have a response maybe a little while after that.

14    But two weeks.  I think that should be fine.

15          THE COURT:  So you would do --

16          MS. FORREST:  Actually --

17          THE COURT:  So you would do it simultaneously,

18    then.  And then --

19          MS. FORREST:  Actually, your Honor, if we're going

20    to do it simultaneously, I might request maybe three weeks.

21    Ms. Voshell is gone all this week and won't be returning

22    until after the holiday.  And I expect her to be very

23    involved in the briefing.

24          THE COURT:  Well, I understand you want a quick

25    response.  So you're going to have to work on my schedule as

1    well in terms of what I'm going to be able to do.  I can

2    give you the three weeks, but it's going to slow down the

3    response at the other end.  But I'll give you until the

4    22nd.

5            And then when can you get your response after

6    that?  I want this done well.  It doesn't do me any good if

7    you don't do a thorough job.  And obviously, you have to

8    cite to the record.  It's got to either be transcripts or

9    it's got to be whatever the evidence is.  So the 22nd is

10   fine.

11           When do you want to do your replies?

12           MR. JEFFRESS:  A week later.

13           THE COURT:  The 29th.

14           I'm going to give some thought as to -- hopefully,

15   I will not get a 50-page response.  So I'm going to look at

16   this as you would a -- there's a set frame that we have to

17   work with and set legal decisions that I need to make.  So

18   I'm hopeful that we can keep this the way you would

19   ordinarily.  And I'll have to look.  I can't remember

20   whether the findings of fact have specific limits on them.

21   But certainly motions do.

22           Do you have some sense of what -- how long you

23   think these would be?  I might give it some thought and I'll

24   look at some other stuff that I've got and maybe set a limit

25   on it.  I'm concerned that everything that's come out is

```
 1    going to be in it, and that'll be long.  I don't need it
 2    that way.  I truly need focused -- you've brought a lot of
 3    evidence in.  I've heard all of it.  And I have the
 4    transcripts, and I've been looking at those as we finish
 5    them.
 6          But I want to -- the findings are really of
 7    interest in terms of what you view as your key points in
 8    findings of fact and conclusions of law.
 9          And I can just tell you, I'm not going to just
10    adopt one side or the other.  I will look at what you've
11    got.  I will consider other evidence that's on the record
12    along with it if it seems appropriate and make a decision.
13          But what I do need is to get you all to help me by
14    telling me your key fact points and how they fit into how
15    you see the law.  So it should be sort of really key as to
16    the important parts.  It may not be everything that's on the
17    record that might be useful.  Okay?
18          And it doesn't mean I'm not going to look at the
19    rest of it.  But if we do it by all of the evidence that's
20    been put forth in the last, what, five sessions we've had or
21    four, it'll make it too long and it's not going to be very
22    helpful.  I can read the transcript, too.  I want you to
23    narrow it to get me to focus on what you think are the key
24    facts, obviously, within the legal framework.  All right?
25          So with that in mind, it should not be all of the
```

1    evidence that we've put on the record.  Okay?

2         So let me give some thought as to how long this

3    should be.

4         I would also ask if you could get something

5    back -- and the defense would be doing it -- about

6    Mr. Quinn.  Do you have some sense of when you would get

7    something in?  And maybe you can answer this question:  If

8    the second filing, which I haven't had a chance to look at,

9    if that's what keeps him out of having a role in terms of my

10   having to consider his position, then I'm less concerned

11   about it.

12         MR. JEFFRESS:  ██████████████████████████████

13   ████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ██████████████████████████

18         THE COURT:  You can put that on there.

19         My question goes to:  Is he going to have some

20   role in this?  Is he expecting to have a role in it?  Or is

21   it just to tell us what his role has been in the past?

22         MR. JEFFRESS:  We can do both of those.  We can

23   verify his role in the past and what his role is legally

24   currently.

25         THE COURT:  Well, tell me what his role is at this

1    point.

2         MR. JEFFRESS:  Well, I would hope that we could

3    give that to you with the declaration.

4         THE COURT:  I know.  If he's going to feel like

5    he's a third party to this that weighs in equally --

6         MR. JEFFRESS:  Sorry, your Honor.  You froze

7    there.

8         THE COURT:  I just lost everybody.

9         MS. FORREST:  We can hear you now.  We've got you

10   back.

11        THE COURT:  So what I'm trying to figure out is,

12   with the declaration of what he has done, et cetera -- and

13   I'm obviously at a loss, you know, because I didn't get

14   enough time to look at the second filing.  I'm trying to

15   find out whether I need to hear from him more formally or

16   not.  Do we know?

17        MR. JEFFRESS:  So, your Honor, if we could have a

18   couple days to confer with him and let the Court know, we

19   could file a notice by Friday.

20        THE COURT:  Okay.  I have to say to you, from my

21   perspective, if he actually has a more formal role, he

22   should have been on this and not doing this -- getting this

23   after the fact.  But at any rate, okay.  Friday, which is

24   the 4th.

25   ███████████████████████████████████████

1

2

3

4

5              The next question is whether he has any particular

6      role or he is relying on, you know, the parties, the present

7      parties, the Government and the defense, to set it out.

8              MR. JEFFRESS:  Okay.

9              THE COURT:  That's fine.

10             MR. JEFFRESS:  Yes.  We will inform the Court --

11     give the Court -- talk to Mr. Quinn and make sure everything

12     is 100 percent accurate and submit it by Friday.

13             THE COURT:  Anything else from the Government that

14     I need to know or that we need to set dates for or anything?

15             MR. MIRANDA:  No, your Honor.

16             THE COURT:  Anything from the defense?  Anything

17     else I need to know?

18             MR. JEFFRESS:  Your Honor, there was one exhibit

19     that Ms. Connor sent around.  That wasn't -- as far as we

20     could tell --

21             Courtney, go ahead.

22             MS. FORREST:  Yes.  So I looked at the exhibit

23     Ms. Connor sent around.  It seems like she may have pulled

24     those from a different version of the medical records than

25     the ones that were submitted as exhibits.  The date on the

1    bottom, where it says "Generated on," there's a different

2    date on her versions than there are on the exhibit versions.

3    And that -- the contents of the document is probably in the

4    joint exhibits somewhere, but it's going to be hard to match

5    the two up.

6        So I don't know if maybe Ms. Connor could search

7    the joint exhibits and tell us where it is in the joint

8    exhibits that she was using.  That would be helpful.

9        THE COURT:  Ms. Connor, either that or separately.

10    But it probably would be better to do it within the joint

11    exhibits that you have.  Can you do that?

12        MS. CONNOR:  I can certainly look for it.  And if

13    I can't find it in the joint exhibits, I will file it on a

14    new number just so that we have it.  But I can certainly

15    look.

16        THE COURT:  What would you -- I know various

17    versions of the records and exhibits have been disseminated,

18    because we've had issues with people getting them and being

19    able to access them.

20        How did you get yours?  From what the defense had

21    filed?  Or you got them separately?  Or what set of

22    documents were you looking at?

23        MS. CONNOR:  It's from our version of the hospital

24    records.  And I thought that it was the same as the joint

25    exhibit, but it appears clearly to not be.

1          THE COURT:  Okay.  So would you have filed it as a

2     separate exhibit or would it have been supposedly included

3     in the joint exhibit?

4          MS. CONNOR:  I thought that it was included in the

5     joint exhibit.  And I think that that's my error.  And so I

6     think -- while I will double-check to make sure, I think I

7     will have to file it as its own just so that we're clear.

8          THE COURT:  Okay.  Dr. Corvin indicated he looked

9     at it.  So at some point, it must be in some record, because

10    he said he was familiar with it.

11         MS. CONNOR:  Right.

12         MS. FORREST:  I think it's a matter of matching up

13    page numbers.

14         MR. MIRANDA:  Your Honor, if I may, that's what I

15    was going to say, your Honor.  I think what happened in this

16    particular case is that each party simply received the

17    hospital records separately and then there was a numbering

18    of the joint exhibits and that we were referring to our own

19    prior copy of the records.

20         So the records are the same, but the numbering

21    might be different.  So I think it's just going to be a

22    matter of marrying up the numbering of the pagination in the

23    exhibits.  But the content is the same across, is what I'm

24    saying.

25         THE COURT:  Can you by Friday, no later than

 1    Friday, have figured this out and tell us what it is?

 2                MR. MIRANDA:  Yes, your Honor.

 3                THE COURT:  Okay.  Anything else from anybody?

 4                MR. MIRANDA:  No, your Honor.

 5                MS. FORREST:  One final thing on the exhibits:

 6         I mentioned earlier that Defense Exhibit 4 we

 7    wanted to admit, and I circulated that to everyone.  I think

 8    it was on the lunch break.  But I just wanted to make sure

 9    that that got formally admitted.

10                THE COURT:  I'm not sure it did.  But I will

11    formally admit it.

12         I assume there's no objection?

13                MR. MIRANDA:  No objection.

14         (Whereupon, Defendant's Exhibit No. 4 was entered

15    into evidence.)

16                MS. FORREST:  Thank you.

17                THE COURT:  Thank you all.  You all have been very

18    patient and you've -- I know it's been quite time-consuming.

19    There's a lot of information for all of us to sift through

20    in terms of making it.  You've all been very well prepared,

21    and I appreciate that.

22         So you obviously know the record and you know what

23    you want to bring out.  And we haven't floundered around,

24    which has occasionally happened with hearings.  So that has

25    not occurred.

1          Once I get the findings of fact and conclusions of

2     law, if I need a hearing, I will set one up.  I generally

3     set them up if I have questions.  And if I do or if I need

4     something clarified, I'll let you know.  Otherwise, I don't

5     automatically do it.  But I'll wait until I get everything

6     to take a look at and go through and make sure if I need

7     something I have one hearing.  It would be mostly

8     clarification issues.  The rest of it is going to be put out

9     in writing.

10          Well, thank you all.  Take care of yourselves.  Be

11    well.

12          MR. MIRANDA:  Take care.

13          MS. CONNOR:  Thank you.

14          MR. JEFFRESS:  Bye.

15          (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

1                       **<u>CERTIFICATE</u>**

2

3                  I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8                       Please note:  This hearing occurred

9       during the COVID-19 pandemic and is therefore subject to the

10      technological limitations of reporting remotely.

11

12

13                      Dated this 4th day of September, 2020.

14

15              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
16              United States District Court for the
                   District of Columbia
17              333 Constitution Avenue, NW, Room 6706
                Washington, DC 20001
18              (202) 354-3269

19

20

21

22

23

24

25